**IN THE UNITED STATES DISTRICT COURT
EASTERN DIVISION OF KENTUCKY
COVINGTON DIVISION**

| | | |
|---|---|---|
| RACHELLE HENRY, | : | CASE NO. 2:10-cv-00009 - WOB |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DELTA AIR LINES, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| DELTA AIR LINES, INC., | : | |
| Defendant. | : | |

Defendant Delta Air Lines, Inc. ("Delta" or "the Company") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment. Plaintiff's claims of gender discrimination and breach of Kentucky public policy are without legal merit, there are no genuine issues of material fact as to the liability of Delta, and Delta is therefore entitled to summary judgment as a matter of law under Rule 56 of the Federal Rules of Civil Procedure.

## I. INTRODUCTION

In June 2008, Plaintiff was employed at the Greater Cincinnati/Northern Kentucky International Airport as a Delta Customer Service Agent assigned to work at the gates boarding passengers when Delta received complaints through the Company's 1-800 hotline in which two different airport employees advised the Company that Delta's premium passengers, also known as medallion passengers, had been improperly denied first class upgrades. Pursuant to its normal processes, Delta investigated the hotline complaints. The Company ultimately determined that Plaintiff had deliberately manipulated the boarding process so that the family of her friend and supervisor, George Gergits (whose family was using his employee benefits to travel for free on standby in empty seats on the aircraft), were assigned first class seats while eligible medallion passengers were denied the upgrade to which they were entitled.

Delta's investigation revealed that this manipulation was accomplished by Plaintiff's use of "hung seats," a secretive computer entry that removes seats from available inventory so that they cannot be sold or assigned to passengers. Hung seats can be viewed only on the computer where they are created, and easily-visible indications of that transaction disappear once the seats are "unhung" – the one exception to this invisibility is if corporate headquarters preserves the electronic records of the agent's keystrokes before Delta's computer systems automatically delete that data. Plaintiff's keystroke records were preserved, and also revealed that the hung seats were released by her back into inventory immediately after the last medallion passenger had boarded the aircraft in their assigned coach seat, apparently believing an upgrade to first class was impossible. Within one minute, the previously hung first class seats were released by Plaintiff and were assigned by her to the Gergits party, who boarded in first class while Delta's premium passengers traveled to San Diego in coach.

Rather than accept responsibility for her poor decisions and misconduct, Plaintiff filed the present lawsuit alleging three claims, all of which are without merit. First, she claims that Delta's decision to terminate her employment was due not to her inappropriate conduct, but was instead based on her gender, in violation of Title VII and Kentucky law. Plaintiff also claims that Delta terminated her employment because of her alleged stated intention to hire an attorney, and that this violated an unspecified Kentucky public policy. As set forth below, Plaintiff has no evidence to support either of her claims.

Plaintiff's gender discrimination claim fails for a number of reasons. First, it is undisputed that the ultimate decision-maker regarding Plaintiff's termination is herself female, and that the two men involved in the termination process both initially did <u>not</u> want to terminate Plaintiff's employment and accepted the appropriateness of the decision only after learning that it

2

was consistent with how such situations had been handled previously.  Moreover, Plaintiff cannot overcome the initial legal hurdle of establishing a prima facie case.  Specifically, she cannot show that she was replaced by any one employee in particular; to the contrary, her duties were absorbed by the remaining dozens of Customer Service Agents in Cincinnati.  She likewise cannot demonstrate any circumstances giving rise to an inference of discrimination.  While she claims that Gergits should have been discharged for the boarding incident, and also relays anecdotes concerning other flight-related instances involving male coworkers, the undisputed facts establish that the violations committed by Gergits and the conduct of the other individuals were not comparable to Plaintiff's own misconduct.  Those employees who to Delta's knowledge did, in fact, commit the same infraction as Plaintiff were all terminated.  In direct contradiction with any claim of gender-related animus, seven of those thirteen terminated employees are male.

Plaintiff likewise cannot overcome Delta's stated legitimate nondiscriminatory reason for her termination.  Indeed, she admits to hanging the seats and awarding them to Gergits' family and she cannot dispute the keystroke findings, all of which led Delta to the reasonable conclusion that she purposely and improperly assigned her friend and coworker's family first class seats ahead of Delta's medallion passengers.  The record also contains other compelling evidence that indicates a lack of discriminatory animus:  the fact that the ultimate decision-maker is female, Plaintiff's male manager signed off on a series of glowing performance reviews, and the same male manager recommended that Plaintiff apply for a promotion, which she received.

Delta also is entitled to summary judgment as a matter of law on Plaintiff's Kentucky public policy claim, because she has not articulated a recognized exception to the Commonwealth's strong at-will policy.  Moreover, Plaintiff has no evidence other than her own speculation that Delta's termination decision was based on anything other than her own admitted

misconduct.  Her public policy claim seems to be based solely on the fact that she claims to have fleetingly mentioned legal counsel during the investigation of her misconduct.  The evidence is undisputed, however, that no one at Delta ever made a negative comment to Plaintiff concerning legal counsel.  Like her discrimination claims, Plaintiff's public policy claim fails as a matter of law and should be dismissed.  Delta's Motion for Summary Judgment should be granted in its entirety.

## II.  <u>STATEMENT OF THE CASE</u>

A.    <u>Delta's Employment Policies</u>

    1.      **At-Will Employment**

As an employee of Western Airlines, Henry became a Delta employee following Delta's acquisition of Western in 1987.  (Deposition of Rachelle Henry ("Pl. Dep."), 29; Pl. Dep. Exh. 1).  The offer letter provided to and signed by Plaintiff advised her that her employment would be "determined and governed by [Delta's] Standard Practice Manual . . .."  (Pl. Dep. Exh. 1).  The Standard Practice Manual was later redesignated as the Human Resources Practices Manual ("HRPM"), which unambiguously states that "Delta may terminate the employment relationship with any employee at any time and for any reason.  The right exists notwithstanding any examples of improper conduct or other statements contained in any personnel handbook or manual or any other statements of Delta's policies or procedures."  (Declaration of Lisa Abraham Brown ("Brown Dec.") attached as Exhibit A, ¶ 3, Exh. 1 ("Terms and Conditions of Employment" policy)).  The HRPM also states that "No Delta supervisory or management personnel other than the President and Chief Executive Officer is authorized to amend or modify these terms of employment."  (<u>Id</u>).  Plaintiff acknowledged during her deposition that she was

aware of her at-will employment status while employed with Delta, and that Delta's policy manual was available to her throughout her employment.  (Pl. Dep. 35).

