UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

RACHELLE HENRY,   : Case No. 2:10 CV-00009-WOB

    Plaintiff,   :

    v.   : DECLARATION OF
       TAMMY MAUER DAVIS IN
DELTA AIR LINES, INC.,   : SUPPORT OF DEFENDANT
       DELTA AIR LINES, INC.'S MOTION
    Defendant.   : FOR SUMMARY JUDGMENT

### DECLARATION OF TAMMY MAUER DAVIS

1. I, Tammy Mauer Davis, declare under penalty of perjury that the following facts are within my personal knowledge and are true.

2. My name is Tammy Davis. I am of legal age and sound mind, and I am fully competent to make this declaration. All of the statements made in this declaration are true and correct and are of my own personal knowledge.

3. I am female. I was hired by Delta Air Lines, Inc. ("Delta") on April 19, 1986. My current job title is Specialist – Revenue Protection Unit ("RPU"). As an RPU Specialist, I am responsible for investigating ticketing transactions and related matters that result in a potential revenue loss to Delta. I have worked as an RPU Specialist since September, 2004.

4. In June 2008, I was provided two hotline complaints concerning the boarding of an aircraft at the Cincinnati airport. Specifically, the hotline reports expressed concern that, on June 8, 2008, nonrevenue passengers were improperly seated in first class ahead of Medallion passengers who were entitled to and awaiting an

Exhibit D

upgrade to first class on Flight 1213, from Cincinnati to San Diego. Upon receiving the reports, I was asked to look into the boarding and determine whether any improprieties had occurred. I, therefore, proceeded to pull up the keystrokes from the computer that was used at boarding, as well as other records relating to the flight.

5. The computer that was used at boarding was located at the gate in question. The agent using the computer must log in using a secure identification number that is unique to that agent. This "fingerprint" enables the Company to determine, if necessary, the identity of the agent who performed a certain transaction, and allows someone with my access to the systems the ability to literally see all of the keystrokes entered into the computer by the agent. The keystrokes entered under an agent's identification number at a particular computer terminal are recorded and maintained in Delta's computer system for approximately 35 days. After that period of time, the keystrokes are automatically deleted unless some or all of them are maintained for other purposes (i.e., an internal Company investigation).

6. Once she is logged into a computer, an agent can access a wealth of information about the departing flight, including passenger name records, which contain passenger information such as name, trip origin, trip destination, and fare specifics, as well as seat assignments, including upgrades. Any changes that are made to the passenger's travel itinerary, such as seat assignment changes, are reflected in the passenger name record. The computer system also records the time that a passenger is cleared and actually boards the aircraft.

7. The computer also allows agents to access the airport standby list for the departing flight. The standby list is comprised of two general groups of passengers: revenue (i.e. those passengers who have paid for a seat on the departing or another aircraft) and nonrevenue (i.e. those passengers who are flying on a reduced fare or for free, on a space available basis - - typically, airline employees or retirees and their friends and family). Thus, the passengers on the airport standby list may include inconvenienced passengers who have been bumped off of another flight, revenue passengers from another flight who are trying to change flights, medallion passengers seeking an upgrade from coach to first class, and nonrevenue passengers. Each of these passengers has a certain priority assigned to their seat request; however, revenue passengers always are given a higher priority than nonrevenue passengers, who board the aircraft only if there is an empty seat.

8. When a flight is overbooked (also known as "oversold"), an agent may decide to "protect" open seats so that she can better accommodate passengers on either the departing flight or another flight that day. This is accomplished by creating a passenger record, blocking a number of seats, entering "CVG Protect," and then ending the record. By ending the record, the agent creates an official, transparent record of her actions that can be pulled up on any computer by any agent who is looking for seats on a flight. This action takes the seats out of inventory available for sale and holds them for passengers who may need seats.

9. An agent also may "hang" an open seat. This occurs when an agent goes to a different level on her computer and makes a computer entry that removes the seat

in question from inventory, so that it cannot be sold. Unlike the process for protecting seats, the "hung" seat record is not ended in the computer and, as a result, there is no official, transparent record of the transaction that is created and visible to other agents. The "hung" seat can be viewed only on the computer at which the hung seat actually has been created, and the record disappears when the seat is subsequently unhung by ignoring the transaction. It is my understanding that agents are not permitted to hang a seat.

