UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

| | |
|---|---|
| **RACHELLE HENRY,** | : Case No. 2:10 CV-00009-WOB |
| Plaintiff, | : |
| v. | : DECLARATION OF |
| | KELLEY NABORS IN |
| **DELTA AIR LINES, INC.,** | : SUPPORT OF DEFENDANT |
| | DELTA AIR LINES, INC.'S MOTION |
| Defendant. | : FOR SUMMARY JUDGMENT |

**DECLARATION OF KELLEY NABORS**

1. I, Kelley Nabors, declare under penalty of perjury that the following facts are within my personal knowledge and are true.

2. My name is Kelley Nabors. I am of legal age and sound mind, and I am fully competent to make this declaration. All of the statements made in this declaration are true and correct and are of my own personal knowledge.

3. I am female. I was employed by Delta Air Lines, Inc. ("Delta") for 14 years, and left the Company in July 2009. At the time I left, my job title was Program Manager –Equal Opportunity and Compliance in Delta's Equal Opportunity department. I returned to Delta in November 2009 to work as a contractor, and then was rehired in my former position on February 28, 2011. During both periods of time that I have worked as Program Manager, I have performed a variety of duties, including but not limited to reviews of employee appeals, investigation of employee complaints (regarding, for example, sexual harassment and workplace violence), and termination reviews. I also serve as a resource to

Exhibit G

Delta's various operational divisions in the event there are questions about discipline or other performance-related issues; among other things, I help to ensure that Delta treats its employees in a consistent manner.

4. During my Delta employment, I became familiar with Rachelle Henry, who at the time was working as a Customer Service Agent in Delta's Airport Customer Service ("ACS") division at the Cincinnati airport. I also became familiar with George Gergits, a Performance Leader in the same operation. I learned from Deb Kircher, Human Resources Generalist for ACS, that hotline reports from Cincinnati employees had raised questions concerning the order in which nonrevenue passengers were boarded on a flight from Cincinnati to San Diego, California. Specifically, it was reported that members of the Gergits family, who were flying on a stand-by status, were seated in first class while Medallion passengers who were eligible for and awaiting upgrades to first class were seated in coach for the long flight to San Diego. I was advised that Delta's Revenue Protection Unit had looked into the matter, with the support of Human Resources and Corporate Security. This included reviews of Henry's keystrokes from the computer that was used to board the aircraft, as well as interviews with both Henry and Gergits.

5. I reviewed the information collected by Revenue Protection, and discussed it with ACS Human Resources, including Deb Kircher. The evidence established that Henry purposefully manipulated the boarding process, which included the use of hung seats, so that members of the Gergits family could board in first class ahead of the Medallion passengers awaiting an upgrade. For example, the keystroke

information reflected that Henry viewed the Gergits listing, then immediately hung three first class seats, then immediately unhung the seats after the last Medallion passenger boarded in coach class and assigned them to the Gergits family. The documentation also showed that Henry chose to hang, as opposed to protect, the first class seats - - a secretive practice that creates no lasting record and is impossible for the station to detect without the assistance of RPU. Henry could not explain why she hung the seats, which she claimed at the time was not her usual practice. While her contemporaneous documentation in the hung seat documentation indicated that she did so due to irregular operations on another airline, Delta was unable to determine that any irregular operations occurred on the day in question. Additionally, the flight in question was not oversold; thus, there would not have been a reason to hold seats using any method. In particular, there would have been no reason to hold first class seats for a competitor airline's passengers.

6. After reviewing the investigation information, I informed Kircher that the incident described in the RPU memos was very serious and, in the case of misconduct like Henry's, historically had resulted in termination of employment. Upon later review of Delta's termination decisions involving situations where employees hung seats or otherwise created fictitious bookings for the benefit of themselves or their friends/family it has been specifically determined that 13 individuals were terminated during the two-year time period preceding Henry's termination of employment. Of those 13 employees, 7 are male and 6 are female. One of the 13 individuals engaged in misconduct that resulted in nonrevenue passengers being

3

seated in first class ahead of revenue passengers entitled to first class seats. That employee is male, and his employment was terminated. Because of the seriousness of the misconduct and discipline, Kircher and I discussed the situation further with Human Resources and the operation's management group.

7. Kircher and I believed that termination was appropriate for Henry, based on the severity of her misconduct and the Company's treatment of other employees who had committed similar offenses. Local management, Gary Schmidberger and Paul Baird, initially felt that some lesser discipline was appropriate. Schmidberger, in particular, argued that Henry should not be terminated, because he said that she was an excellent agent. Eventually, however, everyone agreed that the termination of Henry's employment was appropriate in light of the Company's treatment of past similar situations, and the need for disciplinary consistency. I ultimately reviewed and approved the termination recommendation.

8. We also looked at George Gergits' misconduct, to determine the appropriate level of discipline to be issued. We determined that he engaged in unacceptable behavior, by joking that retiring employees should work the flight so that he could be seated in first class and by requesting that Henry work Flight 1213. He and Henry both repeatedly denied that he asked for special treatment in boarding; thus, we did not conclude that he in any way solicited an inappropriate upgrade. Had he done so, he would have been terminated. The decision was made that Gergits should be suspended without pay for three days and placed on a Performance Improvement Plan for a period of 90 days.

9. At no time did I recommend harsher discipline for Henry because of her gender or because she indicated some desire to retain legal counsel, nor did I recommend lesser discipline for Gergits because he is male. The discipline issued in both situations was based on the facts uncovered in Delta's investigation and was appropriate under the circumstances. I never heard or witnessed any statements or conduct by others, including Human Resources, Gary Schmidberger or Paul Baird that would indicate that Henry was terminated or disciplined more harshly because she is female or because she indicated some desire to retain legal counsel.

10. I certify under penalty of perjury of the laws of the United States that the foregoing information is true and correct.

This 20th day of April, 2011.

_Kelley Nabors_
Kelley Nabors