**3**

TABLE OF CONTENTS

Page

Examination by Ms. Mulloy Myers          4

Exhibit       Description          Page

1     Ethics and Compliance Reporting     20
      General Information dated 6/11/08

2     Ethics and Compliance Reporting
      General Information dated 6/8/08     20

3     Delta Airlines Irregularity Report   46
      dated 6/9/08

4     Delta Internal Memorandum dated     54
      7/15/08

5     Delta Internal Memorandum dated     72
      7/15/08

6     E-mail from Greg Kuhn to Tammy       73
      Mauer dated 7/15/08

(Reporter disclosure made pursuant to
Article 8.b. of the Rules and Regulations of the Board
of Court Reporting of the Judicial Council of Georgia.)

---

**1**

```
1              UNITED STATES DISTRICT COURT
               EASTERN DIVISION OF KENTUCKY
2                 COVINGTON DIVISION
3
4    RACHELLE HENRY,            ) CIVIL ACTION
                                ) NO. 2:10-CV-00009
5                Plaintiff,     )
                                )
6         vs.                   )
                                )
7    DELTA AIRLINES, INC.,      )
                                )
8                Defendant.     )
     _____)
9
10                 DEPOSITION OF
11                  TAMMY DAVIS
12              December 8, 2010
13                 12:31 P.M.
14             1030 Delta Boulevard
                 Atlanta, Georgia
15
16
17         Jannette Price, RPR, CSR
18
19
20
21
22
23
24
25
```

---

**2**

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:
   KELLY MULLOY MYERS, Esq.
   Freking & Betz, PC
   525 Vine Street
   Cincinnati, Ohio  45202

On behalf of the Defendant:

   DAVID T. CROALL, Esq.
   Porter, Wright & Arthur, LLP
   250 East Fifth Street
   Suite 2200
   Cincinnati, Ohio  45202-5118

         - - -

---

**4**

1              TAMMY DAVIS,
2    having been first duly sworn, was deposed and testified
3    as follows:
4              EXAMINATION
5    BY MS. MULLOY MYERS:
6         Q.  Hi, we met a moment ago but, again, my name
7    is Kelly Myers, and I am an attorney representing
8    Rachelle Henry in a matter she has brought against her
9    former employer.  And the reason we asked you here today
10   is you have been identified as someone who might have
11   knowledge relative to those claims.  So the purpose of
12   this afternoon is to ask you some questions to find out
13   what you may know or what you may not know, okay?
14        A.  Yes.
15        Q.  Have you ever had your deposition taken
16   before?
17        A.  No.
18        Q.  Okay.  There are a few things that help the
19   proceedings go smoothly.  Jannette is a court reporter
20   and she is taking down what we are saying, verbatim.
21   And at the conclusion of the deposition, a written
22   transcript may be prepared.  So with that in mind, it is
23   important to remember to keep your answers verbal.
24        A.  Yes.
25        Q.  Nodding your head won't come across on the

Tammy Davis - 12/8/2010

5

1   transcript. Also, yes or no is better than umn-hmn or
2   uh-uh just because it is clearer on the transcript. It
3   is difficult to take down two people talking at once, so
4   if you can let me finish a question before you begin an
5   answer, that's helpful. Even if you know where I'm
6   going with it, let me get it all out before you begin to
7   speak, okay?
8       A.   Okay.
9       Q.   If you don't hear or understand a question
10  that I've asked, please ask me to repeat or rephrase it.
11  If you do answer a question, I'm going to assume that
12  you heard and understood it, okay?
13      A.   Yes.
14      Q.   If you need a break for any reason, just
15  let me know. The only thing I would ask with respect to
16  breaks is if there is a question pending, you answer
17  that one question before we adjourn.
18      A.   Understand.
19      Q.   And the first thing I'm going to have you
20  do is just verify your name, date of birth and address
21  for the record.
22      A.   Okay. My name is Tammy Davis. My address
23  is ████████, Newnan, Georgia 30265. Date of
24  birth, ████ 1966.
25      Q.   And were you also known as Tammy Mauer?

6

1       A.   Yes. I married last year.
2       Q.   Okay. Congratulations.
3       A.   Thank you.
4       Q.   And are you currently employed?
5       A.   Yes.
6       Q.   By Delta?
7       A.   Yes.
8       Q.   What's your date of hire?
9       A.   April 19th, 1986.
10      Q.   Okay. What's your current position?
11      A.   I'm a specialist in Revenue Protection Unit
12  within corporate security.
13      Q.   Okay. Let's see. So you -- did you go to
14  college?
15      A.   Yes.
16      Q.   When did you -- did you graduate?
17      A.   Yes.
18      Q.   When did you graduate?
19      A.   In -- hang on. In 19 --
20      Q.   Close to '86?
21      A.   '87.
22      Q.   In '87, okay.
23      A.   It was a two-year degree.
24      Q.   And what was your degree in?
25      A.   Medical Lab Technology.

7

1       Q.   Okay. Funny how that works, isn't it?
2       A.   Right.
3       Q.   Okay. I don't want to spend a tremendous
4   amount of time going through your career, but if we
5   could kind of hit briefly what you've done.
6           How long have you been in the RPU unit as a
7   specialist?
8       A.   About eight years.
9       Q.   So that takes us to about, what, 2002?
10      A.   Right. I wasn't necessarily a specialist
11  that whole time but it's within RPU.
12      Q.   Okay. And prior to that?
13      A.   I worked in revenue recovery, which was
14  also in finance. We did internal audits, more of a
15  compliance type audit.
16      Q.   Okay. How long were you there?
17      A.   About two years.
18      Q.   Okay. And prior to that?
19      A.   I worked at the Airport Global Assistance
20  Center.
21      Q.   And what's that?
22      A.   They handle calls coming in from the
23  airport and reservations, different divisions. If they
24  have a question about a procedure or policy, they would
25  call us and we would try to assist them.

8

1       Q.   And what was your job in that center?
2       A.   Answer the calls, so I would be assisting
3   the agents.
4       Q.   These were gate agents?
5       A.   Gate agents, ticketing agents, ramp agents,
6   cargo agents.
7       Q.   Okay. And how long were you in that role?
8       A.   Approximately four years.
9       Q.   And prior to that?
10      A.   Prior to that, I worked in reservations and
11  I was there about six months. And prior to that, I was
12  at the airport.
13      Q.   And what was your role at the airport?
14      A.   I worked -- I was a red coat passenger
15  service agent.
16      Q.   What's that, a red coat?
17      A.   Umn-hmn. They would --
18      Q.   You British or something?
19          MR. CROALL: That's what they called
20  them.
21          THE WITNESS: Right. That is what they
22  called them. Passenger service agent, we would
23  assist if there was some sort of a deal. If
24  somebody had a problem, we would try -- we were
25  problem solvers, and that was in the gate area.

Tammy Davis - 12/8/2010

3 (Pages 9 to 12)

9

1      I worked mainly the gates, the gate area.
2  BY MS. MULLOY MYERS:
3      Q.  Okay.  So if somebody was unhappy, the gate
4  agent could say, hey, come here and let you deal with
5  the problem?
6      A.  Right.  They would concentrate on getting
7  their flight out and getting their passengers on board
8  and I would try to handle that passenger myself.
9      Q.  Okay.  How long did you work in that role?
10     A.  Two years.
11     Q.  Okay.  And prior to that?
12     A.  Prior to that -- at the airport I also
13 worked the ramp.  I went from the gates to the ramp,
14 back up to the gates because they had a decrease in
15 staff for upstairs versus downstairs.  So we -- I just
16 flip flopped and then when they needed more people, they
17 -- I volunteered to come back up and work the gates.
18     Prior to working here in Atlanta, I worked in
19 Tampa as a ready reserve -- I take that back.  I was in
20 Tampa in cabin service, which was permanent, so we
21 cleaned the airplanes.  And then prior to that, I was a
22 ready reserve at the ticket counter gates in Tampa.
23     Q.  And what's that, a ready reserve?
24     A.  A ready reserve, it's not a permanent
25 position.  It's like -- we are reserved.  If they had

10

1  somebody call in sick or somebody on vacation, they
2  would use us, temporary type position.
3      Q.  Okay.  Any other jobs that you've held at
4  Delta?
5      A.  No.
6      Q.  And when did you move to Atlanta?
7      A.  In 1988, '87, somewhere around there.
8      Q.  So you were only in Tampa a year or two?
9      A.  Right, right.
10     Q.  Now, when you were at the airport working
11 gates and ramp and then gates, what position did you
12 hold in the gates area?
13     A.  In Atlanta here?
14     Q.  Yeah.
15     A.  I was -- I started out being a gate agent.
16     Q.  Okay.
17     A.  We would work the flights, meet the flights
18 in bound.  And then when I made passenger service agent,
19 we were still working in the gate area and we would
20 assist with flights.  But our primary function was to
21 handle passengers and assist the gate agents as needed.
22     Q.  Okay.  And how long were you a gate agent,
23 if you know?
24     A.  Approximately three to four years.
25     Q.  Okay.  All right.  What did you do to

11

1  prepare for this afternoon's deposition?
2      A.  I met with --
3      Q.  David?
4      A.  -- David.
5      Q.  Okay.  Other than counsel, did you talk to
6  anyone about your deposition?
7      A.  No.
8      Q.  Did you, on your own, outside of counsel's
9  presence, review any documents in preparation for your
10 deposition?
11     A.  Yes.
12     Q.  What documents did you review?
13     A.  The write-up that I completed.
14     Q.  From the interview with Ms. Henry?
15     A.  Correct.
16     Q.  Okay.  Any other documents?
17     A.  I reviewed my binder, which had the
18 documents in it.  When I go to an interview, I take a
19 blue binder with me with supporting documentation.  I
20 flipped through that.
21     Q.  Now, have you produced a copy of that blue
22 binder to counsel in this matter?
23     A.  Yes.
24     MS. MULLOY MYERS:  Okay.  Do you know if
25 that's been produced?

