# Deposition of
# **Rachelle Henry**

October 7, 2010

Rachelle Henry v. Delta Air Line, Inc.
Case Number:  2:10-CV-00009



513.233.3000
877.233.4403
Fax:  513.233.2310
depo@elitereportingagency.com

IN THE UNITED STATES DISTRICT COURT
EASTERN DIVISION OF KENTUCKY
COVINGTON DIVISION

RACHELLE HENRY,                 )
                                )
        Plaintiff,               )
                                )      CASE NO.
           vs.                   )      2:10-CV-00009
                                )
DELTA AIR LINES, INC.,           )
                                )
        Defendant.               )
                                )

Deposition of:   RACHELLE HENRY
Pursuant to:     Notice
Date and Time:   Thursday, October 7, 2010
                 9:35 a.m.

Place:           Porter, Wright,
                 Morris & Arthur, LLP
                 250 East Fifth Street
                 Suite 2200
                 Cincinnati, Ohio  45202

Reporter:        Patti Stachler, RMR, CRR, CLR, CME
                 Notary Public - State of Ohio

**www.elitereportingagency.com**
**513.233.3000**

---

1   APPEARANCES OF COUNSEL:
2
3       For the plaintiff:
4          Kelly Mulloy Myers, Esq
                of
5          Freking & Betz, LLC
           525 Vine Street
6          Sixth Floor
           Cincinnati, Ohio  45202
7          513 721 1975
           kmyers@frekingandbetz.com
8
9
10      For the defendant:
11         Kelly K  Giustina, Esq
                of
12         Delta Air Lines, Inc
           Department 981
13         1030 Delta Boulevard
           Atlanta, Georgia  30354
14         404 773 6520
           kelly k giustina@delta com
15             and
16         David T  Croall, Esq
                of
17         Porter, Wright, Morris & Arthur, LLP
           250 East Fifth Street
18         Suite 2200
           Cincinnati, Ohio  45202
19         513 369 4240
           dcroall@porterwright com
20
21
22             ---
23
24
25

**www.elitereportingagency.com**
**513.233.3000**

---

1                   I N D E X
2
3   RACHELLE HENRY                    PAGE
4       EXAMINATION BY MS  GIUSTINA        4
5
6
7   EXHIBITS            MARKED  REFERENCED
8    DEFENDANT'S EXHIBIT 1     28     29
     DEFENDANT'S EXHIBIT 2     32     32
9    DEFENDANT'S EXHIBIT 3     56     57
     DEFENDANT'S EXHIBIT 4     94     94
10   DEFENDANT'S EXHIBIT 5     94     95
     DEFENDANT'S EXHIBIT 6     95     95
11   DEFENDANT'S EXHIBIT 7     95     96
     DEFENDANT'S EXHIBIT 8     98     98
12   DEFENDANT'S EXHIBIT 9     99     99
     DEFENDANT'S EXHIBIT 10   101    102
13
14   DEFENDANT'S EXHIBIT 11   102    102
     DEFENDANT'S EXHIBIT 12   126    127
15   DEFENDANT'S EXHIBIT 13   128    128
     DEFENDANT'S EXHIBIT 14   140    140
16   DEFENDANT'S EXHIBIT 15   147    147
     DEFENDANT'S EXHIBIT 16   149     -
17   DEFENDANT'S EXHIBIT 17   150    150
     DEFENDANT'S EXHIBIT 18   151    151
18   DEFENDANT'S EXHIBIT 19   185    185
     DEFENDANT'S EXHIBIT 20   199    200
19   DEFENDANT'S EXHIBIT 21   205    205
     DEFENDANT'S EXHIBIT 22   206    207
20   DEFENDANT'S EXHIBIT 23   217    217
     DEFENDANT'S EXHIBIT 24   221    221
21
22
23             ---
24
25

**www.elitereportingagency.com**
**513.233.3000**

---

1              RACHELLE HENRY
2   plaintiff herein, having been duly sworn, was examined and
3   deposed as follows:
4              EXAMINATION
5   BY MS. GIUSTINA:
6      Q.  Good morning, Ms. Henry.  My name is Kelly
7   Giustina.  We met briefly before we sat down.  I'm one of
8   the lawyers who is representing Delta Air Lines in the
9   lawsuit that you've filed against that company arising out
10  of your employment and termination.  And sitting next to
11  me is Dave Croall, who, likewise, is representing Delta in
12  this action.
13         You've been put under oath.  Do you understand
14  what that means?
15     A.  Yes.
16     Q.  All right.  That you're to tell the truth today,
17  and that if you don't tell the truth, then questions may
18  be raised later in the case.  Do you understand that?
19     A.  Yes.
20     Q.  All right.  During the course of the deposition,
21  I'm going to ask a series of questions ranging from some
22  general background questions about you, through your
23  employment, and other related things.
24         When I ask a question, please make sure that you
25  understand what I'm asking.  If you don't understand my

**www.elitereportingagency.com**
**513.233.3000**

1  question, please ask me to rephrase it, and I'll be happy
2  to do that. But if you answer the question, I'm going to
3  assume that you've understood the question. Okay?
4      A.  Okay.
5      Q.  A couple kind of practical reminders; your
6  attorney may have already suggested these things to you.
7  The court reporter is taking down everything that we're
8  saying. And when you and I talk over one another, it is
9  very hard for her to take that information down. So, to
10 the best we can, let's try to allow each of us to finish
11 our sentences before the other talks. Okay?
12     A.  Okay.
13     Q.  Because sometimes, you know, depositions get to
14 be kind of conversational, and just in conversation
15 there's a tendency to speak maybe before somebody else is
16 done. And so, anyway, let's try to help each other out in
17 that respect.
18         Similarly, when you answer a question, if you
19 would give a verbal answer, a yes or a no, as opposed to a
20 nod or a shake of the head or an uh-huh or uh-uh; again,
21 very difficult for the court reporter to take down. And I
22 will do my best to help you remember that to the extent
23 you've answered in that way. All right?
24     A.  Okay. Thank you.
25     Q.  If you need to take a break for any reason, let

1  me know. And as long as a question isn't pending, I have
2  no problem with letting you take a break. Okay?
3      A.  Okay.
4      Q.  All right. Is there any reason that you would
5  have an impaired memory today or would not be able to
6  answer my questions in a full and truthful manner?
7      A.  I don't think so.
8      Q.  Okay. Please state your full name.
9      A.  Rachelle Dove Henry.
10     Q.  And have you ever used any other name during
11 your lifetime?
12     A.  Yes. My maiden name, Hawley, Rachelle Dove
13 Hawley.
14     Q.  And your date of birth is ███████ 1967?
15         THE WITNESS: I'm not allowed to have paper.
16 I'm sorry. I'm hot.
17     A.  Yes, ██████ 1967.
18 BY MS. GIUSTINA:
19     Q.  And your social security number is 5 --
20         MS. MYERS: Objection. Can we do that off the
21 record?
22         MS. GIUSTINA: Sure.
23         MS. MYERS: Because if this is filed, we have to
24 redact it or -- it's easier to --
25         MS. GIUSTINA: Okay.

1          (Off the record.)
2  BY MS. GIUSTINA:
3      Q.  You currently reside at ████████████ in
4  Hebron, Kentucky, correct?
5      A.  Correct.
6      Q.  How long have you lived at that address?
7      A.  Nine years.
8      Q.  And who lives with you at that address?
9      A.  My husband, Alan Henry; my three daughters:
10 Grace, Olivia, and Sara Henry.
11     Q.  And what ages are ████████████?
12     A.  ████████████████.
13     Q.  Is your husband currently employed?
14     A.  Yes.
15     Q.  And where does he work?
16     A.  Children's Hospital.
17     Q.  And what is his profession?
18     A.  He is a supervisor in the call center.
19     Q.  Okay. And how long has he held that particular
20 position?
21     A.  Since 2005.
22     Q.  And has he been at the Children's Hospital prior
23 to 2005 in a different position, or did he begin working
24 for the Children's Hospital in '05?
25     A.  He began working for the Children's Hospital

1  in '05.
2      Q.  Are there health insurance benefits available to
3  your family through his job?
4      A.  Yes.
5      Q.  Do you have any siblings located in the
6  Cincinnati area?
7      A.  No.
8      Q.  Are your parents still living?
9      A.  My mother is living.
10     Q.  And is your mother in this area?
11     A.  No.
12     Q.  Any marriages other than your marriage to
13 Alan Henry?
14     A.  No.
15     Q.  You received a high school diploma, correct?
16     A.  Yes.
17     Q.  When did you graduate?
18     A.  1986.
19     Q.  And what was the name of the high school from
20 which you got the diploma?
21     A.  Temple Christian High School. Oh, excuse me.
22 The diploma came from Clackamas Community College.
23     Q.  Okay. You mentioned Temple Christian and then
24 you amended your answer or changed -- I shouldn't say
25 amended your answer, but you recalled, obviously,

1 something different that made you mention Clackamas
2 Community College. Can you explain to me, did you get a
3 GED?
4    A. No. It is a high school diploma --
5    Q. Okay.
6    A. -- from the community college.
7    Q. Okay. Can you explain to me how that works?
8 I'm just not familiar with that sort of arrangement.
9    A. Yes. I attended Temple Christian for a couple
10 of years and then opted to take advantage of a program
11 through the community college whereby I could acquire
12 early college credits and complete my high school diploma
13 at the same time.
14       So they evaluated my transcripts from the high
15 school. They matriculated the information to let me know
16 what courses would be required to meet the state's high
17 school curriculum and then also matriculated early college
18 credits freshman level that I could begin to combine with
19 that high school curriculum --
20    Q. Okay.
21    A. -- to speed up my educational career.
22    Q. So is it fair to say, when you received your
23 high school diploma in 1986, you had already completed at
24 least one college level course as well?
25    A. Yes.

1    Q. Did you continue your studies at Clackamas
2 Community College following receipt of your high school
3 diploma?
4    A. Yes.
5    Q. Okay. And for how long, approximately, did you
6 attend classes there?
7    A. That was a long time ago.
8    Q. I understand.
9    A. I can't be specific.
10    Q. Just your best approximation.
11    A. But I can guess it was probably a semester in
12 that I began my employment with a company in California
13 the same year. So I can deduct from that that I wasn't in
14 Oregon very long. I just don't have specifics for you.
15    Q. Okay. And Clackamas Community College is in
16 Oregon City, Oregon, right?
17    A. It is.
18    Q. And what were the nature of the classes that you
19 took there? Were they of a particular study or just
20 general classes?
21    A. No. They were the preliminary general education
22 courses.
23    Q. All right. And then, subsequently, you did take
24 some classes at El Camino Community College, correct?
25    A. When I moved to California, I -- shortly after

1 that, I began attending at El Camino College, yes.
2    Q. All right. For roughly what period of time did
3 you take classes there?
4    A. I would have to refer to my educational
5 transcripts. It's been too long. But I lived in
6 California for five years and attended El Camino during
7 that time.
8    Q. Okay. More than one year, you think, that you
9 attended classes?
10    A. I believe so.
11    Q. Okay. And was there a particular focus of your
12 studies at El Camino?
13    A. Again, it was the first couple of years of my
14 education, so the counselors often just recommended the
15 basic courses. It was a community college, which in
16 California prepares you for university -- four-year
17 universities. So it's important that the classes you take
18 will transfer to the four-year university. But they're
19 just general accounting, English, science, PE. And then
20 when you've completed your basic requirements, you will
21 have the foundation to transfer to the four-year college
22 and specify your area of study.
23    Q. Okay. The next educational institution that I
24 have you attending, from looking at your records, is
25 Northern Kentucky University; is that correct?

1    A. Yes.
2    Q. And you ultimately received your bachelor in
3 social work from there; is that correct?
4    A. Yes.
5    Q. All right. And would the years of attendance be
6 1994 to 1998? Does that sound correct?
7    A. That could be correct. It may have been earlier
8 than '94, but that sounds about right.
9    Q. Okay. And you attended Northern Kentucky
10 University during the time you were working at Delta,
11 correct?
12    A. Yes.
13    Q. And you received at least partial reimbursement
14 of your tuition through Delta's tuition assistance
15 program, correct?
16    A. Yes.
17    Q. Subsequent to Northern Kentucky University, you
18 received a master's in social work, correct?
19    A. Yes.
20    Q. And that was from the University of Kentucky?
21    A. Yes.
22    Q. And during roughly what period of time did you
23 take those courses to receive your master's in social
24 work?
25    A. I believe I began the master's program

1  immediately following the bachelor's program.  So based on
2  the dates that you've given me, I would say, then, 1998 to
3  2000 and -- I just can't be sure.  I really would need to
4  refer to my transcripts.
5      Q.  Okay.
6      A.  It was an ongoing steady progression, and I
7  think it was about the time my first daughter -- shortly
8  after my first daughter was born.  So maybe 2000, 2001,
9  something like that.
10     Q.  And, again, you were working at Delta during
11  that time period, correct?
12     A.  Yes.
13     Q.  And for your master's, were you able to take
14  advantage of the tuition assistance program as well?
15     A.  Yes, I believe so.
16     Q.  Okay.  And how did that work?  Did that
17  reimburse part of your educational costs?
18     A.  The educational reimbursement plan changed along
19  the way, but it was based on the grades that you received
20  as to how much reimbursement you would get.  And I don't
21  recall the exact amounts, only that generally I did get
22  the top grades, so I would have been entitled to whatever
23  the maximum amount was, I think, for the most part.
24     Q.  Have you ever been a party to a lawsuit other
25  than the current lawsuit that we're here about today?

1      A.  No.
2      MS. MYERS:  Objection.
3      You can answer.
4      A.  No, I don't think so.
5  BY MS. GIUSTINA:
6      Q.  Are you aware, as you sit here today, of any
7  other lawsuits that you would have been a party to?  And
8  by that I mean you were either the person bringing the
9  lawsuit or somebody was suing you for some reason.
10     MS. MYERS:  Objection.
11  BY MS. GIUSTINA:
12     Q.  You can answer.
13     A.  Oh, no.
14     Q.  When your attorney objects, unless she instructs
15  you not to answer, you can go ahead and answer the
16  question.  Okay?
17     A.  Uh-huh.
18     Q.  Have you ever given a deposition in a legal
19  matter or a court proceeding prior to today?
20     A.  No.
21     Q.  Ever given testimony in court prior to today?
22     A.  No.
23     Q.  Have you ever filed for bankruptcy?
24     A.  No.
25     Q.  Other than the EEOC charge that you filed

1  against Delta, again, pertaining to the termination of
2  your employment, have you ever filed any sort of
3  administrative charge with a governmental agency?
4      MS. MYERS:  Objection.
5      You can answer.
6      A.  No.
7  BY MS. GIUSTINA:
8      Q.  Are you aware that you submitted answers to
9  interrogatories in this litigation?
10     A.  Yes.
11     Q.  Did you assist in preparing those
12  interrogatories?
13     A.  Yes.
14     Q.  And were the responses in those interrogatories
15  true and correct to the best of your knowledge?
16     A.  Yes.
17     Q.  Similarly, some documents were produced.  Are
18  you aware of that?
19     A.  Do you -- are you asking me if we produced
20  documents for you as part of your interrogatory requests?
21     Q.  Yes, ma'am.  Yes.  We also served on your
22  lawyers what's called a document request where we made a
23  request for a variety of different documents, and I
24  suspect what happened is your lawyers asked you for
25  documents.  Are you aware that your lawyers have provided

1  certain documents to Delta in this case?
2      A.  Yes.  I was asked for certain documents, and I
3  provided them under the assumption they were going to
4  Delta's attorneys.
5      Q.  Okay.  And in terms of what you were asked to
6  provide, you gave everything that you had?
7      A.  Yes.
8      Q.  Are you currently taking any medication?
9      A.  I am taking 10 milligrams of -- I think it's
10  Celexa.  It's an antianxiety, antidepressant.
11     Q.  Did you say Celexa?
12     A.  I think Celexa, C-e-l-e-x-a.  Is that right?  Or
13  maybe -- no.
14     MS. MYERS:  That's okay.  Just -- you don't have
15  to guess.  If you don't know, that's fine.
16     A.  I'm sorry.  Yes, I'm taking medication.
17  BY MS. GIUSTINA:
18     Q.  It's okay.  And you believe that it's called
19  Celexa.
20     A.  I don't remember, to be honest.  I'm reaching.
21     Q.  Any other medications that you're currently
22  taking, other than an over-the-counter medication?
23     A.  Yes.
24     Q.  And what would that be?
25     MS. MYERS:  That's okay.  You don't have to

 1        look.  You can just testify as to your memory.
 2        A.  I don't know.
 3   BY MS. GIUSTINA:
 4        Q.  Okay.  All right.  So we know about the
 5   antidepressant you're taking, and then you referenced a
 6   second type of medication you're taking.  What is that
 7   medication for?
 8        A.  Appetite suppression.
 9        Q.  Is that prescribed through a doctor?
10        A.  Yes.
11        Q.  Any other medication?
12        A.  No.
13        Q.  Regarding the antidepressant that you
14   referenced, how long have you been taking that particular
15   type of medication?
16        A.  It was prescribed for me following my suspension
17   from Delta.  Exactly when, I don't remember.
18        Q.  Have you -- and when you say that this
19   particular drug, meaning the Celexa, or whatever the
20   particular type is -- because I recognize there are
21   different types of antidepressants -- have you changed
22   antidepressant medications during that time, or has it
23   been that medication for the entire time since your
24   suspension from Delta?
25        A.  It has been the same.

 1        Q.  Was there ever an occasion prior to your
 2   suspension from Delta that you were prescribed
 3   antidepressant medication?
 4        A.  Yes.
 5        Q.  When would that have been?
 6        A.  Again, the exact year, I don't remember, but my
 7   now seven-year-old daughter was diagnosed in '05 with
 8   leukemia, and during her treatment I was prescribed
 9   antidepressant medication.  Her treatment lasted until --
10   the bulk of her treatment lasted until 2008.
11        Q.  So you believe that it would have been in
12   approximately 2005 that you would have started taking an
13   antidepressant?
14        A.  Her diagnosis was late in '05, so it may have
15   been '06 before I started taking it.
16        Q.  Okay.  And when did you cease using an
17   antidepressant when it -- you know, with respect to the
18   one that you started taking in '06?
19        A.  I'm sorry.  I don't know.
20        Q.  But there was a distinct break in time between
21   taking that antidepressant and then beginning to use an
22   antidepressant following your suspension from Delta?
23        A.  Yes.
24        Q.  Is it your daughter Olivia who was diagnosed
25   with leukemia?

 1        A.  Yes.
 2        Q.  What type of treatment was she receiving when
 3   you reference the bulk of her treatment between 2005 and
 4   2008?
 5        A.  The bulk -- the bulk of the treatment was a
 6   variety of chemotherapy drugs.
 7        Q.  And was there radiation associated with that, or
 8   is it strictly chemotherapy?
 9        A.  Strictly chemotherapy.
10        Q.  And what is her current prognosis?
11        A.  I believe -- this is not confirmed, but I
12   believe that she's considered to be -- well, she's in
13   remission.
14        Q.  Okay.  And when was she determined to be in
15   remission?
16        A.  That's the part I don't know for sure.  We're
17   still seeing the physicians on a regular basis.  I haven't
18   really asked that question.
19        Q.  With respect to the antidepressant that you're
20   currently taking, are there any side effects that are
21   associated with that that you're experiencing?
22        A.  Some nausea.
23        Q.  Anything else?
24        A.  No, I don't believe so.
25        Q.  And the appetite suppression medication, how

 1   long have you been taking that?
 2        A.  Maybe four months.
 3        Q.  And are there any side effects associated with
 4   that medication?
 5        A.  I was given a list when they gave me the
 6   medication.
 7        Q.  And have you experienced any of those side
 8   effects?
 9        A.  No.
10        Q.  Who prescribed the antidepressant medication to
11   you?
12        A.  Dr. Lenighan.
13        Q.  Lenighan?
14        A.  It's L-e-n-i-g-h-a-n.
15        Q.  And who prescribed the appetite suppression?
16        A.  Wasn't that the last question?
17        Q.  No.  I'm sorry.  I was speaking to the
18   antidepressant.
19        A.  Oh, excuse me.
20        Q.  That's okay.
21        A.  Let me correct that.  The antidepressant was
22   prescribed by Dr. Christopher Rawlings.
23        Q.  All right.  And I think what you just said is
24   that the appetite suppression drug was prescribed by
25   Dr. Lenighan?

1    A.  Correct.
2    Q.  All right.  And is Dr. Lenighan associated with
3  the Summit Medical Group, or is he --
4    A.  He has his own practice in Erlanger.
5    Q.  And what type of doctor is Dr. Lenighan?
6    A.  I couldn't say.
7    Q.  How did you come to be treating with
8  Dr. Lenighan?
9    A.  How did I come -- how was I referred to
10  Dr. Lenighan?
11    Q.  Were you referred to Dr. Lenighan?
12    A.  Yes.
13    Q.  By whom?
14    A.  Coworker.
15    Q.  And why, in particular, did you go see
16  Dr. Lenighan?
17    A.  The coworker stated that his office specialized
18  in assisting with weight loss.
19    Q.  And how long have you been seeing
20  Dr. Lenighan?
21    A.  I think it's about four months.
22    Q.  So about the time you started taking the
23  medication?
24    A.  Yes.
25    Q.  One part of the documents that have been

1  provided in the litigation by your lawyers are medical
2  records from the Summit Medical Group.  And within those
3  documents I've seen Dr. Rawlings' name.  Is he your
4  primary physician in that medical group?
5    A.  He's the one I try to see most regularly.
6    Q.  Is there anyone else -- you see other doctors in
7  the practice, correct?
8    A.  I have seen other doctors in that practice.
9    Q.  And that is only when Dr. Rawlings isn't
10  available?
11    A.  Yes.
12    Q.  What kind of doctor -- what kind of specialty
13  does Dr. Rawlings have?
14    A.  Again, I couldn't say.
15    Q.  How long have you been a patient of
16  Dr. Rawlings?
17    A.  This is a guess based on how long I've lived
18  here.  I really don't know.  I'm reaching for that answer.
19  I don't know.
20    Q.  Did you have a regular relationship with a
21  physician in this area prior to Dr. Rawlings?
22    A.  The practice that Dr. Rawlings works at has been
23  my primary care provider, practice associated with my
24  insurance coverages over the years, and it's been many
25  years.  How many, I don't know.  So I've used

1  Dr. Rawlings' practice several times, but for how long
2  I've been seeing him, specifically, I couldn't say.
3    Q.  Do you think that you have received treatment at
4  the Summit Medical Group for longer than ten years?
5    A.  It's possible.
6    Q.  Okay.  Do you currently have any appointments to
7  see Dr. Rawlings or anyone at the Summit Medical Group?
8    A.  No.
9    Q.  We discussed a little bit earlier the fact that
10  Dr. Rawlings prescribed an antidepressant to you during
11  two periods.  Was there ever a time when Dr. Rawlings
12  referred you to a mental health professional?
13    A.  No.
14    Q.  Was there ever a time that you asked to be
15  referred to a mental health professional?
16    A.  Yes.
17    Q.  And you asked that of Dr. Rawlings?
18    A.  No.
19    Q.  To whom did you direct that inquiry?
20    A.  Children's Hospital social worker.
21    Q.  And is that -- would that be a coworker of yours
22  or --
23    A.  No.
24    Q.  How did you come to know the Children's Hospital
25  social worker, through your daughter's illness?

1    A.  Yes.
2    Q.  And did you wind up going to see a mental health
3  professional as a result of that conversation?
4    A.  Yes.
5    Q.  And who is that?
6    A.  The services were provided through Cancer Family
7  Care.  I don't remember the clinician's name.
8    Q.  And is Cancer Family Care a practice group?
9    A.  Yes, I believe so.  It's -- I know it to be an
10  agency that works with families who need psychological
11  support related to cancer.
12    Q.  And when did you begin receiving counseling
13  through Cancer Family Care?
14    A.  I don't know.  It's a bit of a blur.
15    Q.  Do you recall for how long of a period of time
16  that covered?
17    A.  No.
18    Q.  More than a year?
19    A.  I don't know.
20    Q.  Did you see the same counselor or mental health
21  professional through the Cancer Family Care during the
22  period that you were seeking counseling through that
23  center?
24    A.  Yes.
25    Q.  I'm sorry.  Do you remember the person's name?

1    A.  I just remembered her name is Judy McAuliffe.
2    Q.  I'm sorry.  I couldn't hear.
3    A.  Judy McAuliffe.
4    Q.  Can you spell that for me?
5    A.  I think so.  M-c-A-u-l-i-f-f-e, or something
6  close.
7    Q.  And do you know, was Dr. McAuliffe a
8  psychiatrist or a psychologist, a social worker?  Do you
9  know what Dr. McAuliffe's title was?
10    A.  I can't remember her credentials.
11    Q.  How often did you see her during the time that
12  you were actively seeking counseling from her?
13    A.  I think we tried to schedule a once-a-week
14  appointment.  I don't know that I was always able to keep
15  those appointments based on circumstances, but I believe
16  that's what the intent was.
17    Q.  And do you recollect when it was that you ceased
18  receiving counseling services from Dr. McAuliffe?
19    A.  Again, no.
20    Q.  Do you think that it would have coincided with
21  the bulk of your daughter's treatment ending in 2008?
22    A.  Possibly.  Maybe before that.
23    Q.  Did Dr. McAuliffe prescribe any medication to
24  you during that time?
25    A.  No.  I should clarify.  I don't believe she's a

1  doctor.
2    Q.  Okay.  But you're not certain?
3    A.  But I'm not certain of her credentials, so
4  perhaps she is.
5    Q.  Have you seen any other medical providers or
6  counselors, let's say, two times or more since July 14th
7  of 2008, other than Dr. Rawlings?
8    A.  No.
9    Q.  And I suppose I should also say Dr. Lenighan.
10    A.  Sure.
11    Q.  How about prior to that date, July 14th of 2008?
12  You know, we've talked about Dr. Rawlings, and we've
13  talked about Ms. McAuliffe.  Anyone else in terms of
14  medical professionals or counselors who you would have
15  seen more than two times prior to July 14th, 2008?
16    A.  Is there like a time frame prior?
17    Q.  Sure.  Five -- let's say five years prior.
18    A.  No.
19    Q.  Nobody else comes to mind?
20    A.  I don't think so.
21    Q.  Have you ever sought counseling through the
22  church?
23    A.  No.
24    Q.  Have you ever had occasion to file a disability
25  claim?

1    MS. MYERS:  Objection.
2    You can answer.
3    A.  I don't think so.
4    Could you be more specific?
5  BY MS. GIUSTINA:
6    Q.  Sure.  Let's talk about during your employment
7  with Delta, which obviously spanned several years.  Did
8  you ever have occasion during that time to file a
9  disability claim, whether it be short-term or long-term
10  disability?
11    A.  What do you mean by file a disability claim?
12    Q.  Submit; in other words, receive that coverage
13  and the benefits associated with that coverage.
14    A.  I hesitate because I don't know if during my
15  extended leaves after delivering my children -- I don't
16  remember if that utilized any of my disability benefits.
17  It may have run concurrent.
18    Q.  All right.  That's fair.
19    A.  That's my hesitation.
20    Q.  Other than the birth of your children, any other
21  occasion that you would have had to seek short-term or
22  long-term disability while employed at Delta?
23    A.  I don't think so.
24    Q.  Okay.
25    A.  The, again, hesitation because early in my

1  career, I had a job-related back injury, and I don't
2  remember the time off associated with that and how that
3  was classified.
4    Q.  Anything other than the birth of your children
5  and the back injury potentially having a disability claim
6  associated with them; anything else you can think of?
7    A.  No.
8    Q.  You mentioned the back injury.  Did you ever
9  receive any workers' compensation benefits as a result of
10  that injury?
11    A.  I may have.  It was at least 20 years ago.  I
12  don't remember.
13    Q.  Before coming to work at Delta, you worked at
14  Western Airlines, correct?
15    A.  Yes.
16    (Defendant's Exhibit 1 was marked for
17    identification.)
18  BY MS. GIUSTINA:
19    Q.  Ms. Henry, if you would look at the last page of
20  that document.  That is your signature there, is that
21  correct, about halfway down the page?
22    A.  Looks like my signature.
23    Q.  And it looks like the document is dated July 3rd
24  of 1986, correct?
25    A.  Correct.

