Re: FLT 1213/9 JVN    Clearing NRSA instead of Medallions

DUE TO COMBINATION OF HEAVY PASSENGER LOAD/EXTENSIVE LIST OF SEA
T CHANGE REQUESTS/LAST MINUTE DOWNGRADE REQUEST/LACK OF ASSIST A
GENT/NEED FOR AQQFIX ON SEATS 4AB/ AND  LAST MINUTE CONNECTION O
F 12 PAX FROM FLT 6163.....UNABLE TO CLEAR ALL FIRST CLASS STANDB
Y PASSENGERS IN A TIMELY MANNER.  WHEN FINALLY ABLE TO ADDRESS T
HE ASL ALL OF THE UPG PASSENGERS HAD BOARDED. HOWEVER THE NRSA P
ASSENGER WERE STILL IN THE GATEHOUSE.  AS CURRENT POLICY DICTATE
S THAT ONCE ELIGIBLE MEDALLIONS HAVE BOARDED THE AIRCRAFT THEY A
RE NO LONGER CONSIDERED FOR UPG POSSIBILITY I CLEARED THE FIRST
ELIGIBLE NRSA TO F/C CABIN

Rachelle Henry

Δ EXHIBIT 11
Deponent Henry
Date 6-7-10 Rptr. AS
WWW.DEPOBOOK.COM

DL 000153

## Kircher, Deborah

| | |
|---|---|
| From: | Henry, Rachelle D |
| Sent: | Tuesday, July 15, 2008 7:32 AM |
| To: | Kircher, Deborah |
| Cc: | Kuhn, Greg; Schmidberger, Gary |
| Subject: | Addendum |

Deb,

You asked a question yesterday that inquired as to why I think anyone would feel compelled to target me and make accusations such as they have. I don't remember your question verbatim, but that was the gist of it. I know that my response was emotional and insufficient as for the last six weeks the answer to that question has eluded and troubled me more than you can imagine. I have been unable to reconcile to it until last night.

As I mentioned yesterday, certain agents and Leads with whom I work daily have exhibited strange, alienating, shunning and malicious behaviors toward me. As I listened to what the four or you outlined and then processed that in the context of the dynamics of my daily and weekly work environment, things began to make some sense.

Prior to this event, Harold Christiansen who has been my Lead for years, sought me out on a daily basis in a relentless manner in order to malign members of senior management, express his resentment and feelings of being underappreciated for his efforts and having his suggestions for improving the operation categorically dismissed by his direct supervisors and their leaders. He would often relay provocative (albeit inappropriate) comments about behind close door conversations he and other Leads had with their Performance Leaders about my peers. Countless times he tried to elicit my support and validation of his negative feelings against other Leads Joanne Stefan, Pae Caudill, Patsy Zimmerman (when she was in the Lead Program), and Rick Cropenbaker. He did the same regarding Performance Leaders Mike Murphy, George Gergits, and Sam Tumminello. I made a genuine effort to dismiss his comments, or redirect the conversation which on one occasion met with an angry outburst about my lack of understanding of all matters Delta. Later he apologized for his outburst. Apology accepted. Needless to say, I chose to tread lightly around him and tried to maintain an appropriate relationship as he is often my direct supervisor and had the potential to make things difficult for me.

Additionally, Patsy Zimmerman has been outspoken in her disdain for George Gergits specifically, and Delta management in general, in numerous direct conversation with me. I try to listen and empathize when my colleagues are notably angry and upset so as to offer some solace, but regardless of my attempts to appease her anger on the subject, she maintained her stance and even appeared to go out of her way to avoid having to work with me. One one occasion she said to me after George walked away from the gate the two of us were working, " I already told them not to put me with Julie Donohue, I guess I will have to add your name to the list".

I spoke briefly yesterday about my tendency to be outspoken in my comments as they pertain to the implementation of ACS policy. To that end I should mention that very recently, in fact not long before this incident, Pae Caudill gave numerous briefings in which she repeatedly relayed what I knew to be inaccurate information about Breezeway boarding policy changes. Not only was the information she relayed wrong, but delivered in a disdainful and sarcastic tone and comments that made it clear to all listening that she did not agree with what Gary Schmidberger had to say on the subject and felt the entire Breezeway initiative was ridiculous. The first day I simply approached her in her office with a copy of the most recent bulletin on the matter and highlighted what I thought to be clarification on the matters in which we disagreed. I asked that she attempt to get clarification as I wished to comply but did not completely understand what she was saying. The next days briefing was very similar in vein and contained additional information about the new involuntary DBC payout process. Again it was delivered with inaccurate content. As the policy was to take effect the next day I spoke up in briefing to contradict her comments and express how I understood the policy to read. She said she had not read it fully and would need to do so.

8/11/2008

Δ EXHIBIT 12
Deponent Henry
10-7-10
Date Rptr. PS
WWW.DEPOBOOK.COM

DL 000144

When I consider that these are the individuals from whom I have experienced the most hostility in the last 6 weeks, it follows for me that they are most likely some of the individuals on whose comments you have based your conclusions to date. That said, I feel it is incumbent on those involved in the investigation of these allegations to consider the possibility that they may be building a case on the distorted comments of agents with a personal vendetta or otherwise compromising agenda. Also, you repeatedly mentioned the seriousness of this situation, I feel that these observations are important for me to note in writing.

Would you please add a printed copy of this email to the handwritten statement I left with Greg Kuhn yesterday afternoon? Also, would you please send me a copy of the full statement for my records?

Thank you,

Rachelle Henry

288225

DL 000145

8/11/2008

## Kircher, Deborah

| | |
|---|---|
| **From:** | Kircher, Deborah |
| **Sent:** | Tuesday, July 15, 2008 7:00 PM |
| **To:** | Henry, Rachelle D |
| **Cc:** | Kuhn, Greg; Schmidberger, Gary |
| **Subject:** | RE: Addendum |

Rachelle – thank you for your additional comments. I will add them to the case and please know, I thought I emphasized this yesterday however want to be perfectly clear -- we do not have a conclusion at this point. We were seeking the facts on what transpired on that flight from your perspective – and we got that. I will send you the full statement you provided – not a problem.

Rgds,

Deb

*Deb Kircher,* SPHR

Human Resources Generalist, ACS

CVG/BOS Region

859-767-4026

8-752-4026

---

**From:** Henry, Rachelle D
**Sent:** Tuesday, July 15, 2008 7:32 AM
**To:** Kircher, Deborah
**Cc:** Kuhn, Greg; Schmidberger, Gary
**Subject:** Addendum

△ ✗ EXHIBIT *13*
Deponent *Henry*
Dated *10-7-10* Rptr. *PS*
WWW.DEPOBOOK.COM

Deb,

You asked a question yesterday that inquired as to why I think anyone would feel compelled to target me and make accusations such as they have. I don't remember your question verbatim, but that was the gist of it. I know that my response was emotional and insufficient as for the last six weeks the answer to that question has eluded and troubled me more than you can imagine. I have been unable to reconcile to it until last night.