  **2.**  **Employee Discipline, Termination and the Appeal Process**

  Consistent with its at-will employment relationship with its employees, Delta retains the right to discipline its employees in a flexible manner, depending upon Delta's judgment about/concerning the nature and severity of the misconduct.  (Brown Dec. ¶ 3).  To that end, discipline issued can range anywhere from an informal oral warning to termination.  (Id.). Terminated employees have the option of submitting a written appeal of the termination decision to Delta's Equal Opportunity department ("EO").  (Id.; Declaration of JoAnne Guerrant ("Guerrant Dec.") attached as Exhibit B, ¶ 3.  The appeal process generally provides employees with an opportunity to present new information to Delta that perhaps did not come to light during consideration of the termination decision and that the employee feels may justify reinstatement of employment.  (Guerrant Dec. ¶ 3).  EO carefully reviews all information submitted by the employee and, following the conclusion of its review, notifies the employee in writing of the appeal decision.  (Id.).

**B.**  **The Operation of Delta's Gate Area**

  **1.**  **Background**

  Delta's Airport Customer Service division is comprised of many different operational areas that must work together to ensure that Delta's aircraft operate in a safe and timely manner. (Brown Dec. ¶ 4).  One of those areas is referred to as "the gates," which are the numbered desks in an airport's terminal area where passengers gather to board the aircraft.  (Declaration of Gary Schmidberger ("Schmidberger Dec.") attached as Exhibit C, ¶ 4).  One or more Delta customer service agents, depending on considerations such as current staffing and flight loads, is assigned

to board a particular flight.  (Id.; Pl. Dep. 66-67).  Gate assignments generally are communicated to customer service employees during team briefings that occur at the beginning of each shift.  (Pl. Dep. 37; Schmidberger Dec. ¶ 4).  Agents who work at Delta's gates are expected to assist passengers, prepare necessary flight-related paperwork, and implement the polite, timely and orderly boarding of Delta's aircraft.  (Schmidberger Dec. ¶ 4).

While all passengers are valued by the Company, Delta places a special emphasis on providing an especially high level of service and accommodation to its medallion passengers, who are awarded a special status in recognition of the thousands of miles they have flown on Delta during the previous year.  (Pl. Dep. 76-77; Brown Dec. ¶ 5).  The special benefits awarded medallion passengers include Sky Club access,[1] priority boarding, and complimentary upgrades from coach to first class.  (Brown Dec. ¶ 5).  Those medallion passengers seeking upgrades are permitted to request that privilege a certain number of hours in advance of departure; Delta's computer system automatically places them on the standby list in a specific order of entitlement based on several considerations, including medallion level and time of their upgrade request. (Id).

Among the tools that are available to assist agents in performing their duties are computers, located at each gate.  (Declaration of Tammy Mauer Davis ("Davis Dec.") attached as Exhibit D, ¶ 5).  The agent using the computer must log in using a secure identification number that is unique to that agent.  (Id.; Pl. Dep. 69-70).  This "fingerprint" enables the Company to determine, if necessary, the identity of the agent who performed a certain transaction.[2]  (Davis

---

[1] The Sky Club was known as the Crown Room during the relevant time period in this litigation, and will be referred to as such in this memorandum.
[2] All of the keystrokes entered under an agent's identification number at a particular computer terminal are recorded and maintained in Delta's computer system for approximately 35 days.  (Davis Dec. ¶ 5).  After that period of time, the keystrokes are automatically deleted unless some or all of them are maintained for other purposes (i.e., an internal Company investigation).  (Id).

Dec. ¶ 5).  Once logged in, an agent can access a wealth of information about the departing flight, including passenger name records, which contain passenger information such as name, trip origin, trip destination, and fare specifics, as well as seat assignments, including upgrades.  (Id. ¶ 6; Pl. Dep. 70-71).  Any changes that are made to the passenger's travel itinerary, such as seat assignment changes, are reflected in the passenger name record.  (Davis Dec. ¶ 6).  The computer system also records the time that a passenger is cleared and actually boards the aircraft.  (Id).

Additionally, the computer allows agents to access the airport standby list for the departing flight.  (Id. ¶ 7).  The standby list is comprised of two general groups of passengers: revenue (i.e. those passengers who have paid for a seat on the departing or another aircraft) and nonrevenue (i.e. those passengers who are flying on a reduced fare or for free, on a space available basis – typically, airline employees or retirees and their friends and family).  (Id.; Pl. Dep. 62-64).  Thus, the passengers on the airport standby list may include inconvenienced passengers who have been bumped off of another flight, revenue passengers from another flight who are trying to change flights, medallion passengers seeking an upgrade from coach to first class, and nonrevenue passengers.  (Pl. Dep. 62-64; Davis Dec. ¶ 7).  Each of these passengers has a certain priority assigned to their seat request; however, revenue passengers always are given a higher priority than nonrevenue passengers, who board the aircraft only if there is an available empty seat.  (Pl. Dep. 83; Davis Dec. ¶ 7).

2.    The Boarding Process

Agents generally arrive at their assigned gate no later than one hour prior to the aircraft's scheduled departure.  (Schmidberger Dec. ¶ 5).  Thereafter, the agent undertakes a number of activities that will allow her to dispatch the aircraft in a timely manner.  (Id).  For example, early on, the agent typically checks to see if the flight is overbooked (also referred to as "oversold"), as

this will require proactive steps on the agent's part to ensure a timely departure.  (Pl. Dep. 78-82; Schmidberger Dec. ¶ 5).  One of the actions an agent may take in an oversold situation is to "protect" open seats so that she can better accommodate passengers on either the departing flight or another flight that day.  (Schmidberger Dec. ¶ 5; Davis Dec. ¶ 8).  This is generally accomplished by creating a passenger record, blocking a number of seats, entering "CVG Protect" as an explanation and then ending the record.  (Schmidberger Dec. ¶ 5; Davis Dec. ¶ 8).  By ending the record, the agent creates an official, transparent record of her actions that can be pulled up and viewed on any computer by any agent who is looking for seats on a flight.  (Schmidberger Dec. ¶ 5; Davis Dec. ¶ 8).  This action takes the seats out of inventory available for sale and holds them for passengers who may need seats.  (Schmidberger Dec. ¶ 5; Davis Dec. ¶ 8).  While not an encouraged practice, Delta's management recognizes that this is sometimes necessary to allow the operation to run as smoothly as possible.  (Schmidberger Dec. ¶ 5).  The only situation in which seats would need to be protected would be in an oversold situation.  (Id.)