10. Upon receiving the hotline complaints, I began pulling all of the data possible concerning the boarding process, including the standby list and all keystrokes from the computer used by Henry to board the flight. I then analyzed the ticketing entries and other information. The records reflected that the airport standby list for Flight 1213 reflected 7 medallion passengers awaiting first class upgrades, and 6 nonrevenue passengers (including Performance Leader Gergits and his 3 children) awaiting seat assignments. Because there were only 4 unassigned first class seats and 7 medallion passengers standing by for upgrades, it did not appear that any employees or their family flying standby would receive a first class seat assignment; however, because the flight was not full, the entire standby list, including employees and their families, should have been able to receive a seat assignment.

11. One of the steps I took to assist in the investigation was to prepare a timeline of Henry's actions, based on her keystrokes. My timeline is attached to this Declaration as Exhibit 1. The records also reflected that boarding for Flight 1213 commenced in a timely manner, approximately 2 hours before the flight was to

depart. Henry's keystrokes indicated the following: 7:21 a.m. (nearly two hours before departure), she retrieved the Gergits standby listing; 7:23 a.m., she logged into another computer level and hung three first class seats; 7:26 a.m., she added remarks in the hung seat record that she was protecting the seats for an American Airlines operational problem. I was unable to find any information indicating American Airlines operational problems that morning, nor would it have been a typical practice to in any way block first class seats on a Delta aircraft for a competitor airline's passengers. I also discovered that Henry upgraded one medallion passenger, but allowed 5 of the remaining 6 medallion passengers to board in their coach seats while the 3 first class seats remained hung. The relevant timeline is as follows: 8:58 a.m., the 5th of 6 remaining medallion passengers boarded the aircraft in coach; 9:02 a.m., the Gergits party was cleared in coach; 9:03 a.m., the last remaining medallion passenger boarded the aircraft in coach; 9:03 a.m., Henry immediately placed the Gergits family back on the standby list; 9:04 a.m., Henry assigned first class seats to 3 of the 4 in the Gergits party.

12. This evidence strongly suggested to me that Henry hung the first class seats with the intention of holding them for the Gergits family, thereby denying first class seats to Delta's highly valued medallion passengers who were awaiting first class upgrades for a long, cross country flight.

13. I thereafter contacted Corporate Security representative Greg Kuhn and asked that he assist in arranging interviews with Henry and Gergits, to discuss the findings of my investigation thus far and to hear their explanations concerning the

incident. These interviews occurred on July 14, 2008. I was present, as were Human Resources Generalist Deb Kircher, Hub Manager Gary Schmidberger and Kuhn. During the interview with Henry, she was unable to explain why she hung the first class seats, and why it would have been necessary to protect any seats when there were approximately 20 available seats in coach. She also indicated that she usually did not "hang" seats, but rather that she typically would end the record when protecting seats in an oversold situation. Henry denied on several occasions during the interview that Gergits had requested that she help his family get into first class. My summary of the interview is attached to this Declaration as Exhibit 2. Henry provided a written statement at the conclusion of her interview, which is attached to this Declaration as Exhibit 3.

14. Gergits stated during his interview that he did not request that Henry put his family in first class. He reported asking how the flight looked, and that he told Henry that he would appreciate whatever she could do to put his son, who is tall, in first class. Gergits also stated that he had openly joked in the days prior to the flight that an agent taking a retirement package should be assigned to work his flight so that he and his family could get first class seats, and that he had requested that Henry be assigned to work the flight that morning because he believed that she would go out of her way to seat him and his family together. My summary of the interview is attached to this Declaration as Exhibit 4. Gergits provided a written statement at the conclusion of his interview, which is attached to this Declaration as Exhibit 5.

15. Following the interviews with Henry and Gergits, I did some follow-up research. I learned that Delta policy did not require that the gate agent upgrade or change the passenger's seat if an upgrade or other more preferable seat became available once a passenger has boarded the aircraft and taken their originally assigned seat. While this was not required, some agents did, however, make the extra effort to upgrade medallion passengers if a first class seat became available after they had boarded in coach class, either by coming onto the aircraft themselves or by asking a flight attendant to inform the passenger of the available upgrade.

16. At the conclusion of my interview, I concluded that Henry had deliberately manipulated the boarding process to allow nonrevenue standby passengers to board in first class ahead of Medallion passengers who were entitled to and awaiting upgrades to first class. I concluded that Gergits did not request special favors in the boarding process, but it certainly appeared to me that he made some unprofessional comments. I am not involved in the disciplinary process, however, so I turned over my findings to Kircher.

17. At no time did I undertake any actions concerning Henry because of her gender or because she indicated some desire to retain legal counsel. I simply did my job, by looking into the boarding process and assigning the value associated with the seats in question, as is the practice in all RPU investigations.

18. I certify under penalty of perjury of the laws of the United States that the foregoing information is true and correct.

This 25th day of April, 2011.