12

1      MR. CROALL:  Yes.
2  BY MS. MULLOY MYERS:
3      Q.  Okay.  And what kind of supporting
4  documentation did you have in the Henry matter in your
5  blue binder?
6      A.  In the blue binder, I normally take
7  anything that I should need to support me during the
8  interview.  There were PNR's, passenger records.  There
9  were gate removal lists, standby lists, copies of the
10 ethics report from the original tip that we received,
11 flight reports, as far as if the flight was on time, how
12 many passengers it went out with, things of that nature.
13 Oh, and keystrokes.  I apologize.  Keystrokes.
14     Q.  And what are keystrokes?
15     A.  Keystrokes are -- we can look at a certain
16 set address and pull every entry that was made in that
17 computer, the input and output.
18     Q.  Okay.  Anything else in your blue binder?
19     A.  There may be other things, but I can't
20 recall exactly what they are.
21     Q.  Okay.  Did you review any other documents
22 on your own in preparation for your deposition?
23     A.  No.
24     Q.  Do you have any documents in your
25 possession or under your control regarding the Henry

5f420198-d96a-4418-add2-79bff62a5ce3

Tammy Davis - 12/8/2010

---

13

1   investigation that you have not produced to counsel?
2      A.   No.
3      Q.   Do you have any documents in your
4   possession or under your control regarding George
5   Gergits that you have not produced to counsel?
6      A.   No.
7      Q.   What did you do to look for documents
8   regarding the Henry matter?
9      A.   In preparation for the interview?
10     Q.   No, now in preparation for litigation to
11  produce to counsel.
12     A.   Okay.  Could you repeat that?
13     Q.   Sure.  Were you asked -- did you -- you
14  provided some documents to counsel?
15     A.   Yes.
16     Q.   Okay.  What did you do to look for
17  documents to send to counsel?
18     A.   I brought my binder, the blue binder that I
19  had.  We keep those files with us.
20     Q.   Okay.
21     A.   I reviewed e-mails to make sure that I
22  didn't have anything that I needed to produce to them.
23     Q.   Okay.  So you did review your archived
24  e-mails?
25     A.   Yes, yes.  And if there was anything

---

14

1   regarding those two cases, I printed them and brought
2   them with me.
3      Q.   Okay.
4      A.   I believe that's it.
5      Q.   Okay.  Now, did you have a blue binder for
6   George Gergits as well?
7      A.   No.  They were in the same binder because
8   they were relevant to each other.
9      Q.   Okay.  How did you move into the RPU,
10  Revenue Protection Unit?
11     A.   I was interviewed.  I worked in Global
12  Assistance.  I was interviewed and went into their
13  revenue recovery area.  We did, like I told you earlier,
14  a compliance type based audit and they needed -- we were
15  -- RPU was formed out of that group, out of the
16  compliance group, and they asked me to go over to the
17  RPU area to assist with internal --
18     Q.   Oh, was -- I'm sorry.  I didn't want to
19  interrupt.  Was RPU formed after you had already been in
20  internal audits and compliance?
21     A.   Yes.
22     Q.   In your current position as specialist in
23  RPU, to whom do you report?
24     A.   Paulette Henderson.
25     Q.   And how long have you reported to

---

15

1   Ms. Henderson?
2      A.   For ten years.  My whole time being in
3   Revenue Recovery Protection.
4      Q.   What's Paulette's position?
5      A.   She's a manager, Revenue Protection Unit.
6      Q.   Is she located in Atlanta?
7      A.   Yes.
8      Q.   What are your duties as a specialist in
9   RPU?
10     A.   We handle any type of internal fraud,
11  including buddy passes, ticketing, voucher fraud.  We
12  also work credit card fraud.  That's mainly external
13  credit card fraud.
14     Q.   What do you mean "external credit card
15  fraud"?
16     A.   Not employees.  Non-employees using credit
17  cards to purchase tickets that is not an authorized
18  charge.
19     Q.   Anything else?
20     A.   We also do Sky Miles, audits and fraud with
21  fraud related issues.
22     Q.   Are those for employee investigations or
23  external?
24     A.   Both.  For Sky Miles it would be both.
25     Q.   Anything else?

---

16

1      A.   Not that I can think of.
2      Q.   Did you receive any training in conducting
3   investigations?
4      A.   Conducting investigations -- not formal
5   training.  A lot of the audits that we do are based off
6   of our experience.  So the important things would be to
7   know how the agents would, you know, create a ticket or
8   do an entry in the computer.  A lot of our function is
9   to review that.  Investigation-wise, we would learn how
10  to pull from other agents who have already worked in
11  that capacity, what documents to pull and to put in the
12  binder.  But it was basically -- we would learn from our
13  co-workers, no formal training.
14     Q.   Are there other specialists in RPU?
15     A.   Yes.
16     Q.   Do you know how many there are now?
17     A.   Six.
18     Q.   Has that been fairly consistent since 2008?
19     A.   Yes.
20     Q.   About six?
21     A.   For a couple of years, yes.  We've
22  decreased in staff a little bit, but ...
23     Q.   Okay.  Now, are you assigned a certain
24  geographic area, or how are you assigned investigations?
25     A.   We are not assigned geographic areas.  If

---

5f420198-d96a-4418-add2-79bff62a5ce3

**Tammy Davis - 12/8/2010**

17

1  we receive a tip, either our manager or we work amongst
2  each other to see who's working on it, if somebody has
3  something active they are working on or if somebody is
4  available to work an audit but nothing formal.
5      Q.  So it's kind of a rotating assignment?
6      A.  Right.
7      Q.  Now, you've alluded to receiving a tip, but
8  can you indicate how investigations begin?  What's the
9  catalyst for an RPU investigation?
10     A.  We could receive a tip several different
11 ways.  We could get information from station management,
12 HR, other corporate security reps.  We have an e-mail, a
13 generic e-mail that people can send in anonymous tips or
14 non-anonymous tips.  We also have a phone line that
15 people can call in and leave information.
16     Q.  Is that the ethics and compliance?
17     A.  It just changed.  We have both.  We have
18 both.  We were going to go under the ethics line, but
19 they kept us separate.  We have a separate line from
20 ethics.
21     Q.  What's your line called?
22     A.  It's the Revenue Protection Unit hotline, I
23 believe.
24     Q.  Okay.  Before we start talking about this
25 particular case of Ms. Henry, can you give me kind of an

18

1  overview of what the process is when you receive a tip
2  and an investigation is launched?  You receive some kind
3  of tip from one of these sources.  There's a rotating
4  assignment amongst the specialists.  Once that is
5  assigned, what happens, what's the process?
6      A.  The specialist working the case will review
7  the tip and go into different systems that we use to try
8  to validate the tip.  And if it requires to go interview
9  the employee, we will pull documentation, as much
10 supporting documentation as we can, to take with us.
11 And we will work with management and other corporate
12 security, if they are present in that airport, and try
13 to set up an interview time, and we would normally fly
14 to the station and conduct the interview.  If the tip is
15 not validated, then we just close it out, no action.
16     Q.  And how do you validate a tip?
17     A.  We would research the information to see if
18 the employee had done anything that appeared to be not
19 aboveboard.  And if it appears that everything was done
20 correctly, then we would close it out, no action.  But
21 if it was determined that something was done out of the
22 ordinary or not within policy, then we would continue
23 and hold documentation and interview the employee.
24     Q.  How long generally is the lapse between
25 receiving the tip and interviewing the employee?

19

1      A.  It varies.
2      Q.  Do you want that to happen as soon as
3  possible?
4      A.  Yes.
5      Q.  And why is that?
6      A.  Just to ensure that the employee would
7  remember, memory.  It's just -- and if they are doing
8  something that is not aboveboard, then we want to make
9  sure that we discuss it with them to see what the
10 employee would have to say.
11     Q.  Okay.
12         MS. MULLOY MYERS:  I apologize.  I need
13 to take a personal comfort break.
14         MR. CROALL:  That's fine.
15         (A recess was taken.)
16 BY MS. MULLOY MYERS:
17     Q.  All right.  So do you recall how you first
18 came to know or know of Ms. Henry, Rachelle?
19     A.  Yes.  I received information from HR, human
20 resources in Cincinnati and also corporate security in
21 Cincinnati.
22     Q.  And was the HR person Deb Kircher?
23     A.  It was.
24     Q.  And was corporate security Greg Kuhn?
25     A.  It was.

20

1      Q.  What information did you receive from
2  Ms. Kircher and Mr. Kuhn?
3      A.  The ethics report from -- I can't really
4  even remember the names, Zimmerman and --
5      Q.  Okay.
6      A.  I can't remember all the names, but the
7  ethics report that they had received there in the
8  station.
9      Q.  Was there an oral communication as well, or
10 did they just forward the ethics reports to you?
11     A.  I don't remember.  Not that I recall.  Just
12 e-mail.
13     Q.  Okay.  You received the ethics reports by
14 e-mail?
15     A.  Yes.
16     Q.  From both of them separately?
17     A.  I don't remember.
18         (Whereupon, the court reporter
19          marked Exhibits 1 and 2 for
            identification.)
20 BY MS. MULLOY MYERS:
21     Q.  I'm going to hand you what's been marked
22 Exhibits 1 and 2.  If you could, take a moment and
23 review those and let me know if you can identify them.
24     A.  I recognize this one.
25     Q.  Exhibit 1, okay.

Tammy Davis - 12/8/2010

21

1    A.  Exhibit 1.  But I'm unsure whether this was
2  the other one.
3    Q.  Exhibit 2.  Okay.  So you do recognize
4  Exhibit 1 and you're not sure about Exhibit 2?
5    A.  Correct.
6    Q.  Okay.  Did you receive more than one Ethics
7  and Compliance Report from CVG?
8    A.  Yes.
9    Q.  Okay.  How many did you receive?
10    A.  I believe two.
11    Q.  Okay.  So Exhibit 2 may have been the
12  second report that you received; you just don't know as
13  you sit here today?
14    A.  Correct.
15    Q.  What did you do upon receipt of the two
16  Ethics and Compliance Reports?
17    A.  I began looking at the flight for Zimmerman
18  and looking at George Gergits' travel, non-travel and
19  tried to pull the reservations, PNR's to get more
20  information.
21    Q.  And the PNR is the --
22    A.  Passenger Name Record.
23    Q.  And what were you looking for?
24    A.  I was looking for support for this
25  allegation about George Gergits asked Agent Henry to

22

1  clear him in first class.
2    Q.  Is there any policy that states non-revenue
3  passengers cannot be assigned to first class?
4    A.  No.
5    Q.  Okay.  So what policy would have been
6  violated if a non-rev passenger had been cleared into
7  first class?
8    A.  If the non-rev passenger was not properly
9  handled, if the standby list was not cleared correctly,
10  and if first class was not available.
11    Q.  And how is the standby list to be cleared?
12    A.  There's an order.  The standby list gets
13  put into a certain order based on revenue passengers
14  and, of course, they would come first.  And, again,
15  there's an order within that based on the -- they could
16  be a Sky Miles member if they were a misconnect
17  passenger, if they missed their connection flight, and
18  there's also a level between non-revenue, if they are
19  traveling on a vacation pass or based on their
20  seniority.
21    Q.  So what is the order amongst revenue
22  passengers first on that list?
23    A.  First off, you would have your confirmed
24  passengers that don't have a seat.  We call them HK's,
25  hold confirmed.  That would be the first people that

23

1  would need to be cleared.
2    Q.  And what kind of passenger would that be?
3  Somebody who had purchased a first class seat?
4    A.  No.  An HK could be first or coach, if they
5  were holding a confirmed seat on that particular flight
6  and they were awaiting a seat.
7    Q.  Okay.
8    A.  So if the flight does not have any more
9  seats to assign let's say to the ticket counter, they
10  would put them on the airport standby list, and the gate
11  agent would know the HK would be that they're -- they
12  actually hold confirmed space on that flight, but they
13  don't have a seat assignment yet.
14    Q.  Okay.  So they are number one.
15    A.  After that, I don't -- I'm not a hundred
16  percent sure how it goes after that.
17    Q.  Okay.  Now, are certain passengers offered
18  complimentary upgrades to first class, if it is
19  available?
20    A.  Yes.
21    Q.  What passengers are those?
22    A.  It would be our elite flyers.
23    Q.  And what's an elite flyer?
24    A.  It's our upper level Sky Miles members.
25    Q.  That have flown some designated number of

24

1  miles?
2    A.  There is a criteria.  I'm not sure what it
3  is, but they've gotten to a certain level in the Sky
4  Miles program that would give them the opportunity to
5  upgrade on flights, if it was available.
6    Q.  Okay.  Now, do those elite members have to
7  request the upgrade, or are they automatically in the
8  cue for an upgrade?
9    A.  They have to be placed on the airport
10  standby list.  They would request a segment to be booked
11  and then they get placed on the airport standby list.
12    Q.  So how are they placed on the airport
13  standby list?
14    A.  When they check in the day of the
15  departure, when they check in at the ticket counter, or
16  wherever they may check in, they would place them on the
17  standby list that day.
18    Q.  Who, the gate agent, or would they check
19  with the passenger?  I guess what I'm asking is, is it
20  an automatic if an elite flyer comes, checks in, and by
21  virtue of them being an elite flyer, are they
22  automatically placed on that standby list?
23    A.  No.
24    Q.  The passenger has to say, hey, can I get on
25  the standby list?