1    Q.  And if you would look at the first page -- and,
2  obviously, feel free to look at the remainder of the
3  document if you'd like -- but this is the application for
4  employment that you filled out for Western Airlines,
5  correct?
6    A.  Yes, it seems to be.
7    Q.  And in this application on the third page of
8  Exhibit 1, you indicated your previous employment to be
9  Western Express/Skywest, US Bancorp, and Taco Bell; is
10  that correct?
11    A.  That's correct.
12    Q.  And to the best of your knowledge, this
13  constituted all the employers that you had had up until
14  the time you sought employment at Western?
15    A.  Yes.
16    Q.  Western Express/Skywest, were they a connection
17  carrier for Western Airlines?
18    A.  Yes.
19    Q.  And you were working at Western Express/Skywest
20  immediately preceding your employment at Western Airlines,
21  correct?
22    A.  Yes.
23    Q.  Do you recall the date that you were hired at
24  Western Airlines?
25    A.  It was in -- well, it would have been my -- also

1  my employment date with Delta.  So 7/21/86.
2    Q.  And on the last page of Exhibit 1, it indicates
3  there at the bottom -- and I'm assuming, Ms. Henry, this
4  is somebody else's writing at the bottom, but it does
5  indicate that the title you were hired for was customer
6  service representative and weight and balance.  Is that
7  the position you went to work for when you went to Western
8  Airlines?
9    A.  Yes.
10    Q.  And explain briefly what your duties were as a
11  CSR and weight and balance.
12    A.  The ramp personnel would contact the weight and
13  balance office with their loaded bags and cargo mail
14  numbers.  The gate agent would contact us with their
15  passenger numbers and any extra crew member numbers.  And
16  we would compile from that information, along with other
17  details, such as fuel onboard, what the -- I'm going to
18  forget the term, but there was a specific number that was
19  necessary to provide to the pilot so that he could know
20  how to set his trim settings to have the most safe and
21  effective takeoff.
22    Q.  Essentially -- and I'm going to summarize, so
23  correct me if I'm wrong -- it was up to you, as a CSR, to
24  ensure that there wasn't too much on the airplane for the
25  airplane to safely take off, fly, and land, correct?  That

1  was one of your duties?
2    A.  Well, it would have been my duty to provide
3  those numbers.  It was up to the pilot then to make the
4  determination.
5    Q.  To make the appropriate adjustments?
6    A.  Uh-huh.
7    Q.  All right.  And you worked in the weight and
8  balance area prior to going to Western Airlines,
9  correct?
10    A.  I did.
11    Q.  All right.  And is that how you became aware,
12  when you were working at Western Express, of the job
13  opportunity at Western Airlines?
14    A.  Yes.
15    Q.  Subsequent to working as a CSR in weight and
16  balance, you went to work as a cargo agent at Western,
17  correct?
18    A.  Yes.
19    Q.  And what did you do in that particular
20  position?
21    A.  Transported cargo to and from the aircraft to
22  the holding facility warehouse, loaded the cargo and
23  prepared it for departure, and processed customs paperwork
24  for international air cargo.
25    Q.  And that's the position that you held at the

1  time the Western-Delta merger occurred, correct?
2    A.  Yes.
3      (Defendant's Exhibit 2 was marked for
4      identification.)
5  BY MS. GIUSTINA:
6    Q.  Ms. Henry, you've just been given what's been
7  marked as Defendant's Exhibit 2, which is a March 2nd,
8  1987 letter addressed to you from Delta Air Lines.  And
9  this is a letter offering you employment with Delta as a
10  result of the merger, correct?
11    A.  Yes, I believe so.
12    Q.  And is that your signature in the bottom
13  left-hand corner of Exhibit 2?
14    A.  Yes, it looks like my signature.
15    Q.  And if you would please look at the third
16  paragraph of the letter that begins, As with all Delta
17  personnel -- do you see where I'm referring to?
18    A.  Uh-huh, yes.
19    Q.  The remainder of that sentence talks about --
20  and I'm going to generalize here -- but the terms and
21  conditions of your employment would be governed by
22  something called Delta Standard Practice Manual.  Do you
23  remember that -- that personnel manual?
24    A.  Yes.
25    Q.  And, basically, that was a document that

1  contained Delta's workplace rules, right?
2      A.  Among other things, yes.
3      Q.  All right.  What other things do you remember it
4  containing?
5      A.  I remember topics on administrative policies and
6  human resources information; in other words, all the
7  information wasn't specific to the job I did.  Some of it
8  was specific to the company's other departmental
9  functions.
10     Q.  Okay.  All right.  What do you remember
11 specifically about the human resources function?
12     A.  The only thing I cared about, which was my pass
13 benefits at the time.  I just knew where to go to find out
14 who I could travel on.
15         MS. GIUSTINA:  Off the record.
16         (Off the record.)
17 BY MS. GIUSTINA:
18     Q.  So when you referred to the flight benefits and
19 in terms of the HR section, you mean there were sections
20 of the standard practice manual that actually spoke to the
21 benefits that you enjoyed as a Delta employee?
22     A.  Yes.
23     Q.  Okay.  And do you remember the standard practice
24 manual containing an antidiscrimination and harassment
25 policy?

1      A.  I think that was just assumed on my part.  I
2  never read that.
3      Q.  Okay.  You never had occasion to go in and look
4  at that in particular?
5      A.  No.
6      Q.  Were you ever aware of the standard practice
7  manual ever changing names over time, such that, when you
8  were terminated, it was actually called the Human
9  Resources Practices Manual?
10     A.  No.
11     Q.  But, nonetheless, you continued to be aware that
12 Delta had a personnel manual that was available to
13 employees, correct?
14     A.  Yes.
15     Q.  At the time of the Delta-Western merger, that
16 was a hard-copy document that was available to employees,
17 correct?
18     A.  Yes.
19     Q.  And, over time, that manual was put online so
20 that you could access it through your workplace computer,
21 correct?
22     A.  Correct.
23     Q.  At the time of the merger, you were represented
24 by a union, correct?
25     A.  Yes.

1      Q.  And at some point following the merger, the
2  representation ceased, right?
3      A.  Yes.
4      Q.  Do you remember when and how that happened?
5      A.  No.
6      Q.  Do you recall, was it simultaneous with the
7  merger occurring, or did the union exist for some period
8  of time following the merger?
9      A.  I don't remember.
10     Q.  Okay.  At some point, you would agree with me,
11 though, that you were no longer represented by a union as
12 a Delta employee, right?
13     A.  Correct.
14     Q.  And you understood at that point you could
15 resign your employment at any time, right?
16     A.  Yes.
17     Q.  And you understood that Delta was not contracted
18 in any way to employ you for a particular period of time,
19 right?
20     A.  Yes.
21     Q.  All right.  And that they could terminate your
22 employment for any lawful reason, correct?
23     A.  Yes, for any lawful reason.
24     Q.  When you assumed employment with Delta, you were
25 working as a customer service agent in cargo.  So, in

1  other words, you continued doing the same job, or at least
2  were assigned to the same area that you were as a Western
3  employee, correct?
4      A.  Yes.  The area did expand to encompass the
5  buildings that belonged to Delta Air Lines.
6      Q.  And at the time of the merger, did you simply
7  become a Delta employee and start working, or did you
8  attend an orientation that basically introduced you to
9  Delta and the corporate philosophy and what the company's
10 policies and practices were and that sort of thing?
11     A.  I don't remember.
12     Q.  It was a long time ago?
13     A.  Yes.
14     Q.  All right.  But it's possible you could have
15 attended an orientation session?
16     A.  It's possible.
17     Q.  All right.  Did you -- and now I'm going to
18 focus strictly on the time that you were a Delta employee
19 as opposed to a Western employee -- receive any periodic
20 training courses throughout your career?
21     A.  Yes.
22     Q.  All right.  And just, if you could, very briefly
23 give me an idea of the types of courses that you would
24 have taken.
25     A.  There were annual recurrent trainings that were

1 required. In addition to those, there were periodic
2 mandatory safety trainings or federal regulation
3 trainings. I believe my transcript training classes is a
4 couple of pages long, maybe more. So I really don't have
5 any recollection of specifics.
6    Q. Okay. Is it fair to say that, as various
7 corporate policies and procedures changed over time, you
8 would receive training on those issues?
9    A. No. No.
10    Q. No? So when a policy or procedure changed, how
11 would that be relayed to you?
12    A. Often, that information was given in the agent
13 briefings prior to your shift.
14    Q. All right. Was other information shared during
15 the agent briefings?
16    A. Yes.
17    Q. What are the sorts of things that were shared
18 during the agent briefings?
19    A. The expectations in terms of the daily
20 operation, policy changes, scheduling assignments in the
21 form of a schedule being available, a written schedule
22 being available to you.
23    Q. I'm sorry. I couldn't --
24    A. Sorry. You would receive a written copy of the
25 daily work schedule in that briefing.

1    Q. And the daily work schedule being the gates you
2 were assigned to, the flights you were assigned to work
3 for that particular day?
4    A. Correct.
5    (Off the record.)
6 BY MS. GIUSTINA:
7    Q. The daily work schedule would have been the
8 gates that you would have been assigned to work or the
9 flights you would have been assigned to work for that
10 particular day, as well as the person who might be working
11 at that gate with you, correct?
12    A. Yes.
13    Q. Okay. Anything else that would have, you know,
14 typically been covered in an agent briefing?
15    A. Sometimes information about coworkers who had
16 had a death in the family or a promotion, just sort of
17 general news.
18    Q. Okay. Regarding the annual recurrent that you
19 had mentioned previously in terms of training classes that
20 you took -- and you mentioned that that was required, and,
21 obviously, because it's annual, it's required on a yearly
22 basis -- what were the subjects or matters that that
23 covered?
24    A. It depended on your work area.
25    Q. As a 125 gate agent -- and I suppose I should

1 ask this question first. The Cincinnati operation, I know
2 that you did work gates certainly in 2008. Was it such
3 that you would rotate from gate to ticket counter, or did
4 you primarily work gates at that point in time?
5    A. In 2008?
6    Q. Uh-huh.
7    A. What month in 2008?
8    Q. Well, I mean, it could be that you worked both.
9 And if that's the case, that's a perfectly fine answer.
10 I'm just trying to get a sense of what you were doing in
11 2008. Were you strictly working gates during that time
12 period, or might there --
13    A. No.
14    Q. -- also have been a time you were working at the
15 ticket counter, for example?
16    A. No, I was not strictly just working gates.
17    Q. Okay. And in terms of Cincinnati and how they
18 would assign functions, when you did the job bid, would
19 you bid for a particular function, whether it be, you
20 know, baggage service or Crown Room or ticket counter or
21 gates, or might that job function change during the time
22 of your bid period?
23    A. The bid process was offered approximately every
24 six months, but sometimes it was an open bid, meaning you
25 could be assigned to any area of department 125 on a daily

1 basis. Other times it was a closed bid and you bid for a
2 specific area within 125; however, you were generally
3 expected to be available in whatever capacity was needed
4 within that department.
5    Q. Right. Because operational demands might be
6 such that extra people were needed in another area?
7    A. Correct.
8    Q. Was there ever a time when an open bid and a
9 closed bid was available during the same bid so that some
10 folks were bidding open and some folks were bidding
11 closed?
12    A. I think so.
13    Q. Okay. The annual recurrent that you took as a
14 125 agent, did all 125 agents take the same annual
15 recurrent class?
16    A. I don't know.
17    Q. Okay. Let's talk about the annual recurrent
18 that you were taking. What were the subjects -- and let's
19 just focus on the two to three years prior to your
20 termination. What were the subject matters that were
21 covered during that annual recurrent training?
22    A. Acceptance of hazardous materials, something to
23 do with safety in and around the aircraft, external part
24 of the aircraft, the DOT guidelines and rules for working
25 with disabled passengers. I can't remember what else.

1    Q.  Okay.  And do you remember during that
2  three-year time period, roughly 2005 to 2008, whether the
3  course varied depending on what function you might have
4  been working at that time, or was it -- did it seem to be
5  the same subjects covered every year as a refresher, for
6  lack of a better word?
7    A.  It seemed to be the same as a refresher.
8    Q.  Okay.  In reviewing your employment records, it
9  looks as though you were a senior customer service agent
10  for two periods of time, and that was working in 125 for
11  the period of 1988 to '90 you were a senior customer
12  service agent in LAX.  Does that sound correct?
13    A.  Yeah.
14    Q.  And then you moved from LAX to Cincinnati in
15  1991, approximately, right?
16    A.  Yes.
17    Q.  Okay.  And during the time that you were working
18  as a 125 senior customer service agent in LAX, there was
19  an indication in a form you had filled out that you had
20  worked basically almost every function that a 125 agent
21  could perform, meaning counter, gates, Crown Room, baggage
22  service.  Is that your recollection?
23    A.  I worked the counter, the gates, baggage
24  service.  I filled in in the Crown Room generally just at
25  the bar.  Yes, I worked those four areas.

1    Q.  Okay.  Why did you decide to move from LA to
2  Cincinnati?
3    A.  Los Angeles is not my home, and it's expensive
4  to live there.
5    Q.  And why did you choose Cincinnati?  Was there
6  something in particular about Cincinnati?
7    A.  I knew somebody here that worked for Delta.
8    Q.  When you came to Cincinnati, you worked as a
9  ramp agent initially, correct?
10    A.  Yes.
11    Q.  120 agent?
12    A.  Yes.
13    Q.  And then based on the time frame we talked about
14  earlier, you moved back to 125 and worked as a senior
15  customer service agent in that area, correct?
16    A.  Yes.
17    Q.  And is it your recollection that during that
18  frame of time, again, that you basically performed those
19  four functions as a senior customer service agent, being
20  counter, gates, Crown Room, baggage service?
21    A.  What was the time frame?
22    Q.  1992 to 1995.
23    A.  I don't think I worked in baggage service
24  then.
25    Q.  Okay.  But you would have worked counter, gates,

1  and Crown Room?
2    A.  I think my primary assignment was gates.  I
3  think I covered for staffing needs in the other two areas
4  from time to time.
5    Q.  All right.  And in 1995, you became a res agent,
6  correct?
7    A.  That sounds right, yes.
8    Q.  What occasioned that move?
9    A.  Delta was -- I don't know what you call it --
10  restructuring, perhaps.  It was a time in their history
11  where they were trying to cut costs, and they advised us
12  that there was a good possibility that our jobs would be
13  eliminated and offered us reservation sales as an option
14  to keep our employment.
15    Q.  And just generally speaking, what job did you do
16  as a res agent?
17    A.  CSR is just the frontline employee who answers
18  the phones, makes reservations, provides information.
19    Q.  And for the entire time that you worked as a res
20  agent, you worked a domestic reservation sales agent;
21  is that correct?
22    A.  I started out as a domestic reservation sales
23  agent and then went to -- still domestic, but I worked in
24  special member services, which was the department that
25  handles our elite travelers, frequent fliers.

1    Q.  And is that the job that you were working when
2  you eventually moved back to be a customer service agent
3  at the airport?
4    A.  Yes.
5    Q.  All right.  And does -- the records that I
6  reviewed reflected that you were working as a reservation
7  sales agent from 1995 to 1997.  Does that sound correct?
8    A.  That sounds right.
9    Q.  All right.  Then in 1997, you moved back to the
10  airport as a senior customer service agent in 125,
11  correct?
12    A.  Yes.
13    Q.  Now, at some point in 2005 you became a lead
14  customer service agent, correct?
15    A.  Correct.
16    Q.  All right.  And that was also within
17  department 125?
18    A.  Yes.
19    Q.  And at the point in time in 2005 when you became
20  a lead, tell me what the structure was.  As a lead, to
21  whom did you report and so on and so on up the line?
22    A.  My supervisor was who I directly reported to.
23  Their title was just supervisor of ACS 125.  They directly
24  reported to -- I know the people's names, but I don't
25  always recollect the titles.  But they directly reported

1   to what I believe was ACS manager. The ACS manager
2   directly reported to the station manager, was my
3   understanding. That was what I believed to be the chain
4   of command.
5     Q. All right. Were the supervisors called
6   performance leaders?
7     A. Oh, yes. Yes.
8     Q. Okay. And the ACS manager, duty manager, or
9   was --
10     A. Yes. That changed off and on --
11     Q. It did.
12     A. -- over time.
13     Q. It did.
14     A. So --
15     Q. But roughly the equivalent of a duty manager,
16   whether it was called that or not at that time?
17     A. Yes. At one point I knew the duty manager to be
18   duty manager, the same individual later to be just the
19   manager. So, yes.
20     Q. All right. Fair enough.
21     At the time you became a lead customer service
22   agent in 2005, who was the station manager at
23   Cincinnati?
24     A. I think it was Carol Zupancic.
25     Q. And did that ever change at some point in

1   time?
2     A. Yes.
3     Q. Okay. Who succeeded her as station manager?
4     A. Paul Baird.
5     Q. Paul Baird. And then who after Mr. Baird, to
6   your knowledge, anyone?
7     A. I don't know.
8     Q. Okay. And then in terms of the duty manager or
9   the ACS manager that you referenced, who would have been
10   in that position at the time you were promoted to a lead
11   customer service agent in 2005?
12     A. I think it was -- I'm drawing a blank. I think
13   his first name was Phil.
14     Q. What title did you understand Gary Schmidberger
15   to hold?
16     A. Duty manager.
17     Q. Okay. And, to your recollection, when did
18   Mr. Schmidberger become duty manager?
19     A. Sometime after Phil departed.
20     Q. Was it during the time that you were working as
21   a lead customer service agent?
22     A. I don't remember.
23     Q. Did Gary ever become -- did he ever get a
24   promotion, to your knowledge, to station manager?
25     A. No.

1     Q. So he held the same position, to your knowledge,
2   the entire time that you were familiar with him in a
3   leadership role at Delta?
4     A. I believe so.
5     Q. All right. How did you learn of the lead
6   customer service opening?
7     A. Gary Schmidberger.
8     Q. So he told you about the opportunity?
9     A. Yes.
10     Q. And was that -- was that a bid position?
11     A. Yes.
12     Q. Do you know how many available lead positions
13   there were at that particular time?
14     A. I don't know.
15     Q. And Mr. Schmidberger suggested to you that you
16   would be a good candidate for that job?
17     A. Yes.
18     Q. You submitted a bid, correct?
19     A. Yes.
20     Q. As part of that process, were you interviewed?
21     A. Yes.
22     Q. And do you recall who interviewed you?
23     A. Fred Blank.
24     Q. I'm sorry. Blank?
25     A. Fred Blank.

1     Q. Okay.
2     A. And Sue O'Connell.
3     Q. And what positions did Mr. Blank and
4   Ms. O'Connell hold at that time?
5     A. I don't remember.
6     Q. Okay. Were they 125 employees?
7     A. I'm not even sure of that.
8     Q. All right. And they were the only two folks who
9   interviewed you?
10     A. Yes.
11     Q. Did you receive any sort of, to your knowledge,
12   recommendation from any supervisor or management level
13   employees, other than Mr. Schmidberger suggested to you
14   that you would be a good candidate?
15     A. Yeah, I don't know.
16     Q. Do you know, were there others who interviewed
17   for the lead position?
18     A. Yes.
19     Q. How many folks, roughly?
20     A. I don't know. When I arrived for my interview,
21   there were three or four others waiting.
22     Q. And you don't remember how many open slots there
23   were?
24     A. I don't.
25     Q. Okay. Do you know who made the decision to

1    award the lead position to you?
2        A.   I assumed it was a collaboration of management,
3    but I don't know who it was specifically.
4        Q.   Who told you that you had received the job?
5        A.   Gary Schmidberger.
6        Q.   Prior to assuming the lead duties, did you
7    receive any training?
8        A.   Training?
9        Q.   About what you would do as a lead.
10       A.   No.
11       Q.   Tell me what the difference was between being a
12   senior customer service agent as opposed to a lead
13   customer service agent.
14       A.   For me, the differences were extensive and
15   complex because I switched departments.  I didn't switch
16   departments.  It was still department 125.  But I went
17   from working gates, where I had been for years, to the
18   baggage service department, which I don't believe I ever
19   worked while I was in Cincinnati.
20       Q.   Okay.  And the baggage service department, tell
21   me what that is.
22       A.   That department handles the tracking of
23   misplaced luggage; luggage that doesn't arrive with the
24   passenger is tracked and returned to them, hopefully; also
25   handles lost and found personal items; and the replacement

1    of damaged bags, to a certain extent, or the initializing
2    of claims for damaged bags.
3        Q.   So is it fair to say that you were assuming new
4    duties as a lead and also becoming familiar with the
5    operation of the baggage service department?
6        A.   Yes.
7        Q.   Do you remember when in 2005 you became a
8    lead?
9        A.   I think it was May.
10       Q.   Putting aside the challenges in learning a new
11   area or a new function of Delta's operations, in terms of
12   the duties you assumed as a lead, what were those?
13       A.   I don't remember the job description, per se;
14   only that I acquired the responsibility of managing a team
15   of employees, frontline employees, that were assigned to
16   me to train, to coach, to evaluate and motivate.
17       Q.   I'm sorry?  Motivate?
18       A.   And to motivate.  I was responsible for
19   assigning time-off requests.  I was responsible for making
20   the daily work schedule.  I was responsible for providing
21   the agents with a daily briefing of pertinent information.
22   I was responsible for administrative duties that provided
23   senior management with information that tracked the
24   productivity of the department.  I was responsible to
25   attend various related meetings with other upper

1    management and occasionally a station briefing with the
2    station manager.  I had to monitor and evaluate the
3    outside contract that we had with the delivery company
4    that delivers the bags once they've been found.
5        Q.   You mean the company that delivers the bags to
6    the passengers?
7        A.   Yes.  That is contracted.  And I was responsible
8    for monitoring the effectiveness of that, all kinds of
9    customer service complaint resolution, agent complaint
10   resolution.
11       Q.   Is it fair to say on the customer piece that you
12   were called in -- if the frontline employees had a
13   particularly difficult situation that perhaps they were
14   unsure how to handle, they would ask you to step in and
15   facilitate that?
16       A.   Yes.
17       Q.   So it sounds like you acquired several
18   additional duties in connection with your promotion to
19   lead, correct?
20       A.   Yes.
21       Q.   When you mentioned you were responsible for
22   coaching employees, would you make entries in the team
23   book about an employee's performance, be it good or bad?
24       A.   I would provide an e-mail documentation to the
25   performance leader, and they would put that into the

1    electronic team journal or the agent's journal, because I
2    did not have direct access to the journal.
3        Q.   When you sent the e-mail, it was with the
4    understanding that this would be placed in the journal
5    itself, though, however, correct?
6        A.   Yes.
7        Q.   And you also mentioned evaluating employees.
8    What was -- what was the level of your involvement in
9    doing that?
10       A.   I believe that it was considered to be a
11   position where I was to be groomed for the next level as
12   performance leader.  That was my understanding.  So the
13   performance leader would allow me to complete the
14   evaluation forms that Delta used.  He or she would then
15   review those, modify them, and at their discretion either
16   I would present the information to the employee or they
17   would present the information, but they would be in
18   attendance for that as I was being supervised.
19       Q.   Let me make sure I understand.  If you were the
20   person who presented the evaluation to the employee, the
21   performance leader would be present, correct?
22       A.   Yeah.  That was what was supposed to happen.
23       Q.   Okay.  And if the performance leader was the one
24   who presented the evaluation, would you be permitted to
25   sit in on that discussion and hear what was said?

1    A.  As much as was possible to do, yes.
2    Q.  All right.  And did you have an active role in
3  delivering the evaluation when it was the performance
4  leader who was actually giving the paper to the
5  employee?
6    A.  What do you mean, active role?
7    Q.  Yeah.  In other words, did you do any talking?
8  Did you have any verbal input in the meeting, were you
9  asked questions by either the performance leader or the
10  employee your opinion of the employee's performance, for
11  example?
12    A.  Yes.
13    Q.  Okay.  Which would make sense, because you work
14  with the employee every day, right?
15    A.  Right.
16    Q.  All right.  How did the sign-off on the
17  evaluations go?  Obviously, the performance leader signs
18  the evaluation, correct?
19    A.  Correct.
20    Q.  And then the employee signs the performance
21  evaluation, right?
22    A.  Yes.
23    Q.  And do they sign the evaluation and date it at
24  the same time when it is presented?
25    A.  I don't remember.  I don't remember what the

www.elitereportingagency.com
513.233.3000

1  requirements around that issue were.
2    Q.  Okay.  But, you know, certainly, I think we
3  would agree that both sign the evaluation, right?
4    A.  But the employee wasn't required to sign if
5  they --
6    Q.  If they disagreed for some reason?
7    A.  -- disagreed.
8    Q.  Right.
9    A.  There are spaces for both to sign.
10    Q.  Right.
11    A.  Yes.
12    Q.  And, typically, if an employee didn't want to
13  sign the evaluation because they didn't agree for some
14  reason, was the practice to encourage the employee to sign
15  and make note of their disagreement?
16    A.  I believe so.
17    Q.  But, still, there were some employees who didn't
18  want to sign, right?
19    A.  That didn't happen to me.
20    Q.  Okay.
21    A.  But I heard of that happening.
22    Q.  Okay.  Did you ever have to deliver a -- an
23  evaluation that was perceived by an employee to be
24  unfavorable?
25    A.  I don't know if they -- if they perceived it to

www.elitereportingagency.com
513.233.3000

1  be unfavorable, they didn't indicate as much.
2    Q.  Did you ever give an employee an evaluation, or
3  were you ever involved in assessing an employee who
4  received anything less than a meets expectations?
5    A.  I don't remember.
6    Q.  Maybe; you just don't remember?
7    A.  Right.  Maybe.  I don't remember.
8    Q.  Okay.  And then after -- we have the employee
9  who signs, the performance leader who signs, and then
10  there is the next level of management who signs,
11  correct?
12    A.  I don't know.  Maybe.
13    Q.  Okay.  And is it your understanding that
14  whichever managers wind up signing the evaluation, that
15  that person, if their name is on there, has the input to
16  change that evaluation in some way?
17    A.  Oh, yes.  Now that you say that, in thinking
18  back on my own personal evaluations, I do remember that my
19  performance leader had to then submit it to -- as an
20  example, Gary Schmidberger, who then signed off on it, but
21  could make modifications, yes.
22    Q.  And do you remember, now that you're thinking
23  back, would -- in the example you just used, would
24  Mr. Schmidberger have signed off on it before it would
25  have been presented to you?

www.elitereportingagency.com
513.233.3000

1    A.  I don't know.  That's a good question.  I don't
2  know.
3    Q.  Okay.  During the time that you served as a lead
4  customer service agent, did you ever hear any comments by
5  performance leaders or other managers that gender should
6  be considered in any way in administering ratings to
7  employees?
8    A.  Did I hear comments -- say that again, please.
9    Q.  During the time that you served as a lead
10  customer service agent, did you ever hear performance
11  leaders or any other level of management make comments
12  that would indicate that gender should be taken into
13  consideration in assessing an employee, good or bad?
14    A.  Can you give me an example?  I don't know if I
15  understand that question.
16    Q.  In other words, did you ever hear a statement by
17  a leader that an employee should be graded higher or lower
18  simply because of their gender?
19    A.  No.
20    Q.  You ultimately wound up resigning your lead
21  customer service position, correct?
22    A.  Correct.
23      (Defendant's Exhibit 3 was marked for
24      identification.)
25  BY MS. GIUSTINA:

www.elitereportingagency.com
513.233.3000

1    Q.  Before I talk to you, Ms. Henry, about what's
2  been marked as Exhibit 3, how many other lead customer
3  service agents were there working in the baggage service
4  department at the time you served there as a lead?
5    A.  Two others.
6    Q.  All right.  And you all worked on rotating
7  shifts, right?  Because the baggage service operation was
8  24/7?
9    A.  No.  The office closed at a certain time each
10  night and reopened -- roughly closed for approximately
11  four or five hours a night.  And, no, it was not rotating
12  shifts.
13    Q.  So you had a set schedule?
14    A.  Yes.
15    Q.  Okay.  Typically, when that happened, were you
16  the only lead on duty, or was there some overlap?
17    A.  Occasionally there was some overlap.
18    Q.  Okay.  If you would, take a look at what's
19  marked as Exhibit 3.  It's a typewritten letter dated
20  March 21, 2006 to the ACS management team, and that is
21  your name at the bottom of that letter.
22    Ms. Henry, is this a letter that you submitted
23  to the ACS management team resigning your lead role?
24    A.  Yes.
25    Q.  And in that letter you indicate that due to your

1  daughter's illness, just the added responsibilities of the
2  position, and the time that you needed to address your
3  daughter's illness was such that you wanted to step back
4  to your senior customer service agent position, correct?
5    A.  Correct.
6    Q.  Was there any -- anything else that factored in
7  your decision to step back other than your daughter's
8  illness?
9    A.  No.
10    Q.  You ultimately returned to your senior customer
11  service agent duties in April of 2006.  Does that sound
12  right?
13    A.  It looks to be about the right time frame.  I
14  don't know exactly when.
15    Q.  Yes.  If you'll look at the third paragraph, you
16  indicate you'll continue working in that capacity till the
17  end of the bid period --
18    A.  Yes.
19    Q.  -- which would be April of 2006.  Do you recall
20  doing that?
21    A.  Yes, I do.
22    Q.  Okay.  And when you moved back to the senior
23  customer service agent role, that was a seamless
24  transition, right?
25    A.  Yes.