As I mentioned yesterday, certain agents and Leads with whom I work daily have exhibited strange, alienating,

3/2/2010

DL 000646

shunning and malicious behaviors toward me. As I listened to what the four or you outlined and then processed that in the context of the dynamics of my daily and weekly work environment, things began to make some sense.

Prior to this event, Harold Christiansen who has been my Lead for years, sought me out on a daily basis in a relentless manner in order to malign members of senior management, express his resentment and feelings of being underappreciated for his efforts and having his suggestions for improving the operation categorically dismissed by his direct supervisors and their leaders. He would often relay provocative (albeit inappropriate) comments about behind close door conversations he and other Leads had with their Performance Leaders about my peers. Countless times he tried to elicit my support and validation of his negative feelings against other Leads Joanne Stefan, Pae Caudill, Patsy Zimmerman (when she was in the Lead Program), and Rick Cropenbaker. He did the same regarding Performance Leaders Mike Murphy, George Gergits, and Sam Tumminello. I made a genuine effort to dismiss his comments, or redirect the conversation which on one occasion met with an angry outburst about my lack of understanding of all matters Delta. Later he apologized for his outburst. Apology accepted. Needless to say, I chose to tread lightly around him and tried to maintain an appropriate relationship as he is often my direct supervisor and had the potential to make things difficult for me.

Additionally, Patsy Zimmerman has been outspoken in her disdain for George Gergits specifically, and Delta management in general, in numerous direct conversation with me. I try to listen and empathize when my colleagues are notably angry and upset so as to offer some solace, but regardless of my attempts to appease her anger on the subject, she maintained her stance and even appeared to go out of her way to avoid having to work with me. One one occasion she said to me after George walked away from the gate the two of us were working, " I already told them not to put me with Julie Donohue, I guess I will have to add your name to the list".

I spoke briefly yesterday about my tendency to be outspoken in my comments as they pertain to the implementation of ACS policy. To that end I should mention that very recently, in fact not long before this incident, Pae Caudill gave numerous briefings in which she repeatedly relayed what I knew to be inaccurate information about Breezeway boarding policy changes. Not only was the information she relayed wrong, but delivered in a disdainful and sarcastic tone and comments that made it clear to all listening that she did not agree with what Gary Schmidberger had to say on the subject and felt the entire Breezeway initiative was ridiculous. The first day I simply approached her in her office with a copy of the most recent bulletin on the matter and highlighted what I thought to be clarification on the matters in which we disagreed. I asked that she attempt to get clarification as I wished to comply but did not completely understand what she was saying. The next days briefing was very similar in vein and contained additional information about the new involuntary DBC payout process. Again it was delivered with inaccurate content. As the policy was to take effect the next day I spoke up in briefing to contradict her comments and express how I understood the policy to read. She said she had not read it fully and would need to do so.

When I consider that these are the individuals from whom I have experienced the most hostility in the last 6 weeks, it follows for me that they are most likely some of the individuals on whose comments you have based your conclusions to date. That said, I feel it is incumbent on those involved in the investigation of these allegations to consider the possibility that they may be building a case on the distorted comments of agents with a personal vendetta or otherwise compromising agenda. Also, you repeatedly mentioned the seriousness of this situation, I feel that these observations are important for me to note in writing.

Would you please add a printed copy of this email to the handwritten statement I left with Greg Kuhn yesterday afternoon? Also, would you please send me a copy of the full statement for my records?

Thank you,

Rachelle Henry

288225

3/2/2010

DL 000647



# FREKING & BETZ

ADVOCATES FOR WORKING PEOPLE

RANDOLPH H. FREKING*
SHEILA M. SMITH
CARRIE ATKINS BARRON***
KELLY MULLOY MYERS*
MEGAN E. CLARK
GEORGE M. REUL, JR.
MARK W. NAPIER*
CHARLES T. McGINNIS, III
LEANNE R. MONTGOMERY

FREKING & BETZ, LLC
525 VINE STREET
SIXTH FLOOR
CINCINNATI, OHIO 45202

◆

TELEPHONE: 513-721-1975
FACSIMILE: 513-651-2570

◆

*www.frekingandbetz.com*

*mclark@frekingandbetz.com*

JON B. ALLISON
ANN KOLZE WITTENAUER
TOD J. THOMPSON
ELIZABETH S. LORING
HEATHER M. SCHISLER*
BECKY J. GANIS
KATHERINE D. DAUGHTREY

* Also Admitted in Kentucky
** Also Admitted in Indiana and Illinois

November 12, 2008

**VIA FACSIMILE**
421-0991

David T. Croall, Esq.
Porter Wright Morris & Arthur LLP
250 E. Fifth, St., Suite 2200
Cincinnati, OH 45202-5118

     Re:    <u>Rachelle Henry</u>

Dear Dave:

     I understand that you represent Delta Airlines. Please accept this letter with regard to our representation of Rachelle Henry, whose employment at Delta was recently terminated. We intend this letter to both instigate the company's internal grievance procedure as well as to officially notify the company's legal representative of our concerns. Ms. Henry has provided a statement of events (enclosed). Once you have had the chance to review it, please give me a call.

                 Sincerely,

                 *Megan E. Clark/gg*

                 Megan E. Clark

MEC/gg
Enclosure     (Statement Letter)
cc:   Ms. Rachelle Henry

Δ ∅ EXHIBIT _14_
Deponent _Henry_
Date _10-7-10_ Rptr. _DS_
WWW.DEPOBOOK.COM

DL 000471

November 11, 2008

To Whom It May Concern:

I hereby appeal the decision to terminate my employment as a Senior Customer Service Representative with Delta Airlines.

For months I was the target of derogatory comments and slanderous gossip. I initially dismissed the behaviors as juvenile and inconsequential.

However, as time went on, I learned that my friendly association with my supervisor George Gergits was apparently rubbing many people the wrong way. I expressed my discomfort and distaste for these comments to George directly. He appeared to dismiss my concerns. Certain individuals became increasingly hostile and outspoken with their assertions and I began to feel alienated simply for not condoning inappropriate behavior in the workplace. I addressed the issues as they arose and began to call people on their inappropriate comments and conduct. This only made matters worse. I mentioned all of this to George in several different conversations, but I felt that he too saw no way to effect any change.

Then one Sunday in June, I learned, for the first time during the morning briefing, that George and his family were pass riding on the San Diego flight that morning and that I had personally been requested to work it. As my co-workers looked at each other knowingly, I sat angrily trying to decide how best to address this clearly inappropriate conduct. I was mortified that the Lead Agent would announce such a thing to the entire staff and wondered if it were even true.

There was no Performance Leader on duty that morning, but I spoke to one at the first

DL 000472

opportunity about this indiscretion and the necessity for these types of behaviors to stop immediately. Thirty minutes after the briefing, as I sat one room away working on the computer, the same Lead Agent made the same comment to another group of employees during the 6:00 a.m. briefing. I became very angry and even more determined to address the matter with a Performance Leader at the first opportunity.