An agent also may "hang" an open seat.  (Schmidberger Dec. ¶ 6; Davis Dec. ¶ 9).  Although some agents may mix the verbiage of "protect" and "hang,"[3] the two are actually distinct actions with very different results.  (Schmidberger Dec. ¶ 6).  A "hung" seat occurs when an agent goes to a different screen on her computer and makes a computer entry that removes the seat in question from inventory, so that it cannot be sold or assigned.  (Pl. Dep. 92; Schmidberger Dec. ¶ 6; Davis Dec. ¶ 9).  However, unlike the process for protecting seats, the "hung" seat record is not ended in the computer and, as a result, there is no official, transparent record of the transaction that is created and visible to other agents.  (Pl. Dep. 91; Schmidberger Dec. ¶ 6; Davis Dec. ¶ 9).  The "hung" seat can be viewed only on the computer at which the hung seat

---

[3] Plaintiff testified that the phrase "hung seat" is not an "official term" and "could mean a lot of things to a lot of

actually has been created (i.e. an agent at another gate cannot pull up the hung seat on her computer), and the record disappears when the seat is subsequently unhung.  (Schmidberger Dec. ¶ 6; Davis Dec. ¶ 9).  Agents are not permitted to hang a seat, as that term is explained above. (Schmidberger Dec. ¶ 6; Davis Dec. ¶ 9).

Other proactive steps an agent might take prior to commencing boarding include:  assign seats to ticketed passengers who had not previously been assigned a seat number; ensure that families are seated together, if possible; and, determine if any special needs passengers will be boarding the aircraft, to allow for appropriate time and effort.   (Schmidberger Dec. ¶ 7).  The agent also may look to see if it is possible to move medallion passengers who currently have a center seat to a more desirable aisle or window seat.  (Id.; Pl. Dep. 76-77).  Finally, the agent is responsible for managing the airport standby list, including medallion upgrades into available first class seats and, lastly, the seating of nonrevenue passengers.  (Pl. Dep. 83-86; Schmidberger Dec. ¶ 7).  Plaintiff generally began working on the standby list about 20 minutes prior to departure time but, depending on the flight, she might get to it earlier or later in the process.  (Pl. Dep. 85-86; Schmidberger Dec. ¶ 7).

Once a passenger boarded the aircraft, Delta policy did not require that the gate agent upgrade or change the passenger's seat if an upgrade or other more preferable seat became available.  (Davis Dec. ¶ 15; Pl. Dep. 87).  Although not required, some agents did make the extra effort to upgrade medallion passengers if a first class seat became available after they had boarded in coach class, either by coming onto the aircraft themselves or by asking a flight attendant to inform the passenger of the available upgrade.  (Schmidberger Dec. ¶ 8; Davis Dec. ¶ 15).

---

people."  (Pl. Dep. 91).

**C.**    **Plaintiff's Job History and Performance**

Plaintiff was hired by Western Airlines in 1986, and became a Delta employee when Delta acquired Western Airlines in 1987.  (Pl. Dep. 29-32).  The vast majority of years during her Delta employment, Plaintiff worked as a Customer Service Agent in a variety of departments, including the ticketing counter, gates, ramp, cargo, Crown Room, and baggage service.  (Pl. Dep. 31-32, 41-44, 58).  During the time that she worked as a Customer Service Agent, Plaintiff's preferred department was the gate area, where passengers boarded the aircraft, and she would seek to work in that area whenever possible.  (Pl. Dep. 59-60).  Plaintiff also worked for a brief period as a Reservation Sales Agent, where she was responsible for making passenger reservations and answering travel-related inquiries.  (Pl. Dep. 43-44).

In 2005, Hub Manager Gary Schmidberger (male) told Plaintiff that Delta was hiring for the Lead Agent position, which is a quasi-supervisory position intended to mentor frontline agent employees to eventually assume a leadership role.  (Pl. Dep. 50; Schmidberger Dec. ¶ 9).  Schmidberger told Plaintiff that he believed she would be a good candidate, and encouraged her to apply for the promotion.  (Pl. Dep. 47; Schmidberger Dec. ¶ 9).  Plaintiff took Schmidberger's advice, applied for the promotion, and was awarded the Lead position in May 2005.  (Pl. Dep. 50; Schmidberger Dec. ¶ 9).  As a Lead, Plaintiff was responsible for managing a team of frontline employees, including scheduling, coaching and participation in the formal evaluation process.  (Pl. Dep. 50-53; Schmidberger Dec. ¶ 9).  Plaintiff requested to step down from her Lead position in April 2006, due to the illness of one of her daughters.  (Pl. Dep. 57-58; Schmidberger Dec. ¶ 9).  Her request was accepted, and she seamlessly transitioned back to her Customer Service Agent position.  (Pl. Dep. 58-59; Schmidberger Dec. ¶ 9).

After returning to her role as a Customer Service Agent in mid-2006, Plaintiff's job performance was regularly rated in a positive manner. (Schmidberger Dec. ¶ 10). Her 2006, 2007 and 2008 performance evaluations rated her as "Exceeds" expectations in several categories, and "Meets" expectations in the remaining categories. (Pl. Dep. 96-100; Pl. Dep. Exhs. 7-9). In fact, on every evaluation Plaintiff's direct supervisor rated Plaintiff more highly than she herself did in the critical self-analysis section. (Pl. Dep. 96-100; Pl. Dep. Exhs. 7-9). Each of the evaluations was reviewed and signed by Schmidberger. (Pl. Dep. 96-100; Pl. Dep. Exhs. 7-9; Schmidberger Dec. ¶ 10). Plaintiff considered her evaluations to be positive, and was pleased with the results. (Pl. Dep. 100). She did not believe that her score was lower than it should have been because of her gender. (Pl. Dep. 100).