_____
Tammy Mauer Davis

## Timeline

7:17 - Rachelle logs into set level A
7:18 - pulls paperwork for flt 1213 and sets up secondarys
7:19 - removes (off) seat 4B - thru psgr
7:19 - moves 4B to 1D
7:19 - attempts to block 4B - seat already blocked
7:21 - blocks 24BC
7:21 - pulled up last name Gergits
7:23 - Rachelle logs into level C
7:23 - books 3 FC seats under name CVGPROT - never ends record
7:26 - pulls up OA phone numbers in CVG in GRS
7:26 - adds SPCL remarks to CVGPROT PNR - Protect for AA per IROP UA
7:26 - adds seats 4ABD - never ends record
7:27 - goes back to level A
8:04 - blocks seat 18E
8:06 - pulls up NRSA name list and goes through each name
8:16 - attempts to block 4B - seat already blocked
8:22 - unblocks 4AD
8:23 - AQ5FIX 4B
8:23 - breaks 4B
8:23 - blocks 4A
8:23 - unblocks 4A
8:24 - AQ5FIX 4A
8:24 - breaks 4A
8:33 - fixes 4B
8:33 - fixes 4A
8:44 - moved 4C to 15E - IVY per psgr request
8:47 - cleared upg psgr Goad in 4B
8:49 - upg psgr Kouche shown OB in YC by Rachelle
8:50 - upg psgr Stein shown OB in YC by Rachelle
8:51 - put Goad back on standby list
8:51 - changes thru psgr from 1D to 4B
8:51 - cleared Goad in 1D
8:55 - upg psgr Alexander shown OB in YC by Rachelle
8:55 - upg psgr Kelley shown OB in YC by Rachelle
8:58 - upg psgr Hunter shown OB in YC by Rachelle
9:02 - cleared Gergits in YC - 10ABCD
9:03 - upg psgr Fitting shown OB in YC by Rachelle
9:03 - place 4 Gergits back on the standby list
9:04 - divided Gergits PNR
9:04 - cleared 3 of the Gergits in FC 4ACD
9:05 - AQ5FIX 4A
9:05 - AQ5FIX 4C
9:05 - AQ5FIX 4D
9:06 - cleared the last Gergits in YC 10C
9:33 - logs back into C using D000222 sine (IBM personal computers FRA)
9:33 - ignores
9:33 - logs off from level C

Davis Exhibit 1

**▲ DELTA** 🌀

Internal Memorandum
Date: July 15, 2008

TO:        Paulette Henderson, Manager - Revenue Protection Unit, Dept. 687/ATG
FROM:      Tammy Mauer, Revenue Protection Unit, Dept. 687/ATG
SUBJECT:   Case 32912 - Rachelle Henry, EN 028822500, DOE 07/21/86, CVG

**DATE/LOCATION:** July 14, 2008, CVG Airport Main Terminal Conference Room

**INTERVIEWERS:** Tammy Mauer - Revenue Protection Unit

**PREDICATION:**
Employee 288225, Rachelle HENRY was interviewed due to information received by Deb Kircher, Human Resources in CVG. Other employees in the station are questioning activity on flight 1213/08Jun CVG to SAN, in which HENRY was the primary gate agent. Employees are stating CVG Performance Leader George Gergits was standing by, NRSA, with his three children. Gergit's three children were cleared in first class, while revenue upgrade passengers boarded with their coach seats. The other employees are stating that HENRY and Gergits are friends and believes that the upgrade list was not handled appropriately.

The investigation revealed that HENRY booked 3 first class seats approximately 2 hours before flight time. The seats were booked in a different area of the computer and were booked under the name CVGPROT/A/B/C. The booking was never ended, causing the seats to be hung.

Revenue lost for the three first class seats was $4,197.00.

**INTERVIEW:** (Rachelle Henry)
The interview of Rachelle HENRY was held at the CVG airport main terminal conference room. Present in the interview was Greg Kuhn, Corporate Security, Deb Kircher, Human Resources, Gary Schmidberger, Station Manager, and the writer.

After introductions were made, Greg Kuhn asked HENRY if she knew why we were talking to her today. HENRY stated she had no idea. Greg explained that we needed to discuss what had transpired on flight 1213/08Jun CVG to SAN. Greg asked HENRY if she knew what people were saying about that flight. HENRY stated she did not know what people were saying, but she did know she was being treated differently by other employees. HENRY stated she would be left at the gate by herself with no assistance and people would actually walk down the other side of the hallway as her. HENRY also stated that inappropriate comments were made about her and Performance Leader George Gergits. Other agents were even suggesting the two had a personal relationship. HENRY stated she would try her best not to react to the comments.