5f420198-d96a-4418-add2-79bff62a5ce3

Tammy Davis - 12/8/2010

25

1  A.  Yes.
2  Q.  Okay.  And then if the first class or the
3  -- I'm sorry.  If the revenue passengers are seated and
4  there's available first class seats, then you move to
5  the non-rev standby list?
6  A.  Including the upgrades for the Sky Mile
7  members, yes.  You would clear revenue standbys first
8  and then non-revenue after that.
9  Q.  All right.  Is there a policy -- are there
10  any policies that speak to whether or not the agent has
11  to upgrade a standby passenger who has already boarded
12  the plane in coach?
13  A.  Not that I am aware of.
14  Q.  Okay.  Are there passengers who might be
15  eligible for upgrade but who choose to go ahead and
16  board the plane instead of waiting in the gate area to
17  see what happens with an upgrade?
18  A.  I would think so, yeah.  That could happen.
19  Q.  Maybe they get their luggage space and go
20  ahead and get seated.
21  A.  Right.  That makes sense.
22  Q.  Okay.  Particularly when people call, you
23  know, bags like mine a carry-on.
24  A.  Right.
25  Q.  Now, I've heard a lot of testimony about a

26

1  waiver and favor policy.  Are you familiar with that, or
2  have you heard of that term?
3  A.  Yes.
4  Q.  Waivers and favors?
5  A.  Umn-hmn.
6  Q.  And is there a written waiver and favors
7  policy that you are aware of?
8  A.  Yes.  That would be "Simply Good Business."
9  Q.  Okay.
10  A.  We call it SGB.  You may hear it termed
11  like that.
12  Q.  Okay.  So the waiver and favor policy is
13  within the Simply Good Business policy?
14  A.  Yes, it's one and the same.
15  Q.  And what does it say?  What's the policy
16  with respect to waivers and favor?
17  A.  I don't know exactly what the verbiage is,
18  but it basically states that an employee cannot make a
19  waiver or favor for someone they know for gain.
20  Q.  For gain?  What's the gain?
21  A.  Any type of personal gain.
22  Q.  Okay.  And what would be included in
23  personal gain?
24  A.  Several things, money.  I'm sure there's
25  others.

27

1  Q.  Okay.
2  A.  Any type of gain that ...
3  Q.  Okay.  Do gate agents have discretion to
4  hold seats in first class in the event they are needed
5  in the boarding process?
6  A.  What do you mean by "hold"?
7  Q.  To hold them open before they seat the
8  standby list.
9  A.  First class?
10  Q.  Yes.
11  A.  No.
12  Q.  There's no discretion on the agent's part
13  to do that?
14  A.  To hold seats in?
15  Q.  Yes.
16  A.  No.
17  Q.  And where is that policy?  Is there a
18  policy that prohibits that?
19  A.  Not that I'm aware of.  First class is
20  normally not allowed to be overbooked, so there would
21  really be no need to hold any seats.
22  Q.  Well, do gate agents sometimes use first
23  class seats to assuage passengers that might be having a
24  problem or missed a flight or sitting besides somebody
25  who's larger than the seat accommodates?

28

1  A.  Normally, no.  Delta does not like to use
2  first class for that type of purpose.  It's not a
3  service.
4  Q.  Does it happen, though?
5  A.  It could.
6  Q.  Is it a practice in the boarding areas?
7  A.  I don't know.
8  Q.  Now, do gate agents have discretion to move
9  seats around to accommodate passengers or move seating
10  to accommodate passengers for things like traveling with
11  family or traveling with small children or needing a
12  bulkhead seat for some injury or something?
13  A.  Yes.
14  Q.  And what is the gate agent's authority or
15  discretion to be able to do that?
16  A.  They could move people around.  The gate
17  agent has blocked seats in coach that are --
18  Q.  They are what?
19  A.  They are blocked seats.  Other agents do
20  not have access to their seats.  They are just -- they
21  are blocked only for gate agent use for that type of
22  purpose.  If there were a family that should approach
23  the gate agent that may need to be seated together, any
24  type of situation like that, the gate agent has the
25  ability to assign the blocked rows where other agents

5f420198-d96a-4418-add2-79bff62a5ce3

Tammy Davis - 12/8/2010

29

1  would not.
2  Q.  Is it desirable that a gate agent be
3  proactive and aware of circumstances that might arise
4  during the boarding process, be proactive to try to
5  solve those problems so the flight could get boarded on
6  time and out on time?
7  A.  What type of situation?
8  Q.  Well, to take a look at their passenger
9  list and try to anticipate any needs that the passengers
10  might need with respect to boarding requirements.
11  A.  Yes, it would be desirable.
12  Q.  Okay.  So if the gate agent starts the
13  process by looking at the passenger list and sees that
14  there are family members that are in four different
15  areas of the plane, that the agent could proactively
16  take steps to try to move those families together,
17  particularly if there are children, before the
18  passengers arrive at the gate and start the boarding
19  process?
20  A.  Yes.
21  Q.  I take it that it's important that the
22  flight gets out on time?
23  A.  Yes.
24  Q.  How important is it that that happens?
25  A.  Very important.

30

1  Q.  Okay.  So you said upon receipt from CVG of
2  the Ethics and Compliance Reports, you began looking for
3  support regarding the allegation.  Do you recall what
4  specifically you did?  What was the first thing that you
5  did?  And I'd like to kind of walk through the steps of
6  the process that you took with respect to this Henry and
7  Gergits' investigation.
8  A.  I don't remember the first thing I did, but
9  normally in this situation, you would pull anything
10  pertinent to what's said here.  I believe I looked at
11  Gergits' non-revenue travel.  We have a system where we
12  can go in and pull all their non-revenue travel, based
13  on their employee number, and found a flight leaving on
14  the 8th of June and began looking at that.  I pulled
15  reservations to verify what happened and where they
16  checked in, what time they checked in, and what seats
17  they were assigned.
18  Q.  And what did you learn?
19  A.  Can you clarify that?
20  Q.  Yeah.  When you pulled the documents, what
21  were you looking for and what did you learn?
22  A.  I learned from Gergits that he did travel
23  on the flight to San Diego, and I pulled the reservation
24  and noticed that he was -- I believe they were
25  originally cleared in coach and then cleared in first

31

1  class.
2  Q.  Okay.  What else did you notice initially?
3  A.  Well, that -- with them being cleared in
4  coach and then put back on the standby list and cleared
5  in first class, it made me want to look a little
6  further.  And I believe I asked the station management
7  to get me the set addresses for the computers that are
8  at the gate that flight left from and requested that
9  keystrokes be pulled.
10  Q.  And what are set addresses?
11  A.  The computer -- each Delta computer has a
12  name, has a set address specific to that, and I asked
13  for the set addresses from the gate, the flight from
14  Cincinnati to San Diego left from.
15  Q.  Okay.  Who did you ask to pull that
16  information?
17  A.  We had to go through Worldspan, which is
18  our computer system.  At that time, we did not have the
19  ability to do it ourselves.
20  Q.  Okay.  And did you receive those documents?
21  A.  Yes.
22  Q.  And then what did you do?
23  A.  I looked through -- there are multiple
24  sets.  I can't remember if there were two or three.  I
25  reviewed the keystrokes to see the entries that the

32

1  agent made around the time that the flight was leaving.
2  Q.  And what did you see?
3  A.  I noticed that there were -- was a
4  reservation booked and there were three first class
5  seats that were hung in the system.
6  Q.  A reservation booked for who?
7  A.  The name eventually put on the reservation
8  was CVG Port.
9  Q.  Okay.
10  A.  That was not put on initially, I don't
11  believe.
12  Q.  And what does it mean for a first class
13  seat to be hung?
14  A.  An agent can go into Delta reservations and
15  book a segment -- in this case was it first class -- and
16  without ending the record, it will pull the seats out of
17  inventory so that they cannot be used.  And if you don't
18  end the record, there's no history of that in our PNR
19  database.
20  Q.  What's ending the record?
21  A.  You have to ER or E to end.
22  Q.  And what does that do?
23  A.  It creates a reservation and it also gives
24  history credits of who created it, what time.
25  Q.  And will agents make CVG protect seats for

Tammy Davis - 12/8/2010

33

1    purposes of -- I mean, just their activities in boarding
2    a flight and getting a flight off, right?
3        A.  No.
4        Q.  Did you talk to any agents to see if that
5    was a practice at CVG?
6        A.  No.
7        Q.  Is there any policy that would prohibit
8    that?
9        A.  Not that I'm aware of.
10       Q.  Okay.  You mentioned that because the
11   Gergits were cleared in coach and then cleared in
12   full -- first class -- I know.  I keep wanting to call
13   it full class.
14       A.  Same thing.
15       Q.  So let me back up.  You mentioned that
16   because they were initially cleared in coach and then in
17   first class, that made you want to look a little
18   further.  What about that made you want to look further?
19       A.  That just seemed -- it raised more
20   questions on my part as to why -- what created the
21   reason for her to put them back on the standby list and
22   put them in first class.
23       Q.  And does that sometimes happen where people
24   are waiting to see what happens with the standby list?
25       A.  Yes, that could happen.