1    Q.  And did you find that during the time with your
2  daughter's illness in 2006 that the company was supportive
3  of that?
4    A.  By company, to whom are you referring?
5    Q.  Your leaders in terms of -- first of all,
6  allowing you to step back out of your lead role, right?
7  You were allowed to do that?
8    A.  They accommodated my request, yes.
9    Q.  Okay.  Did you receive FMLA leave at some point
10  in time to assist with your daughter's care?
11    A.  I had intermittent FMLA.
12    MS. GIUSTINA:  This is probably a good time to
13  take a break.
14    (A recess was taken from 10:53 to 11:01.)
15  BY MS. GIUSTINA:
16    Q.  Ms. Henry, you mentioned during your testimony
17  before we took a break that you primarily had worked in
18  the gate area, at least I had the sense, in the year
19  from -- the years from 2000 to 2008; is that a fair
20  statement?
21    A.  You're wondering if I worked the gates -- tell
22  me what you're asking.
23    Q.  Yeah.  You made reference earlier to the fact
24  that you had primarily worked the gates so that when you
25  moved to the baggage service department you had to learn

1  basically a whole new operation.  So from that I made the
2  assumption that you primarily worked at the gates other
3  than the stint that you had as a lead in the baggage
4  service department.  Is that -- is my interpretation of
5  your statement correct?
6    A.  Yes.  However, it's partially correct.  But as I
7  said earlier, department 125 agents were expected to be
8  available to perform all of the duties of the department.
9  And also, as I had said before, the bid change -- the bid
10  opportunities were different about every six months.  And
11  with the new bid would sometimes come assignments outside
12  of the gate area for parts of your day.
13    Q.  Okay.
14    A.  But that changed.  It was just very fluid.
15    Q.  Okay.  Is it fair to say that when you had an
16  opportunity to work the gates, that would be your location
17  to work of choice?
18    A.  Yes.
19    Q.  Okay.  Do you have a sense as to how many 125
20  agents -- and let me be clear, I'm not talking about leads
21  and above, but simply either senior customer service
22  agents or customer service agents -- that there were
23  working in the Cincinnati operation at any given time?
24    A.  No.
25    Q.  Okay.  At the time -- and let's focus on 2008

1  right now.  At that time in the Cincinnati airport, were
2  there any of the overhead screens that assist in the
3  boarding process that we now see commonly in many
4  airports?
5      A.  Yes.
6      Q.  Okay.  There were?
7      A.  Yes.
8      Q.  And were those -- what did those screens show,
9  to the best of your recollection, in 2008?
10     A.  When the flight would arrive to the gate, it
11  would automatically, for a period of time, post connection
12  information indicating flight number, city, and departure
13  gate.
14         After that scrolled off, it would -- I think
15  within an hour -- I think it was an hour before, may have
16  been an hour and a half -- I'm forgetting now -- prior to
17  the scheduled departure time of the flight for that --
18  assigned to that gate, it would reflect basic information
19  about the flight -- and I don't remember those details --
20  just basic customer service-type information.
21         And when the boarding process would start, there
22  was a -- something on the bottom of the screen that would
23  tell the passengers where we were in the boarding process.
24  And that was determined by what the gate agent -- that was
25  manually -- it could be set up to operate automatically,

1  but generally it was set up as manually operated by the
2  gate agent.
3      Q.  Let me stop you and ask a question, make sure I
4  know what you're talking about.  I don't know in 2008 how
5  Delta was boarding aircraft.  Was it by zone at that
6  time?
7      A.  I think so, yes.
8      Q.  So if I'm understanding you correctly, the --
9  there would be a little snippet at the bottom of the
10  screen that would tell the passengers, we're now boarding
11  zone one, zone two, zone three, et cetera?
12     A.  Correct.
13     Q.  And if I understand correctly, you could either
14  set the system to change zones every five minutes, for
15  example, or you could make it manual so that the agent
16  working the gate could hit a button and that way kind of
17  control the flow of customers more specific to how the
18  boarding process was actually going?
19     A.  Correct.
20     Q.  Okay.  All right.  Anything else on the overhead
21  screens that you can recall there being?
22     A.  Yes.  Part of the general information provided
23  to the passenger, in addition to -- in addition to
24  departure -- scheduled departure time and destination and
25  weather in that city of arrival, was at so many minutes

1  prior to departure -- and, again, I don't remember the
2  details -- there was an indication of the airport standby
3  list and -- so that they could see how they were
4  progressing in terms of their chances, if you will, of
5  making the flight, if they were standby, to get on the
6  flight, because they did not have a reservation, they were
7  listed there.  And, also, if they were standing by to
8  switch classes of service, they were there.  And it would
9  keep a record for them of information like how many
10  passengers had checked in for the cabin they were standing
11  by for and how many seats were remaining, that kind of
12  thing.
13     Q.  All right.  And there also was an upgrade
14  list?
15     A.  That's what I was just referring to.
16     Q.  Okay.
17     A.  If they were standing by from -- to upgrade from
18  the coach to the first class cabin, that information was
19  indicated there.
20     Q.  Was there an upgrade list and a standby list,
21  two separate lists that you can recall?
22     A.  I think.  I think that on the screen it
23  reflected as two separate, just to minimize confusion for
24  the passenger.  But I couldn't be sure of that.  And
25  then -- because, honestly, as a gate agent, you're not

1  monitoring that screen.  It's sort of an automatic sort of
2  thing that's just going on, and oftentimes you're not even
3  aware of what it's saying.  But it's -- the information on
4  that screen is generated, I believe, by the information
5  that I have in my computer set.  I thought they were
6  linked.  And my list is all one list.
7      Q.  Okay.
8      A.  It's just referred to as the airport standby
9  list.
10     Q.  Okay.  So your list, just to make sure I
11  understand, contains both upgrades and standbys?
12     A.  Uh-huh.
13     Q.  Okay.  Does your computer that you're working on
14  put those folks in the appropriate priority?
15     A.  Yes.
16     Q.  Okay.  So that's not something you have to
17  manually do, correct?
18     A.  Well, I should clarify.  When someone is added
19  to the standby list, the agent adding them could err and
20  in erring in filling in the template for upgrade could
21  inadvertently place them in the wrong place on that
22  list.
23     Q.  And who typically is the agent who does that?
24     A.  Now, it's --
25     Q.  Well, in 2008.

1     A.  In 2008, I mean.  I'm acting as though I'm right
2  back in 2008.  So when I say now, I'm sort of in the
3  moment of 2008.
4     Q.  Okay.  We'll state for the record, if we say
5  now, it's 2008.
6     A.  State for the record -- I'll be more specific.
7     So in 2008 we had the check-in kiosks.  So there
8  was a number of ways that an individual could be placed on
9  that list.  Even -- even they could check themselves in
10  from their phone while driving into the airport.  So it
11  could have been a ticket agent at any of the ticketing
12  locations.  It could have been an up-line city where they
13  checked in earlier in the day and were connecting through
14  Cincinnati to the destination, or it could have been them
15  doing it either online or via their PDA.
16     Q.  And so if I'm understanding correctly, obviously
17  human error could factor in with, you know, a ticketing
18  agent.  How -- I guess I'm not as familiar with the online
19  check-in or checking in at the airport with a kiosk how a
20  passenger could input the wrong information that would
21  result in them being miscoded, if you will, for purposes
22  of the airport standby list.
23     A.  Based on what I know to be true about the
24  system, I don't believe a passenger could do that on
25  purpose.  I do think it could accidentally happen if the

1  agent making the reservation had erred to begin with.
2     Q.  Okay.  That clarifies it for me.
3     A.  Does that help?
4     Q.  Yes.  You referenced earlier the fact that when
5  you were a lead agent in the baggage service center that
6  you made the schedule.  Is the same thing true, within the
7  gate area -- is it the lead agents in the gate area who
8  make the work assignments?
9     A.  In 2008, the lead program was still in effect.
10  And the lead program, as I understood it, was designed to
11  mentor the leads into that performance leader role.  And
12  so the performance leaders were giving the leads some
13  latitude and some opportunity to make those schedules.
14  Sometimes it was referred -- reviewed, rather, by a
15  performance leader and changes were made.  Other times, it
16  was just accepted as is.
17     Q.  All right.  So is it fair to say the leads took
18  the first stab at it with oversight from the performance
19  leaders during 2008?
20     A.  Yes.
21     Q.  Typically, how many agents would be assigned to
22  board a flight?
23     A.  That varied from day to day.
24     Q.  You know, I was going to say, that might not be
25  a simple question as it sounds.  Is it fair to say that

1  that varies on the type of aircraft, recognizing, of
2  course, that there's a lot of connection carriers flying
3  in and out of Cincinnati, so smaller aircraft, depends on
4  the size of the aircraft, number of passengers, that sort
5  of thing?
6     A.  There are many variables that factor into the
7  assignment of agents to any particular flight.
8     Q.  How about a -- you know, a mainline flight?  So
9  we have a bigger aircraft.  Would there ever be an
10  occasion where one agent would be assigned, or typically
11  would they try to have two agents assigned to that
12  flight?
13     A.  There are many instances where one agent is
14  assigned.
15     Q.  Even with a mainline aircraft?
16     A.  Yes.
17     Q.  All right.  Generally speaking, back in 2008,
18  when you were working as a senior customer service agent,
19  how many flights would you assist in boarding in a work
20  shift?
21     A.  Would I assist another agent in boarding?
22     Q.  Well, would you work.  And I realize that
23  sometimes you might primarily be assigned to one gate and
24  then get pulled away to assist somebody somewhere else.
25  So let me ask the question this way.  How many gates on a

1  typical day would you be assigned to work to board that
2  aircraft?
3     A.  I think it's safe to say in 2008 an average of
4  three.
5     Q.  And how long was your shift?
6     A.  In 2008, when I was suspended, and then --
7     Q.  Well, did your shift length vary at any time
8  during 2008?
9     A.  It's possible.  I think there were overlapping
10  bid periods, as I mentioned.  And with each bid period the
11  opportunity for different start times and end times would
12  be there.  I don't remember what I was working in the
13  beginning of '08.  By the --
14     Q.  I'm sorry.  Go ahead.
15     A.  Go ahead.
16     Q.  No.  I was going to ask -- but were you
17  consistently working -- regardless of your start and end
18  time, were you consistently working the same number of
19  hours?
20     A.  Not necessarily.  Sometimes -- I was working --
21  I was trying to work a reduced-hour shift, meaning less
22  than 40 hours in a week.  Sometimes the shift offered
23  would be five hours, sometimes six, sometimes six and a
24  half.  So there were reasons why you might be holding a
25  six-and-a-half-hour shift for one month and then a

1  five-and-a-half-hour shift in a different month.
2      Q.  Okay.  At the time of your suspension, which was
3  July of 2008, do you recall what -- how many hours your
4  shift was lasting at that point in time?
5      A.  I should probably correct you and say I think my
6  suspension was August of '08.
7      Q.  Okay.
8      A.  But I think my shift was something like
9  four-and-a-half hours.
10     Q.  Okay.  And would it be the four-and-a-half hours
11  that you would be boarding three flights during that time,
12  or would that number reduce?
13     A.  No.  Three flights was a good average, I
14  think.
15     Q.  And would the three flights increase if the
16  number of hours worked in your shift increased?
17     A.  Yes, it could.  There was that possibility.  On
18  the other hand, it might not.
19     Q.  When you're working at the gate, you have a
20  computer there that you're working on, correct?
21     A.  (Nodding head.)
22     Q.  You have to verbalize your answer.
23     A.  Yes.
24     Q.  And when you do your work on the computer, you
25  sign in using a sign that is unique to you, correct?

1  or no seat.
2      Q.  Okay.  So it doesn't even give a seat
3  assignment?
4      A.  It -- I'm sorry.  It reflects, for instance,
5  22B, or there may be nothing there which would indicate a
6  seat has not been assigned.  Or in the case of a large
7  number of people in the PNR where all the seats cannot be
8  listed out, there is a reference to an entry to use to
9  generate what those seats are.
10     Q.  Okay.  And if, for some reason, the passenger's
11  seat is changed, let's say they're upgraded, to pick a
12  really simple example, is that information entered into
13  their PNR?
14     A.  That would be reflected in the history of their
15  PNR.
16     Q.  And is that something that, if you were the
17  person at the gate who made that seat change, you would
18  have your sign in the record and it would reflect that the
19  seat was changed from 22D to 1A?
20     A.  The history of the PNR reflects any changes that
21  are made and confirmed by ending of the record, and it
22  reflects what -- I think it reflects what computer set
23  number and agent sign and time that was done.
24     Q.  Okay.  Are there different levels on the
25  computer system that you're working at at the gate, like a

1      A.  Yes.
2      Q.  All right.  And that basically leaves your
3  fingerprint on the record, for lack of a better word?
4      A.  Yes.
5      Q.  One of the things, I guess, that comes up on the
6  computer when you're at the gate are the passenger
7  records, correct, or they can come up if you want them
8  to?
9      A.  You can bring up the passenger name record,
10  yes.
11     Q.  Okay.  And what information is contained in the
12  passenger name record, or the PNR?
13     A.  The PNR contains the name, the number of
14  passengers, the origin, and destination.  Generally
15  speaking, there's a fair construction and fair basis code.
16  There's a booking class.  Sometimes there's a seat
17  assignment.  Sometimes there's a phone number.  Sometimes
18  there's a frequent flier number.  And sometimes there are
19  additional remarks that have been added.
20     Q.  Okay.  And if that particular passenger -- let's
21  say you pull up the PNR for Jane Doe and Jane Doe's seat
22  assignment is changed for some reason.  Does that show up
23  in the PNR, or does that show up somewhere else in the
24  computer system?
25     A.  The initial PNR display reflects simply a seat

1  level A, a level C?
2      A.  Yes.  Each set had, I believe, A through E
3  levels available.
4      Q.  And explain to me how that worked and what the
5  purpose of that setup was.
6      A.  It was -- if you were working in level A, which
7  generally was the level that you initially logged into,
8  and you were in the middle of maybe a -- an extensive
9  documentation in a record and a customer would walk up and
10  have a request for you to look up their frequent flier
11  number and add some mileage, you would switch to a
12  different level so as not to lose the data in the first
13  level.
14     Q.  So is it -- is it somewhat like switching to
15  another screen?
16     A.  It's comparable to opening another window in
17  your Windows program.
18     Q.  Okay.  Helpful.  Thank you.
19         If you would, describe for me the procedure that
20  you would follow for checking in a flight.  And let's
21  focus on, you know, 2008.  Tell me if it's -- if I'm wrong
22  here, but I wouldn't think that process would change,
23  depending on the month of 2008; is that fair?
24     A.  I don't think so, no, unless they come out with
25  some sort of policy change.

1    Q.   Okay.  So focusing now on 2008, walk me through
2  the procedure that you would typically follow for a
3  flight.
4    A.   It's been a long time.
5    Q.   I understand.
6    A.   I just want to put that disclaimer out there.
7    Q.   Right.  You know, understanding that it's been a
8  couple years and understanding that it's a -- can be a
9  technical process, tell me to the best of your
10  recollection.
11    A.   Okay.  There is a process of initial paperwork
12  that must be generated.  One of those things is a flight
13  plan.  Another is a preliminary report for the flight
14  attendant that would reflect information relevant to the
15  jobs that they do.  Additionally, there are some optional
16  entries that you may choose to generate that would be
17  helpful in a proactive way if you're anticipating needing
18  them.
19         For an example, if the computers were to have a
20  moment of downtime in the midst of trying to generate
21  final paperwork, you could contact your load planner in
22  Atlanta, provide him or her with details about your
23  flight, and, if their computer system was working, they
24  could generate your dispatch report to your printer for
25  you.  So a preliminary document that you might want to

1  pull would be the information that reflects that phone
2  number, for instance, and have that handy as a
3  reference.
4    Q.   And that would expedite getting the dispatch
5  report?
6    A.   Because if your computer goes down, you don't
7  know who your load planner is.
8    Q.   How -- how often did the computer go down?
9    A.   I don't know.  It was just suggested that you
10  have that information available, because, obviously, a
11  flight could be delayed in trying to generate that report.
12  And it was part of my initial training.  It was listed as
13  one of the items to be sure you had.
14    Q.   Makes sense.
15    A.   For obvious reasons.
16    Q.   Yeah.
17    A.   It was often unnecessary, I should say.  Many
18  times it ended up in the round file at the end of the
19  flight, but it was a better-safe-than-sorry type of
20  approach.
21         Additionally, you might want to -- you may
22  notice that you have an extensive list of frequent fliers,
23  for instance.  So you may generate various frequent flier
24  lists to be more specific about who and where they're
25  coming from, that type of thing.  There were seat lists

1  that you could generate, group lists, if you thought that
2  you had a large group on your flight or you wanted to know
3  if you were going to have a large group on your flight.
4         Sometimes, for instance, specific cities were
5  notorious for having large groups, so if you were working
6  that city, you might pull that information just to make
7  sure there were no surprises when you were ten minutes
8  before departure and 25 people were missing from
9  boarding.
10    Q.   For example, if you've got tour groups going to
11  Miami for a cruise, that sort of thing?
12    A.   Exactly.
13    Q.   All right.
14    A.   So I think the only mandatory paperwork -- and I
15  know there's a couple of other pieces that were mandatory,
16  but they were mandatory in that they were operational.  By
17  that I mean, it would reflect information maybe of who was
18  assigned in the tower -- who was my contact person in the
19  tower for that flight or something.  But in terms of
20  what -- the manifest and that type of thing, all that was
21  needed was the flight plan for the captain and a
22  preliminary report for the flight attendance.
23    Q.   And the flight plan, just very generally,
24  consisted of what?
25    A.   A bunch of letters and numbers that I don't know

1  how to read.
2    Q.   Okay.
3    A.   I really don't know what all's on there.  There
4  was a couple of things on there that were familiar.
5    Q.   Was it navigational stuff?
6    A.   I believe.  I don't know.
7    Q.   Okay.  And how about the preliminary flight
8  attendant report, what was the information on that?
9    A.   That contained usually some information about
10  who their frequent fliers onboard were expected to be, how
11  many people were booked on the flight, perhaps information
12  about meal service and amenities.  I don't recall much
13  else.
14    Q.   What was the purpose of identifying the frequent
15  fliers?
16    A.   The purpose from my perspective as gate agent or
17  for the flight attendant?
18    Q.   Did you have visibility to seeing, for your
19  purposes, the frequent fliers?  Is that something that you
20  would check?
21    A.   Yes.
22    Q.   All right.  And what would -- what would
23  motivate you to do that?  Why would you want to know
24  that?
25    A.   Serial different reasons.  One I can think of is

1  seating.  If you're a gold medallion frequent flier, you
2  don't want to sit in the middle seat.  So if I am opening
3  up the flight two hours before flight time and you checked
4  in in Cedar Rapids and they gave you 12E in the middle and
5  I now have unlocked some aisle seats, I may presumptuously
6  reassign you and then check with you to see if that was
7  acceptable.
8     Q.  All right.  So, in other words, we want to be
9  nice to the people who fly our airline more frequently?
10    A.  Yes.  And if I wait until that passenger arrives
11  in front of me who is connecting from another city, my
12  good seats may have been taken by somebody else that
13  wasn't a medallion flier.
14    Q.  And explain -- my understanding is that
15  oftentimes people show up to the gate without a seat
16  assignment and then they take the seats that are
17  available.  I believe that's what you're referring to?
18    A.  That's true.  That's one way that it can happen,
19  yes.
20    Q.  All right.  And why -- why does that happen?  Do
21  you know?  Why do they not have seat assignments?
22    A.  I believe it's because only a certain percentage
23  of any flight is -- has designated preassigned seating,
24  and the remainder of the seats are for same-day
25  assignment.

www.elitereportingagency.com
513.233.3000

1     Q.  Okay.  Are there occasions -- have you ever --
2  did you ever encounter a situation where your flight was
3  oversold?
4     A.  In 22 years of service, yes, I did.
5     Q.  Yes.  And that happens when the -- you know, the
6  overbooking they do, I think, automatically on the
7  assumption that some people won't actually purchase the
8  seats, but it happens sometimes that everybody does and so
9  there's more passengers than seats on the aircraft,
10  correct?
11    A.  That's a good summary, yes.
12    Q.  Okay.  What do you do when that happens?
13    A.  You go home sick.  No, I'm kidding.
14    Q.  You probably want to go home sick, but --
15    A.  It requires a much more -- in my opinion, the
16  way that I would approach that -- and I must say it's
17  different than how other people did -- everyone had their
18  own way of doing things.
19       You would try to determine people in up-line
20  cities who were not going to be coming after all so that
21  you could maybe use their seat for an unseated passenger.
22  You would check the records to see if the passenger
23  checked in up-line, but the up-line city may have failed
24  to activate them to the standby list.  They are activated
25  to the standby list not because they're standby but

www.elitereportingagency.com
513.233.3000

1  because it is only one list and anyone requiring a seat or
2  a different seat must be on that list.
3       So the up-line city would have been responsible
4  for generating their seat in the up-line and adding them
5  to the down-line, meaning Cincinnati in this case, standby
6  list, so that I could then know from the moment I opened
7  my flight that I had a party of four who would need seats.
8  Often that is not done.
9       So you would check the records of your unseated
10 passengers to see which ones for sure were going to be
11 there and how many groups of three or four or two were
12 going to be wanting to sit together.
13    Q.  And if I'm understanding correctly, if somebody
14 up-line fails to put these people on the list, you might
15 not have visibility to them, correct?  Is that what you
16 said?
17    A.  There is -- there is always access to that
18 information.  So if I don't access the information, I
19 wouldn't have visibility of it.
20    Q.  Okay.
21    A.  They could potentially sneak up on me.
22    Q.  All right.
23    A.  If I get too busy or I get sidetracked and I
24 don't complete appropriate preliminary planning steps, I
25 could miss something like that.

www.elitereportingagency.com
513.233.3000

1     Q.  Okay.
2     A.  Because it's not as though -- it's not as though
3  I walk to the gate and there are bells and whistles and a
4  piece of paper sitting there saying, hey, you need to help
5  these people.  That's up to me to ascertain that.
6     Q.  So if things work as they should, you should get
7  the names of those people, but sometimes you have to go
8  looking for it; is that a fair way to say it?
9     A.  Yes, that is.
10    Q.  Okay.  Was there ever a point in time -- and I'm
11 sure there has been -- where you weren't able to
12 accommodate everyone onto the aircraft and some people had
13 to be left behind?
14    A.  Yes.
15    Q.  Okay.  And at what point in time typically are
16 you aware that that is going to happen?  Is that something
17 that can sometimes happen just a moment before the plane
18 goes out, or typically do you have an idea far ahead of
19 time, or is it both?
20    A.  It is both.
21    Q.  Okay.
22    A.  Many factors that could help you determine that
23 information early, but you don't always have the luxury of
24 those.  Sometimes it is very much before ten minutes before
25 departure or less.

www.elitereportingagency.com
513.233.3000

1    Q.  And so when people can't get on the plane, what
2  happens?
3    A.  If you anticipate that you will be denying
4  boarding to ticketed passengers, you are responsible to
5  try to acquire volunteers that are willing to give up
6  their seat for the unseated ticketed passenger.  That
7  volunteer would receive some level of compensation and a
8  booking on a later departure to their city.  And you would
9  take their seat away and give it to the unseated person,
10 dispatch the flight, and then come back and provide the
11 necessary compensation to the passenger who volunteered.
12       In some cases, volunteers are not able to be
13 acquired, in which case the passenger that did not have a
14 seat becomes what is called an involuntary denied boarding
15 passenger, and you can imagine that doesn't go well.
16    Q.  Have you ever had a situation where somebody who
17 was -- didn't have a seat assignment or ultimately didn't
18 have a seat to sit down in, that they were the ones who
19 said, you know what, I'll take -- you know, I'll defer
20 going on this plane and wait?
21    A.  So have I ever had somebody come to me that did
22 not have a seat assignment?
23    Q.  But were confirmed for that flight.
24    A.  Confirmed without a seat assignment but would
25 also willingly volunteer?

1    Q.  Uh-huh.
2    A.  Yes.
3    Q.  Okay.  Because I just wanted to understand.  So
4  it's not always the case that volunteers might have to be
5  solicited; you know, that person who is creating the
6  challenge may be willing to forego that flight and wait?
7    A.  Yes.
8    Q.  All right.
9    A.  In exchange for the discussed and, you know,
10 preagreed-upon compensation.
11    Q.  Have you ever had a situation occur where
12 volunteers were solicited to stay off the aircraft to seat
13 somebody, but then other seats become available or the
14 plane goes out with extra seats or you have more seats
15 than you thought you would have?
16    A.  I have had that happen, yes.
17    Q.  Concerning standbys, we talked a little bit
18 earlier about the lists and the fact that the upgrade list
19 and the standby list are together in your computer.  There
20 are various types of passengers standing by for a flight
21 in any given time, correct?
22    A.  Correct.
23    Q.  And some that I happen to think of are going to
24 be your inconvenienced passengers, passengers who want
25 upgrades, and then the non-revenue passengers.  Are those

1  three categories of folks that you have seen on those
2  lists?
3    A.  Yes.
4    Q.  All right.  And so we can be clear, when I talk
5  about a non-revenue passenger, you know, so we're on the
6  same page, I'm talking about either employees or retirees
7  who are traveling using their employee benefits and then,
8  of course, buddy pass riders as well.
9    A.  Right, yes.
10    Q.  All right.  And buddy pass riders are at the
11 bottom of the list in terms of priority, correct?
12    A.  Yes.
13    Q.  And then the non-revenue employee and retirees
14 are one notch above them, correct?
15    A.  Yes.
16    Q.  In terms of priority of boarding?
17    A.  Yes.
18    Q.  All right.  And the revenue passengers are
19 always going to be above them in terms of priority,
20 right?
21    A.  Yes.
22    Q.  Talk me through -- first of all, we talked about
23 the overhead screens and the lists they show.  In 2008, in
24 Cincinnati, were there computer systems that cleared that
25 list for you, or was that a manual process?

1    A.  The gate agent was responsible for clearing the
2  list.
3    Q.  And making the seat assignments, correct?
4    A.  Well, you could set it to randomly assign with a
5  single entry, or you could individually assign them.
6    Q.  Okay.  Individually assign meaning you,
7  yourself, did that manually?
8    A.  You could pick the seat that that person would
9  sit in, manually assigning, for instance, one seat to a
10 specific passenger, or you could do a general entry that
11 would clear four or five people into just random seat
12 assignments.
13    Q.  Okay.  And did you have a particular practice as
14 to which process you liked to use when clearing a standby
15 list?
16    A.  My practice is generally to try to accommodate
17 requests by the passenger.  So that often led me to
18 clearing them by individual seat.
19       The other consideration there is people
20 traveling together but not in the same record.  The
21 computer doesn't know they're together, but you do.  So it
22 would be incumbent upon the primary agent then to remember
23 that passenger A and passenger B are together to assign
24 them seats together, if possible.
25    Q.  And is that something that passenger A and B

1  would have to bring to your attention, or is that somehow
2  reflected in their PNR?
3      A.  Both.  It can be either.
4      Q.  Okay.  So you just explained that your general
5  practice was to accommodate passengers based on their
6  requests.  Was there any other kind of general practice
7  you used in clearing the standby list that you can recall
8  as you sit here today?
9      A.  I don't know.  I guess you'd have to be more
10 specific than that.
11     Q.  Did you ever make an announcement advising
12 people in the gatehouse that, you know, there's still a
13 chance for upgrade, you know, if you have a coach seat,
14 you may want to hang out here in the gatehouse and wait
15 and see whether something opens up in first class?
16     A.  I don't remember doing that, no.
17     Q.  So that -- to the best of your recollection,
18 that wasn't a practice that you engaged in?
19     A.  No.
20     Q.  When in the boarding practice -- or -- I'm
21 sorry -- when in the boarding process do you typically get
22 to the standby list?
23     A.  You're supposed to try to start looking at it
24 about 20 minutes prior to departure time.  It's relative
25 to how the flight is checking in.  So sometimes it can be

1  much earlier.  Other times, you may have only an
2  opportunity at that point for just one seat and you have
3  to wait until that passenger has not boarded within the
4  designated time frame before you can release the seat, so
5  it can become much less than 20 minutes.
6      Q.  And what -- when you talk about boarding within
7  the designated time frame, what -- how long does a
8  passenger have to get to the gatehouse before you
9  basically say to them, sorry, you know, your seat's gone,
10 I've given it to somebody else?
11     A.  My understanding was ten minutes before
12 departure was final boarding call, at which time all
13 confirmed passengers should be onboard or they risk losing
14 their seat.
15     Q.  Okay.  And so at ten minutes prior, you might
16 begin the process of reassigning seats to people who were
17 hanging out in the gatehouse?
18     A.  Ten minutes prior, yeah, I could do that, yes.
19     Q.  Yes.  Okay.  Was it your practice that if
20 somebody desiring -- a revenue passenger desiring an
21 upgrade was already on the plane seated that you would not
22 move that person up to first class if the seat became
23 available?
24     A.  Say that again.
25     Q.  Sure.  Was it your practice in 2008 that if a

1  revenue passenger who had been on the list for an upgrade
2  was already on the plane in coach and perhaps at the last
3  minute a first class seat assignment became available that
4  you would not alert that person to the seat even though
5  they might have been, say, number one on the upgrade
6  list?
7      A.  Yes, that was my practice not to move them once
8  they boarded.
9      Q.  Was it the case, given that practice, that there
10 were occasions where the flight went out with empty first
11 class seats?
12     A.  Yes.
13     Q.  During your employment with Delta -- and let's
14 kind of focus on from 2000 to 2008 -- did you use your
15 non-revenue passes at all?
16     A.  Yes.
17     Q.  Okay.  About --
18     A.  Oh, I'm sorry.  During what time frame?
19     Q.  2000 to 2008.
20     A.  Yes, I believe I did in that eight-year time
21 frame sometime.  Yes.
22     Q.  Was it something -- were they something that you
23 or your family used every year, or was it more sporadic
24 than that?
25     A.  It was more sporadic than that.