I worked the San Diego flight later that morning. The flight was extremely challenging for a number of reasons. As departure time loomed, I began to get a bit behind. As I stood working my standby list and waiting for late connecting passengers, George and his kids were boarding. This was very close to departure time. I told him that it appeared that I was going to have three seats in first class and asked if he wanted me to move his kids up there. He agreed and after a few more straggler connections boarded, I dispatched the flight.

Two or three days later, Performance Leader Sam Tuminello approached me in a jet way as I returned from dispatching a flight, and asked me in an accusing tone about what had happened on the San Diego flight on Sunday. He indicated that many agents had approached him about the fact that George's family "conveniently" boarded in first class while Medallion level frequent flyers were in the coach cabin.

I explained that I followed procedure, and that I resented the accusation. He told me that agents had been hanging documents in the break room that outlined my alleged indiscretion and that they wanted something done about it. I was floored. I sank against the side of the jet way and cried as I told Sam that I can't take this stress at work anymore. I said "you know, Sam, this all stems from their ridiculous assumptions that I am sleeping with George." He asked if I was doing so. I adamantly denied it and told him, "I am sick of all of it and that the accusations,

2

DL 000473

jokes and comments need to stop. I don't deserve to be treated this way, and I have done nothing wrong." He told me that George had been under investigation for a long time. I asked what that had to do with me. He shrugged and had no comment. He told me he believed my story, but would need me to write down the details about the flight for local management to investigate.

For the next six weeks, I came to work every day and did the same job I always do, and pretended that none of it bothered me. I was stressed out beyond belief. I did not know whom to trust and had no idea what local management had to say about the matter. I experienced extremely hostile working conditions as people shunned me openly; left the room when I entered; deliberately avoided eye contact; spent the bare minimum of time required assisting me when they were assigned to work with me; did not speak to me or mumbled a quick response; or spoke to me in an extremely guarded manner. Management never relayed to me the outcome of their investigation, and when George returned from his trip and I asked him what was going on, he indicated that he knew nothing.

Periodically, a few individuals would approach me and indicate that they did not believe what they were hearing or that they supported me, but for the most part I was on my own wondering how much longer this would continue and how much more I could take.

Eventually, Gary Schmidberger approached me and told me that indeed HR wanted to sit down with me and iron out the facts about the flight. I told him I was relieved to have the opportunity. I told him about the very hostile behavior from my colleagues and the need for the incessant rumors to stop. I also expressed my intensely emotional state and the amount of effort it took for me just to come in everyday and deal with my peers.

Several days later, Gary contacted me on my cell phone, and at home and asked me to

3

DL 000474

return to the airport as HR was ready to discuss things with me. I tried to decline, explaining that I had a child care commitment and that later that day I had a doctor's appointment. I asked if we could do it the next day at work. He was adamant that the meeting should occur that day. He insisted that it should only take about 20 minutes and that he could make arrangements for me to park out front so I could be in and out.

I scrambled to make babysitting arrangements and came back to the airport as he requested. Gary escorted me to the conference room where Greg Kuhn, a woman from Corporate, Deb Kircher (HR), and he interrogated me in the most offensive manner I have ever experienced. In a disrespectful tone, they asked repeatedly if George had solicited me to do him a favor on the San Diego flight in June. I was told that several of my peers had made statements about me, about George, and about their perceptions of the events of that day, and that all of it looked suspicious and telling.

Initially, I accommodated the questioning and attempted to answer whatever questions they posed. As the tone became suggestive and accusatory, I became defensive and asked what this was all about. No answer. They presented me with a notebook cataloguing my computer keystrokes and asked me to detail my justifications for random stokes they had highlighted on various pages. They jumped from that to the repeated questions containing a variation on a theme of whether George had solicited a favor from me. I asked why they kept asking me to answer the same question. No answer.

I asked if this had anything to do with my co-workers' apparent belief that I was having an affair with George. This question elicited a nervous shuffling by everyone as they glanced furtively at one another and mumbled that they had not heard anything about that. I began to cry

4

and indicated that this was the limit of what I could endure from an employer.

I explained the mistreatment I had been receiving and that it was making me physically sick to even have to walk through the doors and do my job every day. I asked what I needed to do to protect myself and bring an end to this hostile treatment. She told me "that is not really my area." Incredulously, I asked how HR could say such a thing and whose area did she think it was. She told me I should direct those concerns to my supervisor. "George Gergits," I asked? "Well, Gary Schmidberger," she said. I turned to Gary and said, "What do I need to do to get this to stop? I can't do this any more." He told me that that was not really why we were here today and that he would come out to the concourse another day, have coffee and discuss my concerns.

The conversation shifted back to the questions I had been asked and had repeatedly answered and I finally insisted that we end the meeting. I had been more than accommodating, but it had now been two hours of this nonsense and I had not only been insulted and berated, but had inconvenienced someone at the last minute to provide childcare for my supposed "20 minute" meeting and had missed my child's doctor appointment. I was directed to make a written statement and then walked out to my car and told to await word.

I worked the next day, and 15 subsequent days, and continued to perform my duties and interact with my co-workers as though nothing had happened. I emailed Gary a couple of times to inquire about getting together for our "coffee date" as discussed in the July 14 meeting. He evaded my request.

Finally on August 4, about an hour before my shift was over, my Lead Agent told me to head down to Gary's office. When I arrived, and he informed me that legal had reviewed my statements from July 14 and they advised that based on the fact that they had precedent, I was to

DL 000476

be suspended. He said it had been determined that I was a "threat to revenue." He provided no explanation, and no specifics about the suspension. He collected my keys and employee and Airport ID and instructed me that the airport police would meet me at the employee parking lot to open the gate. I was in a complete state of shock. I did not fully comprehend what had just happened.

I called Gary's office later that morning and left him a message asking for a copy of my personnel file, my written statement from July 14, and any other documents relevant to this incident. It took him several days to comply but some ten days or so later I was able to collect my file and my statement. I was suspended for two months without any contact from Delta and then terminated without comment as to why.

My file reveals that my 22-year employment record is unimpeachable. I have a reputation among my peers for integrity and genuine commitment to Delta and my customers. I have many comments, commendations, and evaluations from a myriad of supervisors that reiterate my standards of excellence, my dependability, my willingness to comply with rules and regulations, and the depth of my personal convictions and reliability. I counted 25 letters of commendation from Delta customers in my personnel file, and just three years ago, I was considered worthy of promotion to a Leadership position managing the Baggage Service Department and coaching and mentoring 25 direct reports. Yet, somehow, the accusations of some agents (a multitude of unprofessional, counterproductive, and self-serving motivations) has resulted in my termination.

My questions on the issue are substantial in number, but just to scratch the surface, why weren't my concerns about bullying and hostility in my work environment addressed any of the many times I asked for help. What were the findings of the local investigation on the matter back

6

DL 000477

in June? Why haven't any of the details about this matter been discussed with me? How did Atlanta get involved in this matter? What does George Gergits have to do with this? What investigation regarding him has been ongoing and why did he end up getting suspended for three days? How does that relate back to my situation and why haven't I been given an opportunity to speak to the accusations being made against me? What does Delta mean in saying I am a "threat to revenue?" How did this go from questioning me about the potential misconduct of my immediate supervisor to my termination while he remains working at Delta with no significant disciplinary consequence? These are just a few of the questions I have concerning this unfortunate outcome.