**D.      Flight 1213 and the Employee Hotline Complaints**

**1.      The Boarding of Flight 1213**

On June 8, 2008, Plaintiff was assigned as the primary agent to work Flight 1213, from Cincinnati to San Diego, California. (Schmidberger Dec. ¶ 11). Plaintiff and other agents were aware that a Delta Performance Leader, George Gergits (male), and his three young-adult children were listed to travel that day on Flight 1213 as nonrevenue passengers. Gergits was Plaintiff's supervisor at the time; he and Plaintiff had a good relationship and often had coffee together in the mornings. (Pl. Dep. 111; Schmidberger Dec. ¶ 11). Indeed, their relationship was perceived by some to be so close that Plaintiff and Gergits were rumored by some to be romantically involved. (Pl. Dep. 112-13).

That morning, the airport standby list for Flight 1213 reflected seven medallion passengers awaiting first class upgrades, and six nonrevenue passengers (including Gergits and his three children) awaiting seat assignments. (Davis Dec. ¶ 10). Because there were only four

11

unassigned first class seats and seven medallion passengers standing by for upgrades, it did not appear that Gergits and his party would receive a first class seat assignment. (Davis Dec. ¶ 10). The flight was not full, however, so it appeared that the entire Gergits party would easily board in coach. (Davis Dec. ¶ 10).

Boarding started on time for Flight 1213. (Davis Dec. ¶ 11). The operation was aware that the flight would be held, if need be, for a late arriving flight with connecting passengers. (Davis Dec. Exh. 2; Declaration of Deborah Kircher ("Kircher Dec.") attached as Exhibit E, Exh. 2). Plaintiff started out as the only agent working the flight; however, a second less senior Customer Service Agent from the Crown Room eventually joined her to assist with the boarding process. (Kircher Dec. Exh. 3). Additionally, Lead Agent Rick Andrae stopped by the gate desk several times to check on the boarding; on one such occasion, Plaintiff told him that she had two hung seats that would need to be addressed. (Kircher Dec. Exh. 2). Andrae offered to fix them for her, but Plaintiff declined his assistance. (Id). As departure time drew closer, Plaintiff assigned the Gergits party coach seats, but two minutes later changed the seating assignments such that the three children were assigned first class seats and Gergits remained in coach. (Davis Dec. ¶ 11; Davis Dec. Exh. 1). All but one of the medallion passengers awaiting first class upgrades were seated in coach. (Davis Dec. ¶ 11).

## 2.    Employee Concern, the Hotline Complaints, and the Resulting Corporate Investigation

On June 8, the same day Flight 1213 departed, Performance Leader Sam Tumminello (male) learned that other Delta employees were questioning whether a Delta supervisor's family members should have been placed in first class on a recently departed flight. Tumminello learned that Plaintiff was the primary agent who boarded the aircraft, and that the supervisor in question was George Gergits. (Declaration of Samuel Tumminello ("Tumminello Dec.")

12

attached as Exhibit F, ¶ 4).  When Tumminello discussed the situation with Plaintiff later that day, she denied any inappropriate conduct and indicated to Tumminello that Flight 1213 was very busy and she simply did not have the opportunity to clear the standby list before the medallion passengers had boarded in their assigned coach seats.  (Tumminello Dec. Exhs. 1 and 3; Kircher Dec. Exhs. 2-3).  Tumminello collected a statement from Plaintiff (and from Lead Agent Andrae), and preliminarily concluded that "There does not seem to be any effort to cover her tracks; meaning, she could have seated them there without a paper trail."  (Tumminello Dec. ¶ 4; Tumminello Dec. Exhs 1-3; Kircher Dec. Exhs. 1-3).  Based on Tumminello's initial inquiry, the matter was considered closed by local management.  (Tumminello Dec. ¶ 4).

Local customer service employees, however, remained unconvinced that the situation had been handled properly.  (Kircher Dec. Exhs. 4-5).  On June 11 and June 16, Delta's Ethics and Compliance Reporting Hotline received two calls from two separate Cincinnati airport-based employees reporting concerns about Flight 1213.  (Id).  The first caller, Customer Service Agent Patsy Zimmerman (female), reported that Gergits had asked Plaintiff to seat him in first class ahead of revenue passengers, and that Plaintiff complied with this request in violation of Company policy.  (Kircher Dec. Exh. 4).  The second caller, Kit Palmer (female), reported that Gergits had asked that Plaintiff be assigned to board Flight 1213 so that he would make it on the flight, and that Plaintiff subsequently boarded his children in first class even though medallion passengers remained on the upgrade list.  (Kircher Dec. Exh. 5).

Pursuant to Delta's practice, the hotline reports were forwarded to Deborah Kircher (female), who was the Airport Customer Service Human Resources Generalist stationed at the Cincinnati/Northern Kentucky International Airport.  (Kircher Dec. ¶ 5).  After reviewing the reports, Kircher advised local management, Schmidberger and Director Paul Baird (male), of her

13

intent to further investigate the events surrounding Flight 1213. (Kircher Dec. ¶ 6). One of the investigatory steps she took was to ask that Delta's Revenue Protection Unit ("RPU"), the division that is responsible for looking into ticketing transactions and related matters that result in a potential revenue loss to Delta, look into the matter. (Kircher Dec. ¶ 6). Analyst Tammy Mauer Davis (female) was assigned to the Flight 1213 matter. (Kircher Dec. ¶ 6; Davis Dec. ¶ 4).

Upon reviewing the hotline complaints, Davis began pulling data concerning the boarding process, including the standby list and all keystrokes from the computer used by Plaintiff to board the flight. (Davis Dec. ¶ 4). Davis then painstakingly analyzed the ticketing entries and other information. (Davis Dec. ¶ 10). This review revealed key electronic information that was not available to local management at the time of the incident - - information that was entirely contrary to Tumminello's initial conclusion that Plaintiff had not taken steps to "cover her tracks":

- 7:21 a.m. - Plaintiff retrieved the Gergits listing
- 7:23 a.m. – Plaintiff opened another computer screen and hung three first class seats
- 7:26 a.m. – Plaintiff added remarks in the hung seat record that she was protecting the seats for an American Airlines operational problem.

(Davis Dec. ¶¶ 10-11; Davis Dec. Exh. 1). Davis' investigation did not uncover any American Airlines operational problems that morning, nor would it have been a typical practice to in any way block first class seats on a Delta aircraft for a competitor airline's passengers. (Davis Dec. ¶ 11). Davis also discovered that Plaintiff upgraded one medallion passenger to first class, but allowed five of the remaining six medallion passengers to board in their coach seats while the three first class seats remained hung. (Davis Dec. ¶ 11). The relevant timeline is as follows:

- 8:58 a.m. - the 5th of 6 remaining medallion passengers boarded the aircraft in coach

- 9:02 a.m. - the Gergits party was cleared in coach
- 9:03 a.m. - the last remaining medallion passenger boarded the aircraft in coach
- 9:03 a.m. – Plaintiff immediately placed the Gergits family back on the standby list
- 9:04 a.m. – Plaintiff assigned first class seats to 3 of the 4 in the Gergits party.