Davis Exhibit 2

DL 000150

Rachelle Henry, EN 028822500, DOE 07/21/86, Dept /CVG
July 15, 2008
Page 2

Greg Kuhn asked HENRY if she knew that George Gergits and his family were traveling on the SAN flight on June 8th. HENRY stated yes. Greg asked HENRY if she knew George had requested for her to work that flight. HENRY stated no. HENRY stated when she came into work on June 8th, her Lead advised her that she needed to work the flight to SAN. Greg asked HENRY if George had asked her to take care of him and his family on this flight. HENRY stated the only thing George asked her was how the flight looked for non revenue travel.

The writer asked HENRY to rate herself as a gate agent. HENRY stated she was exceptional. The writer asked HENRY to explain her procedure for checking in a flight. HENRY stated she would pull the predeparture paperwork and check for connections on the flight. HENRY also stated she would look for passengers traveling together and try to move people around to get them seats together. The writer asked HENRY if she recalled any irregular operation on this flight. HENRY stated she received a call to hold for approximately 12 connecting passengers from a late flight. The writer asked HENRY if this was a connection carrier flight. HENRY stated yes. The writer asked HENRY if she could recall any other irregularities. HENRY stated no. The writer asked HENRY to explain how she would handle the standby list on a flight. HENRY stated she would do all possible to get standby and non revenue passengers together, she would sometimes ask revenue passengers to move around to get people together. The writer asked HENRY to explain what happened with the upgrade standby passengers on flight 1213 on June 8th. HENRY stated she had a hard time handling the flight and the standby list that day. HENRY stated she recalled the upgrade standby passengers asking her how it looked, and she told them that it may be possible to upgrade. The writer asked HENRY if she ever asked them to wait in the gate area, or if she told them to go ahead and board with their coach seat. HENRY stated she never makes an announcement about either of those things. HENRY stated she gets to the list as soon as she can and if the upgrade passengers have already boarded, then she moves to the next people on the list. The writer then stated to HENRY, in this case, the next people on the list were the Gergits family. HENRY stated yes.

The writer showed HENRY the keystrokes from the set she was working on at the gate June 8th. The writer explained to HENRY that she began working the flight at 7:17am and pulled the predeparture paperwork. The writer also explained that she had removed a through passenger in first class - 4B to a different seat - 1D. HENRY stated she was trying to get two other passengers seats together. The writer advised HENRY that the first class passenger was moved before his flight even got into CVG. HENRY advised it was two other people, but she did not recall the names. The writer advised HENRY there was no passenger seated in 4A. HENRY could not explain why no passengers were seated in 4A and B. The writer continued with HENRY'S keystrokes and explained that at 7:23am she logged into another area in the computer - level C, and booked 3 first class seats. The writer asked HENRY if she could explain why she booked those seats. HENRY stated she had no idea. HENRY asked what the names were on the booking. The writer explained it was booked under CVGPROT. HENRY stated if she booked protection seats she would always document and end the record. The writer explained the record was documented at 7:26am "protect for AA per IROP UA", and seats 4ABD were assigned, but

DL 000151

7-14-08

Re: Meeting to clarify accusations made about details surrounding Flt J primaries going to SAN 6/08/08

Asked whether I was approached by my performance leader George Geigits either 6/8 or anytime prior to that date to do him a "favor" on seating for his and his childrens NESA trip to SAN.

George did not approach me at all regarding the flight until about 1 hour before flight time when we discussed whether he would prefer row 10 or row 18. He said row 10 would be great if it worked out. He then left the gate and did not return until the flight was almost ready for departure.

Davis Exhibit 3

DL 000139

7-14-08

Asked about key stroke activity that indicated I intentionally "hung" seats in alternate log in area. I responded that it is not my practice to do that but that I do create CVG protect records in alternate log in levels occasionally in order to protect seats for other agents who express a need for them on their own overbooked flights. My practice however, is to end the record with documentation as to the need. As to why I failed to end the record and document on 6/8, I can only say it was accidental and unintentional. I cannot remember the specifics that may have warranted it.

DL 000140

7-14-08

Asked how I failed to clear medallions into the available first class seats, I responded that due to the chaotic nature of the activities surrounding the operation, and my passengers on that flight, I was late to board, overwhelmed with questions, and in attempting to manage boarding efficiently failed to clear my ASL in a timely manner. As such, the medallion passengers had all boarded the flight by the time I was able to realize that there were still open F/C seats to assign. In keeping with policy, I looked for the next passenger on the list who had not yet boarded & cleared them into the seat. I explained that this is standard practice for me.