34

1        Q.  Whether it be rev or non-rev passengers?
2        A.  Correct.
3        Q.  They go ahead and they basically get their
4    seats in coach, but they continue to wait to see if
5    something eventually opens up in first class.  Is that
6    essentially what's happening there?
7        A.  Revenue or non-revenue?
8        Q.  Either one.
9        A.  Revenue, I would say yes; non revenue, if
10   you get a seat, you would normally board.
11       Q.  But could you wait to see what happened
12   with the standby list if you were not revenue?
13       A.  You could.
14       Q.  All right.  Do you recall anything that you
15   gleaned from your review of the keystrokes?
16       A.  What do you mean by "gleaned"?
17       Q.  Learned.
18       A.  There was a passenger that was downgraded
19   from first class to coach, which wanted me to look more
20   into that.
21       Q.  Did you look more into that?
22       A.  Yes.
23       Q.  And what did you find?
24       A.  The documentation in the record was that
25   the passenger requested to be moved from first class to

35

1    coach to sit next to their companion.
2        Q.  Okay.  And is that reasonable?
3        A.  Yes.
4        Q.  Does that happen?
5        A.  It happens.  Not very often, I'm sure.
6        Q.  Well, somebody would rather sit with a
7    companion than fly by themselves in a different part of
8    the plane.
9        A.  Possibly.
10       Q.  Did you learn anything else in your review
11   of the keystrokes and the -- what else did you call it,
12   the set address?
13       A.  Keystrokes and the set addresses?
14       Q.  Yes.
15       A.  I'm sure I did, but I can't remember many
16   specifics.
17       Q.  Okay.
18       A.  It's a very lengthy document.
19       Q.  What, the keystrokes?
20       A.  Yes.
21       Q.  Okay.  Well, was there anything that caused
22   you concern in your review of the keystrokes, other than
23   that you saw that the Gergits' family had initially
24   cleared in coach and then cleared in first class and the
25   passenger who had moved from first class to coach?

36

1        A.  The thing that was concerning me was the
2    hung seat entry.
3        Q.  Okay.  Anything else?
4        A.  That, besides the revenue passenger moving
5    from first to coach and the seats being changed for the
6    Gergits, nothing I can think of.
7        Q.  Okay.  Did you -- then how did you find out
8    that the passenger moved to coach to sit with a
9    companion?
10       A.  I pulled the reservation for that
11   particular passenger on that flight and it was
12   documented in the remarks area of the record.
13       Q.  And who documented it in the remarks area
14   of the record?
15       A.  I don't remember.
16       Q.  Okay.  Okay.  So then what did you do next?
17       A.  After when?
18       Q.  After you reviewed the keystrokes.
19       A.  I'm sure I pulled more reservations.  I
20   don't remember exactly what I did next after that.  I
21   would pull whatever documentation I would need by
22   looking at the keystrokes.
23       Q.  Okay.  And then what happened?  You got
24   your documentation pulled and then --
25       A.  After seeing that the seats were hung, I

## Tammy Davis - 12/8/2010

**37**

1 notified management and corporate security of that and
2 that it appeared like I would need to schedule an
3 interview with the employee to discuss.
4    Q.  Okay. Who in management did you notify?
5    A.  In this case, I believe, I went to Greg
6 Kuhn in corporate security and he would get with human
7 resources and management to pick a date that we could
8 all be available to schedule the interview. Since he's
9 located in Cincinnati, it was easier for him to do it.
10    Q.  Okay. And Greg's in corporate security?
11    A.  Correct.
12    Q.  Was there anyone in management that you
13 discussed the need for an interview with or your
14 decision that you were going to interview?
15    A.  Not that I recall. I didn't discuss that
16 directly with management.
17    Q.  Okay. So was your communication with Greg
18 just oral communication?
19    A.  I don't remember.
20    Q.  Okay. And at that point, did you just
21 basically say, what, I'd like to schedule interviews?
22    A.  If I stated that -- I let them know that I
23 found that she had hung seats and that it appeared that
24 I needed to come talk to her to get an explanation and
25 that we needed to schedule an interview date.

**38**

1    Q.  How often are hung seats in the system?
2    A.  I don't know.
3    Q.  Did you talk to any other agents to -- gate
4 agents to find out how hung seats would occur or what
5 purposes might be for a hung seat?
6    A.  No.
7    Q.  Now, were you going to talk to anyone other
8 than Ms. Henry? Were you planning on talking to anyone
9 other than Ms. Henry?
10    A.  Yes, George Gergits.
11    Q.  All right. And then you came to CVG?
12    A.  Yes.
13    Q.  And you interviewed Henry and Gergits?
14    A.  Yes.
15    Q.  Did you interview anyone else?
16    A.  No.
17    Q.  Did you ever talk to Patsy Zimmerman about
18 the complaint that she had filed?
19    A.  No.
20    Q.  Do you know if anyone did?
21    A.  I don't know.
22    Q.  Did you direct anyone to?
23    A.  No.
24    Q.  Had a local investigation been conducted
25 regarding the Gergits' flight?

**39**

1    A.  I believe so.
2    Q.  And how did you learn that?
3    A.  I don't know if it's the same time, but I
4 received the statements from other agents and also
5 Ms. Henry's statement regarding the matter while I was
6 doing my investigation.
7    Q.  Before the interviews?
8    A.  Yes.
9    Q.  What statements did you review from other
10 agents?
11    A.  There were other agents. I don't remember
12 their names, that were stating there was some misconduct
13 on the flight to San Diego and also the statement from
14 Ms. Henry regarding that.
15    Q.  Were these written statements from other
16 agents?
17    A.  I believe that they were written and typed.
18    Q.  And what do you recall that they said? Do
19 you recall anything specifically that they said?
20    A.  No.
21    Q.  Were there any statements from agents who
22 said -- that they didn't believe there was any problem
23 on the flight?
24    A.  Not that I remember.
25    Q.  So was it a handwritten statement from

**40**

1 Ms. Henry that you reviewed?
2    A.  I believe her statement was typed.
3    Q.  I'm going to hand you what's previously
4 been marked Rachelle Henry Exhibit 11. Is this the
5 statement that you reviewed from Ms. Henry prior to
6 coming to CVG for interviews?
7    A.  It appears to be the same type but, I mean,
8 I'm not sure this is the same statement.
9    Q.  Do you recall another statement?
10    A.  I don't recall the part about "as current
11 policy dictates." I don't recall that being in there.
12 I recall that she was working the flight and needed
13 assistance. I don't remember if this was the same one
14 or not. It appears the same type, but ...
15    Q.  The same type, you mean the typeface?
16    A.  The font and the --
17    Q.  Right.
18    A.  Yes.
19    Q.  Is that something that's done at the
20 airport terminals?
21    A.  It appears to be from that, yes.
22    Q.  Okay.
23    A.  From the computer at the airport in Delta
24 terminal.
25    Q.  Okay. Is there any policy that requires an

5f420198-d96a-4418-add2-79bff62a5ce3

**Tammy Davis - 12/8/2010**

41

1  agent to fill all the first class seats before a flight
2  departs?
3      **A.   Not that I'm aware of.**
4      Q.   Did you have any reason to disbelieve that
5  there was a heavy passenger load on this flight?
6      **A.   Not to disbelieve it.  At that point, I**
7  **don't know if I knew that there was.  That would be**
8  **something that I would research.**
9      Q.   And did you?
10     **A.   Yes.**
11     Q.   And was there?
12     **A.   The flight had approximately 20 open seats**
13  **in coach.**
14     Q.   And how many seats were filled?
15     **A.   How many seats were filled when it left?**
16     Q.   Yes.
17     **A.   I don't know the exact amount.**
18     Q.   Did you have any reason to disbelieve that
19  there was an extensive list of seat change requests?
20     **A.   I wouldn't know if there were a list of**
21  **seat change requests.  That would normally be something**
22  **the gate agent would handle.**
23     Q.   Okay.  And do requests for seat changes
24  take time for the gate agent to handle?
25     **A.   Yes.**

42

1      Q.   Particularly if the gate agent is the only
2  one working that departure?
3      **A.   It would take any agent time to change a**
4  **seat.**
5      Q.   Okay.  What's an AQQ fix?
6      **A.   That is an entry to reconcile a flight or a**
7  **seat.**
8      Q.   So when does an agent have to do that?
9      **A.   There's multiple reasons why an agent would**
10  **have to do that.  One reason would be if the seat was**
11  **designated as blocked or broken, the computer will**
12  **sometimes require you to AQQ fix the seat.  Also, if**
13  **there is an equipment change on a flight, sometimes the**
14  **computer would make you AQQ fix a whole flight, if there**
15  **was an equipment change.**
16     Q.   Does that mean hold the seat open?
17     **A.   It's to reconcile -- sometimes, in laymen's**
18  **terms, the computer would get confused, you know, if a**
19  **seat was broken or fixed or blocked or whatever, or if a**
20  **flight had changed equipment, a different configuration,**
21  **the AQQ fix would basically fix it.**
22     Q.   Okay.  And does that take an agent's time
23  to do that, perform an AQQ fix on the seats?
24     **A.   You would have to make that entry.  Yes, it**
25  **would take time.**

43

1      Q.   Okay.  And does that agent have to figure
2  out why that AQQ fix is coming up on the system in order
3  to fix it properly and handle it properly?
4      **A.   Say that again.**
5      Q.   Sure.  Would an agent need to figure out
6  why that AQQ fix was popping up on the system?
7      **A.   Sometimes.**
8      Q.   In order to address it?
9      **A.   Yes.**
10     Q.   Okay.  Was there a last-minute connection
11  of 12 passengers from a Flight 6163?
12     **A.   I don't know.**
13     Q.   Okay.  Do last-minute connections create
14  boarding challenges for the gate agent?
15     **A.   Yes.**
16     Q.   What are those challenges?
17     **A.   You would have to ensure you have all the**
18  **passengers.  You can pull up connection lists to see if**
19  **a flight was late and at that point, you would get word**
20  **whether to hold the flight or not and then you would try**
21  **to get all the passengers on that list.**
22     Q.   Does dealing with an activity like that
23  take priority over upgrading the standby list?
24     **A.   I don't know if it would take priority**
25  **because you'd want to handle the standby list.  I mean,**

44

1  **that would be your primary function, and then you would**
2  **-- the passengers would show up.  When they did, you**
3  **would just account for them or ask another passenger, is**
4  **there anyone else behind you?  It's really not a formal**
5  **thing.**
6      Q.   Okay.  Is it fair to say that priority is
7  to get the flight off on time as opposed to upgrading
8  passengers on a standby list?  It would be more
9  important to get the flight off on time than going
10  through the entire standby list?
11     **A.   I don't know if I would say that.**
12     Q.   Okay.
13     **A.   I think it would be close to equally**
14  **important.**
15     Q.   Does a gate agent -- are they subject to
16  any kind of discipline for failing to clear a flight on
17  time or get a flight departed on time?
18     **A.   I don't know.**
19     Q.   Is that a performance measure of the gate
20  agents, their departed flight being off on time?
21     **A.   I'm not a hundred percent sure.  I'm sure**
22  **that's part of their job responsibility.**
23     Q.   Did you review whether there was a policy
24  that dictated that once eligible Medallions had boarded
25  the aircraft, they were no longer considered for upgrade

Tammy Davis - 12/8/2010

12 (Pages 45 to 48)

45

1  possibilities?
2      A.  Could you say that again?
3      Q.  Did you investigate or research whether
4  there was a policy at CVG that indicated once eligible
5  Medallion flyers had boarded the aircraft in coach, they
6  were no longer considered for upgrade possibility?
7      A.  I did not research that beforehand.  I
8  believe Ms. Henry stated that in the interview.
9      Q.  Okay.  Did you research it at any point?
10     A.  After the fact, yes.
11     Q.  And how did you research that?
12     A.  I went in -- I'm sorry.  Were you done?
13     Q.  Yes.
14     A.  Okay.  I went into our standard practice or
15  general reference system and tried to research whether
16  there was anything documented stating that that was the
17  case.
18     Q.  And what did you find?
19     A.  There was a document.  I can't recall if it
20  was a bulletin or how it was stated, but it -- that said
21  that if a Medallion passenger did board the airplane,
22  they were no longer eligible.
23     Q.  Okay.
24     A.  Something to that effect.
25

46

1              (Whereupon, the court reporter
2              marked Exhibit 3 for
3              identification.)
4  BY MS. MULLOY MYERS:
5      Q.  I'm going to hand you what we've marked
6  Exhibit No. 3, part of the paperwork and documentation
7  of the Henry and Gergits investigation.  Did you receive
8  a copy of this document, which is titled "Irregularity
9  Report?"
10     A.  I don't remember.  This does not -- I don't
11  remember.
12     Q.  Okay.  What is an Irregularity Report; do
13  you know?
14     A.  I don't.
15     Q.  Did you talk to Sam Tumminello at all about
16  the San Diego flight that was at issue?
17     A.  I did not talk to Sam.
18     Q.  Do you recall any other documents that you
19  reviewed before coming to CVG for the interviews?
20     A.  I don't recall anything else.
21     Q.  Okay.  Did you review any notes from Deb
22  Kircher regarding any investigation she had done or
23  folks that she had talked to?
24         MR. CROALL:  Before the interviews?
25  BY MS. MULLOY MYERS:
25     Q.  Before the interviews.