1      Q.  Can you give me an estimate during that roughly
2  eight years how many times you or somebody else on your
3  list might have used their pass privileges?
4      A.  I really can't because the distinction here is
5  that my daughter was so sick.  It really inhibited us from
6  benefiting from that during that time frame.
7      Q.  Okay.  How about -- I seem to recall you telling
8  me that her illness was diagnosed in 2005, right?
9      A.  Uh-huh.  Yes.
10     Q.  During the time from 2000 to 2005, before she
11 was diagnosed, did you more frequently travel then,
12 obviously, than you did after her illness?
13     A.  During the time frame 2000 to 2005, I had three
14 babies, so no.
15     Q.  Say no more.  I understand.
16         Okay.  Did your husband ever have occasion to
17 use the flight passes?
18     A.  I'm just going to say, I had three babies.
19 So -- no, I'm kidding.
20     Q.  So, no?
21     A.  The answer is no.  He was home helping me.
22     Q.  Okay.
23     A.  Not very often.  He may have.
24     Q.  What a good husband.  Okay.
25     A.  He may have traveled for the occasional, I don't

1    know, maybe a golf trip or something, but for the most
2    part, we would have done that as a family, and it just
3    wasn't feasible at that time.
4         Q.  Okay.  And on the occasions when you did use the
5    pass privileges, what were your destinations, if you
6    recall?
7         A.  I don't recall the destinations, but we used the
8    pass privileges for weekend getaways, you know,
9    vacation-type travel.  It may be sort of a last-minute
10   deal based on what flights we knew would be open, and we
11   may pick an area of interest that we had heard about and
12   just explore.
13        Q.  I'm going to expand my question now about
14   non-revenue travel to really encompass your entire
15   employment.  But was there ever a time when you were
16   standing by for a flight that you would have sworn you'd
17   never get on and you got on it?
18        A.  I don't remember.  We avoided those flights, so
19   I don't -- I don't remember.  We tried to plan around that
20   happening, so I don't think so.
21        Q.  Okay.  Did you have friends or acquaintances at
22   work who had relayed stories like that?
23        A.  I have heard stories like that, yes.
24        Q.  Let's talk a little bit about charter flights.
25   What are they?

1         A.  I'm not going to be able to speak to that very
2    clearly.  I think -- I really don't know.  So I would just
3    be pure speculating on my part.  I really probably
4    shouldn't --
5         Q.  I don't want you to speculate.
6         A.  Yeah.
7         Q.  So is it fair to say, based on your answer, that
8    you never worked a charter flight while were you employed
9    at Delta?
10        A.  No.  At one time or another I may have been
11   assigned to work them with very specific directions on how
12   that was to be done, and it didn't usually involve the
13   computer.  So it was more a matter of just sort of being
14   available to secure the gate and board the passengers.
15        Q.  So it was more of like an FAA-required function
16   as opposed to any orderly boarding of the aircraft that
17   was involved?
18        A.  Exactly.  And you followed the direction of the
19   charter representative in carrying out duties.  They were
20   the contact person in charge.
21        Q.  All right.  And it is my understanding that
22   Delta aircraft could be chartered and sometimes there was
23   aircraft that wasn't Delta aircraft that would,
24   nonetheless, be parked at our gates and we would provide
25   your services as well as the ground service handling

1    services; is that your understanding?
2         A.  That's true, yes.
3         Q.  What are hung seats?
4         A.  I don't know that that term is an official term.
5    So it could mean a lot of things to a lot of people.
6         Q.  Okay.  What does it mean to you?
7         A.  I think that is about -- for instance, I -- your
8    flight may be arriving soon and I think that you and the
9    other gentleman on the flight you're arriving on are
10   traveling together and so I move you to sit together, 22C
11   and D, across aisles from each other.  I'm thinking you're
12   going to say, that's great, thank you so much, beats the
13   middle seat, but I'm not sure you're going to want those
14   seats just yet.  So I might assign those to you without
15   ending the record --
16        Q.  Okay.
17        A.  -- so that no one else could necessarily assign
18   them and I had an opportunity to check with you before
19   eliminating your other seats.
20        Q.  Okay.  So if you had ended the record, you would
21   have eliminated my other seats?
22        A.  Yes.
23        Q.  Okay.  So is that -- is that the function of
24   ending a record, or one of the functions, I guess?
25        A.  As it pertains to seating, once the seat is

1    changed and the record has ended, the previous seat is
2    returned to the inventory --
3         Q.  Okay.
4         A.  -- for assignment.
5         Q.  So by hanging a seat, as you've defined it as
6    your understanding, the hung seats are taken out of
7    inventory as well, right?
8         A.  They're just sort of hung there.
9         Q.  They're literally hanging there?
10        A.  They're hanging there, yeah.
11        Q.  Okay.  And they can't be sold or used or
12   anything like that, right?
13        A.  Seats can be sold, but the seat -- that
14   particular seat would not be able to be assigned.
15        Q.  Right.  Because it technically wouldn't be in
16   inventory?
17        A.  Correct.
18        Q.  Right.  Okay.  Do you ever -- was that a
19   practice for you to engage in -- I know you just gave me
20   an example, but was that something that you typically did,
21   or that was a practice of yours?
22        A.  In terms of a practice of mine, and by that I
23   assume you mean something I did on a regular basis, I
24   regularly tried to accommodate passengers into acceptable
25   or more acceptable seating.  So as part of that process, I

1   may have done that from time to time for short periods of
2   time while I was working the flight.  But that particular
3   notion of hanging a seat was not something I remember
4   being a day-to-day practice, no.
5      Q.  On the occasions where you might have hung a
6   seat, would you put an explanation typically in the record
7   to indicate why you were doing that?
8      A.  No.
9      Q.  Okay.  If you -- if you change a seat assignment
10  and you end the record, do you have to put in there why
11  you're changing the seat assignment?
12     A.  No, you don't have to.
13     Q.  Okay.
14     A.  It would be nice if you did, but you don't have
15  to.
16     Q.  And I suppose, you know, you might want to do
17  that if you have a passenger who is upset for some reason
18  and you want a record of that?
19     A.  That would be one reason why would you document
20  the record, yes.
21     Q.  All right.  Any other reasons you can think of
22  that you might document the record?
23     A.  If somebody chooses to move from the front of
24  the aircraft to the back of the aircraft to sit with a
25  friend, you might anticipate that you would be questioned

1   about that at a later time, so you might say that it was
2   done due to passenger request to sit with the passenger in
3   seat whatever; more of a CYA in that case, just
4   anticipating a problem.  But documentation is never really
5   a -- well, not never.  Never is not a good example.  But
6   the latitude that you're given as a gate agent does not
7   always require that you document.  It's about utilizing
8   your judgment.
9      (Defendant's Exhibit 4 was marked for
10     identification.)
11  BY MS. GIUSTINA:
12     Q.  Ms. Henry, the court reporter has put in front
13  of you what's been marked as Exhibit 4, and this is a
14  March 3rd, 1989 letter addressed to you from
15  Superintendent Airport Passenger Services LAX, Subject,
16  Attendance.  Do you see that?
17     A.  Yes.
18     Q.  And is that your signature at the bottom of that
19  page?
20     A.  Yes, I think so.
21     Q.  All right.
22     (Defendant's Exhibit 5 was marked for
23     identification.)
24  BY MS. GIUSTINA:
25     Q.  Now, Ms. Henry, if you would look at what's been

1   marked as Defendant's Exhibit 5, this is a single piece of
2   paper dated January 2nd, 1990, addressed to you from,
3   again, Superintendent Airport Passenger Services LAX,
4   Subject, Security Violation, Letter of Concern.  Is that
5   your signature at the bottom of that page?
6      A.  Yes, I think so.
7      Q.  And you wrote the date 1/4/90, correct?
8      A.  Yes.
9      (Defendant's Exhibit 6 was marked for
10     identification.)
11  BY MS. GIUSTINA:
12     Q.  Ms. Henry, if you would now look at what's been
13  marked as Defendant's Exhibit 6, which is a -- again, a
14  single piece of paper dated December 27th, 1991, addressed
15  to you from Superintendent Airport Passenger Services
16  Cincinnati, Subject, Attendance/Dependability.  Is that
17  your signature there in the first signature page on this
18  document -- or first signature line -- I'm sorry -- on
19  this document?
20     A.  Yes.
21     Q.  All right.  And, to be clear, since there's two
22  on that line, it's your signature above the name typed
23  out, Rachelle Hawley, correct?
24     A.  Yes.
25     (Defendant's Exhibit 7 was marked for

1   identification.)
2   BY MS. GIUSTINA:
3      Q.  Ms. Henry, if you would take a look at what's
4   been marked as Defendant's Exhibit 7, and this is a
5   two-page document that at the top says, Delta Air Lines
6   Performance Evaluation.  Do you see that?
7      A.  Yes.
8      Q.  And if you would look at the second page of that
9   document, is that your signature at the bottom above the
10  words Employee Signature?
11     A.  Yes.
12     Q.  All right.  And this is the annual evaluation
13  for the year 2006, correct?
14     A.  Yes.
15     Q.  And we talked a little bit about the evaluation
16  process earlier in the deposition.  And is it correct that
17  what happens is the employee, under the column that says,
18  Employee, gives themselves the rating that they feel they
19  deserve, and then, under the column entitled Team Leader
20  on the first page, the team leader then assesses the
21  employee and, therefore, you have a record of the
22  employee's self-evaluation alongside the team leader's
23  actual assessment of the employee's performance?
24     A.  Yes, that's correct.
25     Q.  Okay.  And on Exhibit 7, would you agree with me

1  that you rated yourself as exceeds in three categories and
2  your team leader rated you as exceeds in five categories?
3      A.  Yes.
4      Q.  And if you would look at the second page of the
5  document, it looks like the lead agent who signed this is
6  Pae, Pae?
7      A.  Pae.
8      Q.  Pae?
9      A.  Pae.
10     Q.  Caudill?
11     A.  Yes.
12     Q.  And the next level signature, is that Gary
13 Schmidberger's signature there?
14     A.  It looks like it.
15     Q.  All right.  And this document indicates that it
16 was discussed with you December 29th of 2006, correct?
17     A.  Yes.
18     Q.  Any reason to dispute that your 2006 year-end
19 evaluation was discussed with you on that date?  Does that
20 sound right?
21     A.  I don't know, because my evaluations were due in
22 the month of July.
23     Q.  Okay.
24     A.  So why it would have been discussed in December,
25 unless they were just extremely behind, which happened --

1  so perhaps, but I don't know for sure.
2      Q.  Okay.
3          (Defendant's Exhibit 8 was marked for
4          identification.)
5  BY MS. GIUSTINA:
6      Q.  Ms. Henry, if you would look at what's been
7  marked as Defendant's Exhibit 8, again, this is a two-page
8  document, again entitled, Delta Air Lines Performance
9  Evaluation.  If you would look at the second page, is that
10 your signature at the bottom of that page?
11     A.  I think so, yes.
12     Q.  Okay.  And looking at the first page, would you
13 agree with me that you rated yourself as exceeds under the
14 employee section in three categories, and the performance
15 leader rated you as exceeds actually in six categories,
16 correct?
17     A.  Correct.
18     Q.  All right.  And looking at the second page, do
19 you know whose signature that is over the performance
20 leader signature line?
21     A.  I'm sorry.  I don't.
22     Q.  Okay.  And it does appear to be Gary
23 Schmidberger on the next level signature line, correct?
24     A.  I think so.
25     Q.  And the date of this document is June 19th

1  of 2007.  Any reason to question the date that that
2  evaluation was given to you?
3      A.  I don't think so.  More in line with what I
4  would have expected.
5      Q.  Okay.
6          (Defendant's Exhibit 9 was marked for
7          identification.)
8  BY MS. GIUSTINA:
9      Q.  Ms. Henry, if you would take a look at what's
10 been marked as Defendant's Exhibit 9, a two-page document
11 entitled, Delta Air Lines Performance Evaluation.  The
12 second page at the bottom, above Employee Signature, is
13 that your signature there?
14     A.  Yes.
15     Q.  And looking at the front page, you had rated
16 yourself as exceeds in four areas and the performance
17 leader rated you as exceeds in six areas, correct?
18     A.  Correct.
19     Q.  And looking at the second page, this document
20 reflects that it was discussed with you on June 30th
21 of 2008.  Any reason to dispute that was the date
22 that this would have, in fact, been discussed with you?
23     A.  No.
24     Q.  And, again, that looks like Gary Schmidberger's
25 signature, there to the left of the date, correct?

1      A.  It does, yes.
2          MS. GIUSTINA:  This is actually a really good
3  place for a break.  I think this is a great place to
4  break for lunch --
5          MS. MYERS:  Okay.
6          MS. GIUSTINA:  -- if that works for you guys.
7          (Lunch recess taken from 11:56 to 12:54.)
8  BY MS. GIUSTINA:
9      Q.  Ms. Henry, if you would, please, I'm going
10 to ask you a couple more questions about Exhibits 7
11 through 9, so I want you to have them handy.  I don't
12 think you'll have to actually refer to them.
13         You consider the evaluation results, by that I
14 mean the section the performance leader completed, to be
15 positive results, correct?
16     A.  Yes.
17     Q.  You were happy with that rating that was given
18 to you, correct?
19     A.  Yes.
20     Q.  Did you at any time believe that you would have
21 gotten a higher score if you were not a woman; in other
22 words, that you were penalized in some way on these
23 evaluations because of your gender?
24     A.  No.
25     Q.  All right.  Do you know how the company became

1    aware of the situation surrounding the flight boarding
2    process, CVG to San Diego, on June 8, 2008, that
3    ultimately led to your termination?
4        A.  I do not know the details of that.
5        Q.  And I should say prior to commencing the
6    litigation, because since then you may have seen some
7    things that shed some light on that.  But prior to
8    commencing the litigation, you did not know?
9        A.  No, I did not.  Sorry.
10       Q.  Was there an irregular operations with any
11   airline that day at the airport that you can recall?
12       A.  I don't know.
13       Q.  You had a meeting with Tammy Mauer, Deb Kircher,
14   Gary Schmidberger, and Greg Kuhn, correct?
15       A.  Correct.
16       Q.  And my records indicate that that was on
17   July 14th of 2008.  Does that sound right?
18       A.  I think that's right, yes.
19       Q.  And at the conclusion of that meeting, you were
20   asked to provide a statement, right?
21       A.  A written statement, yes.
22       Q.  Yes, ma'am.  And you did that, correct?
23       A.  I did.
24       Q.  Okay.
25           (Defendant's Exhibit 10 was marked for

1        identification.)
2    BY MS. GIUSTINA:
3        Q.  Ms. Henry, I've marked as Defendant's Exhibit 10
4    a three-page handwritten document that is dated in the
5    upper right-hand corner 7/14/08.  And it states, Re:
6    meeting to clarify accusations made about details
7    surrounding flight I primaried going to SAN 6/08/08.  And
8    if you would look at the last page of Exhibit 10, is that
9    your signature at the bottom there?
10       A.  Yes.
11       Q.  And it looks like the same handwriting.  I just
12   want to make sure, you were the person who wrote this
13   statement, correct?
14       A.  Yes.
15       Q.  And this was the statement that you wrote in
16   response to the request at the conclusion of the meeting
17   with those four individuals when they asked you to provide
18   your statement of what happened that day, correct?
19       A.  Correct.
20           (Defendant's Exhibit 11 was marked for
21       identification.)
22   BY MS. GIUSTINA:
23       Q.  Ms. Henry, now you have what's been marked as
24   Defendant's Exhibit 11, and this is a primarily
25   typewritten statement contained on one document -- or one

1    piece of paper -- I'm sorry -- and it is titled in
2    handwriting, Re:  Flight 1213, and it goes on to say some
3    other words.  And then there is a signature on that page.
4    Is that your signature?
5        A.  Yes.
6        Q.  And is that your writing at the top of the
7    page?
8        A.  Yes.
9        Q.  And did you type the text that is on Exhibit 11
10   as well?
11       A.  I did.
12       Q.  And that looks like a computer at the airport.
13   Was this prepared at the airport?
14       A.  Yes.
15       Q.  When was this document prepared?  Because, as
16   you can see, it doesn't have a date on it.
17       A.  I don't know exactly, but it was after the date
18   in question and before the July date.
19       Q.  Okay.  So to clarify, it was after the flight in
20   question?
21       A.  Yes.
22       Q.  The CVG to San Diego flight?
23       A.  Yes.
24       Q.  But before the meeting with the four individuals
25   I mentioned earlier?

1        A.  Yes.
2        Q.  Correct?
3        A.  Yes.
4        Q.  Okay.  And you don't remember who requested that
5    you provide this statement?
6        A.  I do remember.  It was Sam Tuminello.
7        Q.  Okay.  And do you remember the context in which
8    Mr. Tuminello asked that you provide this statement?
9        A.  Yes, I do.
10           MS. MYERS:  I'm sorry.  Are we on Exhibit 11
11   we're talking about?
12           MS. GIUSTINA:  Yes.
13           THE WITNESS:  Yes, Exhibit 11.  Okay.
14       A.  He approached me at the end of my workday after
15   my last flight departed, asked if he could speak to me a
16   minute in private.  We walked down a nearby jet bridge,
17   door shuts behind, and --
18   BY MS. GIUSTINA:
19       Q.  I'm sorry.  Did you say the door shut behind you
20   all?
21       A.  The door shuts behind.
22       Q.  Okay.
23       A.  The door automatically shuts.  It doesn't stay
24   propped open; in other words, it was for privacy reasons.
25   We were just the two of us in that jetway because he

1  wanted to speak to me private and there would be other
2  gate agents in the gatehouse outside of that door.
3       Q. Okay.
4       A. And he said, so what happened with that San
5  Diego flight, or something along those lines. And I said,
6  well, George and his family got on okay. And he said,
7  well, I know that. I want to know how they ended up in
8  first class instead of the medallion passengers.
9       And the -- that's about all I remember, because
10 then at that point I had a bit of a -- an emotional
11 response and started to cry a little and explained to him
12 that, you know, this was becoming too much for me to deal
13 with in terms of the way I was experiencing people's
14 reactions and things to me.
15      And he said, well, they came to me, and it's
16 gotten -- they came to me with complaints and it's gotten
17 to the point where they're, you know, very upset and they
18 want something to be done about it, something along those
19 lines. You know, I'm paraphrasing.
20      Q. Right, right.
21      A. But this was the back-and-forth -- gist of the
22 back-and-forth. And I said, what do you mean something to
23 be done? He said, well, I need a statement from you as to
24 what happened. I said, well, I didn't break any rules.
25 He said, I still need a statement from you.

1       Q. And this -- I'm sorry.
2       A. That was pretty much -- paraphrasing, that was
3  pretty much the back-and-forth at the moment. But I was
4  led to believe from that, since the supervisor, of course,
5  was involved and since he was acting very serious, which
6  he never did with me, and that I had to provide this
7  written statement that, you know, there was something well
8  beyond what I thought was an issue going on. But he
9  didn't elaborate.
10      Q. All right. And this is the statement -- this
11 being Exhibit 11 -- that you provided in response to his
12 request?
13      A. I immediately walked out, got on the computer,
14 typed what he had asked me to -- you know, what he had
15 asked me to provide and printed it and handed it to him
16 prior to leaving that day, just a few minutes later.
17      Q. And do you know what he did with the statement,
18 to whom he gave it?
19      A. No idea.
20      Q. All right. I want to go back and talk about a
21 few things that you just mentioned when you were
22 summarizing your interaction with Mr. Tuminello.
23      You mentioned people's reactions in a very
24 general sense. And I would like for you to explain to me
25 in a little more detail what you mean when you say that.

1       A. I had been experiencing quite a bit of general
2  sort of -- I can't think of a better word than shunning,
3  but it was a very overt shunning. It was the kind of
4  shunning where you walk down the hall and the person
5  opposite you coming down the hall, when there's nobody
6  else but you and that person coming down the hall,
7  purpose -- seemed to purposefully avert their eyes, seemed
8  to walk farther away than they might normally, seemed to
9  be avoiding you.
10      Q. Okay.
11      A. And I had had someone mention to me that an
12 agent requested not to have to work with me and what was
13 that all about. Of course, I didn't know. I was just
14 feeling different when I was in the break room. People
15 weren't speaking to me when I was approaching people that
16 I would otherwise have very routine sort of, hey,
17 how-you-doing conversation with. They were shutting off
18 the communication with me quickly and acting very busy,
19 and I didn't know what it was all about.
20      Q. When did that start, this general, to use your
21 words, quote, overt shunning? When did this begin?
22      A. It began -- well, it had been an ongoing thing,
23 but it got worse after the flight and date that you're
24 inquiring about.
25      Q. All right. So I understand that it got worse

1  after the June 8th, 2008 flight. Help me understand,
2  though, preceding that date, when did it start? When did
3  you first notice these sorts of reactions from people in
4  the workplace?
5       A. Well, I just -- again, they're very
6  unexplainable in that I didn't really see how -- what the
7  provocation was.
8       Q. Right. And I don't mean to interrupt you. But
9  understand I'm not asking what caused it, at least not
10 right now. My question really is, when did you first
11 start noticing this sort of thing?
12      A. Just really right before that. I had been
13 experiencing --
14      Q. Like a couple weeks or --
15      A. Yes, maybe, a couple weeks, maybe a month on
16 the --
17      Q. Okay.
18      A. You know, I'm not completely clear on the
19 timeline. Because, honestly, the nature of the airline
20 industry is such that it can be a bit drama laden, for
21 lack of a better way to put it. Oftentimes there are
22 things that, if you choose to get caught up in, you can go
23 for a very long ride. But most of the time, it's
24 unsubstantiated. Most of the time it's just people being,
25 you know, petty.

1  And so my practice was to remove myself from
2  those situations and not be part of that kind of
3  conversation.
4  So when people started to treat me differently
5  in ways that I felt were unexplainable, I just thought,
6  well, you know, people are doing that thing that they do
7  here and for whatever reason I've irritated somebody and
8  this week it's me and next week it will be somebody else,
9  I'll just ride the wave, you know.
10  Q.  And did you have any sense either when this
11  first started or at any point in time as it continued what
12  seemed to be causing or what was the source of people
13  acting this way toward you?
14  A.  Not initially.  And I really don't know that I
15  fully understand it even now.  I'm still at times
16  surprised when like, you know, I read something in a
17  document and I think, oh, where did that come -- I still
18  am very surprised at things from time to time, and
19  basically that's just my own naivete, I guess.
20  But at one point an agent said to me -- I was
21  working with her and I was the primary gate agent, which
22  they would assign a primary agent to a flight, and then
23  she was a secondary agent, as my assist.  And she said to
24  me, I guess I'm going to have to add you to the list of
25  people I -- that I don't want them to put me with, or

1  something like that.  And that came as a real surprise,
2  that she was that forthcoming with that and that it was
3  coming from her.  I didn't understand.  So I said, you're
4  kidding, right?  She goes, no.  I've already told them I
5  don't want to work with so-and-so.  I guess I'll have to
6  put you on that list, too.
7  Q.  Was that Patsy Zimmerman that made that
8  comment?
9  A.  That was Patsy Zimmerman.
10  Q.  Did you gain an understanding as to why she made
11  that comment?
12  A.  No.  She walked away at that point.  Oh, no, no.
13  Prior to walking away, she said something along the lines
14  of, if he's going to be around, or something like that,
15  that I -- I mean, she did not -- she purposely walked away
16  to not have to engage me, and I don't fully understand
17  where that was going.
18  Q.  And if he's going to be around, who is the he
19  we're talking about?
20  A.  I don't know.
21  Q.  You don't know?  And that seems an odd comment.
22  I mean, it's -- it's kind of a non sequitur.
23  A.  Well --
24  Q.  Was there more context to that particular
25  comment?

1  A.  Not that -- no, no, there was not.  And I took
2  that information and asked some friends if there was
3  something I didn't know was, you know, somebody saying
4  something, what did that mean, and thinking maybe they'd
5  heard some rumors or something.  But nobody would
6  elaborate.
7  I did have one friend who thought that it might
8  be because she did not care for George Gergits.  And
9  George and I would have coffee in the morning sometimes
10  and I would talk to him, as I would any of the
11  supervisors, in a, you know, amicable way.  And this agent
12  that I was talking to knew that Patsy, in particular, had
13  been very offended by him in some way.
14  Q.  Okay.
15  A.  And I said, well, I suppose it -- you know, but
16  even so, would you not work with somebody because of that,
17  you know?  But nobody could tell me.
18  Q.  The agent who she said she had asked not to work
19  with other than you, was that Julie Donahue?
20  A.  Yes.
21  Q.  And do you have any understanding as to why
22  Ms. Zimmerman wouldn't want to work with Julie Donahue?
23  A.  No.  That came as a surprise to me.
24  Q.  So I understand your testimony to be that, at
25  least on the part of Ms. Zimmerman, there may have been

1  some ill feelings toward Mr. Gergits that were then
2  transferred to you because you were on good terms with
3  him?
4  A.  Yes.
5  Q.  Fair statement?
6  A.  That was one possibility.
7  Q.  Okay.
8  A.  But then she didn't like a number of other
9  people that would stop by and talk.  Harold Christiansen
10  was somebody who would stop by and talk, and they had been
11  at each other's throats for years.  Rick Cropenbaker was
12  another one.  He would stop and joke about different
13  things and hang out and, you know, she would get up and --
14  first she'd usually make some sort of comment to him and
15  then walk away.  So there were a lot of hims or hes that
16  it could have been.
17  Q.  Other than what we just discussed in terms of
18  the fact that, at least in Ms. Zimmerman's case, she
19  didn't like a number of, I guess, the performance leaders,
20  and perhaps your positive relationship with them might
21  have not benefited you in that instance because she
22  resented you for that, any other explanations that you
23  were able to come up with to explain the conduct by your
24  fellow agents?
25  A.  No.