Please review the matter again from this fresh perspective and consider reversing your determination to terminate my employment.

Regards,

*Rachelle Henry*

Rachelle Henry

7

DL 000478



**Esther L. Hammond, SPHR**
Director HR – Equal Opportunity
and Compliance

**Delta Air Lines, Inc.**
Department 955
P.O. Box 20706
Atlanta, GA 30320-2530
T. +1 404-715-2364
F. +1 404-773-2367
esther.hammond@delta.com

September 1, 2009

Rachelle Henry
1831 Tanner Road
Hebron, KY 41048

Dear Rachelle:

We appreciate your patience as we reviewed your written appeal of Delta's decision to terminate your employment. We apologize for the delay in responding to your letter, our response to your appeal was not mailed to you sooner due to an administrative oversight.

We have received and reviewed the appeal information you presented to our office, as well as the circumstances surrounding the termination of your employment. Based upon our review, you were terminated after an investigation determined that you deliberately manipulated the Company's ticketing system and boarding process to allow George Geritas' three children to board in first class as non-revenue passengers ahead of revenue-paying Delta Skymiles Medallion passengers in violation of company policy. As you know, the company did not deem your explanation for your actions as credible, including providing a false irregular operations explanation for protecting the seats in question. After reviewing the information you provided in support of your appeal, as well as the company's documentation supporting the termination decision and other related information, we have concluded that the termination decision was appropriate and consistent with company policy.

As part of our review, we considered several situations identified by you (through your counsel) where you contend other employees engaged in comparable policy violations but were not terminated. Our findings do not support your contention. To the contrary, none of the individuals identified was determined to have deliberately manipulated our ticketing processes or the boarding system to benefit specific Delta employees.



DL 000456

 **DELTA**

| | |
|---|---|
| **Esther L. Hammond, SPHR** | **Delta Air Lines, Inc.** |
| Director HR – Equal Opportunity | Department 955 |
| and Compliance | P.O. Box 20706 |
| | Atlanta, GA 30320-2530 |
| | T. +1 404-715-2364 |
| | F. +1 404-773-2367 |
| | esther.hammond@delta.com |

Based on our conclusion that your termination was appropriate, we are denying your
appeal. While this denial is not the outcome you may have desired, let me assure you
that appropriate consideration was given to your situation and the information you
provided. An appeal to a termination is the final step in the process; therefore we
consider this matter closed.

We wish you the best in your future endeavors.

Sincerely,

*Original signed by*
*Esther L. Hammond*

Esther L. Hammond

cc: Kelly Marchant, Regional Manager – Human Resources ACS

DL 000457

CHARGE OF DISCRIMINATION | AGE | CHARGE NUMBER
---|---|---

is form is affected by the Privacy Act of 1974; See ...acy Act Statement before completing this form.

EEOC ~73 - ...7 -11 708

and EEOC

State or local Agency, if any

| NAME | | HOME TELEPHONE |
|---|---|---|
| Rachelle Henry | | ████ |

| STREET ADDRESS | CITY, STATE, AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| ████ | Hebron, KY 41048 | 07/24/1967 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE |
|---|---|---|
| Delta Airlines | 50+ | 859-767-4160 |

| STREET ADDRESS | CITY, STATE, AND ZIP CODE | COUNTY |
|---|---|---|
| 1087 B Terminal Drive | Hebron, KY 41048 | |

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE, AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON

- [ ] RACE
- [ ] COLOR
- [x] SEX
- [ ] RELIGON
- [ ] NATIONAL ORIGIN
- [ ] RETALIATION
- [ ] AGE
- [ ] DISABILITY
- [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE

EARLIEST (ADEA/EPA)     LATEST (ALL)
                        10/06/2008

- [ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I am a female and worked for Delta Airlines (the "Company") for over 22 years, from July 21, 1986 until my unfair termination effective October 6, 2008. I held the position of Sr. Customer Service Representative in Airport Customer Service (ACS) and I was a fully qualified loyal and dedicated employee.

I was unjustly suspended and later terminated effective October 6, 2008 relating to how I handled a flight back in June, 2008. Delta appears to have selectively enforced the rules against me. I am aware of several incidents of leniency toward men under similar circumstances. I documented many incidences where I personally watched male agents clear standby passengers out of order, and clear non-revenue passengers into first class seats while eligible medallion passengers remained seated in coach. Sometimes this occurred for legitimate reasons, other times not, but regardless, the practice is quite commonplace. I personally advised George Gergits, my direct supervisor, of particular instances. Nothing was done. I did not break any rules, however, even if the Delta managers believed that I had transgressed, these incidents negate the existence of any legitimate justification for my termination, particularly so in light of my very strong record of performance and documented dedication to customer service. The stated reason for my termination was that I was a "threat to revenue." I believe I have been discriminated against and terminated because of my gender.

I believe I have been discriminated against because of my gender in violation of Title VII of the Civil Rights Act of 1964, as amended.

GAIL S. GUILFOYLE
Notary Public, State of Ohio
My Commission Expires
January 8, 2010

also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

declare under penalty of perjury that the foregoing is true and correct.

EXHIBIT 16
Deponent Henry
Date 10-7-10 Rptr. PS
WWW.DEPOBOOK.COM

NOTARY

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

Rachelle Henry

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)
11 March 2009

Date     Charging Party (Signature)

DL 000371

CITY/COUNTY OF  Hamilton                                    CASE NUMBER

## AFFIDAVIT

I,  Rachelle Henry _____ , being first duly sworn upon my oath affirm and hereby say :

I have been given assurances by an Agent of the U.S. Equal Employment Opportunity Commission that this affidavit will be considered confidential by the United States Government and will not be disclosed as long as the case remains open unless it becomes necessary for the Government to produce the affidavit in a formal proceeding. Upon the closing of this case, the Affidavit may be subject to disclosure in accordance with Agency policy.

I am  41  years of age, my gender is  female  and my racial identity is  Caucasian

I reside at  ████████████

City of  Hebron , County of _____

State of  KY , Zip code  41048 .

My telephone number is  █████████

My complaint is against  Delta Airlines

which is located at  3087 B Terminal Drive

n  Hebron ,  KY  41048

My job classification was  Sr. Customer Service Rep.

My immediate supervisor was  George Gergits, Supervisor ACS

1. **Respondent's business:**
Respondent engages in the business of being a commercial airline service.

2. **Personal harm:**
I was unjustly suspended and later terminated effective October 6, 2008.

3. **Respondent's explanation for the alleged harm and its policies and practices:**
The explanation for my termination was that I was a "threat to revenue."