(Davis Dec. ¶¶ 10-11; Davis Dec. Exh. 1).  This evidence strongly suggested to Davis that Plaintiff hung the first class seats with the intention of holding them for the Gergits family, to the detriment of Delta's highly valued medallion passengers who were awaiting first class upgrades for a long, cross country flight.  (Davis Dec. ¶ 12).

Following her computer-related research, Davis contacted Corporate Security representative Greg Kuhn (male) and asked that he assist in arranging interviews with Plaintiff and Gergits to discuss the findings of her investigation and to hear their explanations concerning the incident.  (Davis Dec. ¶ 13).  The interviews with Plaintiff and Gergits occurred on July 14, 2008; Davis, Kircher, Schmidberger and Kuhn were present.  (Davis Dec. ¶ 13; Kircher Dec. ¶ 7; Schmidberger Dec. ¶ 12).  During the interview with Plaintiff, she was unable to explain why she hung the first class seats, and why it would have been necessary to protect any seats when there were approximately 20 available seats in coach.  (Davis Dec. ¶ 13; Davis Dec. Exh. 2).  She also indicated that she usually did not "hang" seats, but rather that she typically would end the record when protecting seats in an oversold situation.  (Davis Dec. ¶ 13; Davis Dec. Exh. 2).  Plaintiff denied on several occasions during the interview that Gergits had requested that she help his family get into first class.  (Davis Dec. ¶ 13; Davis Dec. Exh. 2; Kircher Dec. ¶ 7; Schmidberger Dec. ¶ 12).  She provided a written statement at the conclusion of her interview.  (Davis Dec. Exhibit 3; Pl. Dep. 101-02; Pl. Dep. Exh. 10).

Gergits confirmed during his interview that he did not request that Plaintiff put his family in first class; he reported asking how the flight looked, and that he told Plaintiff that he would

appreciate whatever she could do to put his son, who is tall, in first class.  (Davis Dec. ¶ 14; Davis Dec. Exh. 4; Kircher Dec. ¶ 8; Schmidberger Dec. ¶ 13).  Gergits also stated that he had openly joked in the days prior to the flight that an agent taking a retirement package should be assigned to work his flight so that he and his family could get first class seats, and that he had requested that Plaintiff be assigned to work the flight that morning because he believed that she would go out of her way to seat him and his family together.  (Davis Dec. ¶ 14; Davis Dec. Exh. 4; Kircher Dec. ¶ 8; Schmidberger Dec. ¶ 13).  Gergits also provided a written statement at the conclusion of his interview.  (Davis Dec. ¶ 14; Davis Dec. Exh. 5).

**E.**    **The Decision to Terminate Plaintiff's Employment**

The information gathered during the RPU interviews was summarized by Davis and subsequently was shared with Kelley Nabors (female), then Program Manager of Delta's Equal Opportunity department.  (Declaration of Kelley Nabors ("Nabors Dec.") attached as Exhibit G, ¶¶ 4-5; Kircher Dec. ¶ 10).  With respect to Plaintiff, it was determined that she had purposefully manipulated the boarding process, including hanging seats, so that Gergits' family could board in first class.  (Nabors Dec. ¶ 5; Kircher Dec. ¶ 9).  This determination was based on:

- the keystroke information reflecting the sequence of events (the early-morning viewing of the Gergits listing, immediately followed by the hanging of the seats, as well as the assignment of first class seats to the Gergits family immediately after the remaining medallion passenger awaiting an upgrade had boarded in coach class);
- Plaintiff's decision to hang (as opposed to protect) the first class seats, a secretive practice that creates no lasting record and is impossible for the station to detect without the assistance of RPU;
- Plaintiff could not explain why she hung the seats, which she claimed at the time was not her usual practice;
- Delta was unable to determine that any irregular operations had occurred on the day in question, despite Plaintiff's entry in the hung seat record; and
- Flight 1213 was not oversold (and, in fact, departed with approximately 20 empty seats in coach class); thus, there would not have been a reason to hold seats using any method.  In particular, there would have been no reason to hold first class seats for a competitor airline's passengers.

16

(Nabors Dec. ¶ 5; Kircher Dec. ¶ 9). Nabors informed Kircher that the incident described in the RPU memos was very serious and, in the case of misconduct like Plaintiff's, historically had resulted in termination of employment.[4]  (Nabors Dec. ¶ 6; Kircher Dec. ¶ 10).  As a result, Kircher and Nabors determined that further discussion within Human Resources and the operation's management group was necessary to determine the appropriate level of discipline, if any, to be issued to Plaintiff and Gergits.  (Nabors Dec. ¶ 6; Kircher Dec. ¶ 10).

Kircher and Nabors believed that termination was appropriate for Plaintiff, based on the severity of her misconduct and the Company's treatment of other employees who had committed similar offenses.  (Nabors Dec. ¶ 7; Kircher Dec. ¶ 11).  Local management, Schmidberger and Baird, initially felt that discipline short of termination was appropriate.  Schmidberger, in particular, argued that Plaintiff should not be terminated, in light of her long tenure with the Company and the fact that she was otherwise an excellent agent.  (Declaration of Paul Baird ("Baird Dec.") attached as Exhibit H, ¶ 5; Schmidberger Dec. ¶ 14; Nabors Dec. ¶ 7; Kircher Dec. ¶ 11).  Ultimately, however, the decision was made after discussions among EO, Human Resources and the operation's management group that a recommendation should be made for the termination of Plaintiff's employment.  (Baird Dec. ¶ 5; Schmidberger Dec. ¶ 14; Nabors Dec. ¶ 7; Kircher Dec. ¶ 11).  The recommendation was signed by both Schmidberger and Baird, and subsequently was approved by EO and several levels of Human Resources, including Kircher, Human Resources Manager Kelly Marchant (female), and Human Resources Director Lisa Abraham-Brown (female).  (Baird Dec. ¶ 5; Schmidberger Dec. ¶ 14; Nabors Dec. ¶ 7; Kircher Dec. ¶ 11; Brown Dec. ¶ 6).