Rachel McHenry 258225

▲ DELTA

Internal Memorandum
Date: July 15, 2008

TO: Paulette Henderson, Manager - Revenue Protection Unit, Dept. 687/ATG
FROM: Tammy Mauer, Revenue Protection Unit, Dept. 687/ATG
SUBJECT: Case 32809 - George Gergtis, EN 034891300, DOE 10/25/71, CVG

DATE/LOCATION: July 14, 2008, CVG Airport Main Terminal Conference Room

INTERVIEWERS: Tammy Mauer - Revenue Protection Unit

**PREDICATION:**
Employee 348913, George GERGITS was interviewed due to information received by Deb Kircher, Human Resources in CVG. Other employees in the station are questioning activity on flight 1213/08Jun CVG to SAN, in which GERGITS and his family were traveling non revenue. Employees are stating GERGITS requested his friend, Rachelle Henry work the flight to ensure he and his family were cleared in first class. Other employees were aware that the GERGITS family were cleared in first class, while revenue upgrade passengers boarded with their coach seats. The other employees are stating that GERGITS and Henry are friends and believes that the upgrade list was not handled appropriately.

The investigation revealed that Henry booked 3 first class seats approximately 2 hours before flight time. The seats were booked in a different area of the computer and were booked under the name CVGPROT/A/B/C. The booking was never ended causing the seats to be hung.

Revenue lost for the three first class seats was $4,197.00.

**INTERVIEW:** (George Gergtis)
The interview of George GERGITS was held at the CVG airport main terminal conference room. Present in the interview was Greg Kuhn, Corporate Security, Deb Kircher, Human Resources, Gary Schmidberger, Station Manager, and the writer.

After introductions were made, the writer asked GERGITS to explain what had transpired on flight 1213, on the 8th of June. GERGITS stated that he and his family were traveling non revenue and were initially cleared in coach, but when they went to board they realized that three of the four passengers were in first class. Greg Kuhn asked GERGITS if he had asked Henry to clear them in first class. GERGITS stated the only thing he said to Henry was to do all possible to sit his son in first class because he was over six feet tall. Henry stated the only thing GERGITS asked her was how the flight looked for non revenue travel. Greg asked GERGITS if he knew that Henry had blocked three first class seats on the flight. He stated he did not. Greg

Davis Exhibit 4

DL 000148

George Gergtis, EN 034891300, DOE 10/25/DEPT. /CVG
July 15, 2008
Page 2

asked GERGITS if he asked her to block the seats. GERGITS stated he did not. Greg advised GERGITS that it appeared to us that HENRY booked the three first class seats so that his family could clear in first class. Greg told GERGITS that Henry could be in a lot of trouble, and if he asked her to do this, he needed to tell us. GERGITS again stated the only thing he asked Henry to do was to do all possible to get a first class seat for his son.

Deb Kircher asked GERGITS if he realized what a difficult position he put Henry in by asking her to do all possible to get his family in first class. He stated he never meant for her to block seats for that reason. Greg asked GERGITS if he ever made the comment to other agents that he was going to have an agent that was taking a package work the gate to get him and his family in first class. This way the agent would not get in trouble, because they were leaving the company. GERGITS stated he did say that, but he was joking. Greg asked GERGITS if he requested that Henry work the flight that morning. GERGITS stated he did ask for Henry to work the flight because he knew that she would get the family seats together. GERGITS stated that there were some gate agents that would go out of their way to seat his family in separate seats. Greg asked GERGITS again if he asked Henry to ensure he made it in first class on flight 1213. GERGITS stated he only asked her to do all possible to get his son in first class. Greg asked GERGITS if he thought she would have hung the first class seats to honor his request. GERGITS stated he did not ask Henry to block seats.

The writer asked GERGITS to write a statement regarding what was discussed. After approximately 10 minutes the interview was concluded.

The employee was returned to work pending further investigation.


cc: Kelley Nabors - EO Policy & Procedure
    Deb Kircher - Human Resources

DL 000149

Sometime prior to June 8th, I spoke with Kevin Clark, Paul Bowmann and Gary Bowman. I joked with them, that I would like to have them work my flights so that my family and I could get into FC.

The day before I left for vacation, I requested Rachelle Henry to work the flights I was going to non rev on. I felt as though she would be a friendly face and at least make the effort to get us all seated together.

The day of departure, I asked her that if there was any way possible, 1 FC seat for my 6'4" son would be great, but if not that was fine.

The cleared list showed us in Row 10, as we went to board, Rachelle motioned to us to wait. Once we scanned on, I was in YC and my 3 children were in FC.



Davis Exhibit 5

DL 000142