47

1      A.  Not that I'm aware of.
2      Q.  Did you review any notes of Deb Kircher's
3  at any point in the investigation?
4      A.  No.
5      Q.  Regarding anything that she may have done
6  as part of an investigation, talking to people or
7  gathering information?
8      A.  No.
9      Q.  Okay.  Other than talking to Greg Kuhn and
10  basically saying, I'd like to schedule these interviews,
11  will you facilitate that process, did you talk to anyone
12  else at CVG prior to coming in for the interviews?
13     A.  No.
14     Q.  Did you talk to anybody in your management
15  structure about this investigation prior to going for
16  the interviews?
17     A.  Yes.  I would normally let my manager know
18  of any interviews that may be coming up and what it
19  entails, just a basic outline of what it is.
20     Q.  Do you recall having done that in this case
21  or was that just your standard operating procedure?
22     A.  I don't recall doing that in this case, but
23  that is our standard.
24     Q.  Okay.  So you don't recall any substance of
25  discussions that you might have had with your management

48

1  about the investigation up until the point you went for
2  the interviews?
3      A.  No.
4      Q.  Okay.  So you went to CVG?
5      A.  Umn-hmn.
6      Q.  And what happened when you got there?
7      A.  I met with -- Greg normally meets us off
8  our airplane and he escorted me to -- where we would
9  have the interview.  And I believe that was -- I don't
10  know if Deb was already there, but she would normally
11  meet us there and the station manager was there.
12     Q.  And the station manager being Gary
13  Schmidberger?
14     A.  Yes.
15     Q.  Okay.  Was this, what, basically a
16  conference room, someplace in the airport?
17     A.  Yes.
18     Q.  So you got to the conference room and what
19  happened?
20     A.  I would normally review the documents
21  briefly with them and let them know what I would be
22  presenting to the employee.
23     Q.  Okay.
24     A.  And then they would get the employee and
25  the interview would begin.

5f420198-d96a-4418-add2-79bff62a5ce3

49

1    Q.   And do you recall what you discussed prior
2  to the interviews in the conference room?
3    A.   I advised that I did find that there -- I
4  showed the keystrokes where they were -- that the seats
5  were hung in the computer and that Gergits and his
6  family were cleared in the seats.  And we would just
7  review the documents that I have in the binder but
8  specifically about the hung seats.
9    Q.   Anything else that you recall discussing in
10  the conference room prior to interviewing the employees?
11    A.   Not that I recall.
12    Q.   So who was interviewed first?
13    A.   Rachelle.
14    Q.   And do you recall that she had already left
15  for the day?
16    A.   I don't recall that.
17    Q.   Do you recall if she came in from home?
18    A.   I don't recall.
19    Q.   Did she mention any child care arrangements
20  she had to make to come in for this interview?
21    A.   Not that I remember.  I don't remember
22  that.
23    Q.   How long did the interview last?
24    A.   I don't remember exactly how long, but they
25  would normally last one to two hours.  But in this case,

50

1  I don't remember specifically.  It didn't seem like it
2  was shorter or longer than normal.
3    Q.   Do you recall Ms. Henry indicating that a
4  child had missed a medical appointment while she was in
5  the interview?
6    A.   I don't remember that.
7    Q.   Do you take handwritten notes during the
8  interview?
9    A.   Sometimes.
10    Q.   Did you in the Henry interview?
11    A.   I will normally type up some standard
12  questions that I ask and I will take that with me just
13  to -- in case I get off track, I know, you know, which
14  questions I need -- normally would ask.  And in this
15  case, I would have that.  I believe there were a couple
16  of things written on that form, but it's --
17    Q.   And did you maintain that form?
18    A.   Yes.
19    Q.   Where is that form?
20    A.   It was in my binder.
21    Q.   So what does that form look like?
22    A.   It's just a Word document with eight or ten
23  questions on it.
24    Q.   And then is there handwriting on it?
25    A.   I believe I had some handwriting on it.

51

1    Q.   Okay.
2    A.   But sometimes I would remember what's --
3    Q.   And you believe that you produced that to
4  counsel?
5    A.   Yes.
6    Q.   So what do you recall about the meeting
7  with Ms. Henry?
8    A.   Ms. Henry came in and we asked her --
9  normally we will ask if they know why they are there and
10  she did not.  She seemed kind of defensive, but Greg
11  advised her why we were there.  And I proceeded going
12  through the binder and her keystrokes and asked her why
13  she hung the three first class seats.
14    Q.   And what did she say?
15    A.   She said she didn't know why she did that,
16  something to that effect.
17        MR. CROALL:  Bathroom break?
18        MS. MULLOY MYERS:  Sure.
19        (A recess was taken.)
20  BY MS. MULLOY MYERS:
21    Q.   What else do you recall about the interview
22  with Ms. Henry?
23    A.   We discussed the keystrokes mainly in the
24  interview and she didn't remember why she had done that.
25  We discussed if George Gergits had asked her to ensure

52

1  he made first class and his family made first class.
2  She said that she only remembered that he asked her how
3  the flight looked, if they were going to make it.  We
4  talked about -- that she was at the gate by herself,
5  that someone came up to help her towards the end of
6  the flight, and we talked about the downgrade of the
7  first class passenger to coach and why that happened.
8        And she changed a seat from a first-class
9  passenger.  The flight had started in another city, came
10  to Cincinnati and then was continuing to San Diego.  It
11  was a through flight, and she had moved a through
12  passenger from first class.  She had changed their seat
13  and that was something that I was curious to know more
14  information about and so I asked her why she changed
15  that through passenger first-class seat, and I believe
16  she did it before the flight even arrived in Cincinnati,
17  so I was wondering how she knew the person wanted to
18  change their seat.
19    Q.   What did she say?
20    A.   I don't remember exactly what she said to
21  that.  I believe she said that he requested it, but then
22  I told her that he -- it was done before the flight
23  arrived in Cincinnati.
24    Q.   Or was it so that he could have a single
25  seat and she was trying to get other peoples' seats

5f420198-d96a-4418-add2-79bff62a5ce3

Tammy Davis - 12/8/2010

14 (Pages 53 to 56)

53

1  together?
2      A.   I don't know.
3      Q.   All right.
4      A.   And we also talked about the revenue
5  upgrade standby passengers that were on the list,
6  standby list, and why they were not cleared in the
7  available first class seats, and she stated that they
8  had already went on board.  And I had asked her if she
9  had had any discussion with them or made an announcement
10  that there would be a possibility for first class, and
11  she said that if she talked to them, that she would tell
12  them it was possible to make first class, but she -- I
13  asked her if she asked them to wait out in the gate area
14  and she said she doesn't normally do that.
15      Q.   Is there any policy that requires a gate
16  agent to ask the Medallion members to wait in the gate
17  area?
18      A.   I don't know of a policy, but it's based on
19  experience as a gate agent.  We would normally say -- if
20  there's a chance, we'd say, just wait here in the gate
21  area and we'll see.
22      Q.   So some agents might do that and some
23  agents might not?
24      A.   I guess.
25      Q.   What else do you recall about the

54

1  interview?
2      A.   I don't remember any other specifics of the
3  interview with Ms. Henry.
4              (Whereupon, the court reporter
5              marked Exhibit 4 for
              identification.)
6  BY MS. MULLOY MYERS:
7      Q.   Let me hand you what we've marked
8  Exhibit 4.  Take a moment and look at that and let me
9  know if you can identify it.
10      A.   Yes.  This is a write-up that I would do
11  when I returned or after the interview with the
12  employee -- of an employee.
13      Q.   So you are the author of this document?
14      A.   I am.
15      Q.   Okay.  Did Rachelle Henry receive any
16  monetary benefit from the Gergits' seating on this
17  flight?
18      A.   I don't know.
19      Q.   Did you ever ask what personal gain she may
20  have gotten from the seating on this flight?
21      A.   I don't remember if I asked that question.
22      Q.   You state about midway down on the first
23  page that revenue loss for the three first class seats
24  was $4,197; is that accurate?
25      A.   That is a figure that our area -- there is

55

1  a procedure that we use -- if it's booked in first
2  class, we would use the first class full fair.  If it
3  were booked in coach, we would use the coach full fair.
4  It's just a consistency within our area.  In this case,
5  she did book F class when she hung the seats, which
6  would mean that they were in first class.
7      Q.   Well, if Medallion members had been
8  upgraded, they would have been upgraded for free,
9  correct?
10      A.   Not necessarily.  They would still pay
11  revenue for their ticket.
12      Q.   Right.  But would a change from coach to
13  first class on those Medallion flyers garner any more
14  revenue for the company?
15      A.   Not necessarily.
16      Q.   Because the upgrade's complimentary for
17  those folks?
18      A.   Right.  They receive it for being a high
19  elite flyer.
20      Q.   Right.
21      A.   Right.
22      Q.   And was anyone denied boarding on this
23  flight because there weren't available seats?
24      A.   Not that I'm aware of.
25      Q.   So everyone that wanted to get on this

56

1  flight got on the flight?
2      A.   I believe so.
3      Q.   Do you recall Ms. Henry stating in the
4  interview that she thought that she was being treated
5  differently than other employees and that she thought
6  people were making inappropriate comments about her?
7      A.   I recall her saying that she did feel that
8  she was being treated differently there by other
9  employees in Cincinnati and that there was comments made
10  that she didn't think was appropriate.
11      Q.   Okay.  And Ms. Kircher was present during
12  this interview?
13      A.   Yes.
14      Q.   Was any action taken to investigate that
15  issue that Ms. Henry raised, that she was being treated
16  differently and that people were making inappropriate
17  comments about her?
18      A.   I don't know.
19      Q.   But that was something that you would
20  investigate in the RPU?
21      A.   Not necessarily.  It depends on what it
22  involved.
23      Q.   Okay.
24      A.   We would handle, basically, if it involved
25  a ticketing or procedure thing.