1  Q.  Was there a rumor that you were romantically
2  involved with Mr. Gergits?
3  A.  Yes.
4  Q.  Okay.  And do you think that might have been
5  fueling any of this conduct?
6  A.  I think some of the conduct that I was
7  experiencing that was supposedly joking comments that was
8  getting ridiculous was fueled by that.  But I don't -- I
9  think if it was truly George that was upsetting Patsy, I
10 think that was just a deep-seated sort of dislike of him.
11 But then I don't know.  I really couldn't say.  How could
12 I -- I really can't speak to what Patsy's thought process
13 was.
14 Q.  Okay.  When you talk about -- you mentioned
15 three different things that I noted.  You mentioned, you
16 know, the shunning and walking down the hall and averting
17 one's eyes when they walked past you.  You mentioned
18 agents requesting not to work with you.  And I assume you
19 mean only Ms. Zimmerman in that context, is that right, or
20 was there another agent?
21 A.  No.  I couldn't give you a name specifically,
22 but I did hear that that was going on.
23 Q.  There was somebody else?
24 A.  Yes.
25 Q.  Okay.  And then the third thing you mentioned is

1  you just felt different in the break room because people
2  weren't speaking to you?
3  A.  Like they wouldn't talk when you walked in.
4  Q.  Okay.  Who -- who was doing this conduct?  Were
5  these coworkers, meaning other senior customer service
6  agents or other customer service agents?
7  A.  Yes.
8  Q.  All right.  Can you give me any names of the
9  folks who you felt in particular you noticed this conduct
10 coming from?
11 A.  Christine Sullivan, Harold Christensen, Patsy.
12 Q.  Patsy Zimmerman?
13 A.  Patsy Zimmerman, Julie Donahue.  I'm trying to
14 think of people's names.  You know, when you don't work
15 with people for a while -- Keith Crabtree.  Keith was very
16 nasty.  Todd Smith, Rick Cropenbaker, Karen Mindell.
17 That's all I can think of right now.
18 Q.  And you mentioned that there were comments made
19 concerning perceptions about your relationship with
20 Mr. Gergits in terms of some romantic relationship.  Who
21 was making those comments?  Was it basically the same list
22 of people you just shared?
23 A.  It's some of those people.  And then sometimes I
24 think, as I said before, people get caught up in the
25 drama.  So people that might not otherwise have cared

1  jumped on the bandwagon, so to speak, and they might call
2  my gate and say, is your boyfriend there, that kind of
3  thing.
4  Q.  All right.  So that's the sort of comment?
5  A.  Well, that was the more benign comments.
6  Q.  All right.  Tell me about some of the others.
7  A.  And then there were -- I think there -- there
8  were comments like from Keith Crabtree that, you look a
9  little disheveled this morning, I noticed you both came in
10 late, that kind of thing --
11 Q.  Okay.
12 A.  -- which was much more specifically denoting
13 like a sexual relationship.  And so from --
14 Q.  Any other -- I'm sorry.  Any other specific
15 comments like that that you can, you know, recall as you
16 sit here today?
17 A.  I just really have -- no.
18 Q.  Okay.  At any point in time did you ever share
19 with a member of management other than Mr. Gergits that --
20 and I'm referring now to more the comments about any kind
21 of a romantic relationship with Mr. Gergits -- that these
22 comments were going on?
23 A.  I shared that with Mike Murphy in the context
24 that sort of, here we go again, because the same thing had
25 happened where he was concerned when he had been my

1  supervisor.
2  Q.  That there were rumors that you --
3  A.  People would make those same --
4  Q.  -- and Mr. Murphy had a romantic relationship?
5  A.  Uh-huh.
6  Q.  And at the time you told Mr. Murphy, basically,
7  here we go again, what was his job title at that point?
8  A.  Performance leader.
9  Q.  Okay.  And did you say anything to him other
10 than, here we go again?  Did you tell him what people were
11 saying?  Did you --
12 A.  Yeah.  I told him I was getting tired of it.  I
13 told him it was getting to the point where that, if they
14 couldn't stop, I was going to have to go and
15 speak with somebody because it was becoming too stressful
16 for me to deal with that.
17        I didn't know why people were acting the way
18 they were.  I did nothing to provoke it.  All the
19 statements were untrue, and it was getting to the point
20 where it had lingered on so long that it was --
21 initially -- like I said before, initially I thought it
22 would just go away on its own, so I disregarded it
23 thinking, you know, just ignore it and next week they'll
24 be on to somebody else.
25        But it had lingered on for so long that it was

1  becoming real defamatory and it was spilling over then to
2  give people like a preconceived notion about my character,
3  where it seemed like they just generalized about me based
4  on -- you know, if you think someone's having an affair
5  with someone and they're cheating on their husband, you
6  like their husband -- these people know my husband, they
7  know my family -- then perhaps you would treat them
8  differently.
9          And it was getting to the point where I felt as
10 though -- and I had talked to my husband about it, and he
11 had suggested -- he was in management at one time in Delta
12 and -- you need to go talk to HR and Gary.  And that's
13 where I was headed when this happened.
14     Q.  When you say this, just to clarify, you mean the
15 investigation concerning the June 8th, 2008 flight,
16 correct?
17     A.  Yes.
18     Q.  Okay.  Prior to sitting down with the four
19 individuals I mentioned earlier in connection with that
20 investigation, had you spoken to either Mr. Schmidberger
21 or somebody in HR about what we just discussed, meaning
22 the treatment by your coworkers?
23     A.  I spoke to Sam Tuminello about it.  He didn't
24 make a recommendation as to what to do.  And I spoke to
25 Gary Schmidberger about it.

1      Q.  Okay.  When did you speak to Mr. Schmidberger?
2      A.  I don't know.  Sometime between the June 8th
3  flight and the July 14th date.  He approached me and
4  informed me that we might be sitting down with HR.  And I
5  said, good, I want to do that for sure, assuming that Sam
6  or somebody had said to him, she needs to talk with you
7  about this, or maybe Mike or somebody.
8          And so then he -- then it turns out what he
9  meant by sit down with HR and what I meant were two
10 different things.
11     Q.  Okay.  So you -- you assumed he meant sit down
12 to discuss the treatment of your coworkers, and he meant
13 to discuss the flight in question?
14     A.  Apparently.  That's how it ended up playing out.
15 So I'm assuming that.
16     Q.  And to be clear, when you talked to
17 Mr. Schmidberger on this particular date when he said,
18 we'll be sitting down with HR, he didn't have any
19 understanding of the specific comments that were being
20 made, right?  You didn't share that with him at that
21 point?
22     A.  I did share that with him.
23     Q.  You shared with him specifics?
24     A.  And how upsetting it was, yeah.
25     Q.  All right.  And he responded that you would be

1  sitting down to meet with HR after you shared that with
2  him?
3      A.  He said --
4      Q.  Why don't you -- maybe the easiest thing for you
5  to do is for you to walk me through the conversation as
6  best you can remember.
7      A.  Thank you.  I'm trying to sort of get there.  So
8  just a second.
9      Q.  Okay.
10     A.  He approached my gate, which wasn't uncommon.
11 He would often walk through the concourse at the end of
12 the heaviest flight departure.  And he would often stop by
13 and say hello.  So when he first approached, I thought
14 nothing of it.  And then he said something about, hey,
15 I've been wanting to talk to you, we need to have a
16 meeting with HR.
17         And I said, oh, good.  And I said, because this
18 is getting ridiculous, or something like that, you know,
19 jumping again to that assumption that it was about what I
20 thought it was about.  And I said, you know, I can
21 tolerate a lot and I know to ignore most of what goes on
22 around here, but I've reached my limit, and this has
23 really got to come to a stop.  These are some of the
24 things that they're saying, these are some of the things
25 I'm experiencing.

1          Then he went on to say something --
2      Q.  Let me stop you.  When you said these are the
3  things I'm experiencing, did you then go on to tell him
4  specifics?
5      A.  I gave him a couple of examples; which ones, I
6  can't even recall.
7      Q.  Okay.
8      A.  Remember, this has been some time.  And I just
9  know that I said to him, you know, for instance, today
10 when I went into the break room, you know, things like
11 that.  And I just -- or, you know, Crabtree comes up to me
12 at least once a day and makes a statement like, blah,
13 blah, blah.  And, you know, one of these points is just
14 going to be too much for me.
15         And he said -- he just kind of was nodding to
16 sort of -- for me to summarize and then said, well, we're
17 going to -- we're going to discuss that, or something, and
18 I'll be right there with you and I'll be able to support
19 you.  He said, we did an -- something about an internal
20 investigation.  And I said, a what?  And he said, into
21 that flight that George boarded with his family.
22         And I said, yeah, what is all that?  And he
23 said, well, we had an internal investigation or something,
24 but we found there to be no intentional wrongdoing.  I
25 said, well, yeah, you know, okay.  And he said, however,

1  there's some people that aren't happy about that. And he
2  said, so that's why we're going to sit down. And I said,
3  well, okay, whatever. But, yeah, we need to do that
4  sooner rather than later.
5      And that was -- I want to still say that was
6  several weeks before it actually happened. Because I do
7  remember thinking, God, when is this going to happen if
8  it's so stinking important, you know. But, again, that's
9  all just my paraphrasing. I mean, I'm not quoting him
10 verbatim.
11     Q.  Going back to your testimony earlier about the
12 conversation that you had with Mr. Tuminello in the jet
13 gateway, you mentioned that he said to you, they want a
14 statement. Did you understand who they was?
15     A.  I just assumed he meant his superiors.
16     Q.  Okay. But he did not provide any specifics on
17 that?
18     A.  No.
19     Q.  Okay. Looking at Exhibits 10 and 11 -- with
20 respect to Exhibit 10, I think we've established that this
21 document was created following the meeting on July 14th,
22 2008, correct?
23     A.  Yes.
24     Q.  Okay. And it was written at work, correct?
25     A.  Yes.

www.elitereportingagency.com
513.233.3000

1      Q.  Okay. And in both statement 10 -- or -- I'm
2  sorry -- Exhibit 10 and Exhibit 11, you included the
3  information in both of those documents that you believed
4  to be important in this situation, correct?
5      A.  No.
6      Q.  No?
7      A.  No. What are you asking me?
8      Q.  With respect to Exhibit 10 and Exhibit 11, you
9  were asked to -- by management to provide your statement
10 about flight 1213, correct?
11     A.  Well, in response to Exhibit 11, I was asked by
12 Sam to provide my reason for boarding non-revs ahead of
13 medallions.
14     Q.  Right. I realize that the request for the
15 statements might have been concerning different issues
16 surrounding that flight, but, nonetheless, whatever the
17 request for the information was, you provided what you
18 felt to be the important information for management to
19 look at in this situation, correct?
20     A.  Well, in the case of Exhibit 10, I was unclear
21 about what they were asking me. After about an hour and a
22 half of them discussing with me, they slid the pad across
23 the table to me and said, we're going to need your
24 statement, or something like that. And I asked for
25 clarification on -- about what. I said, we've been here

www.elitereportingagency.com
513.233.3000

1  an hour and a half. We talked about a lot of different
2  stuff. What is it you're wanting me to put in this
3  document? What do you want me to address?
4      And the three things that Mr. Kuhn asked that I
5  address were whether or not George had approached me to
6  provide a favor for him. And I think there were three
7  things -- whatever the other things here that I addressed
8  were. So I remember specifically trying to answer --
9  speak to those three things.
10     Q.  Okay.
11     A.  But I wasn't completely clear on what he wanted,
12 no.
13     Q.  But with respect to those three items that
14 Mr. Kuhn told you he wanted to see a statement from you
15 on, you provided the information that you felt was
16 pertinent on those three issues, correct?
17     A.  Uh-huh, yes.
18     Q.  All right. And the same thing with respect to
19 Exhibit 11, I understand that was in response to
20 Mr. Tuminello's request that you provide a statement about
21 the boarding of the flight. And, again, you provided the
22 information at that time that you believed to be important
23 for management to understand about your actions and
24 decisions on that day, correct?
25     A.  Yes.

www.elitereportingagency.com
513.233.3000

1      Q.  And the things that you said in here were
2  accurate, correct?
3      A.  Yes.
4      Q.  And truthful?
5      A.  Yes.
6      Q.  All right. And you would agree with me that
7  your memory back in 2008 was probably a little bit clearer
8  than it is now, looking back on those incidents,
9  correct?
10     A.  Yes.
11     Q.  If you need to look at the statements to answer
12 this question, that's fine. Take your time. But is there
13 anything in these statements that's inconsistent with what
14 you would have told Mr. Kuhn and the other three people
15 during the July 14th meeting?
16     A.  What I would have told them if what?
17     Q.  What you told them.
18     A.  Is there anything that's inconsistent --
19     Q.  In other words, is there anything in these
20 statements, Exhibit 10 and Exhibit 11, that is
21 inconsistent with what you would have told those four
22 individuals during the July 14th, 2008 meeting?
23     A.  I think what I wrote on the paper is what I told
24 them the same as what I told them in the meeting?
25     Q.  No. No.

www.elitereportingagency.com
513.233.3000

1      A.  Okay.
2      Q.  What I'm asking you is, is there anything that
3  you've written -- even if it's extra stuff, but is
4  anything in here inconsistent or contrary to what you
5  would have told those four individuals during that July
6  meeting?
7      A.  But this was written at that meeting.
8      Q.  I understand that.  But one was a verbal
9  conversation and this is your written statement concerning
10 certain issues that may or may not have been discussed
11 during that meeting.  So I want to make sure I understand
12 that nothing in this statement contradicts something that
13 you might have told them verbally during that meeting.
14        So, in other words, is what you told them
15 verbally during the meeting consistent with what you wrote
16 in these statements?
17     A.  Let me read it and I'll see if I can better
18 understand.
19     Q.  All right.
20     A.  So I think the answer to your question is, no.
21 And my reason for saying that is that the things that I
22 addressed in here were all discussed at the same meeting,
23 and I responded at the meeting to those same questions in
24 the same way that I responded on this statement.
25     Q.  Okay.  So they're consistent?

1      A.  I believe so, yes.
2      Q.  Okay.  You -- after you had the meeting on
3  July 14th, my recollection is you were not scheduled to
4  work that day, but you returned to work on your next
5  regularly scheduled day, correct?
6      A.  No.
7      Q.  No?
8      A.  I had already worked that day and gone home.
9  And Gary, he called me at home.
10     Q.  Right.  I don't mean to interrupt you --
11     A.  Oh. Oh.
12     Q.  -- but my question is slightly different, I
13 think, than where you're going.  In other words, I
14 understand that after this meeting you weren't scheduled
15 to work that day.  But whatever your next regularly
16 scheduled workday was, you came to work that day, right?
17     A.  Yes.
18     Q.  You weren't suspended, in other words, following
19 this meeting?
20     A.  No.
21     Q.  All right.
22        (Defendant's Exhibit 12 was marked for
23        identification.)
24 BY MS. GIUSTINA:
25     Q.  Ms. Henry, you have what's been marked as

1  Defendant's Exhibit 12, which is a two-page typed e-mail
2  that has a header that indicates it was printed by Deborah
3  Kircher, but the actual e-mail itself has a header from
4  Rachelle D. Henry to Deborah Kircher, and there's some
5  folks cc'd and the subject is, Addendum.  Do you see
6  that?
7      A.  Yes.
8      Q.  And is this an e-mail that you sent to
9  Ms. Kircher on July 15, 2008?
10     A.  Yes.
11     Q.  And this e-mail you sent following up on a
12 question that was asked during the July 14th meeting about
13 why would anyone feel compelled to report that you were
14 doing bad things, correct?
15     A.  Yes.
16     Q.  And after thinking about it, you thought it made
17 sense to report the information that is in this e-mail,
18 right?
19     A.  Yes.
20     Q.  Okay.  And this e-mail, again, is truthful?
21     A.  Yes.
22     Q.  And accurate?
23     A.  Yes.
24     Q.  And, once more, you shared what you believed to
25 be the important facts concerning why these three people

1  might have an agenda or some kind of vendetta against you,
2  correct?
3      A.  Yes.
4      Q.  You would agree with me that -- well, let me do
5  this.  Let's look at what I'm going to mark as Exhibit 13.
6        (Defendant's Exhibit 13 was marked for
7        identification.)
8  BY MS. GIUSTINA:
9      Q.  And, if you would, please, take a look at
10 Exhibit 13, which was an e-mail that was sent in response
11 to Exhibit 12, and -- at least on the first page.  And
12 Exhibit 13, again, is two pages of e-mails, and there's a
13 new e-mail on this one which is an e-mail from Deb Kircher
14 responding to you on July 15th, 2008.  Do you see that?
15     A.  Yes.
16     Q.  And do you recall receiving this response?
17     A.  Yes.
18     Q.  And in her e-mail, Ms. Kircher indicates to you
19 that she will add your statement to the investigation
20 file, correct?
21     A.  Yes.
22     Q.  And you had apparently requested, based on her
23 language there, that you be provided a copy of the
24 statement that you provided.  Did you receive a copy of
25 that statement?

1  A.  No.
2  Q.  You did not?
3  A.  No.
4  Q.  Never?
5  A.  Never.  Not until I requested -- let me think.
6  No, I did not.
7  Q.  Okay.  Did you follow up with Ms. Kircher at any
8  point after receiving this e-mail to inquire what the
9  status of her sending that to you was?
10  A.  I don't remember.
11  Q.  Okay.  Would you agree with me that in terms of
12  having the opportunity to share what you felt to be
13  important facts about this situation, that you had the
14  opportunity to do that?
15  A.  I had an opportunity to do that based on the
16  fact that it's now part of the record, but I don't feel
17  that -- I don't know.  I guess, yes, I had an opportunity
18  to do that, to answer your question.
19  Q.  I mean, I realize you may not have agreed with
20  the decision that was made, but in terms of having the
21  ability to share what you felt to be important, you had
22  every opportunity that you wanted to be able to do that,
23  correct?
24  A.  I guess, to answer that question, rather than
25  the previous one, I did not have every opportunity.  I had

1  an e-mail opportunity, and where it went from there wasn't
2  exactly where I would have liked in that I didn't receive
3  time to sit down and share face-to-face.  I would have
4  liked that opportunity.
5  Q.  Okay.
6  A.  I would have liked for that to have been
7  addressed in a more personal way so that I could share
8  some of the other experiences and have that personal
9  contact from an HR rep.
10  Q.  Okay.  Did you ever consider requesting a
11  meeting with Ms. Kircher?  Did you do that?
12  A.  I did not do that.
13  Q.  Okay.
14  A.  I did not.
15  Q.  Did you ever attempt to send a -- an e-mail or
16  provide a written statement that was refused by anyone for
17  any reason?
18  A.  What do you mean refused?
19  Q.  Well, in other words, that they either told you,
20  thanks -- if it was an e-mail, thanks for the e-mail, but
21  we're sorry, we're not going to take any more statements
22  from you at this time, or, if you try to give somebody
23  physically a piece of paper, they said, no, thanks, we're
24  not taking any more statements at this time?
25  A.  No, that did not happen.

1  But I think, relevant to your question, is that
2  in the meeting of July 14th, Deb deferred to Gary, stating
3  that he should address my concerns about some of the
4  reasons why I felt someone might initiate these types of
5  concerns and the investigation.  When I asked her about
6  it, she said that wasn't her area, deferred to Gary.
7  Gary said, we're not here to discuss that right
8  now, but I will get with you -- we'll meet out at the
9  concourse one day, we'll have coffee, we'll discuss it.
10  So I did send some e-mails to him subsequent to
11  this one I sent to Deb saying, how about that coffee date;
12  at least two that I can recall.
13  Q.  To Gary?
14  A.  To Gary, thinking that that would involve Deb as
15  well.  I can't imagine why he -- but, you know,
16  regardless, I was looking for an opportunity to be heard,
17  and he did not respond.
18  Q.  And that was concerning the conduct by your
19  coworkers, correct?
20  A.  Which comment?
21  Q.  The conduct by your coworkers?
22  A.  Conduct?
23  Q.  Yes.
24  A.  Conduct that, the more I thought about what was
25  happening, I felt might be relevant.

1  Q.  Okay.  But in terms of sharing information not
2  about your coworkers' conduct and what their motivations
3  might have been, but in terms of the actual events
4  concerning the flight in question, you had an opportunity
5  to provide whatever information you wanted on that issue,
6  correct?
7  A.  About the questions pertaining specifically to
8  the flight?
9  Q.  Yes.  In other words, was there ever a time when
10  somebody said, no, we're not going to consider any more
11  information from you, Ms. Henry, so please keep your
12  statements, you know, and quit sending them to us?
13  A.  No one said that, but I did take the act of not
14  responding to my requests to mean something very much the
15  same.
16  Q.  Your request to meet and talk about the conduct
17  of your coworkers?
18  A.  My request to elaborate further on the question
19  they had posed to me at the meeting that I couldn't fully
20  address until later I thought more and wanted that
21  opportunity to discuss further.  And --
22  Q.  And so I understand, that is the conduct of your
23  coworkers, correct?
24  A.  Well, they had asked me the question, did -- why
25  did I think anyone --

1  Q. Right.
2  A. -- anyone meaning my coworkers, would feel
3  compelled to target me and make accusations. And so I
4  couldn't answer them. And all I could say to that was,
5  here's what I've been experiencing and, frankly, I don't
6  understand it. And I've been trying to -- not hard
7  enough, apparently -- but I've been trying to get this
8  addressed so that I know what to do, what's appropriate
9  for me do, what can I do, what can you do. And that's
10 when Deb said, that's not my area. Gary.
11 Q. Right.
12 A. And that's when Gary said, coffee later. And
13 then my request to meet for coffee met with no response,
14 which indirectly said -- to me the message was, I don't
15 want to hear what you have to say.
16 Q. Okay. Other than -- in this e-mail, Exhibit 12,
17 you mention three Delta employees in particular: Harold
18 Christiansen, Patsy Zimmerman, and Pae Caudill. Any
19 reasons other than what you have included in Exhibit 12
20 you believe they may have had some reason to have a grudge
21 or vendetta against you? And if you need to read through
22 that, please take your time.
23 A. Can you repeat the question?
24 Q. Sure. Other than the explanations or incidents
25 that you've relayed in Exhibit 12, are there any other

1  reasons that you believe these three people,
2  Mr. Christiansen, Ms. Zimmerman, and Ms. Caudill, may have
3  had some sort of a personal grudge or vendetta against
4  you?
5  A. None that I can think of.
6  Q. Okay. You were suspended on August 4th of 2008,
7  correct?
8  A. Was it the 4th or the 5th?
9  Q. One of those dates?
10 A. Yes.
11 Q. Okay. Who was at that meeting?
12 A. Me and Gary.
13 Q. Okay. And he told you during that meeting that
14 your termination would be recommended to the company?
15 A. He did not tell me that. I asked him that.
16 Q. Okay.
17 A. He said nothing, just shrugged.
18 Q. Okay. And did you ask him further for clarity
19 when he shrugged in response to that question?
20 A. No. That shrug seemed to indicate that he felt
21 that's the direction it was going in, that he went on to
22 say something along the lines of having tried to go to bat
23 for me, but they didn't believe me.
24 Q. Did he say who the they was?
25 A. Vague reference to the folks in Atlanta, but

1  specifically, no.
2  Q. Okay. Did you ask any other questions during
3  the meeting?
4  A. You know, there's a lot about that meeting that
5  I don't remember because I was surprised. I was told at
6  the end of my shift by my lead that Gary wanted to speak
7  with me. I thought it was our coffee date. So I went
8  down with every intention of having opportunity to
9  converse on matters other than that, than what it ended up
10 being about. So I was quite shocked when he alluded,
11 really, to the fact that I was being suspended. It didn't
12 come out very directly.
13 Q. Well, what did he say, as best as you can
14 remember?
15 A. I just remember having to ask, so are you saying
16 that I'm being suspended? And he said, yes. And I said,
17 as a disciplinary action for -- and I kept having to do
18 that, and then he would give a little bit more. And so
19 much of the details of the conversation I'm foggy on
20 because then it just got kind of -- I was in a bit of a
21 fog.
22 But I remember saying something about my
23 experience being that, unless you're specifying to me now
24 that this is a specific -- I said, my point of reference
25 on suspension is that a suspension of -- designated to be,

1  say, a three-day suspension as a discipline for an action
2  with probationary return or something like that is usually
3  determined before to the point where you could tell me
4  that now. But other types of suspensions are those that
5  are pending termination. That has been my point of
6  reference with fellow employees over the years. Is that
7  the case? And he said -- (indicating) -- and shrugged.
8  Q. And you didn't press him any further?
9  A. And I said, did you -- I think I started asking
10 him, what -- did you explain -- I mean, why is this
11 happening, is this still in reference to that business
12 from that meeting in July, didn't you get all that
13 resolved, did you talk to George. You know, I started
14 just barraging him with questions, and that's when he said
15 something about having gone to bat for me, but they
16 weren't believing me.
17 Q. And so you had -- you had an understanding that
18 the suspension was in relation to the June flight that you
19 had the meeting with the four individuals?
20 A. Yes, I believed it was in relation to that.
21 Q. Okay.
22 A. Only after inquiring, but yes.
23 Q. And you eventually learned that the decision had
24 been made to terminate your Delta employment, correct?
25 A. He later called --

1   Q.  Well, first, did you eventually learn that?
2   A.  Did I eventually learn?
3   Q.  That Delta had made the decision to terminate
4   your employment.
5   A.  Yes.
6   Q.  Okay.  Tell me about how you learned that
7   decision.
8   A.  Late September, early October I received a
9   message from Gary saying the decision had been made to
10  terminate my employment or something about having the
11  option to resign, and that I had to let him know by a
12  certain date or it would be -- it would reflect as
13  terminated or something.
14  Q.  So this was a voicemail message?
15  A.  Uh-huh, yes.
16  Q.  On your home phone?
17  A.  Yes.
18  Q.  Did you call him back?
19  A.  No.  Because his response -- his question -- or
20  his position was that, if I wanted to opt for the
21  resignation, I should call him back, otherwise, it would
22  just go through as a termination --
23  Q.  Okay.
24  A.  -- effective such-and-such a date.
25  Q.  And so you allowed it to go through as a

1   termination?
2   A.  Yes.
3   Q.  Did you have any conversations with any Delta
4   employees between the date of your suspension and the date
5   you learned of your termination?
6   A.  Yes.
7   Q.  Okay.  Who were those conversations with?
8   A.  Carol Isler.
9   Q.  Carol Isler?
10  A.  Isler.
11  Q.  Can you spell that for me?
12  A.  I-s-l-e-r.
13  Q.  Okay.
14  A.  Teresa Stuntebeck.  I'll spell that for you.
15  Q.  Thank you.
16  A.  S-t-u-n-t-e-b-e-c-k.
17  Q.  Anyone else?
18  A.  Lonnie Boden.
19  Q.  Is that B-o-d-e-n?
20  A.  Yes.  Shelly Tudor.  And I'll spell Tudor for
21  you.  It's T-u-d-o-r.
22  Q.  Anyone else?
23  A.  I don't think so, not that I can recall.
24  Q.  And were these fellow customer service agents?
25  A.  Shelly is a lead agent with whom I worked in the

1   baggage service area.  We were both leads together at one
2   point, and then I stepped down.  And Lonnie, Carol, and
3   Teresa are customer service agents.
4   Q.  And how often did you speak with them during
5   that time period?
6   A.  What was the time period?
7   Q.  Between your -- the date you learned of the
8   suspension and the date you learned of your termination.
9   A.  It was pretty infrequent, but I couldn't specify
10  a number.  Only that -- the reason I say it was pretty
11  infrequent is that I was struggling a lot emotionally and
12  it -- it was difficult for me to talk to people.
13  Q.  Okay.  And were you contacting them, or were
14  they contacting you as well?
15  A.  Honestly, I would have to say they all contacted
16  me.
17  Q.  Okay.  And tell me just generally about the
18  conversations that you had with them.
19  A.  How are you doing, I can't believe this has
20  happened, what are they saying, have you heard anything,
21  are you all right, is there anything we can do.
22  Q.  Okay.
23  A.  Wow, do you have any idea what this is about.
24  And then, you know, as time would go on, then Teresa would
25  tell me sometimes, well, I heard that it was because you

1   put George in first class instead of medallions.  And I'd
2   say, well, you know, maybe, but that's not a reason -- you
3   know, if that's what they're basing it on, I said, you
4   know, that's silly.  I don't understand that.  And I said,
5   I don't know.  Nobody told me anything.
6       And eventually, you know, it just kind of went
7   away.  They -- I don't know what they were hoping I would
8   say, but I wasn't getting any information from Delta, so I
9   didn't have a lot to tell them about what was going on.  I
10  was just waiting.
11  Q.  After your termination, after you were told of
12  your termination, you sent a letter to Delta as an appeal,
13  correct?
14  A.  I did.
15      (Defendant's Exhibit 14 was marked for
16      identification.)
17  BY MS. GIUSTINA:
18  Q.  Ms. Henry, I've placed in front of you what's
19  been marked as Defendant's Exhibit 14, and it's several
20  pages of documents.  And for ease of reference, it's
21  just -- they're Bates stamped at the bottom right-hand
22  corner Delta 471 to Delta 478.  And the first page is a
23  cover letter from Freking & Betz sent to Dave Croall from
24  Megan Clark at that firm.  Do you see that?
25  A.  Yes.

1    Q.  Okay.  And Freking & Betz is the firm that is
2  representing you in this legal action, correct?
3    A.  Yes.
4    Q.  When did you retain the services of
5  Freking & Betz?
6    A.  I don't know.  It was sometime between the date
7  of this letter and the date of my suspension.
8    Q.  Okay.  So -- and so I'm clear, it might have
9  been between your suspension and termination?
10    A.  Yes.
11    Q.  Okay.  But are you certain -- I mean, was it
12  during that period or -- do you recollect?
13    A.  I'm not sure of the exact date.
14    Q.  Okay.  But it's possible?
15    A.  It's possible.
16    Q.  It was between your suspension and termination?
17    A.  It's possible.
18    Q.  Okay.  All right.  And attached to Ms. Clark's
19  letter is a -- another typewritten document, but it is
20  distinctly different in that it's not on letterhead and
21  the typeface looks different and it is a November 11, 2008
22  letter that begins, To whom it may concern.  And if you'll
23  look at the last page of Exhibit 14, there is a signature.
24  Is that your signature?
25    A.  It is.