4. **Charging Party's relevant work history:**
I am a female and worked for Delta Airlines (the "Company") for over 22 years, from July 21, 1986 until my unfair termination effective October 6, 2008. I held the position of Sr. Customer Service Representative in Airport Customer Service (ACS) and I was a fully qualified loyal and dedicated employee.

5. **Charging Party's rational basis for believing there was discrimination:**

Δ ж EXHIBIT 17
Deponent Henry
Date 10-7-10  Rptr. RS
WWW.DEPOBOOK.COM

DL 000392

(initials)

CITY/COUNTY OF   Hamilton                                                                        PAGE NUMBER

AFFIDAVIT (cont.)

I was unjustly suspended and later terminated for an alleged policy violation, which did not even occur. I handled the flight in question properly according to written policy. Delta appears to have selectively enforced the rules against me. I am aware of several incidents of leniency toward men under similar circumstances detailed below.

On July 22, 2008, Lead Agent Harold Christiansen was traveling "standby space available" from Cincinnati to San Diego on flight 1521. One of his former Leadership peers, Dennis Sauerhage, who has recently stepped down from management, served as the primary flight agent. Mr. Christiansen's peers knew that he was attempting to board the flight, and joked that his chances of getting on the flight were slim to none as it was overbooked. In fact, some of the folks mentioned that it was the only flight on the concourse that was overbooked that morning. After the flight departed, Lead Agent Rick Cropenbaker approached me and mentioned that Mr. Christiansen had "conveniently" cleared the San Diego flight. I later asked Supervisor George Gergits if Mr. Sauerhage had paid any "denied boarding compensation" ("DBC") on the flight. He affirmed that oversales had been paid. As it turned out, the passenger check-in list reflected that the flight actually went out with two empty seats. Clearly, any unnecessary DBC would mean loss of revenue to Delta. I believe passengers were rerouted early in order to insure a seat for Mr. Christiansen. Mr. Sauerhage is male and former management. The management team was also aware of it and nothing was done.

On October 25, 2008, Agent Ron Zimmerman was the primary agent on flight 1247 from Cincinnati to Orlando. His standby list consisted of at least two "B1" passengers named Michelle Robinson and Christopher Gabel. They had misconnected due to a maintenance issue in their origin city of Rochester. They were accordingly waitlisted for Mr. Zimmerman's flight at 10:45 am and given a booking on the 7:40 pm departure as a back up. Ms. Wendy Van Winkle at the information counter instructed them to wait at Mr. Zimmerman's gate in hopes of clearing the standby list. Fifteen minutes prior to departure of flight 1247, Mr. Zimmerman apparently told these passengers that they would not clear the standby list and should return to the information counter for rerouting. Ms. Van Winkle in turn reviewed the passenger check-in lists and advised the passengers that it appeared that Delta would have three seats remaining and that they should return to the gate. The customers stated that they were uncomfortable doing so, as Mr. Zimmerman had been short with them and quite adamant that they would not be admitted to the flight. Ms. Van Winkle then called the gate directly to inquire. Mr. Zimmerman dismissed her inquiry and firmly stated that the passengers would not clear his list and that she should find another routing for them. Having tried everything she knew to help them, she explained that their only option would be to wait for the 7:40 p.m. flight. She paid for them to have lunch ($14.00), and apologized for the inconvenience. Upon later review, the information counter agent noted that the gate agent, Mr. Zimmerman, cleared three Non-Revenue Space Available passengers on his list into open seats on his flight. Mr. Zimmerman deleted the revenue standby passengers from his standby list at 10:43, two minutes prior to departure. I believe that Delta lost revenue from this incident in at least the following ways : revenue lost from ill will and future travel ramifications; the meals for which Delta paid; and, the fact that the two passengers occupied two seats on the later Orlando departure that could have potentially been sold. The information counter agent, Wendy Van Winkle, presented her direct supervisor, Barry Erb, with all of the information and asked that it be investigated. She was advised that the matter had been addressed. No administrative action appears to have been taken against Ron Zimmerman, a male employee.

Also, Manager of Airport Operations Gary Schmitberger's son now works for Delta at the airport. Just before the Orange Bowl a few weeks ago, Mr. Schmitberger's son and a friend, who was traveling on a "buddy pass," were attempting to travel non-revenue to south Florida for the game. All the flights to anywhere near Miami were overbooked and the standby lists were very long. In addition to the many Delta flights leaving for Miami, there were several charter operations departing from the same concourse. Mr. Schmitberger requested a favor of the charter representative, and consequently, his son and friend departed and returned via the charter service.

Aside from these issues, I documented at least five other incidences where I personally watched agents clear standby passengers out of order, and clear non-revenue passengers into first class seats while eligible medallion passengers remained seated in coach. Sometimes this occurred for legitimate reasons, other times not, but regardless, the practice is quite commonplace. I personally advised George Gergits, my direct supervisor, of particular instances. Nothing was done.

I did not break any rules, as I already explained. However, even if the Delta managers believed that I had transgressed, these incidents negate the existence of any legitimate justification for my termination, particularly so in light of my very strong record of performance and documented dedication to customer service.

6.  **Comparator's names, titles, and how similarly situated:**
    All male similarly situated employees who were treated better and not terminated.

DL 000393

Page 2 of 3

(initials)

CITY/COUNTY OF  Hamilton _____    _____ NUMBER _____

AFFIDAVIT (cont.)

7.  **Witness identification:**

8.  **Class harm:**
    Unknown.

9.  **Remedy:**
    Reinstatement, back pay, lost benefits, front pay, emotional distress damages, attorney fees, any and all other relief available under the law.

10. **Other relevant information:**
    None at this time.

ιave read and had an opportunity to correct this affidavit consisting of  3 typed pages and swear that these facts are true and ‹rrect to the best of my knowledge and belief.

_____

ιbscribed and sworn to before me

s __11th__ day of _March_ 20α9.

_____



GAIL S. GUILFOYLE
Notary Public, State of Ohio
My Commission Expires
January 8, 2010

DL 000394

EEOC Form 161 (2/08)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To: Rachelle Henry

Hebron, KY 41048

From: Louisville Area Office
600 Dr. MLK, Jr. Place
Suite 268
Louisville, KY 40202

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 473-2009-00708 | Joyce E. Andries, Investigator | (502) 582-6745 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Susan Ryan                          10-27-09

Enclosures(s)

Marcia Hall-Craig,
Director

*(Date Mailed)*

cc:

Brian B. San Souci, J.D.
Parlegal
DELTA AIRLINES, INC.
Law Department (982/ATG)
1030 Delta Boulevard
Atlanta, GA 30320

Cindy Piecoro
525 Vine Street
6th Floor
Cincinnati, OH 45202

Δ ≠ EXHIBIT 18
Deponent Henry
Dated 10-7-10 Rptr. ____
WWW.DEPOBOOK.COM

DL 000309

## UNITED STATES DISTRICT COURT
## EASTERN DIVISION OF KENTUCKY
## COVINGTON DIVISION

| | | |
|---|---|---|
| <u>RACHELLE HENRY</u> | : | |
| ███████████ | : | Case No. |
| Hebron, Kentucky 41048, | : | |
| | : | |
| Plaintiff, | : | Judge |
| | : | |
| v. | : | |
| | : | |
| **DELTA AIRLINES, INC.** | : | **PLAINTIFF'S COMPLAINT WITH** |
| 1030 Delta Blvd. | : | **JURY DEMAND ENDORSED HEREON** |
| Dept. 852 | : | |
| Atlanta, Georgia 30354 | : | |
| **c/o Statutory Agent** | : | (Filed Electronically) |
| **CSC - Lawyers Incorporating Service** | : | |
| 421 West Main Street | : | |
| Frankfort, Kentucky 40601, | : | |
| | : | |
| Defendant. | : | |

Comes now Plaintiff Rachelle Henry ("Plaintiff"), and asserts the following claims against Defendant Delta Airlines.