---

[4] The EO department reviews all Company termination recommendations (except, at the time, those from the Technical Operations division) and, therefore, is familiar with how certain misconduct is disciplined at Delta.

It also was determined that George Gergits had engaged in unacceptable behavior by joking that retiring employees should work the flight so that he could be seated in first class and by requesting that Plaintiff work Flight 1213. (Schmidberger Dec. ¶ 15; Nabors Dec. ¶ 8; Kircher Dec. ¶ 12). Delta did not conclude that Gergits was actually seeking to be improperly upgraded to first class; in fact, both Gergits and Plaintiff had repeatedly denied that anything of the sort had occurred.[5] (Schmidberger Dec. ¶ 15; Nabors Dec. ¶ 8; Kircher Dec. ¶ 12). It was determined, however, that Gergits' comments were unprofessional and created a situation where Gergits' leadership role and judgment had been compromised. (Schmidberger Dec. ¶ 15; Nabors Dec. ¶ 8; Kircher Dec. ¶ 12). As a result, the decision was made by Human Resources and the operation management, in consultation with EO, that Gergits would be suspended without pay for three days and placed on a Performance Improvement Plan for a period of 90 days. (Schmidberger Dec. ¶ 15; Nabors Dec. ¶ 8; Kircher Dec. ¶ 12). Among other things, the Performance Improvement Plan required that Gergits individually meet with each of the morning shift employees to discuss their perception of the situation and discuss their expectations of him as a leader, and complete two training courses designed to reinforce Gergits' leadership skills. (Schmidberger Dec. ¶ 15).

**F.    Plaintiff's Appeal of the Termination Decision**

Plaintiff, like all Delta employees, was given the opportunity to appeal the termination of her employment. (Guerrant Dec. ¶ 4). She submitted her initial letter of appeal to Delta on November 12, 2008, which was supplemented by a January 21, 2009 letter from her attorneys. (Guerrant Dec. ¶ 4; Pl. Dep. 140-42; Pl. Exh. 14). Following a careful review of the information

---

(Guerrant Dec. ¶ 3; Nabors Dec. ¶ 3).
[5] Had Delta determined that Gergits requested that Plaintiff give preferential treatment to him and his family, Gergits' employment would have been terminated and Plaintiff's employment would not have been terminated. (Schmidberger Dec. ¶ 15; Nabors Dec. ¶ 8; Kircher Dec. ¶ 12).

provided by Plaintiff, it was determined that Plaintiff did not present any new information to warrant the reinstatement of her employment, and the termination decision was upheld. (Guerrant Dec. ¶ 9; Pl. Dep. Exh. 15).  In short, the individual recommending that the appeal be denied, Program Manager JoAnne Guerrant (female), simply did not find Plaintiff's explanation of her policy violation to be credible and determined that other employee situations identified by Plaintiff were not similar in nature to her misconduct.  (Id).

## III.  ARGUMENT

### A.    Plaintiff's Sex Discrimination Claim Must Fail as a Matter of Law

To establish a prima facie case of sex discrimination under Title VII and Kentucky law, a plaintiff must prove that: (1) she was a member of a statutorily protected group; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a male.  Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir. 2000; Spees v. James Marine, Inc., No. 5:08CV073, 2009 WL 1097559, *3 (W.D. Ky. April 22, 2009) (reversed on other grounds) (citing Kirkwood v. Courier-Journal, 858 S.W.2d 194, 198 (Ky. Ct. App. 1993)) (stating that Kentucky Civil Rights Act gender discrimination claims are analyzed under the Title VII framework).  If the plaintiff can establish a prima facie case, the employer must articulate a legitimate non-discriminatory reason for the discharge of the plaintiff.  At that point, any inference of discrimination raised by the prima facie showing disappears from the case, and the plaintiff must come forward with evidence that the employer's proffered reasons for its employment decision were a mere pretext for sex discrimination[6].  Pucci v. BASF Corp., 55 Fed. Appx. 243, 245 (6th Cir. 2002).

---

[6] A plaintiff may prove pretext by showing "'by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment decision], or (3) that they were insufficient to motivate [the adverse employment decision].'"  Pucci, 55 Fed. Appx. at 246,

     **1.**     **Because the decision-makers regarding Plaintiff's discharge and the denial of her appeal both are female, Delta is entitled to a presumption of nondiscrimination.**

As discussed below, Plaintiff cannot meet her <u>prima facie</u> case, nor can she rebut Delta's legitimate business reason for her termination.  Additionally, Plaintiff faces an even greater burden in this case because the individuals who ultimately made the decision to terminate her employment and deny her appeal are, like Plaintiff, female.  (Abraham Brown Dec. ¶ 3; Guerrant Dec. ¶ 3).  Courts have made clear that circumstances such as these create a presumption that the decision to terminate Plaintiff's employment was not the result of unlawful gender discrimination.  Although the law does not categorically foreclose the notion that a manager could discriminate against an employee of the same gender, federal courts have recognized that a presumption of nondiscrimination arises when the decision-maker is a member of the same protected classification on which the plaintiff bases her claim.  <u>See</u> <u>Richter v. Hook-Superx, Inc.</u>, 142 F.3d 1024, 1032 (7th Cir. 1998) (affirming summary judgment in an age discrimination case and noting that like the plaintiff, the decision-makers were also over the age of forty); <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1471 (11th Cir. 1991) (reaching a similar conclusion).

It also is uncontested that the only two male employees who had input into whether Plaintiff should be terminated – Gary Schmidberger and Paul Baird – both initially did not believe that Plaintiff should be terminated for her misconduct, and openly voiced their views on this issue.  Schmidberger, in particular, strongly argued that Plaintiff should not be terminated.  Ultimately, both men agreed with the decision only when the Company's Human Resources and Equal Opportunity representatives instructed them that prior similar infractions had resulted in the termination of employment, and that termination therefore was necessary in Plaintiff's

---

quoting <u>Manzer v. Diamond Shamrock Chemicals Co.</u>, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original).

situation to maintain consistent application of Delta policies.

### 2.    Plaintiff cannot state a __prima__ __facie__ gender discrimination claim.

To state a prima facie case of individual disparate treatment under Title VII, a plaintiff must establish that she was replaced by a person who is not a member of the protected class. Perry, 209 F.3d at 601.  In the alternative, a plaintiff must establish (in addition to the first three elements stated above), that "a comparable non-protected person was treated better."  Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).  Because Plaintiff is unable to meet either of these burdens, her legally inadequate gender discrimination claim should be dismissed.