5f420198-d96a-4418-add2-79bff62a5ce3

**Tammy Davis - 12/8/2010**

57

1    Q.   A harassment investigation, for instance,
2  that wouldn't fall under the purview of the RPU?
3    A.   Not normally.
4    Q.   That would be HR, or some other function
5  group would do that?
6    A.   Some other function group, yeah.
7    Q.   Is it proper for a gate agent to look for
8  passengers traveling together and try to move people
9  around to get them seats together?
10   A.   Possibly.  It depends on a lot of factors,
11 the time factor and if they have the seat, what kind of
12 seats they have.
13   Q.   Now, the interview was taking place on
14 July 14, 2008?
15   A.   Yes.
16   Q.   And this was a flight that had occurred on
17 June 8, 2008?
18   A.   Yes.
19   Q.   Do you know how many flights Ms. Henry had
20 worked between Flight 1213 on June 8th and July 14,
21 2008?
22   A.   No.
23   Q.   How many people she had cleared from a
24 standby list --
25   A.   No.

58

1    Q.   -- between June 8th and July 14th?
2    A.   No.
3    Q.   What happened after the interview?
4    A.   After the interview with the employee, we
5  would go talk to -- we asked the employee to write a
6  statement, and the other people in the room, HR,
7  corporate security and management would leave the room
8  and allow her to write her statement.  We would discuss
9  any questions about the meeting and then from that
10 point, HR and local management would go back in and talk
11 to the employee once they are through with their
12 statement and discuss what happens after that.  And then
13 I would -- I'm done at that point.
14   Q.   Do you recall anything else about the
15 interview with Ms. Henry, other than what we've
16 discussed and what's in the exhibit?
17   A.   Not that I can think of.
18   Q.   When did you type up Exhibit 4?
19   A.   Let's see here.  July 15th, 2008, the next
20 day.
21   Q.   So did Ms. Henry submit a written statement
22 at the conclusion of the interview?
23   A.   I believe so, yes.
24   Q.   Did you review it?
25   A.   Yes.

59

1    Q.   I'll hand you what's been previously marked
2  as Kircher Exhibit 8.  Is that the written statement
3  that you received at the conclusion of the interview
4  with Ms. Henry?
5    A.   Yes, it appears to be.
6    Q.   Okay.  And Ms. Henry indicated that in that
7  handwritten statement that she would create Covington --
8  or CVG protect records and alternative login levels
9  occasionally to protect seats for other agents who
10 expressed a need for them on their own overbooked
11 flights.
12       MR. CROALL:  Where are you looking?
13 Second paragraph?
14       MS. MULLOY MYERS:  About midway on the
15 second page.
16       MR. CROALL:  Flip back.
17       THE WITNESS:  It's not our practice to
18 do that, but I do create CVG protect records
19 and alternate login levels occasionally in
20 order to protect seats for other agents who
21 express a need for them on their own flights,
22 overbooked flights -- on overbooked flights.
23 BY MS. MULLOY MYERS:
24   Q.   And if a passenger is moved -- has to take
25 another flight because they get bumped from a flight, do

60

1  they get a preference from an upgrade to first class?
2  Is that the level K passenger type that you talked about
3  earlier?
4    A.   Level K?
5    Q.   I might be making that up.
6    A.   HK?
7    Q.   Yes.
8    A.   No.  An HK is a passenger that is confirmed
9  on that particular flight and they are awaiting a seat.
10   Q.   Okay.
11   A.   If a passenger is bumped from another
12 flight, its company -- the company would prefer you not
13 put somebody in first class unless they paid for first
14 class.
15   Q.   But does that happen to kind of assuage a
16 passenger that's been bumped off of a flight?
17   A.   It could.
18   Q.   Is there some discretion to be able to do
19 that?
20   A.   It could happen.
21   Q.   Okay.  So there is some discretion to do
22 that?
23   A.   Yes, but this flight was not overbooked.
24   Q.   Were there any other flights that were
25 overbooked and those people being put on this flight,

**Tammy Davis - 12/8/2010**

61

1 this San Diego flight?
2 **A. Not that I'm aware of.**
3 Q. Okay. And Ms. Henry said in her written
4 statement that she couldn't remember the specifics that
5 may have warranted a flight that had occurred five weeks
6 earlier. Fair to say?
7 **A. Could you say that again?**
8 Q. Sure. In her written statement to you,
9 Ms. Henry said I cannot remember the specifics that may
10 have warranted it?
11 **A. Where do you see that?**
12 Q. At the bottom of page 2.
13 **A. "I cannot remember the specifics that may**
14 **have warranted it." She did say she cannot remember the**
15 **specifics that may have warranted that, yes, warranted**
16 **it.**
17 Q. Okay. And you knew that this interview was
18 taking place over five weeks after the flight had
19 occurred that was in question, right? When you did the
20 interview, you had the date of the flight?
21 **A. Yes.**
22 Q. Okay. And Ms. Henry indicated that there
23 was -- it was a busy flight. There was a chaotic nature
24 of activity surrounding this particular flight, correct?
25 **A. She did say that she was -- the flight was**

62

1 **hectic; that she had a lot of standbys. I believe I**
2 **informed her that there was, I think, approximately**
3 **seven or eight standbys on the list, which in my**
4 **experience, would not be a lot. The flight was not**
5 **overbooked. It had approximately 20 coach seats and it**
6 **wasn't full in first class until she -- you know, she**
7 **had those three seats available to book when she booked**
8 **them in her system in first class.**
9 Q. Did you talk to other gate agents at CVG to
10 find out their experiences with the number of standbys
11 on a list, what's considered a lot?
12 **A. No.**
13 Q. All right. So when you went out in the
14 room and let Ms. Henry draft her statement, her
15 handwritten statement, what did you and the others talk
16 about, if anything?
17 **A. I don't remember specifics. We would**
18 **normally just discuss the interview and how it was --**
19 **how they perceived it to go. I normally like to ask how**
20 **they think I did in my questioning, just for my own**
21 **experience and benefit. But I don't remember specifics.**
22 Q. Did anybody opine as to how they thought it
23 went?
24 **A. What does that mean?**
25 Q. Give an opinion.

63

1 **A. Okay. I mean, they said they thought I did**
2 **good. I mean, that's for my own personal reasons,**
3 **but --**
4 Q. Did anyone give an opinion as to what --
5 **A. -- as far as how I did --**
6 Q. I'm sorry.
7 **A. That's all right. As far as how I did in**
8 **the interview.**
9 Q. Okay. But I'm focused more on what they
10 thought about Henry. Did anyone give an opinion as to
11 whether they thought Henry had violated any policies or
12 practices or whether there was a problem with her
13 actions that day?
14 **A. I don't remember that.**
15 Q. Had you formed a conclusion at the end of
16 the interview with Ms. Henry as to whether there was any
17 violation of policy?
18 **A. Yes.**
19 Q. What was your opinion?
20 **A. She hung the first class seats and she did**
21 **not explain why she had done that. And that's --**
22 Q. Other than telling you what we just
23 reviewed --
24 MR. CROALL: Well, were you finished?
25 THE WITNESS: I just think that -- if I

64

1 may continue with that.
2 BY MS. MULLOY MYERS:
3 Q. Yes.
4 **A. Hanging seats, based on my own experience**
5 **as a gate agent, is not something that the company would**
6 **like us to do.**
7 Q. And when was your last experience as a gate
8 agent?
9 **A. At the gates, it was, I guess, 14 years**
10 **ago. We worked in Global Assistance for four years and**
11 **we had, you know, experience with the gate agents.**
12 Q. Okay. But we've gone through her written
13 statement, your notes. We've talked about the
14 interview. She did tell you that she sometimes hung
15 seats if there were agents that needed it, correct, but
16 that she couldn't remember the specifics of that flight.
17 **A. I don't believe --**
18 Q. It was a busy, hectic flight.
19 **A. I'm sorry. I don't believe her saying**
20 **that -- when I asked her about the hung seats, I think**
21 **she said that she didn't remember why she did that.**
22 Q. Okay. And in her written statement, we've
23 gone through what she said about CVG protect records,
24 correct?
25 **A. We did. Yes, we did.**

Tammy Davis - 12/8/2010

65

1    Q.   CVG protect records, that would be a hung
2    seat, if a record was put in CVG protect, correct?
3        A.   Not necessarily.
4        Q.   How is that different than a hung seat?
5        A.   You can -- A hung seat is not ended. A
6    hung seat is like put out in la-la land. You can create
7    a record under CVG protect, Atlanta protect if you want
8    to book protection seats for a flight that's oversold.
9    That is ended. I mean, you can have an ended record
10   that says CVG protect.
11       Q.   Okay.
12       A.   Which would give a time and date stamp. A
13   hung seat does not do that. It just puts a seat out in
14   la-la land. And --
15       Q.   Okay. And are there times when an agent
16   may be distracted, pulled away from the computer and
17   just simply forget to end a record, not get back to it
18   immediately?
19           MR. CROALL: Objection. Speculation.
20   You can answer.
21           THE WITNESS: It's possible.
22   BY MS. MULLOY MYERS:
23       Q.   Okay. I asked you what your opinion was of
24   Ms. Henry after the interview, whether she had violated
25   any policy, and you said you believe she hung

66

1    first-class seats and didn't explain why she had done
2    that. So did you have an opinion -- did that then cause
3    you to form an opinion as to whether there had been any
4    policy violated, whether she was subject to any
5    disciplinary action?
6        A.   We would normally not get involved with
7    disciplinary action. As far as me thinking that she
8    violated policy, if -- based on my experience, hanging
9    seats was not something that the company would like us
10   to do, but as far as the interview and what my opinion
11   meant to her disciplinary action, we don't get involved
12   in that part of it. RPU does not get involved in that
13   part of it. We present the facts and that's it.
14       Q.   And who do you present the facts to?
15       A.   In the interview, we present them to the
16   employee and ask for their explanation.
17       Q.   Right. But your write-up, who do you
18   present the facts to for consideration of whether
19   they'll be any disciplinary action, HR?
20       A.   Who do I give my report to? Who do I send
21   my report to?
22       Q.   Yes.
23       A.   It would go to the people in the interview.
24   It would go to HR, management and corporate security.
25       Q.   Okay.