1    Q.  And this letter is your appeal to Delta Air
2  Lines, correct?
3    A.  Correct.
4    Q.  You drafted the letter, correct?
5    A.  I did.
6    Q.  And you included the information in this letter
7  that you thought was important for Delta to consider in
8  whether it should decide to bring you back to work,
9  correct?
10    A.  Correct.
11    Q.  And the facts in this statement are accurate?
12    A.  Yes.
13    Q.  Correct?
14    A.  To the best of my knowledge.
15    Q.  Truthful?
16    A.  Yes.
17    Q.  At any point did you provide other documentation
18  in support of your appeal?
19    A.  I don't think so.
20    Q.  All right.  And I'm going to ask you some
21  questions about Exhibit 14.  If you look at the bottom of
22  the first page of your statement -- in other words, not
23  the cover letter from Freking & Betz -- at the end of the
24  fourth paragraph, you relay that there is a lead agent who
25  announced during the group briefing that you had been

1  requested to work the San Diego flight.  Who was that lead
2  agent?
3    A.  Pae Caudill.
4    Q.  Do you know whether you were, in fact,
5  personally requested to work that flight?
6    A.  I don't know.
7    Q.  You then go on to state, There was no
8  performance leader on duty that morning, but I spoke to
9  one at the first opportunity.  Who did you speak with,
10  what performance leader?
11    A.  I don't remember.  I want -- I don't remember.
12  I think it might have been Sam Tuminello.
13    Q.  And do you remember what it is that you said to
14  Sam about that issue?
15    A.  How angry I was, how inappropriate --
16    Q.  That that information was shared?
17    A.  Well, no, that the entire -- that I thought the
18  entire -- I guess that information was shared, yes,
19  in answer to your question, but not that -- it's not the
20  information that was shared.  It was what prompted Pae to
21  do it was of more concerned to me.
22    Naturally, that the information was shared was
23  inappropriate, but my question -- my concern went deeper
24  in that I felt that I needed to get to the bottom of why
25  she would even do that, because I feel that she -- it was

1  my feeling that she had to have had a reason because she
2  didn't seem like the kind of person that would just do it
3  accidentally.
4    Q.  Okay.  You said you thought it might have been
5  Sam.  Was this -- this was a different discussion, though,
6  than the one you had in the jet gateway?
7    A.  Yes, if it was Sam.  But they were at two
8  different times, yes.
9    Q.  Okay.  If you'll look at page 3 of the
10  statement -- and you'll notice it has page numbers at the
11  bottom, so if you'll turn to page 3.
12    A.  (Witness complies.)
13    Q.  And in the first full paragraph you make a
14  statement on the third line that you had no idea what
15  local management had to say about the matter.  And when
16  you say the matter, I read your letter to mean, the flight
17  to San Diego.  Is that correct?
18    A.  I'm still trying to find where you're reading.
19  Tell me again.
20    Q.  The first full paragraph that begins, For the
21  next six weeks.
22    A.  Okay.
23    Q.  And you -- you say on the third line you had no
24  idea what local management had to say about the matter.
25  And I'm trying to understand what matter, to use your

1    word, it is that you're referring to.
2        A.  Okay.  Let me read it.
3        Q.  Okay.
4        A.  I believe I was referring back to the previous
5    paragraph wherein I had been requested to provide
6    management with information about that flight.
7        Q.  Okay.  So, in other words, what you were saying
8    there, then, was that you had no idea what the status of
9    the inquiry was into that flight?
10       A.  That's correct.
11       Q.  Okay.  Did you ever approach anyone in
12   management, for example, Mr. Schmidberger, to ask, gee, I
13   provided this statement to Mr. Tuminello, what is the
14   status of this?
15       A.  No.
16       Q.  You've never approached HR or anyone else about
17   that?
18       A.  No.
19       Q.  If you'll look at page 7, which is the last page
20   of Exhibit 14, in the third sentence you are discussing
21   George Gergits, and you state -- you're listing some
22   questions, and you state, Why did he get -- Why did he end
23   up getting suspended for three days?
24           How -- why do you believe that Mr. Gergits was
25   suspended for three days?

1        A.  I couldn't tell you.  I don't know.
2        Q.  You don't know where you would have received
3    that information?
4        A.  I didn't ever receive that information.  I only
5    heard that he had been suspended for three days, and I
6    never did hear why and --
7        Q.  Okay.  And that's the answer to my question.
8        A.  Okay.
9        Q.  So you heard from somebody that he had been
10   suspended, correct?
11       A.  Yes.
12       Q.  Okay.  From whom did you hear that?
13       A.  I'm thinking probably one of those people, but
14   I -- one of those people that I said I had been talking to
15   that were asking about how things were going.
16       Q.  You're talking about Ms. Isler, Ms. Stuntebeck,
17   Lonnie Boden, or Shelly Tudor?
18       A.  Those were the only people that were there every
19   day to report -- that I spoke to that would have reported
20   on that.
21       Q.  Okay.
22       A.  Oh, no.  I heard it from him.
23       Q.  Okay.
24       A.  I'm sorry.  I did hear it from him.
25       Q.  Okay.

1        A.  At the time we attended the same church.  And as
2    I was walking out of church one day, he stopped me.  And I
3    said, what's going on with everything?  I haven't heard
4    anything.  And he said he received a three-day suspension,
5    but that he was either going back or had gone back.
6        Q.  Did he share anything further about the
7    situation at that time?
8        A.  No.
9        Q.  Between the time that you were suspended and the
10   time that you submitted your appeal to Delta -- so that
11   would have been in November of 2008 -- did you have any
12   conversations with management employees from Delta other
13   than the conversation you've just relayed with Mr. Gergits
14   and obviously --
15       A.  From the time I was suspended until the time I
16   was terminated?
17       Q.  Uh-huh.
18       A.  I don't think so, no.
19       Q.  Okay.
20           (Defendant's Exhibit 15 was marked for
21           identification.)
22   BY MS. GIUSTINA:
23       Q.  Ms. Henry, Exhibit 15 is a letter on Delta
24   letterhead, two-page letter, addressed to you from Esther
25   Hammond in Delta's equal opportunity compliance

1    department.  This is a letter informing you that your
2    appeal of your termination was denied, correct?
3        A.  Yes.
4        Q.  You filed a charge of discrimination, correct?
5        A.  Yes.
6            Can I clarify something?
7        Q.  Sure.
8        A.  On your question about did I speak to
9    management --
10       Q.  Uh-huh.
11       A.  -- can you be specific about who you meant
12   management?
13       Q.  Well, a lead, a -- I will include lead agents
14   and above in that.
15       A.  I did indicate to you that Shelly Tudor was a
16   lead.  That's why I wanted to clarify that.
17       Q.  Yes.  And we did talk about those conversations.
18       A.  Only because I didn't want it to seem as though
19   I was being dishonest.  I mean, I did speak to Shelly as a
20   lead, but I was thinking you meant upper management.
21       Q.  No, no.  And I appreciate that.
22       A.  Okay.
23       Q.  So let me be clear.  Other than Shelly and other
24   than the conversation we talked about with George, did you
25   have any other conversations with employees at Delta who

1  would have been a lead or higher during the time period
2  between your suspension and your appeal of your
3  termination decision?
4      A. Not that I can recall.
5      Q. Okay.
6      A. Thank you. Sorry.
7      Q. No, thank you.
8      A. Go ahead.
9      (Defendant's Exhibit 16 was marked for
10     identification.)
11 BY MS. GIUSTINA:
12     Q. Ms. Henry, is this a copy of the charge of
13 discrimination that you filed against Delta Air Lines
14 concerning your termination?
15     A. Looks like it, yes.
16     Q. And if you'll look down in the bottom right-hand
17 corner, is that your signature?
18     A. Yes, I think so.
19     Q. And you understood when you were signing this
20 document that you were swearing and affirming that the
21 information you included in the charge was true and
22 correct to the best of your knowledge, information, and
23 belief?
24     A. Yes.
25     Q. And you checked the box indicating that you

1  believed you had been discriminated against on the basis
2  of your gender, correct?
3      A. Yes.
4      Q. And you listed the latest date of discrimination
5  to be 10/6, 2008, correct? Do you see where I'm referring
6  to? It's this box right here.
7      A. Date of termination, 10/6 -- last date of
8  discrimination, 10/6. Yes. That was my termination date.
9  So that's probably why I put that there.
10     Q. Okay. And in the body of the charge, it states
11 in the second full paragraph that you believe you were
12 unjustly suspended and later terminated concerning the
13 flight we've already discussed, correct?
14     A. Yes.
15     (Defendant's Exhibit 17 was marked for
16     identification.)
17 BY MS. GIUSTINA:
18     Q. If you would, please, take a look at what's been
19 marked as Defendant's Exhibit 17, which is an affidavit
20 that was submitted by you to the Equal Employment
21 Opportunity Commission. Do you recognize this document?
22     A. Yes.
23     Q. And it's a three-page document with typewritten
24 information on it. And if you look at the bottom
25 right-hand page of each -- the bottom right-hand corner of

1  each page, there are some initials. Are those your
2  initials?
3      A. Yes.
4      Q. And if you look on the last page, there is a
5  signature about halfway down the page on the right-hand
6  side. Is that your signature?
7      A. Yes.
8      Q. And, again, this information is sworn before a
9  notary public that the facts that you've asserted in the
10 affidavit are true and correct to the best of your
11 knowledge, information, and belief, correct?
12     A. Yes.
13     Q. And everything in here is, in fact, accurate and
14 true?
15     A. Yes.
16     Q. And you shared the information with the EEOC
17 that you felt was important for them to know all the facts
18 and investigate your situation, correct?
19     A. Yes.
20     (Defendant's Exhibit 18 was marked for
21     identification.)
22 BY MS. GIUSTINA:
23     Q. Exhibit 18, Defendant's Exhibit 18 is a one-page
24 document entitled Dismissal and Notice of Rights.
25 Ms. Henry, this document was addressed to you, correct?

1      A. Yes.
2      Q. And it is from the Equal Employment Opportunity
3  Commission informing you that it was closing the file on
4  your charge, correct?
5      A. I don't know what you mean by closing the
6  file.
7      Q. Well, I'm reading the line where it says, The
8  EEOC is closing its file on this charge. Here, I'll show
9  you.
10     A. Oh, I see. I see.
11     Q. Okay.
12     A. They're closing this file on this charge for the
13 following reason. I see. Okay.
14     Q. You see they have checked the box they're unable
15 to conclude that the information they obtained establishes
16 violations of the statutes, right?
17     A. Yes.
18     MS. MYERS: If we're going to read from the
19 document, can we read the next sentence as well?
20     MS. GIUSTINA: Sure. This does not certify that
21 the respondent is in compliance with the statutes. I
22 think the document speaks for itself.
23     MS. MYERS: Yes, I agree.
24 BY MS. GIUSTINA:
25     Q. And you recall receiving this document?

1    A.  Yes.
2    Q.  All right.  Are you aware of anyone else at
3  Delta who -- let's say from the year of 2000 to 2008,
4  whose employment was terminated?
5    A.  I don't know the status, once they're
6  suspended -- I don't often hear after that what the status
7  of their employment is, so I can't speak to that.
8    Q.  Okay.  So as you sit here today, you're not
9  aware of anyone who -- whose employment was terminated at
10  Delta?
11    A.  I'm thinking -- I never heard whether or not
12  they were terminated.
13    Q.  Okay.  All right.  If you'll look back at
14  Exhibit 17, I'm going to ask you some questions about
15  that.  If you'd look at the first page of that document
16  and -- did you -- did you type this out?
17    A.  Oh, wait.
18    Q.  Oh.
19    A.  I'm sorry.  I'm thinking about your last
20  question about were they terminated.  2000 to 2008 is a
21  long time.
22    Q.  Right.
23    A.  And I really don't know what the dates of things
24  are for this individual.  But Barbie Zilch was somebody
25  that I believe that might have happened during that time

1  frame.
2    Q.  All right.  What do you know about Ms. Zilch's
3  situation, if anything?
4    A.  Well, I know the reason she was suspended was
5  believed to be -- and, again, I just heard this
6  secondhand -- what do you call that, insubordination with
7  a supervisor.  After that, I don't -- I eventually
8  think -- I did hear, I think, eventually that she was
9  terminated.  So I don't know what the timeline was,
10  though, but I'm thinking it probably happened during that
11  time frame, as I think about it.
12    Q.  And so I'm clear, you didn't hear this directly
13  from Ms. Zilch, but, rather, through the folks in the
14  workplace?
15    A.  I initially heard from folks in the workplace
16  just what I was telling you about, you know, how it does,
17  oh, what happened.  So, eventually, though, yes, I did
18  speak with Barbie.  But at that time she had not yet been
19  terminated, I don't think.  I don't remember hearing from
20  her that she was terminated.
21    Q.  And did -- during this conversation, did
22  Ms. Zilch provide any information to you about why she had
23  been suspended?
24    A.  Just that she had gotten in a disagreement with
25  the supervisor to whom they said she had been

1  insubordinate.
2    Q.  And did she share with you what the disagreement
3  was about?
4    A.  I don't remember.
5    Q.  Okay.  Anybody else who you can think of other
6  than Ms. Zilch?
7    A.  I just can't -- that's a big time span, and I
8  just am not thinking of anybody else right now.
9    Q.  Okay.  Well, do me this favor.  If -- as we go
10  on, if somebody else comes to mind, just raise your hand.
11    A.  Sorry.  I just blurted that right out, oh --
12    Q.  Oh, no, that's perfectly fine.  I have no
13  problem with that.  I'd rather hear it than not hear it.
14  So just let me know.
15    A.  Okay.
16    Q.  So getting back to Exhibit 17, there are
17  questions on here that have answers, and everything is
18  typewritten.  Did you type the responses on this
19  document?
20    A.  I'm not sure.  I'm not sure that I -- are you
21  asking did I type the information directly onto this
22  document?
23    Q.  Yes.  Yes.
24    A.  I don't know that I did.
25    Q.  Okay.  Do you remember how -- if you didn't type

1  this, how the information may have been imparted to the
2  EEOC?
3    A.  I'm thinking I had already retained
4  Freking & Betz at that point.
5    MS. MYERS:  Don't disclose anything that we
6  discussed.
7    Or we can stipulate that the EEOC charge was
8  prepared with the assistance of counsel.
9    A.  I really don't remember.
10  BY MS. GIUSTINA:
11    Q.  But it's fair to say, certainly, that whether
12  you typed it or not, you certainly reviewed it carefully
13  and signed your name at the end of it, right?
14    A.  Yes.
15    Q.  So these are your words, essentially, correct?
16    A.  Yes.
17    Q.  And if you look on the first page in response to
18  number 2, which states, Personal harm, the sentence reads
19  that you were unjustly suspended and later terminated
20  effective October 6, 2008, correct?
21    A.  Correct.
22    Q.  Looking at the next page, you talk about in this
23  document three instances where you believe that male
24  employees engaged in conduct that you believe comparable
25  to yours and yet were not disciplined or terminated,

1  right?
2      A.  Yes.
3      Q.  Okay.  You see where I'm talking about?
4      A.  Yes.
5      Q.  All right.  Talking first about the first
6  incident you relay, which is the one concerning lead agent
7  Christensen and Dennis -- is it Sauerhage?
8      A.  Sauerhage.
9      Q.  Sauerhage.  Other than the details that you have
10  provided in what's been marked as Exhibit 17, are there
11  any other things you know about this incident that you can
12  share with us here today?
13      A.  Not that I can recall.
14      Q.  How did you learn about this particular
15  incident?
16      A.  Rick Cropenbaker approached me --
17      Q.  Okay.
18      A.  -- the day of the incident.
19      Q.  Okay.  And made the statement that
20  Mr. Christensen had, quote, conveniently cleared the San
21  Diego flight?
22      A.  Yes.
23      Q.  Do you know how many passengers on this
24  particular flight were given denied boarding
25  compensation?

1      A.  Yes.
2      Q.  Did he used to be a lead and then was no longer
3  so at this time?
4      A.  He used to be a performance leader, I believe.
5  Remember, I said earlier that designations changed over
6  time and that the lead program had been implemented fairly
7  recently.  I think prior to the lead program being
8  implemented, the first level of management was performance
9  leader.  And I believe he was a performance leader.
10      Q.  Okay.  So at the time this happened, he was a
11  performance leader?
12      A.  No.  He had just recently --
13      Q.  I'm confused.
14      A.  He had just recently stepped down from that role
15  to a --
16      Q.  To a --
17      A.  And he was just in the role of gate agent, the
18  same as me.
19      Q.  So he was a senior customer service agent?
20      A.  He may have just been a customer service agent,
21  but they may have given him senior status.  I don't
22  know.
23      Q.  Okay.  And you go on to state that, The
24  management team was also aware of it and nothing was done.
25      Who on the management team do you believe was

1      A.  I don't remember.
2      Q.  Were you actually present in the gatehouse for
3  the boarding and -- of this flight and the clearing of the
4  standby list?
5      A.  No.
6      Q.  Did you ever at any time examine any records
7  pertaining to the flight?
8      A.  I think when Rick was telling me, I may have
9  looked at the flight's numbers.  And by that, I mean I
10  would have pulled an A display T, which indicates
11  passengers boarded, and I would have displayed an
12  A display LR to see standby passengers cleared to confirm
13  what he was telling me.
14      Q.  Okay.  But beyond seeing the screen indicating
15  standby passengers were cleared, you didn't look at any of
16  the other records underlying decisions that were made with
17  respect to that flight?
18      A.  No.
19      Q.  You make a statement at the last sentence of
20  that particular paragraph.  And it states, The management
21  team was also aware of it and nothing was done.
22      Who on the management team -- I know you state
23  that -- let's see.  First of all, let me take a step back
24  here.  I'm sorry.  You state, Mr. Sauerhage is male and
25  former management?

1  aware of it?
2      A.  Well, I consider Rick to be on the management
3  team, and then George Gergits is who I asked about whether
4  or not Dennis had paid denied boarding compensation for
5  the flight.  So he was aware of it.
6      Q.  So Rick Cropenbaker and then Mr. Gergits,
7  because you inquired of him whether there was any denied
8  boarding compensation paid on that flight, correct?
9      A.  Correct.
10      Q.  All right.  You state nothing was done.  How is
11  it that you know nothing was done?  Why do you believe
12  that?
13      A.  Well, I believe nothing was done because -- for
14  two reasons.  The -- the main reason being that, when
15  something is done there that has to do with admin action,
16  you generally hear about it.  So I made an assumption
17  based on the fact that I never heard any more about it.
18  People like to talk.
19      Q.  Let me ask you a question about that first.  Is
20  that any level of admin action or simply admin action that
21  results in somebody not being in the workplace whether
22  it's because of a three-day suspension or whether it's
23  because of a suspension pending termination?  I mean,
24  would you hear about a warning letter that was issued?
25      A.  Yes.  In the past, I've heard about warning

letters.
Q.  I'm sorry.  I didn't mean to interrupt you.  You
said you made an assumption based on the fact you hadn't
heard any discipline was issued.  Any other reasons?
A.  And because he had not been suspended for -- he
had not missed any work as a result of it.  So those were
assumptions on my part.
Q.  And you state the reason it says -- back into
that paragraph, so I'm kind of working my way backwards.
You state, I believe passengers were rerouted early in
order to ensure a seat for Mr. Christensen.
     Why do you believe that?
A.  I got to think back to what I was talking about.
Give me just a minute.
     I think that -- a common practice on -- let me
go back.  We refer to the banks of departing flights in a
hub city as pushes.  So during that 9:00 push of flights,
because there are often no more flights to the destination
until -- no more nonstop flights to the destination until
late in the afternoon, which is a great inconvenience for
people and which usually means you're less apt to get a
volunteer, it's harder to get them to agree to go at 4:30
when it's 8:30 in the morning.  What often happened was
that they would route the passengers onto a flight with a
connecting city that left during the same push as a means

of --
Q.  To clear seats?
A.  -- as a means of clearing seats, but to sweeten
the pot, if you will.  In other words, I might say to you,
your 9:00 flight to San Diego is overbooked.  If you would
be willing to give up your seat on this flight, I have an
8:50 departure to Salt Lake City.  You would arrive in San
Diego -- you would connect in Salt Lake City and you would
arrive in San Diego just two hours later than you were
originally scheduled to arrive.  Would you be interested
in volunteering to give up your seat?  The voucher would
be $200.
     You would say, well, yeah, two hours, 200 bucks,
sure, I get to leave right now, sure.  And in doing that,
you would guarantee yourself, you know, those two seats,
and you would -- you would not have to wait until
departure time to determine that.
     So what would potentially happen then is that
passengers that were booked on the flight but didn't check
in might be -- might then no-show the flight, which would
have given you the two seats you needed anyway had you
just waited.  So that paying that denied boarding was
unnecessary in the end, cost Delta money, and the flight
might even go out with empty seats because you had jumped
the gun on your -- but you were doing that because you

knew if you said, can I get any volunteers that want to
leave at 4:30 this afternoon, you might not get them, in
which case you might have involuntary denied boarding and
you don't -- maybe you don't want to deal with that.
Q.  I understand your reasoning, but you don't know
for certain that that's what happened on this flight,
correct?
A.  To answer that and why I hesitated initially is,
I don't remember how I knew that, but there was a reason
why I suspected that that was grounded in some fact.  I
don't know if it was that I pulled something up that
reflected that information or if I heard that from Rick
Cropenbaker.  I didn't document what that was.  But I
remember having a valid reason for thinking that.  I just
don't remember what it was now.
Q.  All right.  Regarding the next page -- the next
paragraph concerning agent Ron Zimmerman, you've obviously
got some detail here concerning the incident that you feel
was comparable to yours.  Take a look at that and let me
know whether there are any details that, as you sit here
today, you can remember in addition to what you've already
said in this affidavit.
A.  No, I don't have any additional information.
Q.  Okay.  You indicate in this paragraph that three
non-revenue space-available passengers boarded the flight.

Do you know who those passengers were?
A.  I do not.
Q.  Were you present for this flight?
A.  No.  That was after I had been suspended.
Q.  Did you ever -- I'm assuming it's after you were
suspended, so you never had the opportunity to look at any
records surrounding this flight, correct?
A.  I don't -- I think Wendy might have shown me
some.  Wendy's the one who came to me and said, Rachelle,
something happened that I find troubling.  I just want to
let you know I told Barry Erb, they said they're going to
follow up on it.  And I think she had some documents with
her when she spoke to me, copies of maybe the list or
something like that.
Q.  What list?
A.  It might even have the names on it.  You know
what I mean, like you could print from that computer the
standby removal list, you can print the PNR.  She may have
had a packet of information with her.  I'm sure she had
something with her, but what -- I'm no longer remembering
what.
Q.  You don't remember what those documents
showed?
A.  I'm remembering that I think two passengers'
names were on there, like probably it was a copy of their

 1  PNR.  It was either that or it was a copy of their removal
 2  list, which would be the list of -- the removal list or
 3  the actual list.  I'm not sure.
 4       Q.  And explain to me what the removal list is.
 5       A.  The removal list is the list that shows who got
 6  cleared and into what seat, but they wouldn't have been on
 7  that because they didn't get cleared, so that wasn't it.
 8       Q.  And do you know personally whether management
 9  looked into the situation?
10       A.  No, because I didn't speak to anyone.
11       Q.  Okay.  And do you know if anyone received
12  administrative action as a result of this?
13       A.  I do not know.
14       Q.  Now, you shared that you had heard about this
15  from Ms. Van Winkle, correct?
16       A.  Correct.
17       Q.  And you've already mentioned a question I was
18  going to ask, which this occurred after you had been
19  suspended, right?
20       A.  Yes.
21       Q.  So you're no longer in the workplace?
22       A.  Right.
23       Q.  What job did Ms. Van Winkle have at this time?
24       A.  She was working at the information counter
25  across the hall from the departure gate.  The information

 1  counter is staffed by ticket -- agents from the ticket
 2  counter.  So she was a 125 employee assigned to the ticket
 3  counter.
 4       Q.  And is the computer -- does the computer that's
 5  at the ticket -- or -- I'm sorry -- the information
 6  counter have the same capability in terms of seeing what's
 7  going on as the computers at the gates?
 8       A.  I believe so, yes.
 9       Q.  Do you know that to be the fact?
10       A.  To the best of my knowledge, yes.
11       Q.  Okay.  Have you ever worked at the information
12  counter?
13       A.  Many times.
14       Q.  Okay.  And your recollection is that those
15  computers can watch along the keystrokes as a flight is
16  cleared or print that information out after the fact?
17       A.  Yes.
18       Q.  Had, to your knowledge, Ms. Van Winkle ever
19  worked at the gates?
20       A.  I don't know.
21       Q.  Do you know whether she had any knowledge of the
22  boarding process and how that works?
23       A.  I don't know.
24       Q.  How many of the customer service agents that you
25  worked with on a daily basis were female?  And you can

 1  just give me a percentage, that's fine, just a rough
 2  percentage.
 3            MS. MYERS:  You don't have to guess.  If you
 4       don't know, that's fine.
 5       A.  I don't know.  I'm just trying to get a picture
 6  in my mind of the work schedule and try to guess, but I
 7  couldn't give you a number.  I don't have one for you.
 8  BY MS. GIUSTINA:
 9       Q.  Was it more than 50 percent female?
10       A.  I really don't know.  I never really paid
11  attention to that.  I don't know.
12       Q.  So out of all the years you worked there, you
13  can't give me a more than 50 percent?
14       A.  Well, what I can tell you is, there was nothing
15  glaring to me.  If, for instance, it had been
16  predominantly female with one or two male employees, I'd
17  be able to tell you that.
18       Q.  Or the converse?
19       A.  Or conversely, yes.
20       Q.  Okay.
21       A.  But because there was nothing glaring and
22  obvious to me, I just really didn't notice.
23       Q.  All right.  The final paragraph in this
24  affidavit concerns a situation regarding
25  Mr. Schmidberger's son.  Take a quick look at that and let

 1  me know when you're done reading that.  I have a couple
 2  questions about that.
 3            Do you see where I'm talking about?  It starts,
 4  Also, manager of airport operations, toward the bottom of
 5  that there.
 6       A.  Okay.  What was your question?
 7       Q.  My question is whether you're in possession of
 8  any other details concerning this incident than you have
 9  shared in this paragraph of the affidavit.
10       A.  No.
11       Q.  How did you learn about this situation?
12       A.  It was either Lonnie Boden or might have been
13  Lori Skala.
14       Q.  Can you spell her last name?
15       A.  S-k-a-l-a.
16       Q.  And what was Lori's position?
17       A.  Might have been.  Lori's a customer service
18  agent.
19       Q.  I'm sorry.  You started to say might have been.
20  Were you going to say --
21       A.  I was just thinking out loud it might have been
22  Lori.
23       Q.  Okay.  So you -- at this time you were no longer
24  working at Delta, correct, when this happened?
25       A.  I was not.

1    Q.  So you weren't present for the flight, right?
2    A.  No.
3    Q.  You weren't in the airport for some other
4  reason?
5    A.  No.
6    Q.  Did you ever have the opportunity to see any
7  records pertaining to the charter flight?
8    A.  No.
9    Q.  Do you know whether any passengers were
10  displaced as a result of either Mr. Schmidberger's son or
11  his friend flying on this flight?
12    A.  No.
13    Q.  Because it was a charter, correct?
14    A.  That's what I heard.
15    Q.  Okay.  And did you know, was it a Delta plane
16  flying as a charter or was it another independent airline
17  operating as a charter, as we discussed earlier, Delta was
18  simply providing the gate and ground service?
19    A.  I don't know.
20    Q.  Do you know how charters work?  Let's assume
21  that it's a Delta plane that's being chartered.  Do you
22  know how that payment works, whether there's a flat fee
23  paid or is it per passenger?  Do you have any knowledge of
24  that?
25    A.  I do not.