### PARTIES

1.   Plaintiff Rachelle Henry ("Plaintiff") is a resident and citizen of the Commonwealth of Kentucky.

2.   Defendant Delta Airlines, Inc., ("Defendant") is an employer within the meaning of applicable federal and state law.

3.   Defendant is a foreign corporation doing business in the Eastern Division of Kentucky, Covington Division.

### JURISDICTION & VENUE

4.   This Court has jurisdiction over Defendant because it conducts business within this division and district.



5.      This Court has original jurisdiction to hear this case pursuant to 28 U.S.C. §1331 because Plaintiff's claims arise under the laws of the United States. This Court may also exercise diversity jurisdiction as the parties are completely diverse and more than $75,000 is at stake.

6.      This Court has jurisdiction to hear Plaintiff's remaining Counts arising under Kentucky common and statutory law pursuant to 28 U.S.C. §1367 and 28 U.S.C. §1331, because they are so related to the federal claim in Count 1, over which this Court has original jurisdiction, that they form part of the same case or controversy.

7.      Venue is proper in the Eastern Division of Kentucky, Covington Division, pursuant to 28 U.S.C. §1391(b) because the events giving rise to these claims occurred in this division and district.

8.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 11, 2009, less than 180 days after being notified of her termination on October 6, 2008.

9.      The EEOC did not rule that her Charge was untimely.

10.     Plaintiff received a Notice of Right to Sue from the EEOC on October 27, 2009.

11.     Plaintiff filed this Complaint on January 25, 2010, within 90 days of her receipt of the EEOC Notice of Right to Sue.

12.     Plaintiff has met all procedural prerequisites for her Title VII claim.

## FACTUAL ALLEGATIONS

13.     Plaintiff is a female.

14.     Defendant hired Plaintiff on July 21, 1986. At the time of her termination, Plaintiff had over 22 years of service with Defendant.

2

15.     Plaintiff most recently held the position of Senior Customer Service Representative in Airport Customer Service.

16.     Plaintiff was fully qualified for her job at all relevant times.

17.     Throughout her lengthy tenure with Defendant, Plaintiff was a loyal, dedicated and exemplary employee who received consistent positive performance reviews, merit based salary increases, and enjoyed numerous promotions.

18.     Plaintiff received over 25 letters of commendation from customers during her service with Delta.

19.     Just three years prior to her termination, Plaintiff was offered a promotion to a Leadership Position managing the Baggage Service Department and coaching 25 direct reports. Plaintiff accepted the promotion, but because Plaintiff's daughter had recently been diagnosed with Leukemia, Plaintiff stepped down from the position for personal reasons.

20.     Prior to her termination, Plaintiff had no record of employee discipline.

21.     On October 6, 2008, Defendant terminated Plaintiff's employment, allegedly over an incident that occurred over four months prior.

22.     Plaintiff was accused of allowing her supervisor and his son to fly first class in a flight to San Diego on June 8, 2008, while Medallion customers were allegedly denied first class and traveled in business class.

23.     Plaintiff denies the allegation and/or any transgressions with respect to Delta policy.

24.     During questioning regarding the incident, Plaintiff indicated that she was going to hire an attorney to represent her to protect her legal rights.

25.     Defendant fired Plaintiff after she indicated she planned to hire an attorney to protect her legal rights.

3

26.     On at least five separate occasions similarly situated less qualified male employees have engaged in the conduct Defendant alleges Plaintiff engaged in, yet those employees were neither fired, nor disciplined.

27.     Defendant did not fire Plaintiff's supervisor over the alleged incident on June 8, 2008.

28.     Defendant has treated Plaintiff differently than similarly situated male employees in selectively enforcing its policies and rules.

29.     Defendant's termination of Plaintiff's employment allowed for the retention of less qualified male employees.

30.     As a result of Defendant's intentional, willful, and malicious conduct, Plaintiff has suffered damages in excess of $75,000.

## COUNT I

### (Gender Discrimination - Title VII)

31.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

32.     Plaintiff is female.

33.     Plaintiff was qualified for her position at all times.

34.     Defendant treated Plaintiff differently than similarly situated less qualified male employees.

35.     Defendant's termination of Plaintiff's employment allowed for the retention of less qualified male employees.

36.     Defendant has engaged in a pattern and practice of gender discrimination.

37.     Defendant violated Title VII when it terminated Plaintiff's employment on account of her gender.

38.     Defendant's actions were intentional, willful, wanton and malicious in nature.

4

39.     As a direct and proximate cause of Defendant's unlawful discriminatory conduct, Plaintiff has been damaged and is entitled to relief under Title VII.

## COUNT II

### (Gender Discrimination - K.R.S. §344.040)

40.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

41.     Plaintiff is female.

42.     Plaintiff was qualified for her position at all times.

43.     Defendant treated Plaintiff differently than similarly situated less qualified male employees.

44.     Defendant's termination of Plaintiff's employment allowed for the retention of less qualified male employees.

45.     Defendant has engaged in a pattern and practice of gender discrimination.

46.     Defendant violated K.R.S. §344.040 when it terminated Plaintiff's employment on account of her gender.

47.     Defendant's actions were intentional, willful, wanton, and malicious in nature.

48.     As a direct and proximate cause of Defendant's unlawful discriminatory conduct, Plaintiff has been damaged and is entitled to relief under K.R.S. §344.040.

## COUNT III

### (Breach of Kentucky Public Policy)

49.     Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

50.     There are clear public policies expressed in both state and federal law that employees should not be subjected to retaliation for hiring an attorney to protect their legal rights.

5

51.    Terminating an employee for stating that she plans to hire an attorney would jeopardize clearly established public policies.

52.    Defendant's above-described actions violate these established public policies, and Defendant lacked an overriding legitimate business justification for their actions.

53.    Defendant's actions constitute a breach of public policy, and are willful, wanton, malicious and/or reckless in nature.

54.    As a result of Defendant's retaliatory conduct, Plaintiff has suffered injuries and damages for which she is entitled to recovery.