### a.    Plaintiff was not replaced

It is a well-recognized legal proposition that "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement."  Lilley v. BTM Corp., 958 F.2d 746, 752 (6th Cir. 1992).  When faced with such circumstances, courts have not hesitated to dismiss a discrimination plaintiff's lawsuit for failure to establish her prima facie case.  See id. at 752-53.  See also Barnes v. GenCorp., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990); Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 372-73 (6th Cir. 1999).  Here, the evidence is undisputed that Plaintiff was not replaced by any particular Customer Service Agent; rather, her duties were absorbed by the other agents who worked at the Cincinnati airport.[7] (Schmidberger Dec. ¶ 17).  Plaintiff, therefore, cannot establish a prima facie case of gender discrimination under established Sixth Circuit precedent.

---

[7] The employee given a Senior Customer Service Agent title closest in time to Plaintiff's termination was Jo Ann Stephan, on October 6, 2008 – after the decision was made to terminate Plaintiff's employment, but the day before she was informed of the decision.  (Declaration of David T. Croall ("Croall Dec.") attached as Exhibit I, ¶ 4).

### b.    Plaintiff cannot demonstrate circumstances giving rise to an inference of gender discrimination

Just as she is unable to establish a <u>prima</u> <u>facie</u> case of gender discrimination by demonstrating that she was replaced by a male employee, Plaintiff cannot point to any circumstances that would give rise to an inference of gender discrimination in the termination of her employment.

Plaintiff's gender discrimination claim is based upon her belief that other employees who she believes had engaged in similar misconduct were given lesser forms of discipline.  To establish the fourth element of her termination claim on this basis, Plaintiff must demonstrate that she was treated differently from "similarly situated" male employees with respect to her termination.  To be "similarly situated," the individuals with whom Plaintiff compares herself must be similar in all relevant aspects.  <u>Batuyong v. Gates</u>, 337 Fed. Appx. 451, 453-54 (6th Cir. 2009);  <u>Wine v. Wal-Mart Stores, Inc.</u>, 173 F.3d 857 (6th Cir. 1999).  Specifically, "A similarly situated employee is one who has the same supervisor, was subject to the same standards of conduct, and engaged in 'nearly identical' conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's response."  <u>Batuyong</u>, 337 Fed. Appx. at 453-54.

In an attempt to meet this burden, Plaintiff argues that George Gergits, the Performance Leader whose family boarded Flight 1213 in first class, should have received the same level of discipline as Plaintiff, i.e. termination of employment.  (Pl. Dep. 186-87).  Even a cursory glance at Gergits' conduct establishes that it was entirely different than Plaintiff's decision to manipulate the boarding process to the benefit of Gergits' family.  There is no evidence that Gergits had any idea that Henry had hung seats or taken any other action to enable his family to leapfrog over medallion passengers to receive first class seats.  To the contrary, during Delta's

investigation of the incident, both Plaintiff and Gergits repeatedly denied that Gergits had

requested any sort of preferential boarding treatment from Henry. Ultimately, however, Delta did

determine that Gergits had made unprofessional statements that undermined his credibility as a

leader, and Delta disciplined him accordingly. These facts do not satisfy the prerequisites for

serving as similar situations for purposes of a discrimination claim. As the Sixth Circuit

explained when affirming summary judgment for the employer in another case, "Plaintiff's

allegations regarding other employees not being fired for different, but what she subjectively

believes to be more serious, misconduct simply does not satisfy [her prima facie burden]." Id.

Plaintiff also argues that other male employees engaged in misconduct similar to hers, but

were not terminated. Delta looked into each of the instances as soon as Plaintiff identified them

in her appeal papers, however, and did not uncover any facts that would indicate that those

employees had engaged in any misconduct, let alone misconduct of the magnitude of Plaintiff's.

In one instance, it was determined that a flight was oversold by one seat, and that the only

passengers willing to deplane were a couple who refused to separate; they both were paid denied

boarding compensation and the inconvenienced passenger, as well as a male employee standing

by on his employee benefit flight privileges, received seat assignments. (Guerrant Dec. ¶ 6). In

another circumstance cited by Plaintiff in her internal appeal, two revenue passengers standing by

for another flight were not boarded but three nonrevenue passengers received seat assignments.

(Guerrant Dec. ¶ 7). Delta's investigation determined that the revenue passengers were deleted

from the standby list at 10:43 a.m., and that two nonrevenue passengers were cleared just two

minutes later at 10:45 a.m., at which time the flight immediately departed as scheduled. (Id).

When questioned, the agent stated that his usual practice would have been to page the passengers

and, if they did not appear, he would proceed to board the next passengers on the list. (Id). This

explanation was consistent with the information Delta was able to uncover, and did not indicate that the boarding process was in any way manipulated to favor nonrevenue over revenue passengers.  (Id.)  The final incident raised by Plaintiff involved charter flights and was not comparable to Plaintiff's situation in the least.  (Guerrant Dec. ¶ 8).

In contrast, a number of other employees have been terminated for misconduct comparable to Plaintiff's – that is, they hung seats or otherwise created fictitious bookings for the benefit of themselves or their friends/family.  (Nabors Dec. ¶ 6.  This establishes that Delta viewed Plaintiff's misconduct as a terminable offense, and that the decision to terminate her employment was not arbitrarily made, and certainly was not based on gender.  Indeed, an analysis of those terminated individuals reveals that Delta applied its policy uniformly, regardless of gender:  of the thirteen individuals terminated for booking/seat-related misconduct during the two-year time period preceding Plaintiff's termination of employment (a period specified by Plaintiff for discovery purposes), seven are male and six are female.  (Nabors Dec. ¶ 6).  One of the thirteen individuals, like Plaintiff, engaged in misconduct that resulted in nonrevenue passengers being seated in first class ahead of revenue passengers entitled to first class seats.  (Id.).  That employee is male, and his employment was terminated.  (Id).  Thus, far from establishing any inference of gender discrimination, these undisputed facts actually dispel any possibility of gender-related discriminatory animus.   Without this crucial evidence of comparables, Plaintiff's claim fails.  See, e.g., id. (granting summary judgment for the employer where the plaintiff was unable to identify any similarly situated individuals).