67

1        A.   But, again, that -- I don't believe that
2    has anything to do with the disciplinary action.
3        Q.   Okay. Did you make any determination as to
4    whether Ms. Henry had violated the waiver and favor
5    policy found in the Good Business?
6        A.   Simply Good Business.
7        Q.   Simply Good Business policy.
8        A.   Could you clarify that?
9        Q.   Sure. Did you make any determination as to
10   whether you believed Ms. Henry had violated the Good
11   Business practice policy or the Simply Good Business
12   practice?
13       A.   I believe that she hung the first-class
14   seats to benefit George.
15       Q.   And would that violate the waiver and favor
16   policy?
17       A.   I don't know.
18       Q.   So what happened next? You stepped out of
19   the room; you talked to the other people in the
20   interview; you went back; you got her written statement.
21   Did you talk to Ms. Henry at all after you got the
22   written statement?
23       A.   I don't believe so.
24       Q.   Okay. So then what happened?
25       A.   After I get the written statement, we will

68

1    normally make copies and HR keeps the original and we
2    will step out at that point, depending on what time my
3    flight leaves if I'm out of town. In this case I was.
4    We would go catch a flight, but I believe we were
5    waiting to interview George after that fact. So I
6    waited in another room in this case.
7        Q.   Okay. So then that same day Mr. Gergits
8    comes in for an interview?
9        A.   Correct.
10       Q.   And what do you recall about that?
11       A.   I recall that he came in and Greg asked him
12   about his flight to San Diego, and he asked him if he
13   knew that Ms. Henry had hung seats on the flight so
14   that -- and those were the seats that his family were
15   cleared in, and I believe he said he didn't know that.
16   And Greg asked if he had made a statement, because I
17   think in one of the reports from the other agents,
18   somebody had said he made a statement in the break room
19   that he wanted somebody to work the flight that was
20   about ready to take a package so that they could get him
21   and his family on the flight and not get in trouble and
22   he said he did make that statement, but he was just
23   joking.
24       Q.   And this is a supervisor?
25       A.   He was in a management position, yes.

**Tammy Davis - 12/8/2010**

69

1    Q.   Okay.  What else do you recall?
2    A.   I believe Deb did ask him if he realized --
3  I remember him saying that he did say to Ms. Henry that
4  -- to do what she could to get his son in first class
5  because he was tall, and I believe Deb asked him at that
6  point if he realized what position he had put Ms. Henry
7  in with making a statement like that and he -- I don't
8  recall exactly what he said, but he alluded that he
9  didn't mean to put her in that position.
10    Q.   So in your role, you don't make any
11  disciplinary action decisions?
12    A.   No.
13    Q.   Okay.  I asked a double negative.  Let me
14  ask it again.  Do you make any disciplinary action
15  decisions in your role in RPU?
16    A.   No.
17    Q.   Do you recall anything else about the
18  Gergits' interview?
19    A.   No.
20    Q.   Did you get a written statement from him?
21    A.   I believe so.
22    Q.   Did you produce that to counsel?
23    A.   I believe so.
24    Q.   Okay.  Did the interviewer step out of the
25  room for a period after the initial discussion with

70

1  George?
2    A.   Can you say that again?  Did they --
3    Q.   Did you guys step out of the room and talk
4  after the interview with George?
5    A.   After the interview concluded?
6    Q.   Yes.
7    A.   I don't remember.  I don't remember.
8    Q.   Was there -- that's okay.  Was there any
9  discussion amongst the people in the interview about,
10  you know, what they thought about the interview, what
11  George had said?
12    A.   I don't remember.  I believe I had to go
13  and catch my flight, so I believe -- what I remember is
14  that I had to leave and catch my flight.  I don't
15  remember any discussion after George's interview.
16    Q.   Was there any discussion about opinions
17  regarding the credibility of George's statements?
18    A.   Not that I remember.
19    Q.   Okay.  Did you form an opinion as to
20  George's credibility?
21    A.   No.
22    Q.   Did you form an opinion as to whether or
23  not George had violated any policies?
24    A.   No.
25    Q.   Were you aware of any disciplinary action

71

1  Ms. Henry received as a result of this investigation?
2    A.   Yes.  I was aware she was recommended for
3  termination.
4    Q.   And how did you become aware of that?
5    A.   After a certain -- after a period of time,
6  we will normally check in with HR or corporate security
7  if they were present, to see what the outcome was
8  because we maintain a database about all our interviews
9  and the time and place, you know, the details of the
10  interview, and it's for our own production, our
11  department's production, and we put in what the outcome
12  was of the case that we were to work.
13    Q.   Does the database indicate what policies
14  are alleged to have been violated?
15    A.   It could.
16    Q.   Okay.  So who did you check in with about
17  the Henry matter?  Do you recall who you spoke with?
18    A.   It was either Deb or Greg.
19    Q.   And what were you told?
20    A.   I was told that she was being recommended
21  for termination.
22    Q.   Do you recall any further discussion you
23  had with either Deb or Greg about that?
24    A.   No.
25    Q.   Did you check in about the status of the

72

1  Gergits?
2    A.   Yes.
3    Q.   Who did you check in with?
4    A.   Greg or Deb.
5    Q.   And what were you told?
6    A.   I believe he was demoted.  I'm not
7  100 percent sure about that.
8    Q.   Were you told that he was placed on a PIP,
9  Performance Improvement Plan.
10    A.   Possibly.  I don't recall.
11    Q.   You were aware that he was not recommended
12  for termination?
13    A.   Yes.
14    Q.   Did that surprise you?
15    MR. CROALL:  Objection.  But you can
16  answer.
17    THE WITNESS:  No.
18  BY MS. MULLOY MYERS:
19    Q.   Would you expect that employees would
20  receive consistent treatment with respect to
21  disciplinary action for comparable violations of
22  policies?
23    A.   Yes.
24    (Whereupon, the court reporter
25    marked Exhibit 5 for
      identification.)

5f420198-d96a-4418-add2-79bff62a5ce3

**Tammy Davis - 12/8/2010**

19 (Pages 73 to 76)

73

1  BY MS. MULLOY MYERS:
2      Q.   I'm handing you what's been marked Exhibit
3  5. Are these your interview notes from the Gergits'
4  interview?
5      A.   Yes, it appears so.
6      Q.   Would it be a violation of the waiver and
7  favor policy if a supervisor had asked an employee to
8  ensure that he got first class seating?
9      A.   I don't know if that would be a violation
10  of SGB, Simply Good Business.
11      Q.   So your role was simply fact finding?
12      A.   Yes.
13          (Whereupon, the court reporter
                marked Exhibit 6 for
14          identification.)
15  BY MS. MULLOY MYERS:
16      Q.   I'm going to hand you what's been marked
17  Exhibit 6. I'll ask you to take a look at that and then
18  let me know when you're ready.
19      A.   Okay.
20      Q.   Do you recognize this as an e-mail string
21  regarding the Henry investigation?
22      A.   Yes.
23      Q.   Okay. And the first e-mail is an e-mail to
24  Deb Kircher with Greg Kuhn and Gary Schmidberger copied
25  from Rachelle Henry?

74

1      A.   Yes.
2      Q.   And it looks like Greg then forwarded that
3  e-mail to you?
4      A.   Yes.
5      Q.   Did you receive the e-mail from Ms. Henry?
6      A.   Did I receive it from Ms. Henry, no.
7      Q.   Well, did you receive Ms. Henry's e-mail?
8      A.   Yes, I did.
9      Q.   Okay. And Greg makes the comment, "As the
10  World Turns Soap Opera City." Do you see that?
11      A.   Yes.
12      Q.   Do you know what he was referring to?
13      A.   No.
14      Q.   Okay. And then your response to Greg is,
15  "Doesn't surprise me, but she still didn't explain why
16  she blocked three FC seats. I fully expect we will hear
17  more from her." What did you mean there?
18      A.   It didn't surprise me that she had more to
19  say. During the interview, she appeared to be very
20  defensive and -- it just didn't surprise me that she had
21  more to say about working in Cincinnati and the other
22  employees working there.
23      Q.   And the exhibit says, "We're on the same
24  page, but I'm not sure about Gary and Deb." Do you know
25  what he meant by that?

75

1      A.   I assume he means that she didn't explain
2  why she blocked three first class seats about my
3  comments below.
4      Q.   So did you talk to Greg about that comment?
5      A.   About what comment?
6      Q.   "We are on the same page, but I'm not sure
7  about Gary and Deb."
8      A.   Not that I'm aware of.
9      Q.   Did you have any knowledge as to whether
10  Gary Schmidberger agreed with the recommendation for
11  termination decision?
12      A.   I do not.
13      Q.   Did Deb Kircher later ask you to research
14  George Gergits' non-rev history to see if Rachelle Henry
15  was working on any of his flights?
16      A.   I don't remember.
17      Q.   I'm going to hand you, just to try
18  to refresh your recollection, an exhibit that's
19  previously been marked Kircher Exhibit 7. Ignore the
20  handwriting.
21      A.   Okay.
22      Q.   That's my note to myself. But just take a
23  look at the e-mails and let me know if that rings any
24  bells for you.
25      A.   Okay.

76

1      Q.   Do you recall? Does that help you recall?
2      A.   Yes.
3      Q.   Okay. So Ms. Kircher asked you to look at
4  additional non-rev history?
5      A.   For George.
6      Q.   For George. And did you do that?
7      A.   It appears so, yes.
8      Q.   And what do you recall finding?
9      A.   Well, what I had stated was that I didn't
10  find any other records that Rachelle had touched. Each
11  reservation has a history credit. If somebody were to
12  do anything and end the record in the PNR, you would see
13  their agent's sign, and there was nothing with her agent
14  sign in there. Whether she reviewed anything, I don't
15  know, but she did not make any changes to any
16  reservations or create anything in George's records,
17  besides the one we discussed in the interview.
18      Q.   Okay. And did you have any discussion with
19  Ms. Kircher about that request, why she was asking for
20  you to do this research?
21      A.   None that I remember.
22      Q.   Do you know who printed the standby list
23  for that June 8 San Diego flight?
24      A.   No.
25      Q.   Do you know why it was printed?

**Depo Dynamics**
**(888) 494-3370**

Tammy Davis - 12/8/2010

77

1    **A.  No.  I can assume because I thought**
2  **something was not done correctly, but I don't know why.**
3    Q.  Was it posted in the break room?
4    **A.  I don't know.**
5    Q.  Do you think that would be appropriate?
6    **A.  To post something like that, it would not**
7  **be something that's normally done.**
8    Q.  Okay.  You would not have seen George's
9  PIP, correct?
10    **A.  No.**
11    Q.  Correct?
12    **A.  Correct.  Oh, I'm sorry.**
13    Q.  It's me.  It's my wording.
14    **A.  No, I would not see his PIP.**
15    Q.  Did you play any role in Ms. Henry's
16  request for appeal of her termination or review of her
17  termination?
18    **A.  No.**
19    Q.  Did you do any other investigations at CVG
20  regarding any alleged improprieties in clearing non-rev
21  customers or standby lists?
22    **A.  Say that again.**
23    Q.  Sure.  Did you do any other investigations
24  at CVG regarding any alleged errors or improprieties in
25  clearing non-rev passengers for flight?