1    Q.  If you look at the next paragraph underneath the
2  paragraph where you talk about Mr. Schmidberger, you make
3  reference to at least five other incidents that you had
4  documented where you personally watched agents clear
5  standby passengers out of order or clear non-rev
6  passengers into first class seats while medallions
7  remained in coach.  And I'm loosely paraphrasing that.
8         What are the at least five other incidents that
9  you're referring to there?
10    A.  I think, two years later now, I'd be
11  hard-pressed to tell you all five.  But I can remember
12  talking with George specifically about.
13    Q.  George Gergits?
14    A.  Yes, George Gergits.  And telling him about
15  watching Keith Crabtree do exactly what I described
16  there.
17    Q.  Well, which one?
18    A.  Clear non-revenue passengers into first class
19  seats and clear standby passengers out of order.
20    Q.  Okay.  And --
21    A.  And also Emory Schmitt.
22    Q.  Emory Schmitt is --
23    A.  Is another agent that I watched.  In that case
24  it was -- it was cleared non-rev passengers into first
25  class seats while eligible medallion passengers remained

1  seated in coach.  Those are two that I can still think
2  of.
3    Q.  Okay.  And you mentioned that you documented
4  these incidents.  To a lawyer, that looks -- I think a
5  document, right?  Did you actually write anything down?
6    A.  I jotted down some notes.
7    Q.  Do you still have those notes?
8    A.  I should.
9    Q.  Okay.
10    A.  I should have disclosed -- I should have given
11  you all of that.  You don't have those?
12    Q.  Well, we haven't seen that.
13    A.  Okay.
14    Q.  So if you -- I'm going to assume that perhaps
15  you haven't provided that to your counsel, but if you
16  would, please, I would request that you do that.
17    A.  Okay.  I'll go back and make sure I have it.
18    Q.  All right.  Let's talk a little bit about the
19  Keith Crabtree incident.  You stated that you had told
20  George Gergits about this situation, right?
21    A.  I told him about both of those situations.  The
22  context was basically that I was saying to him that this
23  practice is commonplace.
24    Q.  Okay.  So you were telling him about this after
25  the fact?

1    A.  Yes.  Because the context of the conversation
2  was me saying, I'm not sure I understand what all the fuss
3  is about.  Everybody does this all the time.  For
4  instance, I just worked a flight the other day, blah,
5  blah, blah.
6    Q.  Okay.  So let me make sure I understand.  You
7  told George this after the San Diego flight that we've
8  already discussed, correct?
9    A.  Sometime after the flight -- the flight that is
10  in question here, yes.
11    Q.  And was this before your suspension?  Help me
12  understand.
13    A.  Yes, it would have had to have been.  It was
14  sometime between June 8th and August 5th.  And during that
15  time that I previously mentioned, I was experiencing these
16  unexplainable behaviors from my coworkers and was
17  confused.
18    Q.  So is it fair to say that the situations you've
19  explained concerning Mr. Crabtree and Mr. Schmitt occurred
20  roughly in that time frame?
21    A.  Yes.
22    Q.  Okay.  All right.  So let's talk about
23  Mr. Crabtree.  Were you working the flight with him?
24    A.  Yes.
25    Q.  Okay.  And who was the primary on that flight?

1   A.  He was.
2   Q.  Okay.  Do you recall where the flight was going
3   to?
4   A.  No.
5   Q.  Okay.  And explain to me what happened.
6   A.  What I remember now is that it was close to --
7   it must have been a little over halfway through the
8   boarding process because the gatehouse was fairly clear,
9   and by that I mean the bulk of the passengers had boarded
10  And, generally, about 15 minutes before departure, that's
11  sort of what a gatehouse looks like.
12  Q.  I'm sorry.  You said 15 minutes before
13  departure?
14  A.  Usually, about 15 minutes before departure, the
15  bulk of your passengers, especially if the flight is very
16  full, have gotten onboard to stow their bags and et
17  cetera.  So then what you have in a connecting city are
18  the few stragglers, the non-rev passengers that are
19  desperately awaiting their seats and the connections that
20  are running from their gates.  So the gate can be -- can
21  feel sort of empty.  So I remember that being the
22  experience I had.
23      And he was clearing his standbys, which would be
24  normal practice at that point.  But he was jumping around
25  on the list and clearing them out of order.  And I said

www.elitereportingagency.com
513.233.3000

1   something to him about it, like, what are you doing,
2   probably something like that, and he said something
3   like -- something very Keith Crabtree-like, don't you
4   worry about it, or something along those lines.  He
5   dismissed me.  So I didn't.
6       And then shortly after that, he cleared
7   non-revenue passengers into first class seats, but they
8   weren't the next non-revenue passengers on the list.  Now,
9   I think --
10  Q.  Who was next on the list?
11  A.  I don't know.  I think there were a lot of first
12  class -- if I remember correctly, there were a lot --
13  there were a number of first class seats open, which would
14  mean that you anticipate getting a lot of your non-revs up
15  there.  But he was not clearing them in the order of
16  priority.  He was, say, for instance, going to number
17  five, clearing that and then leaving one and two on there.
18  And I didn't know why.
19      But, anyway, as it turned out -- again -- and
20  now at this point I'm even foggier than I was, but I'm
21  going to try to retrieve that document.  That might help
22  for me to see that again, what I jotted down, because I
23  think I jotted that down fairly close to the occasion.
24  And that might give me more -- jog my memory a little
25  better.

www.elitereportingagency.com
513.233.3000

1   Q.  Okay.  Did you share your concerns with anyone
2   other than -- well, first of all, at the time this
3   happened, did you -- did you tell Mr. Gergits immediately,
4   or was it more in the context of your situation that you
5   used this as an example?
6   A.  I'm not sure how quickly after that happened
7   that I told him.
8   Q.  Okay.  Did you tell anyone else about it?
9   A.  I don't think anybody else was talking to me, to
10  be honest.
11  Q.  Did you tell anyone else in the leadership team?
12  A.  I didn't really work with anyone else on the
13  leadership team.  George was my immediate supervisor
14  and -- of course, the leads.  The leads were there.  I
15  don't remember if I told any of the leads or not.  I may
16  have.  I don't know.
17  Q.  Did you tell Mr. Schmidberger?
18  A.  No.  I didn't have occasion to talk to
19  Mr. Schmidberger.  I would have gone through proper chain
20  of command, anyway, on that issue, which would have been
21  George.
22  Q.  All right.  Let's talk about Emory Schmitt.
23  Tell me -- first of all, again, this would have occurred
24  sometime between June 8th and August 5th, correct?
25  A.  Uh-huh.

www.elitereportingagency.com
513.233.3000

1   Q.  And tell me what happened on this particular
2   flight that you can recall.
3   A.  It was very close to departure time, ten minutes
4   or so, maybe.  The last ten minutes before any departure
5   is otherwise termed crunch time.  There are some specific
6   things that have to go on within that time frame to ensure
7   an on-time departure, which is all but mandatory.
8       It's very drilled into the gate agent to have an
9   on-time departure.  And at ten minutes prior to departure
10  time you are supposed to pull your weight and data report
11  At five minutes before departure time you are supposed to
12  be walking down the jetway with your paperwork.  And at
13  two minutes before departure time you are supposed to be
14  shutting the door and pulling the jetway so as to ensure
15  on-time departure.
16      At ten minutes before departure time, the only
17  way to pull your weight and data record at that time is to
18  have an accurate passenger count.  In some cases it has to
19  be exact.  In other cases, you have what's called
20  tolerance.  Different aircraft has a certain amount of
21  tolerance for the numbers to be off by a couple, two,
22  three, maybe six.
23  Q.  Have a little bit of leeway, basically?
24  A.  But most of the time, at least half the time you
25  did not have tolerance.  So you had to know exactly how

www.elitereportingagency.com
513.233.3000

1 many people were onboard. And if it changed by one, you
2 had to resend that paperwork, which could result in a
3 delay just waiting for that to print off -- it was quite
4 long -- and then running it down the jetway to the
5 captain. It's his final weight and data report.
6         So they requested -- the management, the
7 leadership would request on a regular basis that we
8 remember to adhere to that policy. And so I remember that
9 it was in that crunch time -- which, by the way, is also
10 when you're usually clearing your standby list, because I
11 believe the -- the requirement listed on a passenger's
12 ticket jacket is that they be presenting themselves at the
13 departure gate 15 minutes before departure or their seat
14 is subject to cancellation. I believe that's how it read;
15 at least it did at the time.
16         So you can imagine, then, if 15 minutes before
17 departure time you still have six people that have not
18 presented themself to you at the gate, you have a little
19 less than five minutes to cancel their seats, clear your
20 standby list, print your weight and data report that
21 should be accurate, print off a copy of your flight
22 attendant report, check any gate-checked bags, and report
23 to the plane.
24         So it can be -- hence, the name crunch time.
25     Q.  Uh-huh.

www.elitereportingagency.com
513.233.3000

1     A.  So it can be a little chaotic in that time
2 frame. And, if I remember correctly, Emory was trying to
3 determine who of the non-revenue passengers he was going
4 to clear, and there was some issue of someone traveling
5 with someone else, so if that person wasn't going to be
6 cleared, then I don't want to go. And that happens
7 frequently. For instance, number 1 might be traveling
8 with number 16. Well, number 16 is not getting cleared so
9 skip number 1.
10    Q.  And let me be clear. That's because different
11 seniority dates?
12    A.  That has to do with the fact that someone may be
13 on a buddy pass, for instance, or you and I are traveling
14 and you were hired before me so we're further up the
15 list.
16    Q.  And we're talking about now -- strictly about
17 non-rev seat available?
18    A.  Yes, non-rev space-available passengers that are
19 listed.
20        So, often, what happens is, because you don't
21 know prior to that time the information about who's
22 traveling with who, you won't find that out until you've
23 already cleared them into the seats. So now, for an
24 example, you've cleared numbers 1 through 6 because you
25 have six seats available. And then number 1 comes up and

www.elitereportingagency.com
513.233.3000

1 says, I'm not going to go if number 10's not going to go.
2 Oh, well, in that case we'll clear number 7. So then you
3 start calling out, number 7, number 7. Well, number 7
4 says, I'm going with number 13. Number 8 -- and, you
5 know, you're -- in the meantime, the clock is ticking.
6         And this is what I remember sort of being the
7 atmosphere, possible reason for this. But, anyway, he had
8 already sent down numbers 1 through 5, say, just for the
9 sake of simplifying example. He had already sent down
10 some of the previously cleared non-revs onto the plane.
11 And medallion passengers had already boarded the aircraft.
12 And then the last person that we could figure out that
13 could go that wasn't traveling with somebody else ended up
14 being somebody with less seniority than the other non-revs
15 onboard and certainly not a medallion passenger. The type
16 medallion passengers were still boarded in coach.
17    Q.  Okay.
18    A.  So there's an example of what --
19    Q.  So that person got a first class seat?
20    A.  Yes. So that non-revenue space-available
21 passenger with, say, an S3 priority or an S4 priority was
22 boarded ahead of medallions into first class.
23    Q.  And you said that I think in -- when you were
24 aligning these, because six revenue passengers didn't show
25 up at crunch time --

www.elitereportingagency.com
513.233.3000

1    A.  At crunch time.
2    Q.  Okay.
3    A.  That's not to say they're not on their way or in
4 the airport or running.
5    Q.  Right. But they're --
6    A.  But at that point we have to make a
7 determination we're going without them, so -- and we want
8 to get our numbers either exact or within tolerance so
9 that we can send our paperwork, so we want to know who's
10 here and who isn't. So that's how that happens.
11    Q.  Okay. Any other of the five instances that you
12 can think of other than the two we've discussed?
13    A.  Not right now, no.
14    Q.  Okay. Are you aware of any women who -- female
15 agents who engaged in situations or were involved in
16 situations where, you know, arguably it involved a loss of
17 revenue to Delta?
18    A.  Ever, in my whole career?
19    Q.  Sure. And by that I mean, you know -- you've
20 listed both Mr. Crabtree and Mr. Schmitt, as well as the
21 other three we've discussed, as engaging in behavior that
22 I believe in your affidavit you talk about, you know, this
23 caused a loss of revenue to Delta.
24         And so my question is, are you aware of any
25 female agents who did similar things during your career?

www.elitereportingagency.com
513.233.3000

1    A.  Yes.  There was a woman -- Gary actually
2  referenced her during my suspension conversation.  But I
3  can't think of her name right now.  Let me think for a
4  minute.
5    I cannot think of her name to save my life.  But
6  she had been accused of writing out denied boarding
7  compensation -- some sort of denied boarding compensation
8  fraud.  And -- oh, I'm going to think of it here in a
9  minute.  I can't think of it.  It's on the tip of my
10  tongue.
11    But, anyway, I knew that she had been suspended
12  for that.
13    Q.  Okay.  Was she terminated?
14    A.  I never heard.
15    Q.  All right.  You don't recall her name?
16    A.  (Shaking head.)
17    Q.  If you think of it --
18    A.  If I think of it, I'll tell you, but I'm just
19  drawing a blank.
20    Q.  And you don't know any specifics about the
21  fraud, to use the word that you used earlier?
22    A.  The story I heard was that she was writing them
23  out to friends or family and then they were cashing in on
24  them or something.  But, anyway, it was something she had
25  collaborated with someone else to do.  And I don't know if

1  it was denied boarding compensation vouchers.
2    There's also the possibility that it was denied
3  boarding compensation checks, which now that I think about
4  it, I think that's what it was.
5    Q.  Okay.
6    A.  Because you -- as a denied boarding passenger,
7  if you're involuntary, you can obtain a check for a
8  certain amount of money if it's not a voluntary decision
9  on your part.
10    Q.  And was this a Cincinnati employee?
11    A.  Yes.
12    Q.  Okay.  And you say that Gary mentioned her
13  during your suspension discussion?
14    A.  Yeah.  I said, Gary, what is this all about?  I
15  don't understand any of this.  It makes no sense to me.  I
16  said, you know me, you've known me for years.  This is
17  so -- does it occur to you that this is just ludicrous?
18    He said, well, in light of the reasons why
19  people get terminated, like, for instance, you know,
20  something like-so-and-so, whatever her name is -- I can't
21  think of it -- now, that's something to get fired over,
22  you know.  I said, exactly.  I said, exactly.  That's not
23  me.  So that's how he mentioned her.
24    Q.  Okay.  Are you aware of -- and not so much even
25  from management saying, but things you've witnessed at the

1  gates over the years -- women who have engaged in conduct
2  that you might have deemed questionable at the time?
3    A.  Oh, that's a very broad question.  Questionable
4  in what way?  What do you mean questionable?
5    Q.  Well, to the extent you're questioning the
6  people we've already discussed, the male employees and how
7  you disagreed with the actions they took and the actions
8  they took resulted in lost revenue to Delta in some way,
9  shape, or form.
10    So my question is --
11    A.  Oh, have I ever --
12    Q.  -- are there women who have done that who you
13  have witnessed doing that?
14    A.  That same thing.  I can't think --
15    Q.  Or something similar?
16    A.  Something similar that would result in a loss of
17  revenue?
18    Q.  Yes.  Yes.
19    A.  That would have affected me similarly where I
20  would have said, now that's just not right?
21    Q.  Yes, exactly.
22    A.  No, I can't think of any.  But -- but, remember,
23  my point for bringing this up to George was that I didn't
24  view what they had done as particularly troubling until I
25  was in question for doing the same thing, because I didn't

1  view it to be a violation of any policy.
2    Q.  Oh, well, I understand that.  But what I'm --
3  you know, obviously, when you were questioned about this
4  and they did come to mind, you shared them with Gary
5  and -- or with -- Gary -- George?
6    A.  I'm sorry.
7    Q.  Two Gs.  I'm sorry.  I couldn't keep it
8  straight.  You shared with George and you were able to
9  recollect them.  So my question is, were there female
10  agents you were able to recollect as well?
11    A.  No.  And I think that's because, you know, I
12  was -- this was all just what happened in that short time
13  between my July conversation and my August suspension.  It
14  was just a matter of me saying, for instance, George, I
15  just worked a flight the other day and in that case, it
16  was Emory and whoever else I -- you know, Keith, that I
17  was recollecting.
18    You know, I'll try to find that document.  If
19  that sheds more light, that might answer that more.
20    Q.  Among the five that you mentioned, were those
21  all male as well?
22    A.  I -- I don't recall.
23    MS. GIUSTINA:  Okay.  Why don't we take a short
24  bathroom break?
25    (A recess was taken from 2:48 to 2:56.)

BY MS. GIUSTINA:

Q. Ms. Henry, are you aware of anyone else who you believe or are you aware of anyone who you believe intentionally manipulated the ticketing system or the boarding process to seat non-revenue passengers in first rather than medallion passengers? I know we've talked about some instances, but other than those, are you aware of any others?

A. Not that I can think of right now.

Q. Okay.

(Defendant's Exhibit 19 was marked for identification.)

BY MS. GIUSTINA:

Q. Ms. Henry, what's in front of you has been marked as Defendant's Exhibit 19, and it's the complaint that was filed in this case. Do you recognize this document?

A. Yes.

Q. And did you review it before your attorney filed it on your behalf?

A. Yes.

Q. And is everything in the complaint true and accurate?

A. Yes.

Q. We've discussed at some length the flight

situations concerning Mr. Christensen, Mr. Zimmerman, and Mr. Schmidberger, as well as the two additional individuals just before break. Are there -- is there any other evidence that you have to support your gender discrimination claim?

A. Is there evidence that I have to support?

MS. MYERS: Objection to the extent it calls for a legal conclusion.

But you may answer.

BY MS. GIUSTINA:

Q. Any other reason you think you were discriminated against on the basis of your gender, other than what we've talked about?

MS. MYERS: Same objection.

You can answer.

THE WITNESS: Thank you.

A. I don't know that it's evidence or -- or that I could really speak to legalities of it, but I just know that one of my ongoing and primary considerations in this matter has been how George's experience was so significantly less punitive than mine.

There's been a lot of unanswered questions as to his involvement, the level of his involvement, what prompted all of the concern in his direction and then why, if the primary focus of concern, which is what I gathered

from what I learned in the course of my conversations with management prior to my suspension -- if the focus of the concern was really about his improprieties, how did that then result in his having three-day suspension with a PIP and a probationary period and my termination?

BY MS. GIUSTINA:

Q. And did he tell you he received a PIP as well when he told you that he had a three-day suspension?

A. No.

Q. Okay. How did -- why do you believe that he received a PIP?

A. I think I read that in some of my discovery documents.

Q. Okay. So some of the information that Delta provided to you?

A. Yes.

Q. Okay. You told Delta, did you not, that Mr. Gergits in no way asked you to do him any favors on his flight, correct?

A. Right.

Q. Okay. Do you see Mr. Gergits's conduct to be the same as yours under these circumstances, concerning the flight in question?

A. I don't know what you mean.

Q. I mean, in other words, you did something

different, right? You were told that you -- that the company determined that you intentionally manipulated the ticketing system and boarding process to favor people on Mr. Gergits's flying pass ahead of medallion passengers?

A. Yes, that's what I was told.

Q. Okay. And are you aware of what it was determined Mr. Gergits might have done wrong?

A. I'm only aware of what I read in the discovery documents --

Q. Okay.

A. -- where he stated that, when asked if he had asked me to do him a favor, or something along those lines, he said that he had not. But I think they also asked him about accusations made by other employees that he had asked them to manipulate something on his behalf, and he responded by saying that that had been a joke.

Q. Okay.

A. I'm aware of his statement and the questions that were posed to him.

Q. And you've become aware of those specifics after your lawsuit was filed?

A. Just when I reviewed discovery documents. That's the first I --

Q. Right. So after your litigation was filed, correct?

1    A.  Yes.
2    Q.  Okay.
3    A.  I mean, to some extent, remember that I knew
4  that he had had a three-day suspension, because that
5  information was early in coming my way.  So right off the
6  bat I knew that he certainly had -- here's what I would --
7  where I was operating from.  I didn't do anything wrong.
8  I don't know what they're talking about.
9          They even told me why -- at this point they
10  haven't even told me why I'm suspended.  I eventually
11  ended up terminated and didn't even receive a reason why I
12  was terminated in writing, didn't even know the reason
13  until I got Esther Hammond's letter as to why they were
14  terminating me and in that time frame was told and
15  experienced questions that would have led me to believe
16  that George was somehow guilty of something, didn't know
17  what that was, and he had received what appeared to be a
18  slap on the hand by comparison to my termination.
19    Q.  Okay.  You mentioned that nobody told you in
20  writing why you had been terminated.  But you understood
21  you were terminated because of the incidents surrounding
22  the flight in question to San Diego, correct?
23    A.  The only thing I knew was that Gary had said to
24  me -- when I asked for what reason or why, he had said,
25  they don't believe you and you're viewed as a threat to

1  revenue.
2    Q.  Okay.
3    A.  So those were the terms that I knew were being
4  thrown around, but I never heard the details.
5    Q.  When you received the message from
6  Mr. Schmidberger stating, you know, the decision has been
7  made, if you wanted to go through as a termination, that's
8  fine, but if you would like to resign, call and let me
9  know, did you call him at any point and ask what the
10  decision was based on?
11    A.  No.
12    Q.  Did you call anyone in human resources,
13  Ms. Kircher, for example, who was present at the
14  meeting --
15    A.  No.
16    Q.  -- in July to ask her that same question?
17    A.  No.
18    Q.  All right.  Anything else other than what we've
19  discussed that would support your claim that you've been
20  treated less favorably at Delta because of your gender?
21      MS. MYERS:  Objection.
22      But you may answer.
23    A.  Not that I can think of at this time.
24  BY MS. GIUSTINA:
25    Q.  Ms. Henry, you're also asserting a cause of

1  action that essentially says that you were treated badly
2  because you retained legal counsel.  Are you aware of
3  that?
4    A.  Yes.
5    Q.  Okay.  What are the facts that support that
6  claim?
7      MS. MYERS:  Objection to the extent it calls for
8  a legal conclusion.
9      But you may respond.
10    A.  I really don't know what supports the claim or
11  doesn't support a claim.
12  BY MS. GIUSTINA:
13    Q.  Well, I can ask you some questions.  That's
14  fine.
15    A.  Okay.
16    Q.  Who knew you hired a lawyer?
17    A.  Gary.
18    Q.  Okay.  And when did you tell Gary that you hired
19  a lawyer?
20    A.  The day that I was suspended.
21    Q.  And was that Freking & Betz that you had
22  hired?
23    A.  Oh, I'm sorry.  I told him I was going to hire
24  an attorney, that I had spoken with an attorney, and that it
25  was recommended that I get a copy of my personnel file,

1  and that I was going to pursue legal action.
2    Q.  Okay.  And you told him that when you were
3  suspended?
4    A.  Just within the hour of my suspension, yes.
5    Q.  You mean you called him back to tell him that?
6    A.  I called his office and got his voicemail and
7  left that on his voicemail shortly after I left the
8  employee parking lot.
9    Q.  Did Mr. Schmidberger contact you at any
10  point and tell you not to hire a lawyer?
11    A.  Not that I recall.
12    Q.  Did he call and say bad things to you because
13  you had told him that you were going to hire a lawyer?
14    A.  No.
15    Q.  Did he discuss at all with you the fact that you
16  had said you were going to hire a lawyer?
17    A.  No.
18    Q.  So what is it that makes you think Delta took
19  action against you because of that?  Help me understand
20  that.
21    A.  I feel like I had mentioned -- in the July
22  meeting, for example, I had mentioned that I was feeling
23  that the line of questioning was no longer about George
24  and quickly becoming a question of my character.
25      The comment was made to me by Greg Kuhn, after

1  repeatedly asking me the same thing, so you mean to tell
2  me, then, that you're willing to be fired instead of
3  telling us that George asked you to do this for him? And
4  when he said that, I said, what do you mean, fired, how is
5  this about me all of a sudden, and, I think I need to get
6  an attorney.
7      Q.  Okay.
8      A.  So that was mentioned in the July 14th meeting.
9          Subsequent to that meeting, remember I sent Gary
10  a couple e-mails asking for some time to discuss; did not
11  receive a response. And my interpretation was, not going
12  to put myself out there to talk to you right now. I was
13  already aware that they were in contact with the revenue
14  protection unit people in Atlanta. Corporate security is
15  who Greg represented, so I knew corporate security was
16  involved. And I knew there was -- I suspected there was a
17  likelihood that legal was involved.
18          That being said, I felt like his not responding
19  to me indicated a reluctance or maybe even so much as a
20  direction not to discuss further because -- until they
21  decided what they were going to do, it put them at risk.
22  That was my assumption.
23          But Gary and I had always had a very open
24  relationship, and, at the very least, I would have
25  received a response saying that he couldn't make it or

1  something.
2          Then in addition to that -- sorry, I lost my
3  train of thought for a second there. Let me go back.
4          Okay. Then one of the things that I remember
5  talking with Gary about was getting that copy of my
6  personnel file. And I'm trying to think, did I talk to
7  him or did I get this on a message? I think it was a
8  message. We were leaving each other messages, and I think
9  at one point I called and said, I still haven't heard from
10  you regarding that copy of my personnel file. And I
11  think --
12      Q.  And when was this? I'm sorry.
13      A.  This would have been shortly -- within a week or
14  so, probably, of -- remember, I asked for my personnel
15  file the day I was suspended. His comment to me later
16  that day on a voicemail was that he would see if he could
17  provide that for me. In addition, the copy of my
18  personnel file, I asked for all the documents pertaining
19  to the suspension. So he said he would see if he could
20  provide that for me and he would let me know when I could
21  pick it up.
22          I'm thinking at least a week went by and I began
23  to wonder what the holdup was, frankly, because I know
24  they keep -- at least with my personnel stuff, they keep
25  that locally, and then how long does that really take; you

1  know, company mail takes a day or two. So then I felt
2  like perhaps they were just stalling me. I mean, it felt
3  like that, because it doesn't take that long to get that
4  information when you want to get it.
5          And so I called back and referenced why the
6  holdup, what's taking so long, can I come pick that up.
7  And he called me back and left a message saying he was
8  checking with -- I don't know if he said legal department,
9  I don't know if he said -- he made reference to checking
10  with the department in Atlanta to see if -- maybe it was
11  human resources to see what he could provide me.
12          And the next message I got from him, and I want
13  to say it was two or three days later, was, it will be
14  available for you to pick up and here's where you can get
15  it. But I know that took way too long, going on, you
16  know, somewhere in the vicinity of ten days to two weeks.
17          And then when I got that information, it was not
18  complete in terms of even -- obviously, it didn't have --
19  well, not obviously, but I should tell you it did not have
20  anything pertaining to my suspension in there and it did
21  not contain -- did it contain my statement? It did
22  contain my statement that I had originally asked Deb
23  Kircher to provide me a month prior that she never got me.
24  It did have that statement in there, but then, of course,
25  it didn't have any of the other statements.

1          And during that conversation in July, Greg Kuhn
2  kept referencing a folder of documents of incidents where
3  my peers had been questioned and provided them
4  information. And I said, you know, I can't really speak
5  to what you're saying they said, I don't even know who
6  you're talking about in what context you're talking
7  about, but he wouldn't let me see the documents. He
8  just -- I can't do that, but I can just tell you that we
9  have, you know, had conversations and this is what they're
10  saying and what do you say about that.
11          And so I was hoping to get those documents, like
12  the formal statements from my peers, that would indicate
13  to me something as to why and what was it that I was
14  missing. And when I didn't get any of that and then, in
15  addition to that, I received documentation that was not
16  complete, for instance, these documents that you've given
17  me such as document Number 7, 8, and 9, my --
18      Q.  Your performance evaluations?
19      A.  -- my performance evaluations, I would have the
20  first page that had the comparison of evaluation with
21  check marks, but the back page with all the performance
22  leader comments was not included.
23      Q.  Oh, so like a copy was made and they missed the
24  back of the page?
25      A.  Considering that they're stapled together --

1    Q.  Well, that -- that's a copy that I made for --
2    A.  So it's a front-and-back document.  They
3  failed -- you're thinking they failed -- well,
4  regardless --
5    Q.  Well, I'm asking you if this is what it would
6  look like?
7    A.  This is what I would get, but this is the meat
8  of the appraisal that indicated a lot more information and
9  would have been more relevant to me.  As it turns out, I
10 kept most of them myself, but, you know, I still wanted to
11 compare that with what they had and couldn't do that
12 because things were missing.
13       So, then, that, of course, led me to believe
14 that they were purposely retaining some information.  And
15 if that was the part -- if that was missing, what else was
16 missing.  So, naturally, I felt that, as things went on,
17 they were responding to me all the way from day one as
18 though they, you know, were upset with me.
19   Q.  Okay.  Any other reasons that you think -- or
20 action that you think Delta was taking against you because
21 you had told them you were going to retain a lawyer?
22   A.  Not that I can think of.
23   Q.  Following the date you were informed of your
24 termination, did you have any conversations with current
25 or former Delta employees from that time to the present?