**WHEREFORE**, Plaintiff, Rachelle Henry demands judgment against Delta Airlines, Inc., as follows:

(a)    That Plaintiff be reinstated to her former employment with Defendant;

(b)    That Plaintiff be awarded all lost pay and benefits;

(c)    That Plaintiff be awarded compensatory damages;

(d)    That Plaintiff be awarded punitive damages;

(e)    That Plaintiff be awarded front pay;

(f)    That Plaintiff be awarded reasonable attorney's fees; and

(g)    That Plaintiff be awarded all other legal and equitable relief to which she may be entitled.

Respectfully submitted,


/s/ Kelly Mulloy Myers
Kelly Mulloy Myers (86727)
Heather M. Schisler (90187)
Attorneys for Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, OH 45202
PH: (513) 721-1975
FX: (513) 651-2570
*kmyers@frekingandbetz.com*
*hschisler@frekingandbetz.com*

## JURY DEMAND

Plaintiff hereby demands a trial by jury of these matters.


/s/ Kelly Mulloy Myers


7

UNITED STATES DISTRICT COURT
EASTERN DIVISION OF KENTUCKY
COVINGTON DIVISION

| | | |
|---|---|---|
| **RACHELLE HENRY** | : | Case No. 2:10-cv-00009 |
| | : | |
| Plaintiff, | : | Judge Bertelsman |
| | : | |
| v. | : | **PLAINTIFF'S RESPONSE TO** |
| | : | **DEFENDANT'S FIRST SET OF** |
| **DELTA AIRLINES, INC.** | : | **INTERROGATORIES** |
| | : | |
| Defendant. | : | |

## GENERAL OBJECTIONS

1.      Plaintiff objects generally to Defendant's interrogatories on the grounds and to the extent it requires her to reveal the mental impressions and legal strategies of her attorneys which are protected from disclosure by the work product doctrine.

2.      Plaintiff objects generally to Defendant's interrogatories on the grounds and to the extent which they require her to provide a lengthy explanation which can be explored through deposition. See, e.g., FDIC v. Butcher, 116 F.R.D. 203 (E.D. Tenn. 1987); In re Convergent Technology Securities Litigation, 108 F.R.D. 328 (N.D. Cal. 1988); Penn Central Transp. Co. v. Armco Steel Co., 271 N.E. 877, 27 Ohio Misc. 76 (Montgomery County Court of Common Pleas, 1971) ("The interrogatory should be a narrow question that is capable of being answered by a categorical statement without a lengthy explanation such as can be explored on deposition.").

3.      Plaintiff objects generally to Defendant's interrogatories on the grounds and to the extent that Defendant seeks information which is protected by attorney-client privilege.

4.      Plaintiff objects generally to Defendant's instructions insofar as they go beyond what is required by the Federal Rules of Civil Procedure.



## INTERROGATORIES

INTERROGATORY NO. 1

Identify each person whom you expect to call as an expert witness at any hearing held in connection with any motion or at the trial of this case.

**RESPONSE: Plaintiff states she has not yet determined which, if any, expert witness she expects to call at the trial in this matter. Plaintiff will supplement this information in accordance with the rules and the orders of the Court and the Federal Rules of Civil Procedures.**

INTERROGATORY NO. 2

With respect to each witness identified in your response to Interrogatory 1, identify all documents or reports, including any working or preliminary drafts thereof, prepared or generated by or at the direction of such person in relation to the subject matter of this case.

**RESPONSE: See Plaintiff's Response to Interrogatory No. 1.**

INTERROGATORY NO. 3

Identify each person in the nature of an expert who has been retained or specially employed by you in anticipation of litigation or preparation for trial in this matter and who is not expected to be called as a witness at trial or hearing.

**RESPONSE: See Plaintiff's Response to Interrogatory No. 1.**

INTERROGATORY NO. 4

Identify every application for employment of any kind or character you have made since August 5, 2008, including, but not limited to, the full name and business address of the employer

to whom you made such application, the date or dates when you made such application, whether such application was made orally or in writing, and whether such application was made in person or by telephone or correspondence, the character or nature of the work applied for, the name and address of each individual who participated in or was present during such application for employment and/or pre-hiring interview, and whether you placed any restrictions on the nature or hours of employment you would apply for or accept.

**RESPONSE:**    **Objection. Plaintiff objects to this Interrogatory because it is over broad, unduly burdensome, and requires a narrative response better suited to deposition. Without waiving the foregoing objections, Plaintiff recalls applying for positions with the following employers:**

**Cincinnati Children's Hospital Medical Center**
**Plaintiff applied for a Social Worker position and various other human service positions**
**Plaintiff was not offered employment**

**Veteran's Hospital, Cincinnati**
**Plaintiff applied for a Social Worker position**
**Plaintiff received no response**

**White Family Services, Indiana**
**Plaintiff applied for a Social Worker position**
**Plaintiff received no response**

**State of Kentucky - Early Intervention Program**
**Plaintiff applied for a Service Coordinator position**
**Plaintiff received an offer of employment and accepted the position**

**St. Elizabeth Health Providers**
**Plaintiff is currently employed st the Service Coordinator for Kentucky Early Intervention Program**

INTERROGATORY NO. 5

Identify each employer you have had since August 5, 2008, including the full name and business address of the employer, the dates of employment, the nature of the employment

involved including job title or position, the name of your supervisor, and the compensation or

wage you have received from the employer (including a complete description of all benefits).

**RESPONSE:** **Objection. This Interrogatory seeks information that should be explored through deposition. Without waiving the foregoing objection, Plaintiff has been employed by the following employers since August 5, 2008:**

**Cabinet for Health and Family Services Kentucky**
**Department for Public Health, Division of Adult and Child Health Improvement, First Steps Program**
**275 East Main**
**Frankfort, KY 40621**
**Plaintiff was independently contracted as a Service Coordinator for the Early Intervention Program. She held this position from September 2, 2008 through October 31, 2009. Plaintiff received no benefits and her salary was dependent on her caseload and billable time. Plaintiff earned $2,160.00 in 2008 and $27,200.00 in 2009. Plaintiff's supervisor was Dr. R. Shepard, Division Director.**

**St. Elizabeth Health Providers**
**1 Medical Village Dr.**
**Edgewood, KY 41017**
**Plaintiff is currently employed st the Service Coordinator for Kentucky Early Intervention Program. She started this position on October 12, 2009. Plaintiff earned $5,800.00 in 2009 and has earned $20,000.00 year to date. Plaintiff is receiving benefits.**

INTERROGATORY NO. 6

Identify every opportunity for employment of any kind or character that you have

declined or refused since and including August 5, 2008, including, but not limited to, the full

name and business address of each employer involved, the name and address of each individual

who has personal knowledge of your refusal to accept any opportunity for employment, the date

when you declined or refused any opportunity for employment, the nature of the employment

involved including job title and position and compensation or wage for each, and the reasons for

your refusal to accept each such opportunity for employment.

**RESPONSE:** **Plaintiff has not declined any opportunity for employment.**

INTERROGATORY NO. 7

Identify any unemployment compensation or other public aid that you have received since August 5, 2008, including the name and address of the agency from whom you received such compensation, the date or dates of your application for such compensation, the location to where each such application was delivered or forwarded, the date and amount of each payment of such compensation, and the period or periods for which it was paid.