### 3.      Plaintiff cannot present sufficient evidence to rebut Delta's nondiscriminatory rationale for her termination.

Plaintiff's gender had no bearing on the employment decision in this case.  As the undisputed evidence establishes, Delta terminated Plaintiff's employment solely because the

Company concluded that she had intentionally manipulated the boarding process to the benefit of her friend and to the detriment of Delta's medallion passengers. Delta cannot condone such conduct by any of its employees, let alone those entrusted with customer service responsibility. When confronted with the specifics, Plaintiff did not deny that she had hung the three first class seats, which she had documented as being necessitated by another airline's operational problems. It also is undisputed that only one of the seven medallion passengers eligible for and awaiting an upgrade received a first class seat even though four first class seats were available, and that Gergits' family members were seated in the three first class seats that Plaintiff unhung immediately after the last medallion passenger boarded the aircraft in coach. It was this undisputed series of events, and the inevitable resulting conclusion that Plaintiff used her experience and position to "game the system," that resulted in the decision to terminate her employment.

Faced with this nondiscriminatory reason for Delta's termination decision, Plaintiff must present "affirmative evidence" of discrimination to satisfy the burden of surviving summary judgment here. Mitchell, 964 F.2d at 584 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510 (1986)). She cannot do so and, instead, again relies on the lesser discipline issued to Gergits for his involvement with Flight 1213, as well as her belief that other male employees engaged in conduct similar to hers but were not terminated. As explained above, however, these other employees are not similarly situated to Plaintiff and in no way support her discrimination claim.

The record otherwise is devoid of any evidence of gender discrimination. To the contrary, the record shows that, until the unfortunate day of her misconduct, Plaintiff was well respected and perceived by her managers to be a high performer. Plaintiff herself testified that she

repeatedly received positive evaluations, signed off on by Gary Schmidberger, and did not feel that her gender adversely affected her performance ratings in any way. It was at Schmidberger's suggestion that she applied for and was promoted to a job that was an established stepping stone to a management position. Moreover, the two male employees involved in the termination decision initially did not support the termination of Plaintiff, and agreed to the decision only in light of the company's past treatment of similar situations; and the ultimate termination decision was made by a female. In short, there is not one shred of evidence supporting Plaintiff's claim that her termination was motivated by her gender. Her sex discrimination claim must be dismissed as a matter of law.

**B.**     **Plaintiff's Creative but Nonexistent Claim for Breach of Kentucky Public Policy Should Be Dismissed.**

The Kentucky Supreme Court has steadfastly protected the employment-at-will doctrine and in doing so has held that, to be legally actionable, a discharge must be contrary to a fundamental and well-defined public policy as evidenced by a constitutional or statutory provision. Firestone Textile Co. Div. v. Meadows, 666 S.W.2d 730, 731 (Ky. 1983). The court subsequently adopted a caveat to Firestone, recognizing only two situations where the reason for discharging an employee is so contrary to public policy as to be actionable absent explicit legislative statements prohibiting the discharge: "[f]irst, where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment. Second, when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment." Grzyb v. Evans, 700 S.W.2d 399, 402 (Ky. 1985) (quotations omitted). The determination of whether the public policy claimed by a plaintiff meets this criteria is a question of law. McCown v. Gray Kentucky Television, Inc., 295 S.W.3d 116, 118 (Ky. Ct. App. 2008)

Kentucky courts applying this Kentucky Supreme Court precedent have limited their analysis to whether the discharge was for one of these two enumerated reasons.  See, e.g., McCown, 295 S.W.3d at 118; Hammond v. Heritage Commc'ns, Inc., 756 S.W.2d 152, 154 (Ky. Ct. App. 1988); Nork v. Fetter Printing Co., 738 S.W.2d 824, 827 (Ky. Ct. App. 1987); Moss v. Robertson, 712 S.W.2d 351, 353 (Ky. Ct. App. 1986).  Federal courts applying Kentucky law have applied the same analysis.  See, e.g., Hall v. Consol of Kentucky, Inc., 162 Fed.Appx. 587 (6th Cir. 2006); Maiden v. North American Stainless, 183 Fed.Appx. 485 (6th Cir. 2005); Barlow v. Martin-Brower Co., No. 3:98CV-456-S, 1998 WL 34202237, *1-2 (W.D. Ky. Oct.22, 1998).

Here, Plaintiff alleges that Delta violated a public policy that employees should not be retaliated against for hiring an attorney to protect their legal rights.  (Complaint ¶ 50).  Tellingly, however, she does not cite to any Kentucky statutes or other legislative enactments to support her sweeping legal theory, for the simple reason that none exist.  Similarly, she does not allege that Delta terminated her employment for refusing to violate a law in the course of her employment. Plaintiff's legally void public policy claim is likewise lacking in any factual support.  She offers nothing but her own supposition to support her claim that Delta's decision to terminate her employment for admitted misconduct, as it has discharged both male and female employees for comparable rule violations in the past, was actually due to her fleeting reference to possibly retaining counsel.  (Pl. Dep. 191-92).  Indeed, at no time did any Delta employee say anything negative to Plaintiff about hiring a lawyer.  (Pl. Dep. 192).

In short, Plaintiff has alleged nothing during this proceeding to support her wrongful discharge claim.  Consequently, her claim for breach of Kentucky public policy must be dismissed.

## IV.  **CONCLUSION**

For all of the foregoing reasons, Delta respectfully requests that the Court grant its

Motion for Summary Judgment and dismiss Plaintiff's claims in their entirety.

Respectfully submitted,


*/s/ David T. Croall*
David T. Croall (0009149)
Porter Wright Morris & Arthur LLP
250 E. Fifth St., Suite 2200
Cincinnati, Ohio 45202
Phone:  (513) 369-4240
Fax:  (513) 421-0991
*dcroall@porterwright.com*

Kelly K. Giustina (admitted pro hac vice)
Georgia Bar No. 429935
Delta Air Lines, Inc.
Department 981
1030 Delta Boulevard
Atlanta, Georgia  30354
Phone:  (404) 773-6520
Fax:  (404) 715-2233

Attorneys for Delta Air Lines, Inc.

**CERTIFICATE OF SERVICE**

I certify that, on April 29, 2011, I electronically filed the foregoing using the Court's

CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys

of record.

*/s/ David T. Croall*

CINCINNATI/180490v.3