78

1    **A.  I did research some information**
2  **regarding -- that came from your office, I believe, the**
3  **incidents.**
4    Q.  Okay.  Let me show you what's been marked
5  Guerrant Exhibit 3.  Have you seen that document?
6    **A.  No, I have not.**
7    Q.  Okay.  Well, it might just help us in the
8  discussion.  This is a document that I talked about with
9  Ms. Guerrant.  Do you know who she is?
10    **A.  JoAnne Guerrant, yes.**
11    Q.  This was an e-mail between Deb Kircher and
12  JoAnne Guerrant regarding a couple of incidents at CVG.
13  Did you do any research with respect to a Harold
14  Christensen flying non-rev, taking a non-rev flight?
15    **A.  I did -- one of the incidents was regarding**
16  **Harold Christensen.**
17    Q.  Okay.  And who asked you to research that?
18    **A.  Meg Taylor.**
19    MS. MULLOY MYERS: She's leaving?
20    MR. CROALL: Yes.
21    THE WITNESS: The e-mail was --
22    MR. CROALL: Wait, wait, wait.  Any
23  conversations between you and the law
24  department, anybody in the law department,
25  we're not going to talk about.  It's okay you

79

1  said the request came from Meg, but that's
2  about as -- that's about where it should stop,
3  okay?
4    THE WITNESS: Okay.
5  BY MS. MULLOY MYERS:
6    Q.  Did you have any conversations with Deb
7  Kircher or anybody in HR regarding Harold Christensen?
8    **A.  Not that I recall.**
9    Q.  What research did you do regarding Harold
10  Christensen taking a non-rev flight, without telling me
11  anything that you and Ms. Taylor discussed?
12    **A.  I pulled the flight capacity, what the**
13  **flight went out with as far as seat-wise.  I pulled some**
14  **reservations and I pulled an oversale report.**
15    Q.  And what did you -- did you draw any
16  conclusions?  Not what you talked about with Ms. Taylor,
17  but just whether you drew any conclusions.
18    **A.  Well, that's what I talked about with**
19  **Ms. Taylor, was my conclusion.**
20    Q.  Well, I don't want to know what you and
21  Ms. Taylor spoke about.  I just want to know if you drew
22  a conclusion from your research.
23    **A.  Well, that's what we spoke about.**
24    MR. CROALL:  Wait a minute.  And I'm
25  going to direct her not to answer about any

80

1  conclusion she reached because that's what she
2  communicated back to counsel.
3  BY MS. MULLOY MYERS:
4    Q.  What did you learn from pulling these
5  documents?
6    MR. CROALL: I still think we're in the
7  privilege realm.  I might let you take a little
8  step over the line on what she did, but I think
9  that's where I'm going to stop it.
10  BY MS. MULLOY MYERS:
11    Q.  Are you going to answer the question?
12    **A.  Based on what David is saying, no.**
13    Q.  Okay.  Did you research a flight involving
14  Ron Zimmerman working as the gate agent?  Wendy Van
15  Winkle had raised some concerns or complained about some
16  rev passengers being boarded and some non-rev passengers
17  being cleared.
18    **A.  I don't remember that.**
19    Q.  Did you do any research regarding Gary
20  Schmidberger's family members taking a non-rev flight on
21  a charter?
22    **A.  Yes.  That was part of the same incident**
23  **discussed with Meg Taylor.**
24    Q.  What research did you do?
25    MR. CROALL: I think this time I'm going

**Tammy Davis - 12/8/2010**

---

81

1    to draw the line a little closer. I mean, I
2    think if Meg makes a request for her to do
3    certain things, then what she does is part of
4    the discussion back with Meg. So I'm going to
5    instruct her not to answer.
6    BY MS. MULLOY MYERS:
7    Q.  Are you going to answer the question?
8    A.  Based on what David's saying, I'm not.
9    Q.  Okay. Did you -- have you done any other
10   investigations of any non-rev flights of CVG?
11   A.  Not that I remember.
12   Q.  Have you done any other investigations of
13   matters that might violate the waiver and favor policies
14   in the -- what initials did you say?
15   A.  SGB.
16   Q.  SGB, the Simply Good Business policy?
17   A.  Any other investigations?
18   Q.  Just at CVG.
19       MR. CROALL: Just at CVG.
20       THE WITNESS: Just at CVG, yes.
21   BY MS. MULLOY MYERS:
22   Q.  What other ones?
23   A.  I did one recently with a CVG Sky Club
24   employee. There may have been others, but that's -- I
25   don't recall anything else off the top of my head.

82

1    Q.  Okay. Do you recall who the employee was?
2    A.  Who, the Sky Club member -- or employee?
3    Q.  Yes.
4    A.  It was Matt Lemming.
5        MR. CROALL: Designate as confidential
6    any personnel condition relating to him or
7    anyone other than Ms. Henry.
8    BY MS. MULLOY MYERS:
9    Q.  Okay. And do you recall what the issue was
10   that you were investigating?
11   A.  It was a waiver for Sky Miles members that
12   were believed to be acquaintances of his, that he was
13   making changes to their tickets without collecting the
14   appropriate fees.
15   Q.  And do you know the outcome of that
16   investigation?
17   A.  I believe he received a letter in his file.
18   Q.  And how did you learn that?
19   A.  By going back to the HR person or Greg
20   Kuhn. I can't remember which one I went to and it was
21   Deb that was in that one also.
22   Q.  Okay. Do you have any knowledge as to how
23   the disciplinary step was chosen for Mr. Lemming?
24   A.  No.
25   Q.  Okay. Any other investigations you did at

83

1    CVG regarding potential violations of the Simply Good
2    Business policy?
3    A.  Not that I can remember.
4    Q.  Any other Simply Good Business
5    investigations you've done at CVG?
6    A.  Not that I can remember.
7    Q.  I'm sorry. I thought you heard me earlier.
8    Okay. I think I distracted myself. What about outside
9    CVG? Do you recall doing any investigations where the
10   alleged behavior may have been in violation of the
11   waiver and favor policy or the Simply Good Business
12   policy?
13   A.  Yes, we would handle those, yes.
14   Q.  How many others have you done?
15       MR. CROALL: Ever?
16   BY MS. MULLOY MYERS:
17   Q.  In your time in RPU.
18   A.  I have no idea.
19   Q.  Okay. Are you aware of any investigations
20   where the investigation indicated that there
21   was some violation of policy or procedure and the
22   employee was not recommended for termination?
23   A.  Could you say that again?
24   Q.  Sure. Are you aware of any investigations
25   where you believe the facts, your investigation showed

84

1    that the SGB policy or the waiver and favor policy had
2    been violated and you learned that the employee had not
3    been recommended for termination?
4    A.  Not recommended for termination, I would
5    say, yes.
6    Q.  Okay. Can you think of any occasions where
7    that has happened by name?
8    A.  Matt Lemming would be one.
9    Q.  Anybody else?
10   A.  Not that I can think of off the top of my
11   head.
12   Q.  And Matt Lemming is a male employee?
13   A.  Yes.
14   Q.  Okay.
15       MS. MULLOY MYERS: Can we take a quick
16   break? Let me just kind of review my notes.
17       MR. CROALL: Okay.
18       MS. MULLOY MYERS: Take a little break
19   to make sure we are not leaving out anything.
20   I think we are about ready to wrap up.
21       (A recess was taken.)
22   BY MS. MULLOY MYERS:
23   Q.  All right. Do you recall anything else you
24   did as part of the Henry/Gergits investigation that we
25   have not discussed this afternoon or have I exhausted

5f420198-d96a-4418-add2-79bff62a5ce3

Tammy Davis - 12/8/2010

85

```
 1    your memory?
 2         A.   I don't remember anything else.
 3         Q.   Okay.
 4              MS. MULLOY MYERS:  Those are all the
 5    questions that I have.  Thank you for your
 6    time.
 7              THE WITNESS:  Okay.
 8              MR. CROALL:  We would like to review and
 9    opportunity for signature when and if it is
10    transcribed.  Thanks.
11
12    (Whereupon, the deposition concluded at 3:05 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

86

```
 1
 2
 3              C E R T I F I C A T E
                - - - - - - - - - - - -
 4    STATE OF GEORGIA:
      COUNTY OF FULTON:
 5
 6    I hereby certify that the foregoing transcript was taken
 7    down, as stated in the caption, and the questions and
 8    answers thereto were reduced to typewriting under my
 9    direction; that the foregoing pages 1 through 85 represent
10    a true and correct transcript of the evidence given upon
11    said hearing, and I further certify that I am not of kin
12    or counsel to the parties in the case; am not in the
13    regular employ of counsel for any of said parties; nor am
14    I in anywise interested in the result of said case.
15              This, the 5th day of May, 2011.
16
17
                _____
18              JANNETTE PRICE, CCR-B-2177
19
20
21
22
23
24
25
```

87

```
 1              E R R A T A   P A G E
 2
 3
 4              Pursuant to Rule 30(e) of the Federal
 5    Rules of Civil Procedure and/or Georgia Code Annotated
      9-11-30(e), any changes in form or substance which you
 5    desire to make to your deposition testimony shall be
 6    entered upon the deposition with a statement of the
      reasons given for making them.
 7
 8    To assist you in making any such corrections, please use
      the form below.  If supplemental or additional pages are
 9    necessary, please furnish same and attach them to this
      errata sheet.
10
      I, the undersigned, TAMMY DAVIS, do hereby certify that
11    I have read the foregoing deposition and that to the
      best of my knowledge, said deposition is true and
12    accurate (with the exceptions of the following
      corrections below).
13
14    Page  /Line /    Change        / Reason
15
16    ___ /___/_____/_____/
17    ___ /___/_____/_____/
18    ___ /___/_____/_____/
19    ___ /___/_____/_____/
20    ___ /___/_____/_____/
21    ___ /___/_____/_____/
22    ___ /___/_____/_____/
23    ___ /___/_____/_____/
24    ___ /___/_____/_____/
25    ___ /___/_____/_____/
```

88

```
 1    ___ /___/_____/_____/
 2    ___ /___/_____/_____/
 3    ___ /___/_____/_____/
 4    ___ /___/_____/_____/
 5    ___ /___/_____/_____/
 6    ___ /___/_____/_____/
 7    ___ /___/_____/_____/
 8    ___ /___/_____/_____/
 9    ___ /___/_____/_____/
10    ___ /___/_____/_____/
11    ___ /___/_____/_____/
12    ___ /___/_____/_____/
13    ___ /___/_____/_____/
14    ___ /___/_____/_____/
15    ___ /___/_____/_____/
16    ___ /___/_____/_____/
17    ___ /___/_____/_____/
18    ___ /___/_____/_____/
19    ___ /___/_____/_____/
20    ___ /___/_____/_____/
21    Tammy Davis
22         Sworn to and subscribed before me
23         _____,
           Notary Public, this _____ day of
24
           _____, 2011.
25         My commission expires: _____
```

5f420198-d96a-4418-add2-79bff62a5ce3

Tammy Davis - 12/8/2010

1

2

3              C E R T I F I C A T E
               - - - - - - - - - - - -

4    STATE OF GEORGIA:

     COUNTY OF FULTON:

5

6    I hereby certify that the foregoing transcript was taken

7    down, as stated in the caption, and the questions and

8    answers thereto were reduced to typewriting under my

9    direction; that the foregoing pages 1 through 85 represent

10   a true and correct transcript of the evidence given upon

11   said hearing, and I further certify that I am not of kin

12   or counsel to the parties in the case; am not in the

13   regular employ of counsel for any of said parties; nor am

14   I in anywise interested in the result of said case.

15          This, the 5th day of May, 2011.

16

17

18          JANNETTE PRICE, CCR-B-2177

19

20

21

22

23

24

25