1    A.  Following which date?
2    Q.  Since you learned of your termination.
3    A.  Yes.  Periodically I run into people at
4  Kroger.
5    Q.  Who have you seen that you can recollect?
6    A.  I've seen Eileen Blades, I've seen -- I don't
7  even -- can't even remember half their names.  They're
8  just people that I worked with that would approach me or
9  that I would see and say hello to.  And usually from there
10 would be a conversation about, how are you doing, is
11 everything okay.  Mike Gardner, Mike Murphy, Mike Gardner.
12 But I didn't talk to Mike Murphy.  I did talk to Mike
13 Gardner.  And Mike saw me and I saw him, but we
14 purposely -- he averted his eyes and walked on.
15       I mean, I just -- it's a small community.  I
16 live in a neighborhood where I run into people from Delta
17 all the time.
18   Q.  And with any of the folks who you've seen since
19 your termination, have you discussed Delta or your legal
20 case with any of those people?
21   A.  What do you mean discussed?  Discussed that I
22 have a legal case?
23   Q.  Sure.
24   A.  Yes.
25   Q.  Any -- anything to do with it.  Okay.  Who --

1    A.  I don't know.  It has come up.  Usually they
2  already knew.
3    Q.  Okay.
4    A.  So I just would say, yeah, uh-huh.  I mean, I
5  don't discuss, discuss.
6    Q.  Beyond acknowledging that you had a lawsuit
7  pending against Delta, any other discussion surrounding
8  the litigation?
9    A.  Uh-uh.
10   Q.  Have you asked anyone to be a witness for you in
11 this litigation?
12   A.  I asked Wendy if she would mind, if we had to
13 call her, to comment on the paperwork that she -- you
14 know, that incident that she reported to me when she asked
15 me -- when she told me about it, I asked her, how would
16 you feel about, you know, if you had to be called to talk
17 about that.  She said that would be fine.
18   Q.  You're referring to Wendy Van Winkle?
19   A.  Yes, ma'am.
20   Q.  Anyone else other than her who you have
21 discussed possibly testifying or serving as a witness for
22 you in this litigation?
23   A.  No.
24      (Defendant's Exhibit 20 was marked for
25 identification.)

1  BY MS. GIUSTINA:
2    Q.  Ms. Henry, Defendant's Exhibit 20 is a copy of
3  the interrogatory responses that you have served in this
4  case, correct?
5    A.  Yes, it appears to be.
6    Q.  Yeah.  I mean, take your time if you'd like to
7  look through it, absolutely.
8    A.  Okay.  So you're asking me -- this always
9  confuses me.  So you're asking me then if these are the
10 questions I posed to Delta?  No, you posed to me and I
11 responded.
12   Q.  Correct.  Correct.
13   A.  Okay.
14   Q.  So what I'm asking you is, are these your
15 answers to Delta's questions in this case?
16   A.  Oh, okay.  Yes.  Those are my responses to the
17 interrogatories.
18   Q.  And I believe you've already testified that you
19 assisted in preparing these and that they were true and
20 correct to the best of your knowledge, right?
21   A.  Yes, ma'am.
22   Q.  Okay.  If you would do me a favor.
23 Unfortunately, there aren't page numbers at the bottom,
24 but if you'll turn to the fourth page, I do have a couple
25 questions for you about your response.

1    A.  Okay.
2    Q.  And it's the response in bold at the top that is
3  talking about your current employment.  And in particular
4  I'm focused on the fact that with your current employer,
5  St. Elizabeth, that you are receiving benefits through
6  that employer.
7       When you were employed at Delta, was your family
8  insured through Delta's insurance; in other words, were
9  you the holder of the insurance --
10   A.  Yes.
11   Q.  -- in your household?
12   A.  Yes.
13   Q.  And was your entire family on Delta's
14  insurance?
15   A.  I think so.  I have to go back and look.  There
16  was a point in time where my husband was separated off
17  under his own, but I don't remember exactly if that was
18  the time frame.
19   Q.  Okay.  Would the children have been on your
20  Delta insurance?
21   A.  Yes.  Yes.
22   Q.  Okay.  Do you recall what plan -- and,
23  obviously, this is going to be most recently that I'm
24  inquiring about this because I don't expect you to be able
25  to remember going back much further than that.  But do you

1  recall what plan -- what level of coverage you had opted
2  for under Delta's plan?
3    A.  I believe it was the most expensive one with
4  UnitedHealthcare.
5    Q.  Most expensive and, therefore, most generous in
6  terms of coverage and that sort of thing?
7    A.  Yes.
8    Q.  And through Delta -- so you had health
9  insurance.  Did you elect dental insurance?
10   A.  I believe so.
11   Q.  And did you have the prescription drug
12  insurance?
13   A.  Yes.
14   Q.  Okay.  Any other -- did you have eye care
15  insurance?
16   A.  I went back and forth with eye care.  Not every
17  year that I was with Delta did I carry that.  Usually
18  about every other year, so I don't remember that year in
19  particular.
20   Q.  Any other coverage that you can think of that
21  you opted for at Delta?
22   A.  I would have had, you know, the voluntary
23  insurances such as, you know, accidental death and
24  disability.  I probably increased my -- there was a
25  certain amount of long-term disability given by the

1  company that you could opt to raise that a bit for a fee.
2  I think I opted for that.
3    Q.  Did you opt for short-term disability
4  coverage?
5    A.  Yes.  And I opted for a certain amount of life
6  insurance for me and also for my spouse and I think for my
7  children as well.
8    Q.  Okay.  I wasn't aware you could do that.
9    A.  There's a maximum, but yes.
10   Q.  Okay.  At the time you were -- I guess, at the
11  time you were suspended from Delta, did you at some point
12  receive a COBRA notice?
13   A.  Yes.
14   Q.  Okay.  And between that time when your benefits
15  at Delta ceased and when you started receiving benefits
16  through St. Elizabeth, where were you getting insurance
17  benefits, if at all, during that time?
18   A.  Through my husband's plan.
19   Q.  And so you and your children all switched over
20  to his plan at that time?
21   A.  As soon as I could get what I needed
22  documentation-wise to make that happen, yes.
23   Q.  Okay.  And what -- what was the coverage that
24  you opted for and was available under his plan at his
25  employer?

1    A.  Honestly, I would need to refer to the specific
2  documents to know for sure.
3    Q.  Okay.  Did you have health insurance coverage?
4    A.  Yes.
5    Q.  Did you have dental?
6    A.  Yes.
7    Q.  Did you have vision?
8    A.  I think so.
9    Q.  Okay.  And did you have prescription medication
10  insurance?
11   A.  Yes, I think so.  Yes.
12   Q.  Were there any life insurance options available
13  under his plan?
14   A.  There were, but, again, I don't know how we --
15   Q.  What you opted to do?
16   A.  Yeah.  There were -- I think there were some
17  limits that were applicable when you just first start into
18  the program.
19   Q.  Okay.  Currently you're receiving benefits from
20  St. Elizabeth, correct?
21   A.  Some benefits are through St. Elizabeth, yes.
22   Q.  Are -- did everyone -- or at least your children
23  move back with you onto St. Elizabeth or -- kind of
24  explain to me where everyone in your family sits as
25  opposed to -- as it relates to insurance coverage

1  currently, or at least since you went to work at
2  St. Elizabeth.
3      A.  Okay.  I choose dental for the whole family
4  through St. Elizabeth.  I believe I have vision through
5  St. Elizabeth.  I'm not sure on that, but I think it's
6  through St. Elizabeth.  And the medical is through my
7  husband's hospital -- or employer.
8      Q.  And do you, through St. Elizabeth, have any
9  short or long-term disability coverage?
10     A.  I think so.
11     Q.  Do you know, is it either or both?
12     A.  I think I -- I think they give me a certain
13  amount of short term and long term, and I opted to accept
14  those.  I can't remember on the voluntary options.
15     Q.  Okay.
16         (Defendant's Exhibit 21 was marked for
17         identification.)
18  BY MS. GIUSTINA:
19     Q.  Ms. Henry, if you would take a look at what's
20  been marked as Exhibit 21.  This was a document you
21  produced in this case.  And it is a one-page document that
22  is a 2009 miscellaneous income tax form and is addressed
23  to you.  And can you -- I just want to confirm, is this
24  the payment that you received and reported to the
25  government from your salary as an independent contractor

1      Q.  Ms. Henry, Exhibit 22 is the response that was
2  submitted on your behalf to some document requests that
3  Delta had submitted.  If you'd take a look at that
4  document and confirm that that is indeed your responses,
5  please.
6      A.  Yes, this seems to be my responses.
7      Q.  Okay.  Following your suspension from Delta in
8  August of 2008, when did you begin looking for other work,
9  other employment?
10     A.  Maybe a day or two after I was suspended without
11  pay.
12     Q.  And what did -- what did you do to start
13  looking?
14     A.  Internet searches, called a friend of mine who
15  is a social worker.
16     Q.  And were you looking specifically for social
17  work employment?
18     A.  It was -- it was more about finding work that
19  was relatable to that educational background; didn't have
20  to necessarily be traditional social work.
21     Q.  What other types of jobs might that be?
22     A.  Human resources.
23     Q.  I'm sorry?
24     A.  Human resources positions.
25     Q.  Okay.

1  with the early intervention program?
2      A.  For the time period that I was employed by the
3  Commonwealth of Kentucky, yes.
4      Q.  Okay.  And it was confusing simply because of
5  the box that it's in on the form.  It indicates that it's
6  medical and health care payments.  I just wanted to
7  confirm with you that this is your salary as opposed to
8  something other than that; is that correct?
9      A.  Yes.  I see where that would be confusing.  I
10  don't know why that's that way.  But that -- I believe --
11  I was an independent contractor for the state, so I don't
12  know if that changes how it's reported on here.
13     Q.  That's kind of what I guessed, but I wanted to
14  ask you.
15     A.  Yeah.  I was independently contracted.
16     Q.  Make sure.
17     A.  And there were no taxes removed from that
18  salary.  So --
19     Q.  Okay.  And so you wound up having to -- they
20  didn't remove taxes, but you wound up having to pay the
21  taxes on your own, correct?
22     A.  That's correct.
23         (Defendant's Exhibit 22 was marked for
24         identification.)
25  BY MS. GIUSTINA:

1      A.  Some of the medical field jobs, similar -- well,
2  similar to what I'm doing now, you know.  When I do early
3  intervention, service coordination, it's very similar to
4  what you might imagine a social worker doing, but it also
5  has other components to it, and that degree is not
6  required for that position.
7      Q.  Okay.  But -- so it's fair to say that you were
8  trying to utilize your degree in the employment that you
9  were looking for?
10     A.  Yeah.  My thinking was the opportunity for
11  airline employment was slim to none in this area, so
12  better try plan B.
13     Q.  Okay.  You said -- I'm sorry.  You said you
14  called a friend of yours and -- and what was his or her --
15     A.  She's a social worker, and I was just asking if
16  her company was hiring or if she knew of others that were
17  and asking about the job that she did to see if it was
18  something that I might be interested in.  So I ended up
19  applying to her agency, and that's listed on your
20  interrogatory responses or -- yes, interrogatory
21  responses.
22         And then Children's Hospital had always been a
23  place that I thought would have a lot of different types
24  of opportunities wherein I could use the degree.  And so I
25  looked at their website, and they have a process whereby

1  you electronically generate interest.  So I signed up for
2  that, and then they would send me weekly e-mails as to
3  what positions they were currently looking for.  So I kind
4  of broadened that out beyond just the social worker at the
5  hospital to other areas I thought might work.
6       Q.  When you referenced your friend's agency, which
7  of the --
8       A.  Whites Family Services.
9       Q.  Whites Family Services in Indiana?
10      A.  Yes.
11      Q.  Okay.  And were you looking at a particular
12  geographical region with respect to your job search?
13      A.  Yes.  I started here, within driving distance of
14  my home, first, yes.
15      Q.  And help me out.  I mean, what do you consider
16  to be driving distance of your home?  Different people
17  have different tolerances when it comes to that.
18      A.  Right.  Well, the furthest point that I inquired
19  was Children's Hospital.  So that's about a 25, 30-minute
20  drive from my home.
21      Q.  With respect to the Internet, were you going to
22  sites like monster.com?
23      A.  Yes.
24      Q.  All right.  So with respect to the positions
25  that you applied for that you've identified in response to

1  interrogatory number 4, were there actual openings at all
2  of these places, or were some of these locations simply
3  you submitted your resume in the hopes that they would
4  keep it on file in case something came open?
5       A.  The Whites one I don't think that I was aware of
6  any openings, so, yes, that was more of a I'm interested,
7  if something comes up, call me.  I asked my friend to keep
8  her ears open as well.
9       The ones, as I said before, with Children's
10  and -- was there another one?  Seems like there was
11  another one.
12      Q.  How about Veterans Hospital?
13      A.  Oh, that was through usa.gov, looking at
14  government job options with my degree.  And it was just an
15  online process of applying, and they had sent me an e-mail
16  based on my inquiries to their website saying that they
17  had certain positions open at Veterans Hospital.  I
18  applied electronically through their process, and I never
19  heard anything back from them.
20      Q.  Okay.  But, again, there were specific positions
21  there that you were submitting your resume --
22      A.  Yes.
23      Q.  -- in hopes of obtaining?
24      A.  And that was true of Children's Hospital as
25  well.

1       Q.  Right.  Okay.  When you say from each of these
2  that you received no response, both from Veterans, from
3  White Family Services, literally, you received not a word,
4  not even a no thanks?
5       A.  Right.
6       Q.  Okay.  You indicate with respect to the
7  Children's Hospital that you were not offered employment,
8  which leads me to believe there was perhaps a bit more
9  dialogue with them than simply no response.  Is that a
10  fair statement?
11      A.  The only thing was a letter saying, thank you
12  for your interest, but we've decided not to hire you.
13      Q.  Okay.  And you did, I guess, first receive the
14  position at the early intervention program, the state of
15  Kentucky; is that right?
16      A.  My first job offer was from Commonwealth of
17  Kentucky to work in their early intervention program.
18      Q.  Okay.  Is that the same thing -- I'm looking at
19  that and I'm looking at your response to interrogatory
20  number 5, where you talk about Cabinet for Health and
21  Human Services.  Is that the same thing?
22      A.  It's the same thing.  The Cabinet is under the
23  Commonwealth, and I'm under the Cabinet.
24      Q.  Okay.  Thank you.
25      A.  Yes.

1       Q.  And it's -- you were not offered any employment
2  that you didn't accept, correct?
3       A.  That's correct.
4       Q.  Okay.  Since your suspension from Delta, other
5  than the employers that we've discussed and you've
6  disclosed in your interrogatory responses, were you
7  receiving any other income from other sources during that
8  time?
9       A.  No.
10      Q.  Were you ever, for example, paid in kind for any
11  services?
12      A.  What does that mean?
13      Q.  Well, I mean, either you were -- I'm going to
14  phrase it this way.  You were either paid for -- I don't
15  know.  Let's say you have a creative streak and you made
16  something and were paid for it or perhaps somebody, you
17  know -- you bartered your services in exchange for
18  somebody to do something for you that was productive;
19  anything like that?
20      A.  No.
21      Q.  Okay.  Self-employment, other than I know we've
22  talked about your contracting work?
23      A.  No.
24      Q.  All right.  Have any investments or rental
25  property?

1       MS. MYERS: Objection.
2       You can answer.
3       A. No. Well, investments. I mean, my 401 --
4    BY MS. GIUSTINA:
5       Q. Okay. 401(k)?
6       A. -- (k). And I have a couple of Roth accounts in
7    the girls' names that we're --
8       Q. Contributing to?
9       A. Yes, but not -- nothing else.
10      Q. Withdrawing from any of those during this
11   time?
12      A. No.
13      Q. Did you receive any loans during that time?
14   Again, we're talking about since your suspension from
15   Delta.
16      A. I already had an existing loan, like a home
17   equity loan, line of credit.
18      Q. Okay.
19      A. So I drew off of that.
20      Q. Okay. Do you remember approximately how much
21   you drew off?
22      A. From what time to what time?
23      Q. Following your suspension from Delta. So August
24   of 2008 --
25      A. Till now?

1       Q. Uh-huh.
2       A. About 20,000.
3       Q. How about during the time period from your
4    suspension from Delta to your employment with the Cabinet
5    for Health and Family Services, Kentucky?
6       A. How much did I draw from the home equity line
7    between the time I was suspended from Delta until I was
8    employed with St. Elizabeth?
9       Q. Uh-huh. Which would have been September
10   of 2008. So that actually was pretty quickly after.
11      A. Well, that was my employment with the state of
12   Kentucky. Is that what you asked me?
13      Q. Yes.
14      A. Oh, sorry. I don't know. That was -- what was
15   that, a month?
16      Q. It was actually a very short period of time. It
17   was shorter than I realized.
18      A. Yeah. I don't remember.
19      Q. Okay. How about between the time between your
20   suspension and when you went to work at St. Elizabeth's?
21      A. So when was the employment date at
22   St. Elizabeth?
23      Q. October of 2009. So roughly a -- for that year
24   after your suspension.
25      A. I would say the bulk of it, probably about --

1    probably, you know, two-thirds of the 20,000 that I
2    estimated would have happened on the front end of my
3    loss.
4       Q. During that time period?
5       A. Loss of income.
6       Q. Okay. Did you ever apply for unemployment
7    compensation?
8       A. I did not.
9       Q. Okay. In your complaint you allege physical,
10   mental, emotional distress, correct?
11      A. Correct.
12      Q. What are the facts that support that
13   allegation?
14      A. I was extremely depressed at how I had been
15   dismissed and how people that I thought I had good
16   relationships with seemingly turned on me for no apparent
17   reason. It -- I wasn't able to reconcile what had
18   happened, and it caused me to be unable to sleep, severe
19   headaches, lots of crying, and trying to, you know,
20   just -- just trying to come up with a reason why and --
21   how and why me and all of that to the point where I just
22   really couldn't function well.
23      Q. Were you able to take care of yourself during
24   that time?
25      A. Basic needs of safety, yeah.

1       Q. And your children?
2       A. Yes. I was able to take care of basic
3    function.
4       Q. Is there a point in time where you started to
5    feel better about things?
6       A. Yes.
7       Q. When would that have been?
8       A. About a year ago. Feel better, I should
9    qualify. Felt much better after I was able to benefit
10   from the antidepressants. I'm not exactly even sure when
11   I sought that treatment. It wasn't probably very far into
12   things because I was very much aware of how I was not
13   getting it together like I thought I should be and that it
14   was impacting on my family.
15      So having had that previous experience of
16   seeking out medication during a similar type of feeling, I
17   thought it might help. And, in fact, I do think within a
18   couple of weeks I started to feel better, quote/unquote,
19   from just the natural effects of that medication. And
20   then I was able to sleep, which automatically helped me to
21   feel better.
22      But the tearfulness and the edginess and the
23   depression, in general, was still very prevalent, and that
24   probably only started to get better within the last six
25   months. And I attribute that to just having a sense of

1  value at my new position and feeling as though people like
2  what I'm doing.
3      Q.  At any point in time following your suspension
4  did you consider seeking counseling, psychological
5  counseling?
6      A.  My thinking was that, if things didn't improve
7  with the medication alone, that I would need to actively
8  seek that out.
9      Q.  And you did not do that, correct?
10     A.  I did not end up doing that.
11     Q.  Okay.  Any -- any other facts or manifestations
12 in your life to support your claim of emotional
13 distress?
14     A.  Not that I can think of.
15         (Defendant's Exhibit 23 was marked for
16     identification.)
17 BY MS. GIUSTINA:
18     Q.  Ms. Henry, what's been marked as Defendant's
19 Exhibit 23 is the first initial -- it's a document called
20 Initial Disclosures that were filed in this litigation.
21 And just so you know, it's a document that is required by
22 the court's rules which sets forth certain information,
23 including people who you believe have knowledge of the
24 facts alleged in the complaint.  And if you would, please,
25 take a moment and look at those individuals.  I do have a

1  couple questions for you.
2      A.  Okay.
3      Q.  With respect to number 3, you've listed Richard
4  Anderson, who's a CEO of Delta.  Have you ever met
5  Mr. Anderson?
6      A.  No.
7      Q.  Have you ever had him come through Cincinnati
8  and interact with you in any way in your capacity as a
9  customer service agent?
10     A.  Yes.  He's spoken to me when he's come through
11 Cincinnati in a -- just to engage in back-and-forth
12 niceties.
13     Q.  Okay.  When you say that he may have knowledge
14 of the way you performed your job duties, share with me
15 how it is that Mr. Anderson would have knowledge of that
16 particular fact.
17     A.  I think just by virtue of the fact that he is,
18 you know, representative of the company as a whole and
19 would have a general expectation and understanding of what
20 my role as a department 125 agent --
21     Q.  Okay.
22     A.  -- was.
23     Q.  But in terms of your personal job performance,
24 he would not have knowledge of that, correct?
25     A.  I'm not sure.  He would have had access to any

1  of the information any time, so I can't be sure of that.
2      Q.  Okay.  But any information that he would get
3  under that statement that you just made would be through
4  your personnel file as opposed to through any personal
5  observations he may have had?
6      A.  Oh, I don't know.  He may have observed me doing
7  my job.  He came through Cincinnati frequently enough.
8      Q.  And are you aware of him ever doing that?
9      A.  Of him observing --
10     Q.  Actually observing you --
11     A.  -- me?
12     Q.  -- doing your job?
13     A.  No.  I'm sure I didn't notice.
14     Q.  Okay.  And fourth on that list is Mike Campbell,
15 who is a -- I believe he's an executive vice president of
16 human resources.  And has Mr. Campbell ever had occasion
17 to observe you performing your job duties?
18     A.  I don't know.
19     Q.  Okay.  You're not aware of him ever doing that,
20 correct?
21     A.  Correct.
22     Q.  Any reason that you think he would be aware of
23 the allegations contained in your complaint?
24     A.  Head of human resources.  I think at one point I
25 even, in an effort to get some response on what was going

1  on with my insurance so that I could be certain that I had
2  a -- did not have lapse of coverage, because I hadn't been
3  informed of how to go about acquiring the letter stating
4  that I was no longer covered, I think I may have copied
5  him into an e-mail or addressed it to him and copied in
6  Deb Kircher or something.
7      Q.  Concerning your insurance --
8      A.  Something concerning my concerns, yes.
9      Q.  Okay.  How about Beth Johnston, number 16, who
10 is a former vice president of human resources, did you
11 have interactions with Ms. Johnston, any substantive
12 interactions?
13     A.  She may -- no, I don't know for sure.  Nothing
14 where she viewed me doing my job necessarily.  I mean, I'm
15 not aware of that.  But by virtue of the fact that she,
16 too, is a human resources employee, it's very possible I
17 cc'd her in on that.  I was just looking for responses
18 from anyone who would help me.
19     Q.  Okay.  And same question with respect to
20 number 17, Cynthia PerLee.
21     A.  Only to the extent that she is employed in that
22 department of human resources or by that department in
23 whatever capacity.
24     Q.  Okay.  So no personal interaction --
25     A.  No direct interaction with Ms. PerLee.

1  Q.  -- with Ms. PerLee?
2  A.  I think there was a point at which there was
3  maybe a letter from her.  The last name is very familiar.
4  So in the initial stage of things there may have been
5  something I received from her that I had to follow up on
6  or -- I'm not sure, to be honest, but it sounds familiar.
7  Q.  Okay.  If you'll look at page 6 under Relevant
8  Documents.  Are you there?
9  A.  Uh-huh.
10  Q.  The third bullet under there is Unemployment
11  information.  Do you know what that's referring to?
12  A.  I believe that would be referring to
13  documentation that supports my answers to your
14  interrogatories about my job search.
15  Q.  Okay.
16  (Defendant's Exhibit 24 was marked for
17  identification.)
18  BY MS. GIUSTINA:
19  Q.  Ms. Henry, what's been marked as Exhibit 24 is a
20  second go-around on your initial disclosures in this case.
21  And if you take a quick look, you'll notice that the list
22  of individuals with knowledge has expanded quite
23  considerably.  Take a moment, if you need, after I ask
24  this question, but I want to know whether, with the
25  exception of Dr. Rawlings, are all of these people listed

1  here either current or former Delta employees?
2  A.  Yes.
3  Q.  Okay.  And for the names that are added on
4  there, how did you -- what made you decide to add those
5  names onto this list?
6  A.  I felt that they would be people that would have
7  that direct knowledge of just how I performed my job and
8  what the policies and procedures related to that job were.
9  Q.  I mean, is it fair to say that this is close to
10  pretty much all the coworkers who -- whose names you could
11  recall that you may have worked with?
12  A.  No.
13  Q.  No?
14  A.  Uh-uh.
15  Q.  So you don't think this even begins to be the --
16  you know, to be enough people to cover that?  This seems
17  like a lot of people to me who are coworkers.  So I'm
18  trying to understand where all these names came from, I
19  guess.  Literally, is this everyone whose name you could
20  think of that you've worked with?
21  A.  No.  No.
22  Q.  Okay.  So where do these names come from,
23  exactly?
24  A.  As I look at them, they are just the names of
25  people that have worked closely enough to meet the

1  criteria and understand, you know, how I did my job.  And
2  either they worked under me or they worked alongside me or
3  I worked under them or I worked collaboratively with them
4  so that I felt that they would be able to give answers to
5  those questions as they were outlined here as to
6  individuals with knowledge.
7  Q.  And other than Ms. Zilch, who I believe we
8  discussed previously, have any of these people been
9  involuntarily terminated by Delta or asked to resign?
10  A.  With the exception of those individuals from the
11  human resources department with whom I've had no
12  communication, other than as it relates to the information
13  I previously referred to, no, none of them other than Barb
14  Zilch.
15  Q.  Have you ever been arrested, Ms. Henry?
16  A.  No.
17  Q.  Have you ever used illegal drugs?
18  MS. MYERS:  Objection.
19  A.  No.
20  BY MS. GIUSTINA:
21  Q.  Okay.  Do you drink alcohol at all?
22  MS. MYERS:  Objection.
23  A.  Yes.
24  BY MS. GIUSTINA:
25  Q.  Okay.  Any need for you to undergo any kind of

1  alcohol rehab or anything like that?
2  MS. MYERS:  Objection.
3  A.  No.
4  MS. GIUSTINA:  Okay.  Why don't we take a quick
5  break?  And I think I'm very close to being done.
6  (A recess was taken from 3:52 to 4:00.)
7  MS. GIUSTINA:  I don't have any other
8  questions.
9  MS. MYERS:  We would like signature.
10  THE REPORTER:  Are you ordering this?
11  MS. GIUSTINA:  Yes.
12  THE REPORTER:  Would you like a copy?
13  MS. MYERS:  Yes, please.
14  THE REPORTER:  E-Tran?
15  MS. MYERS:  Yes.
16
17  _____
RACHELLE HENRY
18
19
        ---
20
    DEPOSITION ADJOURNED AT 4:02 P.M.
21
        ---
22
23
24
25

1        C E R T I F I C A T E
2    STATE OF OHIO     :
                       : SS
3    COUNTY OF HAMILTON  :
4
5        I, Patti Stachler, RMR, CRR, CLR, CME, the
6    undersigned, a duly qualified and commissioned notary
7    public within and for the State of Ohio, do certify that
8    before the giving of her deposition, RACHELLE HENRY was by
9    me first duly sworn to depose the truth, the whole truth
10   and nothing but the truth; that the foregoing is the
11   deposition given at said time and place by RACHELLE HENRY;
12   that I am neither a relative of nor employee of any of the
13   parties or their counsel, and have no interest whatever in
14   the result of the action.
15
16        IN WITNESS WHEREOF, I hereunto set my hand and
17   official seal of office at Cincinnati, Ohio, this _____
18   day of _____, 2010.
19
20        _____
         Patti Stachler, RMR, CRR, CLR, CME
21       Notary Public - State of Ohio
         My commission expires October 5, 2013.
22
23
24
25

**www.elitereportingagency.com**
**513.233.3000**

---

1        E R R A T A  S H E E T
2       DEPOSITION OF:  RACHELLE HENRY
            TAKEN:  OCTOBER 7, 2010
3
4    Please make the following corrections to my deposition
     transcript:
5
6    Page  Line Number        Correction Made
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23
24   _____        _____
     Witness Signature              Date
25

**www.elitereportingagency.com**
**513.233.3000**

1  alcohol rehab or anything like that?

2          MS. MYERS:  Objection.

3      A.  No.

4          MS. GIUSTINA:  Okay.  Why don't we take a quick

5      break?  And I think I'm very close to being done.

6          (A recess was taken from 3:52 to 4:00.)

7          MS. GIUSTINA:  I don't have any other

8      questions.

9          MS. MYERS:  We would like signature.

10          THE REPORTER:  Are you ordering this?

11          MS. GIUSTINA:  Yes.

12          THE REPORTER:  Would you like a copy?

13          MS. MYERS:  Yes, please.

14          THE REPORTER:  E-Tran?

15          MS. MYERS:  Yes.

16

17                          _____

18                          RACHELLE HENRY

19

20                          - - -

20          DEPOSITION ADJOURNED AT 4:02 P.M.

21                          - - -

22

23

24

25

1    E R R A T A   S H E E T

2    DEPOSITION OF:   RACHELLE HENRY
          TAKEN:   OCTOBER 7, 2010
3

4    P ease make the following corrections to my deposition
     transcript:
5

6    Page   Line Number              Correction Made

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23

24   _____        _____
     Witness Signature                Date
25