**RESPONSE:  Plaintiff has not received any unemployment compensation or other public aid.**

INTERROGATORY NO. 8

Identify all formal education or training that you have received at any time following your first application for employment to Western Airlines.  For all such education or training, identify the name and address of the institution from which you received such education or training, the inclusive date or dates of such education or training, and any additional licenses, degrees or certifications that you received as a result of such education or training.

**RESPONSE: Objection.  This interrogatory is overly broad, vague, ambiguous, and unduly burdensome because it clearly exceeds the discovery obligations of the responding party as set forth in the Federal Rules of Civil Procedure. Plaintiff further objects to the extent that it seeks information that is irrelevant or not reasonably calculated to lead to the discovery of admissible evidence.  Additionally, this Interrogatory requires a narrative response that it is better suited to a deposition question.  Without waiving the foregoing objections, below is Plaintiff's educational background:**

- **Plaintiff attended community college in Southern California between 1986-1996; no degree completed**

- **Plaintiff attended Northern Kentucky University between 1994-1998; Plaintiff completed the BSW program**

- **Plaintiff attended The University of Kentucky between 1998-2005; Plaintiff completed the MSW program**

INTERROGATORY NO. 9

Other than those from Delta, describe any wages, salary or income of any kind or character you have received since and including August 5, 2008, including the full name and address of the individual, person, party or organization from whom monies were received, the date or dates on which the monies were received, and the amount of monies so received.

**RESPONSE: See Plaintiff's Response to Interrogatory No. 5.**

INTERROGATORY NO. 10

Identify any income that you have obtained or received from any source other than from wages or salary since and including August 5, 2008, including each and every payment received, the identity of each and every payor, the date of each and every such payment, the amount of each such payment, and the identity of each and every document which reflects, refers to or relates to any matter asserted in response to this Interrogatory.

**RESPONSE: Plaintiff has not received any income from any source other than from wages or salary since and including August 5, 2008.**

INTERROGATORY NO. 11

Identify all litigation, administrative proceedings or claims for relief or damages in which you have been involved, including any in which you appeared as a plaintiff, claimant, defendant, respondent or witness, including, but not limited to, the identity of every person against whom you have made any claim or filed any lawsuit, who has made any claim or filed any lawsuit against you, or who has called you as a witness; the case or claim style, name and number; the court or administrative tribunal in which the claim or action was pending; the date upon which the action or claim was filed; and the status or disposition of the case or claim. This

Interrogatory includes, but is not limited to, workers' compensation proceedings, bankruptcy proceedings and divorce proceedings.

**RESPONSE:** **Objection. This Interrogatory is overbroad, unduly burdensome, and not reasonably calculated to lead to this discovery of admissible evidence, and seeks information which bears no relevance to the material issues of the case. Without waiving the foregoing objections, Plaintiff states that she has not been involved in any litigation other than the current action.**

INTERROGATORY NO. 12

Please identify any monies that you received as a result of the settlement of any litigation of claim referenced in your answer to Interrogatory No. 11, including the amount of the settlement, the terms of the settlement agreement, including the terms of the payment of any settlement amount, where the settlement funds are presently invested, the amount of interest or dividends received annually as a result of these investments and, if said monies are invested in a stock or bond portfolio, state the current value of the portfolio.

**RESPONSE:** **See Plaintiff's Response to Interrogatory No. 11.**

INTERROGATORY NO. 13

Provide the name and address of any health care provider from whom you sought treatment relating to any physical, psychological or emotional injury or upset that you may have suffered during the time period ten (10) years preceding August 5, 2008, up to and including that date. For each such provider, please state the dates upon which you sought treatment, the name of the health care provider, any diagnosis or opinion held by the health care provider, any physical, psychological or psychiatric tests that were administered to you and the results of those tests, and the nature of any regimen of treatment recommended for you.

**RESPONSE:** **Objection.  Plaintiff objects to this Interrogatory because it is overly broad,
seeks detailed information that can be explores through deposition
testimony, seeks discovery of privileged medical information, and is not
reasonably calculated to lead to the discovery of admissible evidence.**

INTERROGATORY NO. 14

Provide the name and address of any health care provider from whom you sought

treatment relating to any physical, psychological or emotional injury or upset that you may have

suffered since August 5, 2008.  For each such provider, please state the dates upon which you

sought treatment, the name of the health care provider, any diagnosis or opinion held by the

health care provider, any physical, psychological or psychiatric tests that were administered to

you and the results of those tests, and the nature of any regimen of treatment recommended for

you.

**RESPONSE:** **Objection.  Plaintiff objects to this Interrogatory because it is overly broad,
seeks detailed information that can be explores through deposition
testimony, and seeks discovery of privileged medical information.  Without
waiving the foregoing objections, Plaintiff has seen Dr. Chris Rawlings at
Summit Medical Group in Hebron, Kentucky.  Plaintiff is producing her
medical records from Dr. Rawlings herewith.**

INTERROGATORY NO. 15

State whether you have received or have been promised any reimbursement by any

insurance company, or other person or entity, for any expenses you incurred in connection with

any of the services referred to in answer to Interrogatory Nos. 13 and 14.

**RESPONSE:** **Plaintiff has not been promised any reimbursement in connection with any of
the services referred to in her answer to Interrogatory Nos. 13 and 14.**

INTERROGATORY NO. 16

With respect to the allegations of damages contained in your Complaint, please state the monetary value of all salary and benefits you have allegedly lost as a result of your being terminated by Delta and the manner in which such amounts were calculated, and identify every document which supports, reflects, refers to or relates to each amount claimed by you in this case and each and every person having knowledge or information of any item of damages described in your response to this Interrogatory.

**RESPONSE:** **Objection. See General Objections Nos. 1 and 2. This Interrogatory seeks information protected by attorney-client privilege and calls for a legal conclusion. Plaintiff further objects that this Interrogatory is over broad and seeks detailed information that should be explored through deposition testimony. Without waiving the foregoing objections, Plaintiff produced a calculation of damages in her initial disclosures. The calculation was a preliminary estimate. Plaintiff reserves the right to supplement or change her calculation. The initial disclosures do not take into account increases in pay Plaintiff would have received has she not been unlawfully terminated, attorney fees, or other damages or remedies legally available to Plaintiff, including but not limited to punitive, liquidated, and compensatory damages.**

As to objections,,

/s/ Heather M. Schisler
Kelly Mulloy Myers (86727)
Heather M. Schisler (90187)
Attorneys for Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, OH 45202
PH: (513) 721-1975
FX: (513) 651-2570
*kmyers@frekingandbetz.com*
*hschisler@frekingandbetz.com*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon counsel for

Defendant as follows:  David T. Croall, Esq., Porter Wright Morris & Arthur LLP, 250 East Fifth

Street, Suite 2200, Cincinnati, OH  45202 via electronic mail, this 23rd day of August, 2010.

/s/ Heather M. Schisler