

**Henry vs. Delta  KIRCHER**    11/18/2010

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

-----------------------------------------
                                          :
RACHELLE HENRY,                           :
                                          :
            Plaintiff,                    :
                                          :
    vs.                                   :    CASE NO.
                                          :  2:10-cv-00009
DELTA AIR LINES, INC.,                    :
                                          :
            Defendant.                    :
                                          :
-----------------------------------------

DEPOSITION OF:    DEBORAH KIRCHER
TAKEN:            By the Plaintiff
DATE:             November 18, 2010
TIME:             Commencing at 10:06 a.m.
PLACE:            Offices of:
                  Freking & Betz
                  525 Vine Street
                  Sixth Floor
                  Cincinnati, Ohio  45202
BEFORE:           THERESA LYNN WESTFELT
                  Court Reporter
                  Notary Public - State of Ohio

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**    11/18/2010

Page 2

1   APPEARANCES:
2       On behalf of the Plaintiff:
3           KELLY MULLOY MYERS, ESQ
                of
4           Freking & Betz
            525 Vine Street
5           Sixth Floor
            Cincinnati, Ohio  45202
6
        On behalf of the Defendant:
7
            DAVID T CROALL, ESQ
8               of
            Porter Wright Morris & Arthur LLP
9           250 East Fifth Street
            Suite 2200
10          Cincinnati, Ohio  45202
                and
11          KELLY KUBES GIUSTINA, ESQ
                of
12          Delta Air Lines, Inc
            1030 Delta Boulevard,
13          Dept  981
            Atlanta, GA 30320
14
        Also Present:  Rachelle Henry
15
16      S T I P U L A T I O N S
17          It is stipulated by and among counsel for
18  the respective parties that the deposition of DEBORAH
19  KIRCHER, a witness herein, may be taken at this time by
20  Counsel for the Plaintiff as upon cross-examination
21  pursuant to the Federal Rules of Civil Procedure; that
22  the deposition may be taken in stenotypy by the notary
23  public-court reporter and transcribed out of the
24  presence of the witness; that the transcribed deposition

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**    11/18/2010

Page 3

1   is to be submitted to the witness for examination and
2   signature, and that signature may be affixed out of the
3   presence of the notary public-court reporter
4           I N D E X
5   DEBORAH KIRCHER               PAGE
6   CROSS-EXAMINATION BY MS  MULLOY MYERS       4
7   EXAMINATION BY MR  CROALL         -
8
            CONFIDENTIAL MATERIAL
9           UNDER SEPARATE SEAL
        PURSUANT TO AGREEMENT OF COUNSEL
10
            Page 85
11          Page 98
            Pages 100-102
12          Pages 105-108
            Page 123
13          Page 127
            Pages 132-135
14          Page 200
15          EXHIBITS
16  Kircher Exhibit       Marked       Referenced
17      1       40          -
        2       62          -
18      3       80      80, 109, 119, 178
        4       137        185
19      5       138         -
        6       162         -
20      7       170        175
        8       181         -
21      9       182         -
        10      185         -
22      11      186        196
        12 (Under Seal)  200        -
23
24

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**    11/18/2010

Page 4

1           DEBORAH KIRCHER
2   of lawful age, a witness herein, being first duly sworn
3   as hereinafter certified, was examined and deposed as
4   follows:
5           CROSS-EXAMINATION
6   BY MS. MULLOY MYERS:
7       Q.   Good morning.  My name is Kelly Myers and
8   I'm an attorney representing Rachelle Henry in a matter
9   she's brought against her former employer.  And the
10  reason we've asked you here today is you've been
11  identified as someone who may have knowledge of the
12  claims Ms. Henry has asserted.  So the purpose of this
13  morning is just to ask you some questions to find out
14  what you may know or what you may not know, okay?
15      A.   Okay.
16      Q.   Have you ever had your deposition taken
17  before?
18      A.   I have not.
19      Q.   Okay.  There are a few ground rules that
20  will help the proceedings go smoothly.
21      A.   Okay.
22      Q.   Theresa's a court report and she is taking
23  down what we're saying verbatim.  At the conclusion of
24  the deposition, a written transcript may be prepared.

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 5

1   So with that in mind, it's important to remember to keep
2   your answers verbal.
3       A.   Okay.
4       Q.   Shaking your head or gesturing won't come
5   across in the transcript.  Also "yes" or "no" is
6   preferable to "um-hmm" or "huh-uh," just because it's
7   clearer on the transcript, okay?
8       A.   Okay.
9       Q.   It's difficult to take down two people
10  talking at once and it's difficult to follow that in the
11  record.  So if you could let me finish a question before
12  you begin to speak, that's helpful.
13      A.   Okay.
14      Q.   Even if you know where I'm going with it,
15  let me get it all out before you begin to answer, okay?
16      A.   Okay.
17      Q.   If you don't hear or understand a question
18  that I've asked, please ask me to repeat or rephrase it.
19  If you do answer a question, I'm going to assume that
20  you heard and understood it, okay?
21      A.   Okay.
22      Q.   If you need a break for any reason, just
23  let me know.  The only thing I would ask with respect to
24  breaks is that if there's a question pending, you answer

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 7

1   months.
2       Q.   So do you recall the month and the year
3   that you assumed the HR --
4       A.   Um-hmm (nodding head affirmatively).
5       Q.   -- Generalist role?
6       A.   May of 2005.
7       Q.   Okay.  And just briefly, I want to go
8   through the progression of your career at Delta.  Is it
9   easier for you to go forward or backwards?
10      A.   Oh, it doesn't matter.
11      Q.   Okay.  So immediately prior to the HR
12  Generalist position, what role did you hold?
13      A.   I was a field service manager in Inflight
14  Service.
15      Q.   And what were your responsibilities in that
16  role?
17      A.   I was a supervisor for flight attendants.
18      Q.   Where were you stationed?
19      A.   Previous to my HR position, I was in
20  Cincinnati.  Previous to that, I was in Chicago.
21      Q.   Okay.  When you were a field service
22  manager, where were you?
23      A.   Cincinnati and Chicago.
24      Q.   So there was some overlap between the two

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 6

1   that one question before we adjourn, okay?
2       A.   Okay.
3       Q.   And the first thing I'm going to have you
4   do is just verify your name for the record, please?
5       A.   It's Deborah, D-E-B-O-R-A-H, Kircher,
6   K-I-R-C-H-E-R.
7       Q.   And what is your date of birth?
8       A.   ████████, 1966.
9       Q.   What is your home address?
10      A.   ████████████ in Batavia, Ohio.
11      Q.   What's the ZIP there?
12      A.   45103.
13      Q.   And how long have you lived there?
14      A.   Since 2002, so eight years.
15      Q.   Are you currently employed?
16      A.   Yes.
17      Q.   By whom are you employed?
18      A.   Delta Air Lines.
19      Q.   When did you become employed by Delta?
20      A.   In 1991.
21      Q.   What's your current position?
22      A.   Human Resources Generalist.
23      Q.   How long have you held that position?
24      A.   Five years, about five years and six

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 8

1   locations?
2       A.   Yeah, I moved to Cincinnati in 2002.
3       Q.   Okay.
4       A.   (Continued)  I went into the role of
5   supervision in 1997 in Chicago.  And when I transferred
6   from Chicago to Cincinnati, maintained that same title.
7       Q.   So you assumed the field service manager
8   position in Chicago in 1997?
9       A.   Correct.
10      Q.   Transferred to Cincinnati in '02, and held
11  that role until you moved into the HR Generalist
12  position in 2005?
13      A.   Correct.
14      Q.   Okay.  And what did you do prior to the
15  field service manager position?
16      A.   I was a flight attendant.  I will say there
17  was a time in there when I was a field service manager,
18  I had a different title called Reliability Manager --
19      Q.   Um-hmm.
20      A.   -- where I managed fight attendant sick
21  leave for Cincinnati, that was in Cincinnati.  And then
22  when I was on maternity leave, I came back, that
23  position was eliminated, and I came back to my field
24  service manager role.

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

**Henry vs. Delta  KIRCHER**　　　11/18/2010

Page 9

1　　Q.　How long did you hold that Reliability
2　Manager position?
3　　A.　Let's see, I had it for two years.
4　　Q.　Okay.  And how long were you a flight
5　attendant?
6　　A.　Between 1991 and 1997.
7　　Q.　Now, what occurred so that you moved into
8　that HR Generalist position in 2005?
9　　A.　Well, that was where my interests were.
10　When I was the Reliability Manager in Cincinnati, I was
11　performing the duties of -- very similar to an HR
12　function, and I partnered with the Inflight HR person on
13　many occasions, particularly Benefits.  And that's just
14　where my interested lied, and I pursued a career -- I
15　was interested in actually HR for Inflight, but the
16　opportunity presented itself for Airport Customer
17　Service.  And when the opportunity presented itself, I
18　was -- expressed interest, and got the job.
19　　Q.　Okay.  Do you have any education in human
20　resources?
21　　A.　I have a SPHR certification --
22　　Q.　Okay.
23　　A.　-- and a business administration degree.
24　　Q.　Okay.  Where's the business administration

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**　　　11/18/2010

Page 11

1　　Q.　All right.  Now, have you always been
2　assigned in your role as HR Generalist to the Airport
3　Customer Service --
4　　A.　Yes.
5　　Q.　-- people?  All right.  And at CVG?
6　　A.　Yes.
7　　Q.　When you assumed the HR Generalist role,
8　who was your immediate supervisor?
9　　A.　Lisa Blackmon, B-L-A-C-K-M-O-N.
10　　Q.　And how long was Ms. Blackmon your
11　supervisor?
12　　A.　From what I remember -- I had several.
13　　Q.　Okay.
14　　A.　(Continued)  I can't remember exactly how
15　long she was my immediate supervisor, but I would say at
16　least nine or ten months.
17　　Q.　Okay.  Do you recall who was next after
18　Ms. Blackmon?
19　　A.　Yes, Mindy Davidson.
20　　Q.　And do you recall how long she was your
21　supervisor?
22　　A.　A couple years, from what I recall.
23　　Q.　Okay.  And then who was next?
24　　A.　Kelly Marchant, M-A-R-C-H-A-N-T.

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**　　　11/18/2010

Page 10

1　degree from?
2　　A.　North Dakota State University.
3　　Q.　When did you graduate?
4　　A.　1990.
5　　Q.　Is that a bachelor's?
6　　A.　Um-hmm (nodding head affirmatively).
7　　Q.　Okay.  When did you obtain your SPHR
8　certification?
9　　A.　2009 -- or wait, let me think about that
10　for a second.  It was three years ago, three years ago
11　this January.  So would that be 2009?
12　　　MR. CROALL:  '8.
13　　A.　2008, I'm sorry.
14　　Q.　So you had it about three years?
15　　A.　Yes.
16　　Q.　Okay.  So when you said the opportunity
17　presented itself, was there an opening that was posted?
18　　A.　Um-hmm (nodding head affirmatively).
19　　Q.　"Yes"?
20　　A.　Yes, I bid on an opening.  Talked to a lot
21　of colleagues that were doing the HR generalist
22　functions and talked to the Field Director at the time
23　of Cincinnati and just really felt it was a right fit
24　for me, went through an interview, and was selected.

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**　　　11/18/2010

Page 12

1　　Q.　And how long was she your supervisor?
2　　A.　About a year or to a year-and-a-half,
3　approximately, I don't remember the exact time.
4　　Q.　Any other supervisors?
5　　A.　My current one, Cassandra Lee-Austin.
6　L-E-E, hyphenated, A-U-S-T-I-N.
7　　Q.　And Ms. Lee-Austin is your current
8　supervisor?
9　　A.　Correct.
10　　Q.　And do you recall how long she has been
11　your supervisor?
12　　A.　Just about a year, a little bit over a
13　year.
14　　Q.　Okay.  And do you recall who your
15　supervisor was at the time Ms. Henry was terminated from
16　her employment?
17　　A.　Kelly Marchant.
18　　Q.　Now, what was Ms. Marchant's position at
19　the time?
20　　A.　Human Resources Manager.
21　　Q.　And was she stationed at CVG?
22　　A.　No, she's in Salt Lake City.
23　　Q.　Okay.  So she was in Salt Lake City at the
24　time that you reported to her?

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

**Henry vs. Delta  KIRCHER**                              **11/18/2010**

Page 13

```
 1        A.    Correct.
 2        Q.    Did you have anybody locally that you
 3   reported to?
 4        A.    No.
 5        Q.    Okay.  Can you describe what your duties
 6   are as HR generalist?
 7        A.    Sure.  Pretty much everything that has to
 8   do with people.  You know, we have administrative action
 9   or discipline process, hiring, reorganizations, handle
10   complaints, employee relations.
11        Q.    Okay.  And what positions do you support in
12   a HR capacity?
13        A.    Airport Customer Service employees.
14        Q.    Did you do anything to prepare for this
15   morning's deposition?
16        A.    Yes.
17        Q.    What do you do?
18        A.    I reviewed my notes from the case and met
19   with these (indicating) two yesterday.
20        Q.    Okay.  Other than counsel, did you talk to
21   anyone about your deposition?
22        A.    No.
23        Q.    Anybody at Delta, any of your management
24   personnel, outside of the presence of counsel?
```

**AMS DEPO**

**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                              **11/18/2010**

Page 14

```
 1        A.    I let them know, my boss, what I was doing,
 2   yes.
 3        Q.    Okay.  Did you have any substantive
 4   discussion about your deposition with your boss?
 5        A.    No.
 6        Q.    Just, hey, I'm going to this depo?
 7        A.    Right, so she knows where I'm at.
 8        Q.    What notes did you review in preparation
 9   for your deposition?
10        A.    The recommendation for termination letters,
11   the case notes from the Revenue Protection Unit, and I
12   believe there was a summary that I reviewed.
13        Q.    And have all those documents that you
14   reviewed been produced to counsel in this matter?
15        A.    Yes.
16              MS. MULLOY MYERS:  Dave, do you know if all
17   of those have been produced?
18              MR. CROALL:  To the best of my knowledge,
19   they all have.
20              MS. MULLOY MYERS:  Okay.
21        Q.    Any other documents that you reviewed in
22   preparation for your deposition?
23        A.    No.
24        Q.    Do you have any notes in your possession or
```

**AMS DEPO**

**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                              **11/18/2010**

Page 15

```
 1   under your control regarding Ms. Henry that have not
 2   been produced to counsel in this matter?
 3        A.    No.
 4        Q.    When did you first come to know Ms. Henry?
 5        A.    I don't remember the exact time.  I would
 6   say within the first year of my position as HR.
 7        Q.    Okay.  Do you recall how you first came to
 8   know her?
 9        A.    I do not.
10        Q.    And Ms. Henry was a --
11        A.    Customer --
12        Q.    -- Airport Customer Service --
13        A.    Correct.
14        Q.    -- Agent --
15        A.    Yes.
16        Q.    -- at CVG?
17        A.    Yes.
18        Q.    Okay.  Did you have any understanding of
19   how long she had been employed with the company?
20        A.    I don't know exactly how long, I don't
21   remember, but I know it was lengthy, 20-some years.
22        Q.    Prior to the investigation and subsequent
23   termination of Ms. Henry's employment, did you have any
24   day-to-day contact with her?
```

**AMS DEPO**

**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                              **11/18/2010**

Page 16

```
 1        A.    No, an occasional passing in the hallway or
 2   the concourse, but that's about it.
 3        Q.    With respect to disciplinary action of
 4   Customer Service employees, what role as an HR
 5   Generalist do you take?
 6        A.    I provide counsel to the leaders.
 7        Q.    And the leaders would be people in what
 8   position?
 9        A.    Managers -- well, let's start with
10   performance leaders, which is a supervisory level.  They
11   report to the manager, and the manager reports to the
12   field director.  Any one of those levels, I provide
13   counsel to.
14        Q.    Okay.  Did you ever have any discussions
15   about Ms. Henry's performance prior to June 8th of 2008?
16        A.    I had not.
17        Q.    Okay.  So the June 8th, 2008 incident was
18   the first time that you became involved in any kind of
19   disciplinary action regarding Ms. Henry?
20        A.    Yes.
21        Q.    Had you been involved in any performance
22   evaluations of Ms. Henry prior to June of 2008?
23        A.    No.
24        Q.    Okay.  So how did this issue with respect
```

**AMS DEPO**

**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 17

1   to Ms. Henry come to your attention?
2       A.    It came to my attention the day after, on
3   June 9th, from the Field Director in Cincinnati, which
4   is Paul Baird.  He gave me a heads-up that there was
5   chatter in the station about the standby list not being
6   cleared correctly by Ms. Henry, and that I should be
7   aware of it.
8       Q.    So you said there was chatter in the --
9       A.    That's what he said.
10      Q.    I'm sorry, but was the -- you said there
11  was chatter in the --
12      A.    In the station, amongst the employees, yes.
13      Q.    And "the station" refers to just the
14  terminal --
15      A.    Correct, the Airport.
16      Q.    -- at CVG?
17      A.    Yeah, the Airport Customer Service
18  employees.
19      Q.    Okay.  So chatter about a standby list not
20  being cleared properly?
21      A.    Correct.
22      Q.    That's what he said to you?
23      A.    Yes, he said that to me.
24      Q.    What are the duties of a field director,

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 19

1       A.    Agents that work the ticket counter and
2   gates.  The "low-wing" are the agents that work the
3   ramp.
4       Q.    And "tower"?
5       A.    Tower agents, they actually work in the
6   tower at the airport and have oversight of the
7   operation.
8       Q.    Now, these aren't --
9             MR. CROALL:  Air traffic controllers?
10      Q.    Yeah, these aren't air traffic controllers?
11      A.    No.
12      Q.    Okay.  So there's customer service people
13  in the tower?
14      A.    Yeah, they basically do gate plotting and
15  determine what flights go where, they determine if
16  they're going to take a delay for connecting passengers,
17  and that sort of thing.
18      Q.    Okay.  Was this first communication to you
19  about some possible issue with Ms. Henry an in-person
20  conversation you had with Mr. Baird?
21      A.    Yes.
22      Q.    Okay.  Do you recall anything else about
23  the communication other than what you just relayed?
24      A.    About the communication that --

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 18

1   what was his role within the airport?
2       A.    He has oversight, he has leadership
3   management oversight of the entire ACS Division of Delta
4   Air Lines for Cincinnati, that includes the above-wing
5   agents, below-wing agent, and the tower.
6             And I believe at time, in 2008, he had a
7   regional responsibility of smaller stations close to the
8   Cincinnati area.
9       Q.    So who is the highest level employee at
10  CVG?
11      A.    In the Airport Customer Service, in our
12  division?
13      Q.    Yes, I'm sorry.
14      A.    That would be Paul.
15      Q.    Okay.  And do you know who Paul reports to?
16      A.    He reports to Carol Zupancic.
17      Q.    Is that a man or a woman?
18      A.    Woman.
19      Q.    And what's Ms. Zupancic's position?
20      A.    She's Vice-President.
21      Q.    Now, is she stationed at CVG?
22      A.    No, Atlanta.
23      Q.    She's in Atlanta?  And you mentioned
24  "above-wing," what does that refer to?

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 20

1       Q.    Between you and Mr. Baird?
2       A.    About the standby list?
3       Q.    Yes.
4       A.    At the time, no.
5       Q.    Okay.  What happened next?
6       A.    What happened next?  In the next few days
7   nothing in regards to Ms. Henry.
8       Q.    Okay.  Did Mr. Baird at the time tell you
9   anything more about what the chatter was --
10      A.    No, huh-uh (shaking head negatively).
11      Q.    -- with respect to the standby list?
12      A.    No.
13      Q.    Okay.  Did you do anything after he gave
14  you this kind of heads-up?
15      A.    I don't recall doing anything.
16      Q.    Okay.  So what happened next?
17      A.    Well, how it -- what -- the more
18  information I got, how it came to my attention?
19      Q.    Yeah.
20      A.    Was that I received, I believe, it was two
21  ethics and compliance calls; and what those are, the
22  employees call a number in Atlanta when they have
23  concern over compliance, and those reports get routed
24  back to me, if it's in my region --

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

**Henry vs. Delta  KIRCHER**                          **11/18/2010**

Page 21

1      Q.    Um-hmm.
2      A.    -- and I received two of them on this
3  standby list issue.
4      Q.    Okay.  So there's an 800-number that goes
5  to Atlanta where employees can lodge a complaint?
6      A.    Correct.
7      Q.    And, I guess, is there someone in Atlanta
8  that monitors those calls?
9      A.    There is.
10     Q.    They figure out who those calls need to be
11  directed to?
12     A.    Correct.
13     Q.    And direct them to the appropriate
14  personnel?
15     A.    Yes.
16     Q.    So do you know who in Atlanta that was?
17     A.    I don't.
18     Q.    Okay.  So you got these calls?
19     A.    Correct.
20     Q.    Were they transferred to you, like, did you
21  actually listen to the calls?
22     A.    No, they're -- they come via document.
23     Q.    Okay.  And what do you recall about these
24  two compliance and ethic calls?

**AMS DEPO**

**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                          **11/18/2010**

Page 23

1  investigate what happened on June 8th.
2      Q.    Did you go to Mr. Baird and
3  Mr. Schmidberger separately?
4      A.    Yes.
5      Q.    Okay.  And Mr. Schmidberger's position at
6  the time was what?
7      A.    Hub Manager in Department 125, which is the
8  Above-Wing Group.
9      Q.    Now, what was Ms. Henry's position at the
10  time in June of 2008?
11     A.    Customer Service Agent.
12     Q.    Was she Above-Wing or Below-Wing?
13     A.    Above-Wing.
14     Q.    Okay.  So you said the Below-Wing people
15  are the people that work the ramp?
16     A.    Correct.
17     Q.    And what is the ramp?
18     A.    The ramp is where they load bags --
19     Q.    Okay.
20     A.    -- so that's what their responsibility is,
21  loading the bags onto the aircraft.
22     Q.    Did Mr. Schmidberger at the time report
23  directly to Mr. Baird?
24     A.    Yes.

**AMS DEPO**

**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                          **11/18/2010**

Page 22

1      A.    What I recall from them is that there was
2  concern that this flight, particular flight on June 8th,
3  the standby list was not worked correctly, that the
4  nonrev, which included George Gergits and his three
5  children, were boarded in first class over medallions,
6  and that nothing was done about it.
7      Q.    And at the time what was Mr. Gergits'
8  position?
9      A.    Performance Leader.
10     Q.    And is performance leader kind of a
11  first-line supervisor --
12     A.    Yes.
13     Q.    -- for the Customer Service Agent?
14     A.    Yes.
15     Q.    And do you recall who made these two calls
16  to the Ethics and Compliance line, or were they
17  anonymous?
18     A.    I don't recall.  I don't believe they were
19  anonymous.  I don't remember who it was.
20     Q.    So upon receiving these two ethics calls,
21  what did you do?
22     A.    I went back to Paul Baird and Gary
23  Schmidberger, who was the manager at the time, and let
24  them know I was going to look into this further and

**AMS DEPO**

**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                          **11/18/2010**

Page 24

1      Q.    All right.  Do you recall anything further
2  about your communication with Mr. Baird?  I mean, did
3  you say anything else to him, other than I got these
4  calls and I'm going to investigate them?
5      A.    I don't remember saying anything more, I
6  don't remember.
7      Q.    Okay.  Do you recall what Mr. Baird's
8  response was?
9      A.    I don't.
10     Q.    All right.  And what do you recall saying
11  to Mr. Schmidberger?
12     A.    The same thing, that I got these calls and
13  about the situation, and I'm going to look into it
14  further.
15     Q.    And did Mr. Schmidberger have any response?
16     A.    I don't remember.
17     Q.    Okay.  So what did you do next after you
18  advised Mr. Baird and Mr. Schmidberger that you were
19  launching an investigation into these two ethics hotline
20  calls?
21     A.    I determined who I wanted to speak to in
22  the investigation, I wrote down their names and began
23  the process of finding out what their schedule was.
24     Q.    So what were you investigating?

**AMS DEPO**

**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 25

```
 1      A.    I was investigating what happened on June
 2  8th.
 3      Q.    And how did you determine who you wanted to
 4  speak to?
 5      A.    Well, I looked at who worked -- who was the
 6  lead agent that had responsibility of the gate area --
 7      Q.    Um-hmm.
 8      A.    -- and leads typically have responsibility
 9  for more than one flight.  And I wanted to talk to the
10  lead on duty that morning and find out how the work was
11  assigned.
12      Q.    Um-hmm.
13      A.    (Continued)  And, of course, I planned on
14  talking to Rachelle and George, as well; however, I
15  don't recall anybody else.
16            I know I talked to Harold Christiansen, who
17  was a lead, but I can't remember why I talked to him.
18  He may have been in the Ethics Compliance call.
19      Q.    What was his first name?  Henry?
20      A.    Harold.
21      Q.    Harold Christiansen?
22      A.    (Nodding head affirmatively).
23      Q.    So who was the lead on duty that you spoke
24  to?
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 26

```
 1      A.    The one that had oversight of the flight?
 2      Q.    Yes.
 3      A.    That would have been Rick Andre, A-N-D-R-E.
 4      Q.    So is his position the same as George
 5  Gergits'?
 6      A.    No.  It's a front-line position that has
 7  operational oversight, if you will, of the agents, but
 8  purely operational.
 9      Q.    So what do you mean by that?
10      A.    They don't have any administrative action
11  or evaluation-type responsibilities; they just make sure
12  the operation is running smoothly.
13      Q.    And how were leads assigned to flights?
14      A.    I don't know the answer to that.
15      Q.    Okay.  How did you determine that Rick
16  Andre was the lead over the June 8th, 2008 San Diego
17  flight?
18      A.    I got that information from Gary.
19      Q.    When did you get that information from
20  Gary?
21      A.    I don't remember exactly when.  After I
22  started the investigation, I went to Gary for their
23  schedules and -- you know, first of all, I had to find
24  out who was involved, and that's who I got the
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 27

```
 1  information from.
 2      Q.    What did he tell you at that time?  Did you
 3  have a conversation with him at that time?
 4      A.    No, I basically asked him who was on duty,
 5  who made the schedule, who assigned Rachelle to the
 6  gate, and what their work schedules were, and that's,
 7  you know, how I get my information, is from the leaders,
 8  and that's what I got from Gary.  I don't recall any
 9  other conversation.
10      Q.    Who was the first person that you spoke to
11  as part of this investigation?
12      A.    Oh, I don't remember.  I spoke to them all
13  pretty closely together, I don't remember who was first.
14      Q.    Okay.  What do you recall about your
15  conversation with Rick Andre?
16      A.    What I recall about my conversation with
17  Rick, Rick had oversight of the gate area, and what
18  stands out, what I remember from my conversation with
19  him, is that he said that it was busy on that morning
20  and he had went to Rachelle and offered her some
21  assistance and Rachelle said to him that she had a hung
22  seat, and he offered to fix it, and she said, no, I got
23  it.
24            And the other thing I recall from Rick, in
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 28

```
 1  my conversation with him, is that the way that the
 2  standby list was worked that morning was very unusual
 3  from his perspective.
 4      Q.    What is a hung seat?
 5      A.    A hung seat is when you go in -- an agent
 6  goes in and blocks a seat, actually books it as if
 7  they're booking it so nobody else can book it, as a
 8  passenger, and then doesn't end the record, and then it
 9  gets hung.  And once it's hung, there's an entry that
10  they put into the computer to release it so it's back in
11  inventory.
12      Q.    How often are there hung seats on flights?
13      A.    I don't know.
14      Q.    Did you do any investigation to determine
15  how often there would be hung seats on outgoing flights?
16      A.    No, I never even heard of it before this
17  incident.
18      Q.    So you didn't know if it was a fairly
19  routine --
20      A.    I didn't know.
21      Q.    -- matter?
22      A.    Correct.
23      Q.    So you recall Mr. Andre saying that the way
24  the standby list was worked that morning was unusual?
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                11/18/2010

Page 29

1    A.    Yes.
2    Q.    Did you ask him to elaborate?
3    A.    What I remember is him saying -- he walked
4    me through the -- all the -- the computerized keystrokes
5    of what -- how the standby list was worked and explained
6    that to me, and said it's unusual that six medallions
7    would have been boarded in coach, and then boarding
8    nonrevs on a West Coast flight without -- after
9    discovering that there's first classes was available,
10   going back on the airplane and upgrading those
11   medallions.
12   Q.    I'm sorry, what was the last part?
13   A.    Going back on the flight after they've
14   boarded, and upgrade them from coach to first class.
15   Q.    It would be unusual --
16   A.    It would be unusual not to do that, and put
17   nonrevs up there instead.
18   Q.    So Mr. Andre said it would be unusual after
19   medallions were boarded --
20   A.    It would be unusual to put nonrevs in first
21   class, instead of upgrading them from coach to first
22   class.
23   Q.    And what are medallions?
24   A.    They're a high-value customer, frequent

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                11/18/2010

Page 30

1    flyer.
2    Q.    And how is that defined?  Is there a
3    certain number of miles or --
4    A.    There is, but I don't know what that is.
5    Q.    And would that be a complimentary upgrade
6    to the medallion member?
7    A.    I don't know the answer to that.
8    Q.    I mean, is there any additional revenue by
9    moving a medallion member from coach to first class?
10   A.    I don't know.
11   Q.    Did Mr. Andre indicate whether or not the
12   medallion members were already on board --
13   A.    Yes.
14   Q.    Hold on.
15   A.    Sorry.
16   Q.    Let me finish my question.  Did Mr. Andre
17   indicate whether or not the medallion members were
18   already on board when the nonrev passengers were seated?
19   A.    Yes.
20   Q.    What did he say about that?
21   A.    All I recall him saying is they were on
22   board.
23   Q.    Okay.  Now, once passengers have boarded
24   the plane, do you know whether they would typically be

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                11/18/2010

Page 31

1    moved after they have boarded the flight?
2    A.    From my experience, yes.  The gate agent on
3    the board, the flight attendants, will know who they
4    are, page them, and offer them a first-class seat.
5    Q.    After they're already on the plane?
6    A.    Yes.
7    Q.    And when was your experience from?
8    A.    I see it all the time, I fly a lot.
9    Q.    So do the gate agents come down to the
10   plane and move people around?
11   A.    Yes, they do.  In fact, I've been one
12   that's been asked to move up front after I've been on.
13   Q.    Were you flying nonrev?
14   A.    I don't remember.  I fly company business
15   when I fly nonrev, I don't recall if I was nonrev-ing.
16   Q.    And is company business also a nonrev?
17   A.    No, it's positive space.
18   Q.    What's the difference between nonrev and
19   positive space?
20   A.    It means you actually have a seat, you
21   don't have to stand by for the flight.
22   Q.    Okay.  But do you pay for the ticket?
23   A.    No.
24   Q.    Is there a policy that requires a boarded

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                11/18/2010

Page 32

1    medallion member to be moved or upgraded to first class
2    before nonrevenue passengers are put on the flight?
3    A.    I believe there is, but I don't know for
4    sure.
5    Q.    Are there policies in place with respect to
6    getting a flight off on time?
7    A.    I believe so.
8    Q.    Do you know what kinds of delays may be
9    caused by moving passengers from coach to first class
10   after the plane has been boarded?
11   A.    No.  It's a fairly quick process.
12   Q.    Do you know how much time it takes?
13   A.    A couple minutes.
14   Q.    Would the agent have to come down the ramp,
15   get onto the plane, make the changes --
16   A.    Or --
17   Q.    -- and get off of the ramp?
18   A.    They can, or they can call, they can call
19   the flight attendant and ask the flight attendant to do
20   it.
21   Q.    Do you know how many people were working
22   the San Diego flight on June 8th, 2008, in addition to
23   Ms. Henry?
24   A.    I don't recall anybody else working it.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 33

```
 1        Q.    So if there's only one agent at the gate,
 2   should they leave the gate to go on to board the flight
 3   to make seating changes?
 4        A.    I don't know the answer to that.  There's
 5   one agent that works the flight, at the time, and there
 6   are other people that assist.
 7        Q.    Was there anybody assisting Ms. Henry on
 8   that June 8th, 2008 flight?
 9        A.    I would say Rick Andre was the one that was
10   assisting.
11        Q.    And was he there at the gate?
12        A.    I don't know.
13        Q.    So when you interviewed Mr. Andre, he
14   opined that he thought it was unusual that six medallion
15   members would be boarded in coach?
16        A.    That were on the first-class standby list,
17   yes.
18        Q.    Do medallion members sometimes want just to
19   get on the plane and will take a coach seat?
20        A.    I can't answer that.  Sometimes; sometimes
21   they'll wait, because they really want that first-class
22   seat.
23        Q.    But sometimes they'll just board?
24        A.    I imagine, but I don't know the answer.  I
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 34

```
 1   know they will board if an announcement is made that
 2   first class is checked in full.
 3        Q.    Okay.  And will they board before that
 4   announcement is made?
 5        A.    I don't know.
 6        Q.    What else did Mr. Andre tell you?
 7        A.    I can't remember anything else.
 8        Q.    Okay.  What happened next?
 9        A.    I spoke to the other two agents, as I
10   mentioned, Harold and Pae, P-A-E.
11        Q.    Now, who is Pae?
12        A.    She was the lead agent on duty that made
13   the assignment, assigned the agents to the gates -- or
14   the flights that they were responsible to work that
15   morning.
16        Q.    And that's Pae Caudill?
17        A.    Correct.
18        Q.    So how was her role different than Rick's?
19        A.    She has the same role.  That morning,
20   particularly, she was the one that made the gate
21   assignments.
22        Q.    Why did you speak with Pae Caudill?
23        A.    Because Gary told me she was the one that
24   made the gate assignment.
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 35

```
 1        Q.    Why did you want to speak to the person who
 2   made the gate assignment?
 3        A.    To find out if -- how she was awarded -- or
 4   not "awarded," but assigned to the gate.  I wanted to
 5   find out if George had asked her to assign Ms. Henry to
 6   the gate.
 7        Q.    And why did you want to find that out?
 8        A.    Because I wanted to find out what role
 9   George played in the situation.
10        Q.    When you began your investigation, were you
11   investigating Mr. Gergits?
12        A.    Yes.
13        Q.    Were you investigating Ms. Henry?
14        A.    Yes.
15        Q.    What were you investigating Mr. Gergits
16   for?
17        A.    I wanted to find out what role he played in
18   this and if he had asked Rachelle to do what she did.
19        Q.    Which was what?
20        A.    Hang the first-class seat so that they were
21   not assigned to other customers and place him and his
22   family in first class, because he was nonrev-ing that
23   day.
24        Q.    And was there a first-class seat that was
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 36

```
 1   hung, or was it a coach seat?
 2        A.    First class.
 3        Q.    And how many first-class seats?
 4        A.    Three.
 5        Q.    You believe three first-class seats were
 6   hung?
 7        A.    Yes.
 8        Q.    And how often are first-class seats hung
 9   during the boarding of a flight?
10        A.    I don't know the answer to that.  In this
11   particular case, I know that these were hung two hours
12   approximately before the flight departed.
13        Q.    Okay.  Did you do any investigation to find
14   out on similar flights how often seats would be hung?
15        A.    No.
16        Q.    Did you do any investigation to find out
17   why seats might be hung?
18        A.    No, because I knew that what happened there
19   was that seats were blocked, they were protected, and
20   that happens all the time.  The "hung" term was all new
21   to me at the time.
22        Q.    Okay.  But the term, calling it "hung," was
23   a new term to you?
24        A.    Um-hmm (nodding head affirmatively).
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010 — Page 37

1  Q. But you knew that it was a frequent
2  practice for seats to be blocked?
3  A. Correct, if there was an operational need
4  to block them.
5  Q. Okay. But what kinds of operational needs
6  would arise?
7  A. Another flights cancels.
8  Q. So if another flight cancels, why
9  would that cause a need to block seats on another
10  flight?
11  A. So that you protect seats for passengers
12  that need to get to a similar destination or if they can
13  connect to that destination on the flight that you are
14  protecting the seats.
15  Q. On the morning that a flight boards, do you
16  know how many seats are bought -- new seats are bought
17  the morning a flight leaves?
18  A. No, I don't.
19  Q. Is that fairly usual that flight -- new
20  tickets are bought the morning of the departure?
21  A. I wouldn't think so.
22  Q. What other operational needs would cause an
23  operational need to block seats?
24  A. Other than a flight cancelation, I really

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010 — Page 38

1  don't know, or if there's a weather perhaps, that's all
2  I really can say.
3  Q. Okay. How does a flight -- or a customer
4  service agent work on boarding a flight? When are they
5  assigned to the gate?
6  A. I don't know exactly.
7  Q. Okay.
8  A. (Continued) I would say an hour before
9  departure --
10  Q. Okay.
11  A. -- that they report to the gate.
12  Q. They report to the gate?
13  A. Correct.
14  Q. And then what do they start doing?
15  A. I don't know.
16  Q. You don't know?
17  A. I really don't. I mean, I've never been a
18  gate agent.
19  Q. Okay.
20  A. (Continued) I imagine they prepare for the
21  flight.
22  Q. Okay. Do you know if there's any proactive
23  work that goes into looking at who's scheduled to be on
24  that flight, and looking at seating arrangements, and

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010 — Page 39

1  looking at whether changes are going to need to be made?
2  A. No. I know they work back-to-back flights,
3  so I don't know how much time they have for any real
4  preparation, if you will.
5  Q. Okay. So you're not familiar with what
6  preparatory work might go into boarding a flight and
7  getting it off on time?
8  A. Not in a level of detail, no.
9  Q. Okay. So what do you recall you and Pae
10  discussing?
11  A. Pae -- what I recall from talking to Pae is
12  that she said that George had asked her to assign
13  Rachelle to the flight.
14  Q. Okay. What else do you recall?
15  A. That's all I really remember. I don't
16  recall anything else.
17  Q. Well, did Pae change her recollection at
18  some point?
19  A. Not that I'm aware of.
20  Q. Okay. Anything else you recall about your
21  conversation with Pae Caudill?
22  A. I don't.
23  Q. And you said you also spoke with Harold
24  Christiansen?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010 — Page 40

1  A. Correct.
2  Q. I don't know why I want to call him Henry.
3  And why did you interview Harold?
4  A. You know, I don't remember.
5  Q. Okay. What do you recall about your
6  interview with Harold?
7  A. I don't remember. I don't recall my
8  conversation with him.
9  (Off-the-record discussion.)
10  (Kircher Deposition Exhibit No. 1 was
11  marked for identification.)
12  Q. I'm going to hand you a document and first
13  just ask you if you can recognize it or if you can
14  identify it?
15  A. (Reviewing document). I'm sorry, did you
16  ask me a question?
17  Q. Sure.
18  A. Okay.
19  Q. If you can take a look at what has been
20  marked as Exhibit 1 --
21  A. Okay.
22  Q. -- review it and then let me know if you
23  recognize the document or can identify it?
24  A. Yes. Yes, these are my notes.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010

Page 41

```
 1      Q.    Okay.  So this is your handwriting?
 2      A.    Yes.
 3      Q.    Okay.  And these are your notes from the
 4  Henry and Gergits investigation?
 5      A.    Correct.
 6      Q.    All right.  They're kind of light and I'm
 7  wondering if we can just kind of go through it --
 8      A.    Sure, okay.
 9      Q.    -- and you can help me figure them out.  So
10  June 30, '08, is that the date that you reported these?
11      A.    That's the date that I spoke to the agents.
12      Q.    Okay.  All right.  And it looks like a
13  Patsy Zimmerman.
14      A.    Correct.
15      Q.    I think it might be easier, would you mind
16  just reading your notes?
17      A.    I can try.
18            MR. CROALL:  It would -- would the
19  originals help?  It might be a little more
20  legible.
21            MS. MULLOY MYERS:  Yeah, yeah, sure.
22            (Off-the-record discussion.)
23      Q.    Okay.  So we are starting with "Patsy."
24      A.    Okay.  Patsy dropped by the Orlando flight.
```

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010

Page 42

```
 1  Where's Rachelle?  George -- "GG" stands for George
 2  Gergits.
 3      Q.    Okay.
 4      A.    -- asked Rachelle to work his flight.
 5  Caron Mindel announced in briefing.  Pae was at 5:30
 6  briefing.  George behind gate constantly, he's asking --
 7  at her gate two or three hours always, carrying on like
 8  they always do, people watched because he asked Rachelle
 9  to work the flight.  I'm not sure what "PVR" stands for.
10  "SNA" is Orange County.
11      Q.    So one's PVR and then PG (sic) --
12      A.    Well, "PZ," she was working that flight,
13  Patsy Zimmerman was working that flight, PVR flight.
14      Q.    Which is?
15      A.    I don't know.
16      Q.    Is that an airport?
17      A.    It's a city code --
18      Q.    City code, okay.
19      A.    -- but I don't know what is it.
20      Q.    Okay.
21            (Off-the-record discussion between Ms.
22      Mulloy Myers and Rachelle Henry.)
23      Q.    Puerto Vallarta, is that what "PVR" stands
24  for?
```

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010

Page 43

```
 1      A.    Sorry.
 2      Q.    That's all right.
 3      A.    The next one is -- I knew that one, that's
 4  Orange County.
 5      Q.    "SNA" is Orange County?
 6      A.    Yeah.  Rachelle assigned first-class seats
 7  over medallions.  One hung.  Standard practice to AQ.
 8      Q.    What's "AQ"?
 9      A.    That's the entry to unhang it, if you will.
10            (Off-the-record discussion between Mr.
11      Croall and the witness.)
12      A.    "SNA" should have been "SAN."
13      Q.    Okay.  Which is the San Diego flight?
14      A.    Correct.  (Continued)  Not unusual to
15  assign Rachelle Henry to gate, however perception of
16  Rachelle and George had a close relationship.
17      Q.    Okay.
18      A.    (Continued)  Heard G. Bowman (phonetic),
19  Kevin Clark to work secondhand.  Then below that it
20  said, did George ask him to work the flight?  In
21  parenthesis, KC not here.
22      Q.    Okay.  Did Harold (sic) Bowman and Neil
23  Clark, what did you say?
24      A.    It's Gary Bowman and Kevin Clark.
```

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010

Page 44

```
 1      Q.    Kevin Clark, okay.  To work, what, on the
 2  San Diego flight?
 3      A.    Yeah, they -- he -- I asked her if George
 4  had asked them to work the San Diego flight, because
 5  evidently Gary, particularly, was taking a package and
 6  leaving the company.
 7      Q.    At the time?
 8      A.    Yes.
 9      Q.    I'm sorry, Gary who?
10      A.    Bowman.
11      Q.    Okay.  And why was he leaving the company?
12      A.    At the time we were offering packages.
13      Q.    Oh, just like a volunteer RIF?
14      A.    Yeah, voluntary RIF, in conjunction with
15  retirement.
16      Q.    Okay.  So what Patsy Zimmerman is saying
17  that she had heard that Bowman and Kevin Clark --
18      A.    She heard, secondhand, they were asked to
19  work the flight.
20      Q.    By whom?
21      A.    By George.
22      Q.    Okay.  And then "KC," that is Kevin Clark?
23      A.    Correct.
24      Q.    Not here?
```

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                     11/18/2010

Page 45

1     A.    Correct.
2     Q.    So what did that mean, or what do you
3  recall that referencing?
4     A.    I don't recall, other than maybe he wasn't
5  there that morning --
6     Q.    Okay.
7     A.    -- but I don't know.
8     Q.    And Patsy's position, I think you might
9  have told me, but what was it?
10     A.    Customer Service Agent.
11     Q.    So she was a peer of Ms. Henry?
12     A.    Correct.
13     Q.    Okay.  What's BS/B4 (sic)?
14     A.    Okay, B2/B4 --
15     Q.    Oh, sorry.  Is that the gate number?
16     A.    That's the gate number.
17     Q.    No first-class check-in-full announcement;
18  what did that mean?
19     A.    I asked her if she heard there was an
20  announcement was made, and she said -- and I wrote down
21  no, she didn't hear it.
22     Q.    So what was B2/B4, is it the San Diego --
23     A.    It's the flight -- there's a concourse down
24  at the very end, they're all very close together --

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                     11/18/2010

Page 46

1     Q.    Yeah.
2     A.    -- and it was in that low gate, B2/B4 area.
3     Q.    Okay.  So San Diego was one of those gates?
4     A.    Yes.
5     Q.    And what, was Patsy working the other gate?
6     A.    She was in the area, I don't know where she
7  was working.
8     Q.    Okay, all right.  So you asked her if she
9  heard an announcement?
10     A.    Correct.
11     Q.    And she said she didn't?
12     A.    She did not.
13     Q.    Why did you ask her that?
14     A.    Because I wondered why the six medallions
15  boarded so quickly together at the same time.
16     Q.    Okay.  Okay.  So you were asking if she'd
17  heard an announcement, because that would have -- if an
18  announcement was made that first class was full, you
19  would perhaps expect the medallions then to go ahead and
20  get on board?
21     A.    Correct.
22     Q.    And she said she had not heard such an
23  announcement?
24     A.    No.

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                     11/18/2010

Page 47

1     Q.    Okay.  And what's your next line there?
2     A.    First class board, watching the screen --
3     Q.    Yeah.
4     A.    -- boarded to get bags on.  Not against
5  policy to put nonrevs when check-in standby boarded.
6     Q.    Okay.
7     A.    (Continued)  Because I think I asked her
8  what was the policy, and she said it's not against the
9  policy to do that.
10     Q.    Okay.  Let me back you up a little bit.
11     A.    Okay.
12     Q.    So first class board.  What does that mean,
13  "watching the screen"?
14     A.    "Watching the screen," I think Patsy was
15  watching the screen.
16     Q.    Or do the first-class people watch the
17  screen, or the people waiting for first class?
18     A.    I don't remember.
19     Q.    Okay.  And then what was she saying,
20  boarded to get bags on?
21     A.    (Reviewing document).  Other than what's
22  written there, I don't remember.
23     Q.    Okay.  Did she tell you that sometimes
24  people on standby for first class will go ahead and

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                     11/18/2010

Page 48

1  board so they can get their bags on the plane and take
2  their seat?
3     A.    Well, I wrote, not against policy to put
4  nonrevs when checked -- standby boarded, so.
5     Q.    Okay.
6     A.    (Continued)  Yeah, I'm sorry, I can't
7  elaborate on that one.
8     Q.    So you asked Patsy if it was against Delta
9  policy to board revs into first class once the people
10  who were on the standby for upgrades to first class went
11  ahead and boarded the plane?
12     A.    It appears that way.
13     Q.    All right.  And she said, in her opinion,
14  it was not?
15     A.    Correct.
16     Q.    Okay.  And then what's the next line there?
17     A.    It says George did not want first class, he
18  wanted seats together.
19     Q.    Do you recall talking to her about that,
20  Ms. Zimmerman?
21     A.    I recall talking to her.  I don't -- I
22  mean, that's what she told me.  I don't know --
23     Q.    Okay.
24     A.    -- any (witness did not complete response).

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 49

1      Q.    So do you know where she developed that
2  knowledge or opinion that George wasn't looking for
3  first class, but just seats together?
4      A.    Yeah, I don't know.
5      Q.    Okay.  Now, George Gergits would have been
6  Ms. Zimmer's (sic) supervisor?
7          MR. CROALL:  Is it Zimmer or Zimmerman?
8          THE WITNESS:  Zimmerman.
9          MS. MULLOY MYERS:  Oh, sorry.
10         MR. CROALL:  That's all right.
11     A.    Not necessary, there are several
12  performance leaders, and it depends on -- each of them
13  have a group of agents that are assigned to report to
14  them; so she could report to him or somebody else.
15     Q.    All right.  How are agents assigned to the
16  performance leaders?
17     A.    Usually it's by shift.  You know, they're
18  assigned -- we want the performance leader to have the
19  agents that work the same shift as the performance
20  leader on duty, and they do that via a bid.
21     Q.    Okay.  And does it stay pretty constant,
22  like the people on one shift stay on that shift?
23     A.    It changes every six months.
24     Q.    Every six months, all right.  But if

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 50

1  somebody for some reason worked a variant shift, would
2  they report to that performance leader on that shift?
3      A.    Correct.
4      Q.    Okay.  So in essence, the performance
5  leaders are in management positions above the gate
6  agents?
7      A.    Yes.
8      Q.    All right.  And then GG behind podium?
9      A.    This is Patsy telling me George was behind
10  the podium, he had to know there were six medallions on
11  the standby list.
12     Q.    So what does that mean, "behind the
13  podium"?
14     A.    There's a podium at each gate --
15     Q.    Right.
16     A.    -- and behind that, which is where Rachelle
17  would have been working, she saw him behind that.
18     Q.    Okay.  So the podium is basically the desk
19  that the gate agent stands behind --
20     A.    Correct.
21     Q.    -- with their computer --
22     A.    Right.
23     Q.    -- and their work tools --
24     A.    Yes.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 51

1      Q.    -- okay, that will take --
2          MS. HENRY:  To make you check your bag.
3          (Off-the-record discussion.)
4      Q.    All right.  So were you asking her
5  questions or was Ms. Zimmerman volunteering information
6  to you, do you recall?
7      A.    Both.
8      Q.    Okay.  Did you ask her about that, where
9  George was standing when he was waiting to board the San
10  Diego flight?
11     A.    I don't remember if I asked her or if she
12  volunteered that information.
13     Q.    Okay.  And then there's a note in the
14  margin?
15     A.    Um-hmm (nodding head affirmatively).
16     Q.    It says --
17     A.    Oh, yeah, that, I do remember.  I asked her
18  if she was wearing his badge, and she didn't know.
19     Q.    And that would be his Delta badge?
20     A.    Correct.
21     Q.    Okay.  Showing that he was an employee?
22     A.    Correct.
23     Q.    And then your next notes look like two open
24  first class and one hung?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 52

1      A.    Correct.
2      Q.    What do you recall about that?
3      A.    I believe that's what she told me there
4  was.
5      Q.    Now, Ms. Zimmerman wasn't working this
6  flight, correct?
7      A.    Correct.  But they can see, they have
8  computer access, they can see what's going -- what's
9  being transpired in the computer.
10     Q.    Okay.  Do gates agents routinely look at
11  that?  Are they paying attention to what openings other
12  flights have?
13     A.    I would say no.
14     Q.    Okay.  Do you know why she apparently knew
15  that there were two open first class and one hung on
16  this San Diego flight?
17     A.    Yes, there was attention at this particular
18  flight, because there was chatter that George was
19  asking -- and jokingly asking other agents that were
20  taking a package to work this particular flight that he
21  was nonrev-ing on, because he wanted to get in first
22  class, so they were paying attention to it.
23     Q.    Would that be appropriate for a manager to
24  ask the gate agents to put him in first class?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 53

1    A.    No.
2    Q.    Why would that be inappropriate?
3    A.    Because that's not something they control.
4    Q.    Something who controls?
5    A.    The gate agents.  They have procedures that
6    they follow.  They can't arbitrarily put somebody in
7    first class and supersede the procedures.
8    Q.    And who told you that George was asking
9    agents who were taking the package to put him in first
10   class?
11   A.    I can't remember specifically.  It may have
12   been one of these folks that I spoke to.
13   Q.    Um-hmm.
14   A.    (Continued)  But I don't remember
15   specifically.
16   Q.    Do you think that would violate Delta
17   policy for a manager to ask a gate agent to place them
18   in first class?
19   A.    Yes.
20   Q.    What policy would it violate?
21   A.    Well, first of all, George is a performance
22   leader --
23   Q.    Right.
24   A.    -- so as a leader, it would be

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 54

1    inappropriate for him to ask an agent that reports to
2    him, excuse me, or a level below him, to do something
3    that is not right by the company.
4    Q.    Okay.  And is there a second?  You said --
5    you began your answer with "first of all"?
6    A.    Oh, I'm sorry.  I mean, it's common
7    knowledge you just don't -- you don't manipulate the
8    seats, if you will.
9    Q.    Okay.  So you don't ask for it?
10   A.    Correct.
11   Q.    And if it happens, great?
12   A.    Exactly.
13   Q.    As an employee, are you prohibited from
14   taking an upgrade?
15   A.    No.
16   Q.    Obviously not, because you mentioned
17   earlier that you can -- that you've been upgraded to
18   first class?
19   A.    Oh, yeah, employees can stand by for first
20   class, absolutely.  And if they're awarded it, then
21   they're not prohibited from it.
22   Q.    Okay.  And sometimes when you're waiting --
23   if you're on standby for first class, is it sometimes a
24   waiting game to see whether it opens up?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 55

1    A.    Yes.
2    Q.    And the last person standing, can they
3    sometimes be awarded those seats?
4    A.    It can happen.
5    Q.    Because they've waited to kind of see what
6    happens?
7    A.    Not because they've waited, because they're
8    next in line --
9    Q.    Okay.
10   A.    -- and that's by seniority.
11   Q.    And what do you mean by that?
12   A.    When you get to the nonrevenues --
13   Q.    Yeah.
14   A.    -- which are our employees --
15   Q.    Yeah.
16   A.    -- or retirees, or whoever is on their pass
17   privileges, it goes by your hire date; the more senior
18   you are, you are next in line, if you will.
19   Q.    Okay.
20   A.    (Continued)  Senior to most junior.
21   Q.    Got it.
22   A.    (Continued)  That's how the nonrevenue list
23   is worked, for open seats, coach or first class.
24   Q.    All right.  So the standby list, the

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 56

1    preference goes first to whom?
2    A.    Revenue standby.
3    Q.    And then nonrev by seniority?
4    A.    Correct.
5    Q.    Is there anybody else that fits in there?
6    A.    No, it's either revenue or nonrevenue.
7    Q.    Okay.  And how do the revenue people get on
8    the standby list?
9    A.    I don't know specifically, I really don't
10   know how they actually get on the standby list.
11   Q.    Okay.  And if a revenue passenger is
12   upgraded to standby, is there a charge for that to that
13   revenue customer?  I mean, are they paying for the
14   upgrade?
15   A.    They may, they may not, I don't know.
16   Q.    Okay.  Okay.  I'm sorry, I can't make out
17   the next line.
18   A.    Okay, where were we at?
19   Q.    We were under two open --
20   A.    Okay.
21   Q.    -- first class and one hung.
22   A.    Oh, I don't know what that first word is.
23   I'm not sure what that first word is.  It says at Row 11
24   perception of -- oh, medallion, okay, it's my

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta KIRCHER | 11/18/2010 |
|---|---|

Page 57

1  abbreviation. Medallion at Row 11, perception of
2  medallion seeing George's family on the flight.
3       Q.    What -- do you recall what that was all
4  about?
5       A.    I think that was her telling me that.
6       Q.    Telling you what?
7       A.    That she believes there was a medallion at
8  Row 11, and they may have seen George and his family
9  board the flight.
10      Q.    And how would that have --
11      A.    In first class. They may have seen --
12 since Row 11 is right, you know, close to the first
13 class cabin --
14      Q.    Yeah.
15      A.    -- they may have seen him and his family
16 seated in first class, that's what that means.
17      Q.    Okay. And would that medallion person have
18 any idea who George and his family were?
19      A.    They may.
20      Q.    How would they know? How would they know
21 that?
22      A.    He was -- if he was behind the podium, if
23 he was wearing his ID.
24      Q.    Okay. But that --

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta KIRCHER | 11/18/2010 |
|---|---|

Page 58

1       A.    (Continued) Sometimes they know who the
2  nonrevenues are, that they're employees.
3       Q.    But did anybody talk to this medallion
4  member?
5       A.    No, not that I'm aware of.
6       Q.    Okay. Did Delta receive any complaints
7  from any passengers on this flight?
8       A.    Not that I'm aware of.
9       Q.    Okay. And would you expect that would you
10 have been made aware of that as part of your
11 investigation?
12      A.    No.
13      Q.    Okay. Who would know if passengers had
14 complained about the boarding of this flight?
15      A.    It goes to Atlanta; customer -- whether
16 it's complaints or compliments, they go to Atlanta, and
17 then they're distributed to the leader.
18      Q.    The leader of CVG would have been?
19      A.    Their direct supervisor or performance
20 leader.
21      Q.    Okay. And did any of the performance
22 leaders at CVG receive complaints from passengers on
23 this flight about the boarding of the flight?
24      A.    I don't know.

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta KIRCHER | 11/18/2010 |
|---|---|

Page 59

1       Q.    Did you inquire as part of your
2  investigation?
3       A.    I did not.
4       Q.    Okay. So then the next line is typically
5  RH, I guess that's Rachelle Henry?
6       A.    Um-hmm (nodding head affirmatively). Would
7  have been able to handle it differently. And then it
8  goes right in line with the next one, if we have time,
9  we move them up.
10      Q.    Okay. So "if we have time"?
11      A.    Um-hmm (nodding head affirmatively).
12      Q.    We move who up? We move the standby list
13 up?
14      A.    That's referring to the medallions.
15      Q.    Okay. And if there's not time --
16      A.    I --
17      Q.    -- conversely, I guess if there's not time,
18 you don't move them up?
19      A.    I didn't ask that question.
20      Q.    Okay. But there is some -- you understood
21 from your investigation that there was some discretion
22 of the gate agent how to use as to moving the medallions
23 up on the standby list?
24      A.    Yes.

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta KIRCHER | 11/18/2010 |
|---|---|

Page 60

1       Q.    Okay.
2       A.    (Continued) And I also know that this
3  flight particularly was on holding for a connecting
4  passenger.
5       Q.    Who told you that?
6       A.    Oh, gosh, I can't remember who it was
7  specifically. It was one of the folks that I talked to,
8  I can remember who.
9       Q.    Did this flight get off on time?
10      A.    I don't know.
11      Q.    Do you know how long the flight was holding
12 for a connecting passenger?
13      A.    It was holding for a connecting passenger,
14 but I don't know exactly what time it departed, I don't
15 remember.
16      Q.    What's the next?
17      A.    Patsy Zimmerman, PZ, never been in
18 situation.
19      Q.    What situation?
20      A.    One first class nonrev, not three; you
21 know, I don't know. I don't know what that's referring
22 to.
23      Q.    Okay. What's the next line?
24      A.    The next line is not -- it looks like it

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                                11/18/2010

Page 61

1   might be unrelated.
2       Q.   Is it payroll issue?
3       A.   Payroll issue George, MSS transaction
4   incorrectly -- he put in the wrong code, how does it get
5   corrected if we didn't bring it to George's attention.
6       Q.   So is this a completely different issue?
7       A.   I think it is.
8       Q.   Were you investigating George on some other
9   matter?
10      A.   No, I think she was just trying to ask me
11  about something else, about payroll.
12      Q.   So did she have a beef or a problem with
13  George?
14      A.   It looks like she may have concerning a
15  payroll issue.  It looks like he didn't do a MSS
16  transaction; that was done incorrectly, when she brought
17  it to his attention, he didn't act on it.
18      Q.   What an MSS transaction?
19      A.   That's the computerized system that we do
20  pay-type position changes, that sort of thing.
21      Q.   Okay.  And what's MSS?
22      A.   Oh, gosh, I don't know what it stands for.
23  I honestly don't know what it stands for.
24      Q.   Okay.  But this paragraph doesn't have

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                                11/18/2010

Page 62

1   anything to do with --
2       A.   No.
3       Q.   -- Rachelle?
4       A.   Huh-uh (shaking head negatively).
5       Q.   Well, actually, let me ask it this way:
6   Does that paragraph about the payroll issue have
7   anything to do with Rachelle Henry?
8       A.   No.
9            MR. CROALL:  Kelly, since we're at the end
10  of Page 1, can we take a short break?
11           MS. MULLOY MYERS:  Sure.
12           (At which time, a recess was taken from
13           11:18 a.m. until 11:32 a.m.)
14           (Kircher Deposition Exhibit No. 2 was
15           marked for identification.)
16      Q.   Deb, we've handed you what we've marked
17  Exhibit 2, which is, I think, a little better copy --
18      A.   Okay.
19      Q.   -- of what we have been looking at as
20  Exhibit 1, so hopefully we're not ruining our eyes quite
21  so much.  But if you can turn to --
22           (Off-the-record discussion.)
23      Q.   Okay.  So looking at Page 2?
24      A.   (Reviewing document).  Okay.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                                11/18/2010

Page 63

1       Q.   We start with PA (sic) is that?
2       A.   It's actually RA.
3       Q.   That's "RA," so that refers to your
4   conversation with who?
5       A.   Rick Andre.
6       Q.   Okay.  And can you help me out?
7       A.   Didn't hear firsthand any of George's
8   comments.
9       Q.   Okay.
10      A.   (Continued) Rachelle is top notch.
11      Q.   Uh-hmm.
12      A.   (Continued) Two seats were hung.  She said
13  she would clear them.  Ten minutes before, agent asked
14  if he was aware of what's going on -- I'm sorry, it
15  looks like a "P," but it's actually an "R," RA, which is
16  Rick, Row 10, George's family -- I think he was telling
17  me they were originally in -- cleared in Row 10, him and
18  his family.
19      Q.   Which is coach or --
20      A.   It is.
21      Q.   Okay.
22      A.   (Continued) Agent said no in first class,
23  I'm not sure what that means.
24      Q.   It says agent --

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                                11/18/2010

Page 64

1       A.   Agent said no in first class, and I'm
2   sorry, I don't know what that means.
3       Q.   All right.  Was he telling you what agents
4   had told him or --
5       A.   I think so.  I'm thinking it meant agents
6   were saying that there was -- it didn't look like
7   anybody would be in first class.
8       Q.   Okay.
9       A.   (Continued) Clear one revenue standby.
10      Q.   Um-hmm.
11      A.   (Continued) I think that's a 3 -- I don't
12  know what that is, maybe the seat, 3D, and in
13  parenthesis it says Goad, that's a passenger's name,
14  last name --
15      Q.   Um-hmm.
16      A.   (Continued) Oh, no, okay, now I got it.
17  30 minutes in -- okay, Rachelle cleared one revenue
18  standby, 30 minutes, which is passenger's name of Goad,
19  and I think that's referring to Seat 4B at 8:47, 4A and
20  B were the hung seats, it says Rachelle cleared hung
21  seats in parenthesis.  4A and B hung.  Why didn't she
22  clear other standbys?  4B to 4C at 8:51.  4C to 1D 8:51.
23  I think that passenger Goad --
24      Q.   Um-hmm.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

**Henry vs. Delta   KIRCHER**          **11/18/2010**

Page 65

1      A.   -- was being moved around, and that's what
2  I was referring to in my notes, and ultimately landed in
3  seat 1D.
4          Goad boarded at 9:13.  Late connect from
5  Norfolk flight.  Authorized to hold.  Unusual for her to
6  do this.
7      Q.   Unusual for her to do what?
8      A.   Move a passenger from one first-class seat
9  to the other --
10     Q.   Okay.
11     A.   -- while others boarded, that's what is in
12 the side margin there.
13     Q.   Do you --
14     A.   (Continued)  I think what he was saying is
15 that this passenger Goad was en route, it wasn't upon
16 request.  And it's unusual to move a passenger's seat,
17 particularly from a board to bulk head seat in Row 1
18 without the passenger requesting that.
19     Q.   Well, he was being moved to better seats,
20 or different seats, or what?
21     A.   Passengers typically don't like the bulk
22 head seat.
23     Q.   What's the bulk head seat?
24     A.   It's the seat, which is 1D, where there's

**AMS DEPO**

**(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio**

---

**Henry vs. Delta   KIRCHER**          **11/18/2010**

Page 66

1  no seat in front of you, so you have to store all your
2  stuff up in the overhead bin.
3      Q.   Okay.  But does it have more leg room?
4      A.   Maybe, it depends on the aircraft.
5      Q.   And do you know if this aircraft was one
6  where the bulk head seat had more leg room?
7      A.   I don't know.
8      Q.   Do you know if a good gate agent will try
9  to anticipate passengers', particularly frequent flyers
10 or medallion members, needs and assign them to better
11 seats if they can?
12     A.   I would say that would be unusual.
13     Q.   But would it be good practice?
14     A.   Not necessarily.
15     Q.   Would it be good practice for a gate agent
16 to anticipate requests for families to be sitting
17 together, or parents to be seated with children before a
18 flight started?
19     A.   Oh, yes, yes, of course.
20     Q.   And try to make those accommodations?
21     A.   Yes, um-hmm (nodding head affirmatively).
22 Families sitting together, yes.
23     Q.   Okay.  And would a good gate agent do that
24 before the family even had to request it?

**AMS DEPO**

**(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio**

---

**Henry vs. Delta   KIRCHER**          **11/18/2010**

Page 67

1      A.   I don't know.
2      Q.   Okay.  Do you know if this San Diego flight
3  typically had groups of people flying together or
4  families flying together?
5      A.   I have no idea.
6      Q.   I mean, do Saturday morning flights
7  typically have more family travelers?
8      A.   Perhaps.  Although, this flight, I believe
9  had about 20 open seats.
10     Q.   Do you recall anything else about your
11 conversation with Mr. Andre?
12     A.   No, I really don't.
13     Q.   Now, did you talk to -- are your notes in
14 the order of when you talked to folks?
15     A.   I don't remember the order.
16     Q.   Okay.  You can turn to Page 3.
17     A.   Okay.
18     Q.   It looks like you have a date in the margin
19 of 6/16/08?
20     A.   (Reviewing document).  Correct.
21     Q.   So is that the date that you --
22     A.   Talked to them.
23     Q.   -- made these notes?
24     A.   The date that I talked to the agents.

**AMS DEPO**

**(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio**

---

**Henry vs. Delta   KIRCHER**          **11/18/2010**

Page 68

1      Q.   Okay.  And "Harold" is Harold Christiansen?
2      A.   Correct.
3      Q.   And "Pae" is Pae --
4      A.   Caudill.
5      Q.   -- Caudill?  Okay.  So Harold said he came
6  in late Monday?
7      A.   8:00 agents pulled off --
8      Q.   What does that mean?
9      A.   I don't know what that means.  Do you want
10 me to continue?
11     Q.   Yes, please.
12     A.   Okay.  (Continued)  George Bowman, which is
13 that Gary Bowman referenced earlier or someone to work
14 his flight, George asked, that's what that means.  He
15 wanted the retired guys to work the flight.
16         George asked Rachelle, which is "RH" to
17 work the flight.  Other agents are watching the flight.
18 Two weeks he asked me if I was working the schedule,
19 wanted to get retired guys to work the flight, getting
20 on the flight, so he could get on the flight, that's
21 what that refers to.  George is on cruise.  Can't
22 remember who he may have talked to other than in the
23 hallway.  Flight was not oversold two weeks out -- at
24 two weeks out the flight was not oversold.

**AMS DEPO**

**(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio**

**Henry vs. Delta  KIRCHER**                        **11/18/2010**

Page 69

```
 1        Q.    Um-hmm.
 2        A.    (Continued)  9:15 people gone from the
 3   gate.
 4        Q.    What does that reference?
 5        A.    I think that was the departure time.
 6        Q.    Um-hmm.
 7        A.    That's people gone from the gate, I don't
 8   know what else that means, other than they boarded.
 9        Q.    Okay.
10        A.    (Continued)  Not usual for them to board
11   early to not have to check bag.
12        Q.    And who is that referring to?  Is that
13   referring to --
14        A.    That's Harold telling me that.
15        Q.    And who is "them"?
16        A.    "Them," passengers.
17        Q.    Okay.  So that would include standby
18   passengers -- or I'm sorry, not standby passengers.
19   That would include passengers who were standby on first
20   class, so it wouldn't be unusual for them to go ahead
21   and board early to not have to check their bags?
22        A.    I don't know the answer to that.
23        Q.    Okay.
24        A.    (Continued)  You don't have to get them
```

**Henry vs. Delta  KIRCHER**                        **11/18/2010**

Page 70

```
 1   upgraded once on board.  However, it's unsual to put
 2   nonrevs even -- I think that up there is first class,
 3   one or two times I've seen.  Scheduled up to leads
 4   working among ourselves.
 5        Q.    And what does that refer to?
 6        A.    The -- who schedules agents to work
 7   flights.
 8        Q.    Okay.  So Mr. Christiansen's confirmed that
 9   once passengers were on board, you didn't have to
10   upgrade them, that the gate agent was not required to
11   move them into first class once they boarded the plane?
12        A.    He said you don't have to get them upgraded
13   once on board, however it's unsual to put nonrevs up
14   there, referring to first class.
15        Q.    Okay.  How many times have you been
16   upgraded as a nonrev?
17        A.    Oh, you mean once on board or just in
18   general?
19        Q.    Just in general.
20        MR. CROALL:  And you're just asking about
21   nonrev, as opposed to business travel?
22        MS. MULLOY MYERS:  Yes.
23        A.    I mean, I'm a long-time employee, it used
24   to be a lot easier.  So long ago, probably several
```

**Henry vs. Delta  KIRCHER**                        **11/18/2010**

Page 71

```
 1   times, I can't answer the exact number.
 2        Q.    Okay.
 3        A.    (Continued)  Recently, I can't remember the
 4   last time.
 5        Q.    Okay.  So recently within the past, what?
 6        A.    Year, I don't think I've even traveled.
 7        Q.    Okay.
 8        A.    (Continued)  Do you want me to continue?
 9        Q.    Sure.  So the schedule is up to the leads,
10   they work on them among themselves, and that's who
11   assigned to the gate?
12        A.    Correct.
13        Q.    All right.
14        A.    (Continued)  Some agents are bad for
15   dealing with nonrevs, for example, no seats together.
16   Not uncommon to -- I don't know what that word says.
17        Q.    Line up?
18        A.    Line up?  Oh, thank you.  Not uncommon to
19   line up agents to work flight when nonrev-ing.
20        Q.    What is that about, do you recall that?
21        A.    I believe that was about George, when he's
22   nonrev-ing, asking why we would hand select somebody to
23   work the flight, and I asked Harold that, and he said
24   it's not uncommon.
```

**Henry vs. Delta  KIRCHER**                        **11/18/2010**

Page 72

```
 1        Q.    And did you ask him if other -- if other
 2   managers flying would ask for particular gate agents or
 3   line up the gate agents?
 4        A.    I don't know if I asked him that
 5   specifically --
 6        Q.    Um-hmm.
 7        A.    -- but the fact that I wrote down "not
 8   uncommon to line up agents to work when nonrev-ing," was
 9   a similar type question.
10        Q.    Okay.  All right.
11        A.    (Continued)  And then hung up hang up, in
12   quotes --
13        Q.    Um-hmm.
14        A.    -- no one can give out seat.  That was me
15   asking him what that meant.
16        Q.    Okay.
17        A.    And then the next line, AQQ, which is the
18   entry, referring to hung up, which is the arrow, and
19   it's gone; that's the entry I referenced earlier that
20   releases the seats so that they can be assigned.
21        Q.    Okay.
22        A.    (Continued)  Agents and leaders can do it,
23   can do it and it's in common practice.
24        Q.    Okay.  To hang a seat?
```

## Henry vs. Delta  KIRCHER — 11/18/2010

Page 73

```
 1        A.    I think it's referring to the AQQ.
 2        Q.    He is also referring to the fact that it's
 3   common practice to hang up seats?
 4        A.    I think it's referring to the AQQ entry.
 5        Q.    So you wouldn't have to enter the AQQ entry
 6   unless the seat was hung?
 7        A.    Correct.
 8        Q.    Okay.  So if it's common practice to make a
 9   AQQ entry, it would be common practice to have hung
10   seats; fair to say?
11        A.    Correct, but I don't think it's common
12   practice for an agent to hang up seats, I think that can
13   happen other ways.
14        Q.    Okay.  Did you ask him that?
15        A.    I may have.
16        Q.    Okay.
17        A.    (Continued)  I was advised that, as I
18   mentioned earlier, I didn't know what hung meant before
19   the situation --
20        Q.    Um-hmm.
21        A.    -- but I don't recall if it specifically
22   came from Harold.
23        Q.    All right.
24        A.    (Continued)  Do you want me to move onto
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010

Page 74

```
 1   Pae?
 2        Q.    Not just yet.
 3        A.    Okay.
 4        Q.    Well, who, other than an agent, would hang
 5   a seat?
 6        A.    I believe customers can do it on delta.com,
 7   online, I can't tell you how, but I believe that's what
 8   I remember hearing.
 9        Q.    Okay.  So you think customers may be able
10   to hang a seat and agents can hang --
11        A.    Free them up.
12        Q.    -- or free them up?
13        A.    Correct.
14        Q.    Okay.  And who did you hear that from, that
15   customers can hang a seat?
16        A.    You know, I don't remember.
17        Q.    All right.  Pae?
18        A.    Okay.  Not working in area.  She was at
19   5:00 briefing.  Rachelle was requested to work the San
20   Diego flight, and she didn't think anything of it, which
21   was Pae.  Some agents don't take care of nonrevs.
22   Agents felt flight was underhanded.
23        Q.    Hold on, wait a minute.
24        A.    Okay.
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010

Page 75

```
 1        Q.    So not working in area; so Pae was not
 2   working in the area?
 3        A.    Correct, she was at the 5:00 briefing.
 4        Q.    Okay.  And the 5:00 briefing, is that a.m.
 5   or p m.?
 6        A.    A.M.
 7        Q.    Okay.  So she said Rachelle Henry was
 8   requested to work San Diego flight?
 9        A.    Correct.
10        Q.    By whom?
11        A.    I want to say by George, but I don't have
12   that in my notes.
13        Q.    Okay.  And she didn't think anything of it?
14        A.    Right.
15        Q.    Okay.  And then what, some agents don't --
16        A.    Don't take care of nonrevs.
17        Q.    Okay.
18        A.    (Continued)  The agents felt the flight was
19   underhanded.
20        Q.    What agents?
21        A.    The agents working that morning that were
22   watching it.
23        Q.    Who?
24        A.    I --
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

## Henry vs. Delta  KIRCHER — 11/18/2010

Page 76

```
 1        Q.    Did she name names?
 2        A.    No.
 3        Q.    Did you ask her?
 4        A.    I did not.
 5        Q.    Okay.
 6        A.    (Continued)  Or I don't remember; if I did,
 7   I didn't write it down.
 8        Q.    Okay.
 9        A.    (Continued)  Didn't hear the retiree
10   comment.
11        Q.    What was that about?  What are you
12   referencing there?
13        A.    Referencing George asking folks that were
14   going to retire or take a package to work the gate, his
15   flight.  That's referencing that she, Pae, did not hear
16   that comment.
17        Q.    And what's the next line?
18        A.    Some move, some don't when medallions are
19   boarded.
20        Q.    So what does that reference?
21        A.    I think that's referencing some move, some
22   don't when boarded -- yeah, I don't know what that's
23   referencing.
24        Q.    Okay.  Is that after the medallion has
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 77

1    boarded, sometimes they're moved and sometimes they're
2    not?
3         A.    Yeah, it could be.  That could be what that
4    is referencing.
5         Q.    Okay.  And then the next sentence?
6         A.    Connection, don't know if they're
7    connected.
8         Q.    Don't know who's connected or what's
9    connected?
10        A.    I think that's a question I asked her in
11   reference to if there's a connection between Rachelle
12   and George.
13        Q.    Okay.  Did you ask anybody else that?
14        A.    I don't remember.
15        Q.    Okay.  And when you've flown business
16   purpose -- or what did you call that when you're flying
17   for business?
18        A.    Company business.
19        Q.    Company business, have you been upgraded to
20   first class?
21        A.    I have on occasion.
22        Q.    How many times?
23        A.    I don't know.  I don't know the answer to
24   that, I fly all the time.

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 79

1         Q.    Did she take handwritten notes?
2         A.    She did.
3              MS. MULLOY MYERS:  Have those been
4    produced, do you know?
5              MR. CROALL:  I think -- well, I think she
6    took notes, they were converted to typewritten.
7    I'm not aware of any handwritten notes from Tammy
8         A.    Yes, she has -- she comes prepared with the
9    information and she makes notes on that document, and it
10   gets transitioned into the written document.
11        Q.    And that's Tammy Mauer?
12        A.    Yeah.
13        Q.    And she's out of Atlanta?
14        A.    Correct.
15        Q.    Did you interview George Gergits?
16        A.    Yes, I did.
17        Q.    And was anyone else present?
18        A.    Yes.
19        Q.    Who else?
20        A.    Tammy, Greg Kuhn, and Gary Schmidberger.
21        Q.    Did you take notes in your conversation
22   with George Gergits?
23        A.    Again, I don't remember if I did or not.
24        Q.    I'm just going to hand you a document,

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 78

1         Q.    Recently have you been upgraded when flying
2    business?
3         A.    I don't recall -- no, I've -- I mean, most
4    of the flying that I do is on regional jets that don't
5    have first class.
6         Q.    Now, did you talk to Rachelle Henry as part
7    of your investigation?
8         A.    I did.
9         Q.    Do you have handwritten notes?
10        A.    I don't think I do.
11        Q.    Did you --
12        A.    I'm sorry, I don't think I do, no.
13        Q.    Did you take notes during your conversation
14   with Rachelle Henry?
15        A.    I may have.
16        Q.    Why would you have kept the handwritten
17   notes from your interview with some but not all of the
18   people in the investigation?
19        A.    Because the interview, in the absence of
20   others, was just me, and I needed to take notes.  When
21   we talked to Rachelle, another person was responsible
22   for taking notes.
23        Q.    And who was that?
24        A.    Tammy from Revenue Protection Unit.

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 80

1    before we mark it, to see if you can identify it.
2         A.    Okay.
3         Q.    Do you know, can you identify what's been
4    marked DL000627?
5         A.    (Reviewing document).  Yeah, those are my
6    notes.
7         Q.    So these are your typewritten notes --
8         A.    Um-hmm (nodding head affirmatively).
9         Q.    -- of what?
10        A.    Of two investigations; one is the one we're
11   talking about and then a different one.
12        Q.    Okay.
13             MS. MULLOY MYERS:  Let's go ahead and mark
14   it then.
15             (Kircher Deposition Exhibit No. 3 was
16             marked for identification.)
17        Q.    All right.  We handed you what is marked as
18   Exhibit 3, and these are typewritten notes that you
19   authored, which include investigation notes from the
20   Rachelle Henry-George Gergits San Diego flight?
21        A.    (Reviewing document).  Correct.
22        Q.    When did you author these notes?
23        A.    The date at the top, August 13th of '08.
24        Q.    And what was the purpose of authoring these

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 81

1 notes?
2     A.    Just documenting -- documenting the
3 situation, the investigation, that involved Gary.
4     Q.    Was there more than one investigation
5 involving Gary?
6     A.    No, it wasn't -- it wasn't an investigation
7 on Gary.
8     Q.    No, under Gary?
9     A.    Yeah, it was his handling of the
10 investigation, if you will.
11     Q.    Okay.  So these were investigations that
12 you were part of that were of employees reporting to
13 Gary Schmidberger?
14     A.    Correct.
15     Q.    Okay.  Did he ask you for notes?  Did Gary
16 ask you for notes?
17     A.    No.
18     Q.    All right.  And were there additional pages
19 to this RH/GG investigation?
20     A.    No.
21     Q.    So it's a one-page deal?
22     A.    Yes.
23     Q.    And where were these notes kept?
24     A.    In my computer.

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 82

1     Q.    Is it a -- what kind of program?  Word
2 Perfect or --
3     A.    Yeah, this one -- this is just a Word
4 document, that I saved -- sent to myself in e-mail and
5 put in my e-mail folder.
6     Q.    Okay.  Now, have you reviewed your archived
7 documents on your computer and your documents to ensure
8 that you have looked for all documents --
9     A.    Yes.
10     Q.    -- regarding Rachelle Henry?
11     A.    Yes, I did.
12     Q.    Okay.  And you produced everything that you
13 found to counsel?
14     A.    Yes.
15     Q.    So you said the investigation began on June
16 11th, '08, and concluded on 8/8 of '08?
17     A.    Correct.
18     Q.    And what's "GS" that's next to that, what's
19 that mean?
20     A.    That's referring to the length of time it
21 took was due to Gary's excessive absences.
22     Q.    Okay.  And when it came to interviewing
23 RH -- and that's Rachelle Henry, right?
24     A.    Correct.

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 83

1     Q.    -- Gary Schmidberger advised RPU, who's
2 that?
3     A.    Tammy.
4     Q.    Tammy Mauer?
5     A.    Correct.
6     Q.    GK?
7     A.    Greg Kuhn.
8     Q.    I'm sorry, what's his position?
9     A.    He's Corporate Security.
10     Q.    Is he out of Atlanta, as well?
11     A.    No, he's Cincinnati.
12     Q.    -- and I to meet on 7/14/08 at 11:00?
13     A.    Correct.
14     Q.    And Tammy was flying in and arriving around
15 10:00 a m.?
16     A.    Correct.
17     Q.    Was Rachelle scheduled to work that day?
18     A.    Yes.
19     Q.    Was she at work when you interviewed her?
20     A.    No.
21     Q.    Where was she when you interviewed her?
22     A.    She came back from home.
23     Q.    Who made the call to her to ask her to come
24 in for the interview?

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 84

1     A.    I want to say it was a performance leader,
2 but I can't remember who.
3     Q.    Do you know what they told her?
4     A.    No.
5     Q.    Do you know if she missed any appointments
6 because of coming back in to talk to you?
7     A.    I have no idea.
8     Q.    Okay.  So Gary Schmidberger advised not to
9 pre-arrange Rachelle Henry to come up like he did with
10 DJ?
11     A.    Um-hmm (nodding head affirmatively).
12     Q.    What was that about?
13     A.    He was referring to the employee above,
14 David Jolley.
15     Q.    And David Jolley is a male?
16     A.    Correct.
17            * * *
18
19
20
21
22
23
24

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 86

1                    * * *
2        CONFIDENTIAL MATERIAL EXCERPTED
3                 UNDER SEAL
4                  PAGE 85
5                    * * *
6        Q.    All right.  So on the morning of July 14,
7    '08, you happened to walk in with Sam Tuminello at 8:30
8    who said he was on his way to advise Rachelle Henry of a
9    9:30 meeting with us in the director's room?
10       A.    Um-hmm (nodding head affirmatively).
11       Q.    Who's Sam Tuminello?
12       A.    He's a performance leader.
13       Q.    Okay.  So you called to confirm with --
14       A.    Gary -- no, I'm sorry, Greg Kuhn.
15       Q.    Okay.  So you called Greg Kuhn to find out
16   if the meeting with Rachelle had changed, and he said it
17   was still 11:00?
18       A.    Um-hmm (nodding head affirmatively),
19   correct.
20       Q.    So who's ST?
21       A.    Sam Tuminello.
22       Q.    Okay.  So Sam Tuminello would be a peer
23   with Schmidberger?
24       A.    No.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 87

1        Q.    With who?
2        A.    He reports to Gary.
3        Q.    Okay.  So he would be a peer with George
4    Gergits?
5        A.    Correct.
6        Q.    Okay.  So you called Sam and told him not
7    to say anything to Rachelle?
8        A.    Correct.
9        Q.    And then you called Schmidberger to
10   determine if there was a change --
11       A.    Correct.
12       Q.    -- in time?
13       A.    Yeah.
14       Q.    And he said Rachelle will be out of here by
15   9:30, however is scheduled off at 10:00 a.m.
16       A.    Correct.
17       Q.    And then you say that Gary Schmidberger
18   never told any of us 11:00 would not work?
19       A.    Correct.
20       Q.    And then you have a question mark?
21       A.    Correct.
22       Q.    What's that about?
23       A.    Referring to why didn't he communicate that
24   to us that there was a change.  We scheduled it for

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 88

1    11:00.
2        Q.    Okay.  So you asked Gary Schmidberger to
3    tell Sam when he advised her, Rachelle Henry, to come up
4    and that never happened, what's that about?
5        A.    I asked Gary to tell Sam, to advise her to
6    come up at the time we scheduled, 11:00, and he did not
7    do that, he did not communicate with Sam.
8        Q.    And what was the 9:30 briefing?
9        A.    It was a briefing we have every morning, an
10   operational briefing.
11       Q.    And who is "we"?
12       A.    The operational leaders.
13       Q.    Which would include who, at the time in
14   '08?
15       A.    Yeah, it's the ACS leader, inflight
16   leaders, cargo leaders, check-out (phonetic) leader, and
17   tower.
18       Q.    So how many people are we talking?
19       A.    It varies.
20       Q.    Between, what, like, 10 or 15, or 50, or --
21       A.    No, about between 5 and 15.
22       Q.    Okay.  So Gary told you that Rachelle was
23   coming up after her shift, he said yes, and then at
24   10:10 we were all ready to meet and no Rachelle.  What

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 89

1    is that about?
2        A.    That's my documentation saying that we were
3    ready to meet with her, we assumed that she knew there
4    was a meeting then, and that she wasn't there.
5        Q.    I thought the meeting was at 11:00?
6        A.    It got moved up because Rachelle was
7    getting off work.
8        Q.    All right.  So what did Gary say, Gary
9    Schmidberger?
10       A.    I don't recall.
11       Q.    Okay.  So you called Sam, he said he would
12   try to catch her, he didn't, so Rachelle was asked to
13   come in from home?
14       A.    Correct.
15       Q.    And your notes don't indicate who made that
16   call?
17       A.    I don't remember who made that call.
18       Q.    Why the notation that Rachelle return to
19   meet in street clothes, is there anything about being in
20   street clothes that is of note?
21       A.    No, when we typically interview employees,
22   it's while they're on duty.
23       Q.    And then the next note, leader conference
24   call on 7/30/08; what was that?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 90

1       A.      To concur Rachelle's termination and
2   George's as a PIP.
3       Q.      And George is a male, correct?
4       A.      Correct.
5       Q.      And Rachelle is a female?
6       A.      Correct.
7       Q.      Who recommended that Rachelle be
8   terminated?
9       A.      The leadership.
10      Q.      Who?
11      A.      Paul Baird and his -- who he reports to, we
12  mentioned earlier, Carol Zupancic.
13      Q.      Anybody other than Paul Baird and Carol
14  Zupancic that recommended Rachelle's termination?
15      A.      Yeah, that would be Gary Schmidberger.
16      Q.      Anybody else?
17      A.      No.
18      Q.      Did you agree with it?
19      A.      I did.
20      Q.      So you concurred with Rachelle's
21  termination?
22      A.      I did.
23      Q.      Anybody else that had input into Rachelle's
24  termination?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 92

1       A.      No.
2       Q.      And a PIP is a performance improvement
3   plan?
4       A.      Correct.
5       Q.      Which is a lesser disciplinary action than
6   termination?
7       A.      Correct.
8       Q.      Who made the decision to place Mr. Gergits
9   on the performance improvement plan?
10      A.      The leaders.
11      Q.      Which would include who?
12      A.      Gary, Paul, and Carol.
13      Q.      Anybody else involved in the decision to
14  place Mr. Gergits on the PIP?
15      A.      It would be the same.
16      Q.      Yourself?
17      A.      Myself, Kelly, Meg, and Joanne.
18      Q.      Did you concur with placing Mr. Gergits on
19  a PIP?
20      A.      Yes.
21      Q.      Was there discussion about termination for
22  Mr. Gergits?
23      A.      Yes.
24      Q.      Okay.  Why was Mr. Gergits not terminated?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 91

1       A.      Yes.
2       Q.      Who?
3       A.      My boss at the time.
4       Q.      Kelly Marchant?
5       A.      Correct.
6       Q.      Anybody else?
7       A.      Equal Opportunity.
8       Q.      Who in EEO?
9       A.      Joanne Guerrant, G-U-E-R-R-A-N-T.
10      Q.      Where is she?
11      A.      She's in Atlanta.
12      Q.      Did you talk to her?
13      A.      I talk to her all the time.
14      Q.      Did you talk to her about Rachelle Henry?
15      A.      I did.
16      Q.      When did you talk to her, Joanne Guerrant?
17      A.      I don't remember.
18      Q.      Are there notes from your conversation?
19      A.      No.
20      Q.      Anybody else?
21      A.      Legal.
22      Q.      Who in Legal?
23      A.      Meg Taylor.
24      Q.      Anybody else?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 93

1       A.      Because he did not ask Rachelle to block
2   the seats.
3       Q.      He's the one who utilized the seats?
4       A.      Correct, him and his family.
5       Q.      And the family included, what, two sons?
6       A.      Three children, I don't know the gender.
7       Q.      Three children?
8       A.      Correct.
9       Q.      Had Mr. Gergits received any prior action
10  to the PIP?
11      A.      Not to my knowledge.
12      Q.      Did you review his personnel file before a
13  PIP was instituted?
14      A.      I did.
15      Q.      And do you recall any disciplinary action?
16      A.      I don't remember.
17      Q.      Did you review Ms. Henry's personnel
18  file --
19      A.      Yes.
20      Q.      -- before termination?
21      A.      Yes.
22      Q.      And had there been any prior disciplinary
23  action?
24      A.      Yes.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 94

```
 1      Q.    When?
 2      A.    I don't know the exact dates, I want to say
 3  the early '90s.
 4      Q.    Okay.  And what was the disciplinary
 5  action?
 6      A.    I believe there were two warning letters in
 7  there.
 8      Q.    And what were the warning letters for?
 9      A.    If I recall, one was for attendance and
10  perhaps one for was safety.
11      Q.    And do those warning letters drop off at
12  any point out of consideration?
13      A.    Well, I don't know what you mean by "drop
14  off."
15      Q.    Does Delta have a progressive disciplinary
16  policy?
17      A.    No.
18      Q.    There's no progressive disciplinary policy?
19      A.    There's one, it depends on the offense.
20      Q.    What is the progressive disciplinary
21  policy?
22      A.    It starts with a verbal warning, goes
23  written warning, probation, final warning, termination.
24      Q.    And do written warnings ever cease to be
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 96

```
 1      A.    "Merit" is somebody that's in a management
 2  role.
 3      Q.    Have PIPs been used for front-line
 4  employees?
 5      A.    No.
 6      Q.    Is Mr. Gergits still employed?
 7      A.    Yes.
 8      Q.    What's his current position?
 9      A.    Performance Leader.
10      Q.    What did you and Joanne Guerrant discuss
11  regarding Ms. Henry's termination?
12      A.    You know, I talk to her all the time, I
13  didn't document my discussion with her, but my
14  recollection is talking about her, discussing
15  comparables.
16      Q.    What were the comparables?
17      A.    And I don't recall.
18      Q.    And what were the comparables?
19      A.    That's -- it's something that I wouldn't
20  know, that's why I called Joanne.
21      Q.    Can you elaborate on that?  What are you
22  referring to when you say "comparables"?
23      A.    Situations similar to this event and how
24  they were handled.
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 95

```
 1  considered in applying further disciplinary action?
 2      A.    Can you repeat that question?
 3      Q.    Sure.  If somebody has a warning letter
 4  from the early '90s, is it still relevant when looking
 5  at disciplinary action in 2008?
 6      A.    No.
 7      Q.    Okay.  So did those two earlier warnings
 8  that Rachelle had in the early '90s have any impact on
 9  the termination decision?
10      A.    No.
11      Q.    And what's the purpose of having a
12  progressive disciplinary policy?
13      A.    Employees have performance issues that are
14  not meeting Delta's expectations, the purpose of that is
15  to get their attention so that they can bring their
16  level of performance up to the expectation.
17      Q.    And where does the performance improvement
18  plan fall under the progressive disciplinary?
19      A.    Performance improvement plan is something
20  that we used for merit employees, not front-line
21  employees.
22      Q.    For what employees?
23      A.    Merit.
24      Q.    What does that mean?
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 97

```
 1      Q.    Okay.  And did Joanne share with you any
 2  comparables?
 3      A.    She shared with me that there are
 4  comparables, but I don't remember what they were.
 5      Q.    Have you been involved in any investigation
 6  of agents who were alleged to have let nonrev flyers
 7  have first-class seats?
 8      A.    I don't recall specifically nonrev, you
 9  know, clearing somebody out of order, so to speak, so
10  somebody can sit up in first class.  But I have had
11  several investigations that involved manipulating, if
12  you will, the seating, the inventory, seats on board the
13  plane.
14                    * * *
15
16
17
18
19
20
21
22
23
24
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 99

1              * * *
2        CONFIDENTIAL MATERIAL EXCERPTED
3                UNDER SEAL
4                 PAGE 98
5              * * *
6        Q.    And how would blocking seats on an oversold
7    flights make a flight easier to work?
8        A.    I don't know if I know the answer to that,
9    but what I recall is that not as many people would show
10   up at the gate to try to board the flight.
11       Q.    Okay.  Now, do you provide HR support for
12   locations other than CVG?
13       A.    I do.
14       Q.    And what other locations?
15       A.    Memphis, Boston, Providence, and Hartford.
16       Q.    Are there other HR generalists assigned to
17   those locations, or are you the only one?
18       A.    For Airport Customer Service, it's just me.
19             * * *
20
21
22
23
24

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 104

1    show up --
2        A.    Right, because it was a fake --
3        Q.    Right.
4        A.    -- fake name, fake person.
5        Q.    So there would be an opening?
6        A.    Right.
7        Q.    And he could get on?
8        A.    Right.
9        Q.    Any other ticketing investigations that you
10   were involved with or aware of?
11             * * *
12
13
14
15
16
17
18
19
20
21
22
23
24

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 103

1              * * *
2        CONFIDENTIAL MATERIAL EXCERPTED
3                UNDER SEAL
4               PAGES 100-102
5              * * *
6        Q.    Do you recall Rachelle Henry indicating
7    that she would retain counsel or hire an attorney?
8        A.    No, I don't.
9        Q.    Okay.  Any other investigations that you
10   have been involved with or aware of regarding seating
11   issues, ticketing issues?
12       A.    Ticketing issues, yeah, there's this one
13   right in front of me, David Jolley, I think we already
14   talked about that one.
15       Q.    And he was hanging a seat so he could fly?
16       A.    Um-hmm (nodding head affirmatively), he was
17   blocking seats so he could fly.
18       Q.    What's the difference between "blocking"
19   and "hanging"?
20       A.    Blocking is when you go in and actually
21   book the seat, and he was -- in his case, he was booking
22   it with a fictitious name, as if it was a regular
23   passenger.
24       Q.    And then the regular passenger wouldn't

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 109

1              * * *
2        CONFIDENTIAL MATERIAL EXCERPTED
3                UNDER SEAL
4               PAGES 105-108
5              * * *
6        Q.    Okay.  If you think of any others that pop
7    in your mind --
8        A.    Okay.
9        Q.    -- as we go along, if you can let me
10   know --
11       A.    Sure.
12             (Reference to previously-marked Kircher
13             Deposition Exhibit No. 3.)
14       Q.    Okay.  Turning back to Exhibit 3, the next
15   line you said, "during call," and you're referring to
16   the leadership conference call?
17       A.    Um-hmm (nodding head affirmatively), yeah.
18       Q.    Gary Schmidberger indicates George Gergits
19   is not serious offense, resists suspension, and it goes
20   on to say, "if we all said something we shouldn't, we'd
21   all be in trouble"?
22       A.    Excuse me, um-hmm (nodding head
23   affirmatively).
24       Q.    (Continued)  So Gary Schmidberger went to

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 110

1    bat for George Gergits; is that fair to say?
2        A.    I would say it's fair to say that he
3    didn't, in his mind, think it was as serious what George
4    did and the role he played in this, as his leaders did.
5        Q.    All right.  Did Gary Schmidberger go to bat
6    at all for Rachelle Henry?
7        A.    I would have to say no to that, I can't
8    remember.  I wouldn't say he went to bat for her.
9        Q.    Okay.  Was suspension on the table for
10   George?
11       A.    Yes, and he was suspended.
12       Q.    So he was suspended?
13       A.    Correct.
14       Q.    Plus given a PIP?
15       A.    Correct.
16       Q.    How long was he suspended for?
17       A.    He was suspended until the paperwork was
18   prepared to be delivered to him, and I don't recall the
19   date.
20       Q.    I mean, was it a matter of days, or weeks,
21   or months?
22       A.    I would say weeks, I don't recall.  I don't
23   recall, and I can't say that -- (witness did not
24   complete response).

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 112

1        Q.    Did Gary Schmidberger express any concern
2    about Rachelle Henry being terminated?
3        A.    Yeah, he was hesitant.
4        Q.    And what do you base that comment on?
5        A.    I don't think he thought termination was
6    the action we should take.
7        Q.    Was there any discussion about how you got
8    to a place where you were terminating Ms. Henry, yet
9    suspending Mr. Gergits and placing him on a PIP?
10       A.    I'm sorry, ask that question again.
11       Q.    Was there any discussion in this leadership
12   call about how you could justify termination of Ms.
13   Henry, yet the lesser disciplinary action of suspension
14   and a PIP for Mr. Gergits?
15           MR. CROALL:  Okay, let's me just interject
16       here to the extent that any part of the call
17       involved the leadership team requesting advice
18       from Meg Taylor or getting advice from Meg Taylor
19       on the legal front, you're not permitted to
20       testify about that.
21           THE WITNESS:  Okay.
22           MR. CROALL:  But to the extent that the
23       discussion was among the business people about
24       what decisions to make regarding the disciplinary

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 111

1        Q.    Are managers, such as George Gergits,
2    subject to the same policies and procedures with respect
3    to ticketing and rev passengers as agents, such as
4    Rachelle Henry?
5        A.    They are, however, they have authority to
6    make up overrides --
7        Q.    Okay.
8        A.    -- and to make decisions to overrides.
9        Q.    So then they have discretion that the
10   agents don't have --
11       A.    Correct.
12       Q.    -- but George would have been subject to
13   the same policies with respect to medallion upgrades
14   prior to nonrev upgrades?
15       A.    Correct.
16       Q.    Okay.  He didn't have authority to put
17   himself ahead of a medallion flyer?
18       A.    Oh, no, no, no.
19       Q.    Okay.  And you note that Gary Schmidberger
20   also twice expressed concern about how long George
21   Gergits should be suspended?
22       A.    Yeah, which line was that?
23           MR. CROALL:  (Indicating).
24       A.    (Reviewing document).  Yeah, okay.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 113

1    actions for either or both of these employees, you
2    can testify about that.
3           THE WITNESS:  Okay.
4        A.    On that call we concluded that because
5    George did not ask Rachelle to block the seats for him,
6    that he would be issued a performance improvement plan
7    and Rachelle would be terminated for taking the action.
8        Q.    For taking what action?
9        A.    For hanging seats and then putting George
10   and his family in them when there were six standbys,
11   medallions, revenues that were on the standby list.
12       Q.    Were those six medallions on the standby
13   list on board and seated when Mr. Gergits and his family
14   were boarded?
15       A.    When they were boarded?
16       Q.    Yes.
17       A.    Yes.
18       Q.    Okay.  And you talked to agents that said
19   there was no policy that required medallion passengers
20   to be moved up to first class once they had been boarded
21   and seated?
22       A.    Correct, and they also told me it was very
23   unusual for us not to go on board and upgrade them with
24   the timing they had during this particular flight to do

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 114

```
 1    that.
 2        Q.    It may be unusual, but there was no
 3    policy --
 4        A.    Correct.
 5        Q.    -- prohibiting that?
 6        A.    That's what they told me.
 7        Q.    And did you have any reason to doubt that?
 8        A.    No, I don't think I doubted it.
 9        Q.    I mean, did you research the policy to see
10    what the actual policy said?
11        A.    I don't remember if I did that or not.
12        Q.    Would you expect that an agent follow the
13    policies and procedures that are written and in place
14    and promulgated to them?
15        A.    Can you repeat that question?
16        Q.    Sure. Can you identify any written policy
17    that Ms. Henry violated?
18        A.    Is that a different question than the
19    previous one?
20        Q.    Probably, yeah.
21        A.    Okay. Yes.
22        Q.    What?
23        A.    Blocking the seats.
24        Q.    Okay. What is the written policy that's --
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 115

```
 1        A.    I can't --
 2        Q.    -- against blocking the seats?
 3        A.    I can't articulate that. We don't allow
 4    our agents to manipulate the inventory.
 5        Q.    Well, didn't your investigation notes show
 6    that it was common practice for seats to be hung?
 7        A.    No. And if I recall saying earlier, that's
 8    the first time I heard that term. It would be common
 9    practice, from my understanding, to clear the hung seat.
10        Q.    You said before you heard the term "hung,"
11    you understand it to be blocking seats, correct?
12        A.    Before I heard the term "hung"?
13        Q.    Yeah.
14        A.    (Continued) I didn't know what it meant.
15        Q.    I believe you testified earlier that you
16    understood there was a practice of blocking seats?
17        A.    Correct.
18        Q.    And that was a common practice?
19        A.    Correct, for the operation.
20        Q.    Okay. As operational needs dictate?
21        A.    Correct.
22        Q.    Okay. And then during the investigation,
23    you heard that that term might be used as hung seats or
24    hanging seats?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 116

```
 1        A.    Correct.
 2        Q.    And it's synonymous with blocking seats,
 3    correct?
 4        A.    It's different.
 5        Q.    How is it different?
 6        A.    From my understanding is that "blocking"
 7    seats is when you actually go and block the seat, and
 8    protect it, so it can't be used. And then you document
 9    the record to say why, and then you end the record.
10            "Hung" means if you go and you block the
11    seat or you protect the seat so it can't be used, and
12    you don't end the record, it becomes hung.
13        Q.    And how long is a seat blocked?
14        A.    Until somebody does that entry to release
15    it.
16        Q.    So essentially, a seat will be hung until
17    it's released?
18        A.    Correct, that's my understanding.
19        Q.    Okay. So while the seat is being blocked,
20    it's either being blocked or being hung, it's the same
21    term?
22        A.    I would say it's a different term.
23        Q.    Until it's released, is that what you're
24    saying? If it's released, it's blocked?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 117

```
 1        A.    If it's released, it becomes unblocked. It
 2    became hung because the record wasn't ended.
 3        Q.    At all?
 4        A.    No.
 5        Q.    The record was never ended?
 6        A.    It was not ended.
 7        Q.    The flight took off, and what happened with
 8    the record?
 9            MR. CROALL: What hung seat are we talking
10    about?
11            MS. MULLOY MYERS: Any hung seat.
12        Q.    Are you saying that if a flight departs and
13    there are seats that are still blocked in the record,
14    that's a hung seat? I'm just not understanding the --
15        A.    Correct.
16        Q.    -- difference you're trying to imply here.
17        A.    It's a hung seat unless somebody goes in
18    and clears it, and then assigns it to somebody else.
19        Q.    And how often does that happen, that
20    blocked seats are cleared?
21        A.    I don't know the answer to that.
22        Q.    Did you do any investigation to find out?
23        A.    No.
24        Q.    And there are operational needs that would
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 118

1    dictate blocking a seat?
2        A.    Correct.
3        Q.    And are there times when you just don't get
4    back to releasing it because you're busy with other
5    duties getting a flight boarded and off on time?
6        A.    Probably so, but in this case, it was two
7    hours before departure.
8        Q.    Did you look -- did you investigate how Ms.
9    Henry handled blocking of seats on flights that didn't
10   include Mr. Gergits?
11       A.    No.
12       Q.    Did you ask her about what the operational
13   needs were for blocking seats before a flight?
14       A.    No, but we asked her, on that particular
15   day, what the operational needs were for blocking the
16   flight.
17       Q.    On what, during the interview that you
18   called her back from home --
19       A.    Correct.
20       Q.    -- to take part in?
21       A.    Correct, yes.
22            MR. CROALL:   Can we take a short break,
23   five minutes?
24            MS. MULLOY MYERS:   Sure.

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 120

1    done at the same time.
2        Q.    Okay.  So was there a discussion that Ms.
3    Henry would be suspended?
4        A.    Yes.
5        Q.    As opposed to terminated?
6        A.    Well, typically when we have a termination,
7    we suspend them before we actually terminate.  We
8    recommend them for termination, and in that time frame
9    they're suspended, but they're not actually terminated.
10       Q.    So there's suspension pending termination?
11       A.    Correct.
12       Q.    But a termination decision has been made?
13       A.    Correct -- well, a recommendation.  A
14   decision to recommend them for termination has been
15   made.
16       Q.    On July 30, KM, who's that?
17       A.    Kelly Marchant.
18       Q.    Okay.  Informs me Sunday a.m. should be the
19   time and implied Carol Zupancic indicated this with PB,
20   who's, what, Paul Baird?
21       A.    Paul Baird, correct.
22       Q.    And so you and Paul Baird discussed
23   ensuring that that happened at the beginning the shift?
24       A.    Correct.

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 119

1            (At which time, a recess was taken from
2    12:38 a.m. until 12:53 a.m.)
3            (Reference to previously-marked Kircher
4    Deposition Exhibit No. 3.)
5        Q.    Okay, so on Exhibit 3, one of your bullet
6    points is on July 30, 2008, CC-CZ; who's that referring
7    to?
8        A.    "CC" stands for conference call.  "CZ" is
9    Carol Zupancic.
10       Q.    Okay.  And you told me, where is she?
11       A.    She's in Atlanta.
12       Q.    Atlanta, okay.  Is that ATL?
13       A.    Correct.
14       Q.    Implied the two of them should be suspended
15   together (same date) Sunday/Monday.
16       A.    Um-hmm (nodding head affirmatively).
17       Q.    What's that about?
18       A.    When they were going to be suspended.  That
19   was her direction to us on the call.
20       Q.    Who is "they"?
21       A.    Rachelle and George.
22       Q.    Okay.  And was there any indication of why
23   she felt that the two should be suspended together?
24       A.    I think she just wanted to make sure it was

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 121

1        Q.    And on August 4th, you were informed at
2    9:10 by Paul Baird that the suspensions didn't take
3    place, and if I could sit in; what's that about?
4        A.    That it didn't happen on that Sunday, as we
5    discussed.  So on August 4th that's when he advised me
6    that it didn't happen and if I was available to sit on
7    the discussion, and I was not available.
8        Q.    And why did it not happen?
9        A.    I don't know.
10       Q.    Okay.  On August 4th both George and
11   Rachelle were suspended at the end of their shift?
12       A.    That's what it says.
13       Q.    And you said per GS, Gary Schmidberger?
14       A.    Correct.
15       Q.    Both were given an opportunity to write
16   another statement?
17       A.    Correct.
18       Q.    Do you know what was said?
19       A.    I was not a part of that conversation.
20       Q.    And on August 4th you were informed by Gary
21   Schmidberger that he didn't agree with the Rachelle
22   Henry termination decision?
23       A.    Correct.
24       Q.    What did he tell you?  I mean, did he tell

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 122

1   you why he didn't agree with it?
2       A.   I don't remember details going into that
3   conversation.
4       Q.   Okay.  So Gary Schmidberger is no longer
5   with Delta?
6       A.   Correct.
7       Q.   Do you know what happened to his
8   employment?
9       A.   Yes.
10                  * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 124

1                    * * *
2        CONFIDENTIAL MATERIAL EXCERPTED
3              UNDER SEAL
4              PAGE 123
5                    * * *
6       Q.   And those leaders would include who?
7       A.   Paul Baird and Carol Zupancic.
8       Q.   Okay.  So on August 4th of '08, did Gary
9   Schmidberger tell you why he didn't agree with the
10  Rachelle Henry termination?
11      A.   I don't remember why he didn't agree with
12  it, but I will say on record he questions a lot of
13  terminations.  He struggled holding people accountable
14  when he was here.
15      Q.   Did he tell you that he thought there was a
16  problem in terminating the female employee and
17  suspending the male employee?
18      A.   We never had that conversation.
19      Q.   So why did you refer them to Paul Baird?
20      A.   Because that's his leader.
21      Q.   Okay.  And then there a line that's
22  redacted, do you know what --
23      A.   I don't know what that is.
24           MR. CROALL:  That's privileged.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 125

1           THE WITNESS:  Oh, okay
2           MS. MULLOY MYERS:  So Dave, you're saying
3   that the line that's redacted is because of
4   attorney/client privilege?
5           MR. CROALL:  Yes.
6       Q.   And then the next line you say, Gary
7   Schmidberger explains on 8/8/08 conference call he has
8   no concern with bringing Gary (sic) Gergits back to a
9   leadership position?
10      A.   George Gergits.
11      Q.   Sorry, yeah, George Gergits.
12      A.   Yes.
13      Q.   So what was that about, can you elaborate
14  on that?
15      A.   The question I asked him if he had concerns
16  about George maintaining his role as a leader.
17      Q.   Okay.  Did you have any conversations with
18  Paul Baird about Gary Schmidberger conveying to you that
19  he did not agree with the Henry termination decision?
20      A.   I don't recall.
21      Q.   Did you talk to anybody about Gary
22  Schmidberger's communication to you that he did not
23  agree with the Henry termination decision?
24      A.   If I did have that conversation,

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 126

1   particularly with Paul, it would have been after the
2   fact when we were going through the review of Gary's
3   performance.
4       Q.   And do you recall?
5       A.   I don't recall the specifics.
6       Q.   So you say you remind Gary on August 11th
7   that he has two PIPs to prepare?
8       A.   Um-hmm (nodding head affirmatively).
9       Q.   Who is that?
10      A.   George's and another performance leader.
11      Q.   Who was the other performance leader?
12                  * * *
13
14
15
16
17
18
19
20
21
22
23
24

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 128

```
 1                    * * *
 2        CONFIDENTIAL MATERIAL EXCERPTED
 3               UNDER SEAL
 4               PAGE 127
 5                    * * *
 6        Q.    You said on August 13, 2008 that you went
 7   to look up Rachelle Henry's employment number and
 8   discovered the MSS trans?
 9        A.    Transaction.
10        Q.    So that's some sort of payroll transaction?
11        A.    Yes, that's what we were talking about
12   earlier, MSS system.
13        Q.    Was incorrectly processed?
14        A.    Correct.
15        Q.    Who entered the MSS transaction?
16        A.    Gary.
17        Q.    And it showed disciplinary action/active
18   status rather than suspended?
19        A.    Correct.
20        Q.    What's the difference between the two?
21        A.    Well, suspended would be inactive.
22        Q.    What's the difference between active and
23   inactive?
24        A.    One is paid and one is not paid.
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 129

```
 1        Q.    Well, are they only paid for time that is
 2   worked?
 3        A.    They're paid for the time that they've
 4   worked, but when an employee is on suspended status,
 5   they're not paid.
 6        Q.    Okay.  But if an employee is on
 7   disciplinary action/active status and they're not
 8   working any hours, are they getting paid?
 9        A.    Well, they are paid a monthly salary, so
10   they're -- I mean, are you asking about how they're
11   paid --
12        Q.    Yeah.
13        A.    -- in general?
14        Q.    Yeah.
15        A.    Okay.  They have a schedule that they work.
16   And if they don't work, for whatever reason, then we ask
17   them to use a liability day, which means a vacation or a
18   holiday, something that pay protects them.  If they pay
19   -- if they don't have that or they don't use that, then
20   we don't pay them for that day.
21        Q.    Okay.  So an employee on disciplinary
22   action/active status who's not working is not being
23   paid, is that --
24        A.    It doesn't change the fact if they're on
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 130

```
 1   disciplinary action, it's still active; the payroll
 2   system still remains the same, unless they're suspended.
 3        Q.    So you inquired with Gary what he did, and
 4   he stated that he put disciplinary action no pay
 5   status --
 6        A.    Um-hmm (nodding head affirmatively).
 7        Q.    -- and verified with Denise in Payroll that
 8   they won't get overpaid.  Who's Denise?
 9        A.    At the time, one of our payroll reps.
10        Q.    Do you know her last name?
11        A.    Denise, what is her last name?  I can't
12   remember.
13        Q.    What's your parenthetical that says
14   "confidentiality"?
15        A.    Because he had to discuss it with her, and
16   we don't discuss employee deals with other employees, so
17   I made sure that he knew it was confidential, the
18   conversation that he had with her.
19        Q.    Well, doesn't the Payroll person have to
20   have knowledge of these MSS transactions?
21        A.    Well, they may or may not.
22        Q.    And did you take any action after Gary
23   raised the concern he had about Rachelle Henry's
24   termination?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 131

```
 1        A.    I referred him to Paul.
 2        Q.    Other than that?  Did you talk to your
 3   boss?  Did you talk to Kelly Marchant?
 4             MR. CROALL:  About what Gary had told her?
 5             MS. MULLOY MYERS:  Yes.
 6        A.    I may have.
 7        Q.    What do you recall about that?
 8        A.    I don't -- I mean, we talk all the time.  I
 9   probably told her, you know, I was having -- this is a
10   pattern of Gary and his leadership behavior, and I
11   probably told her the results of this -- here we go
12   again, another example that he doesn't want to hold his
13   employees accountable.
14        Q.    Have there been any other employees where
15   Gary Schmidberger questioned a termination decision?
16        A.    Yes.
17                    * * *
18
19
20
21
22
23
24
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER          11/18/2010

Page 136

```
 1                        * * *
 2            CONFIDENTIAL MATERIAL EXCERPTED
 3                    UNDER SEAL
 4                   PAGES 132-135
 5                        * * *
 6        Q.   So after the termination decision is
 7    recommended, what happens next procedurally?
 8            MR. CROALL:  Just talking generally, or are
 9    you talking about Ms. Henry specifically?
10            MS. MULLOY MYERS:  Generally.
11        A.   The termination decision, or the
12    recommendation for termination?
13        Q.   The recommendation.
14        A.   Okay.  After the recommendation for
15    termination is completed by the leader --
16        Q.   Um-hmm.
17        A.   -- then I make a letter supporting the
18    recommendation -- I prepare the letter, I should say,
19    but it's signed under my leader --
20        Q.   Um-hmm.
21        A.   -- and then it goes through a review.
22        Q.   By whom?
23        A.   By Equal Opportunity --
24        Q.   Um-hmm.
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 137

```
 1        A.   -- Legal, and HR.
 2        Q.   And did you have any conversations with
 3    anyone in Equal Opportunity about your recommendation of
 4    Ms. Henry's termination?
 5        A.   After the recommendation?
 6        Q.   Yes.
 7        A.   No.
 8        Q.   Okay.  Did you have any conversations with
 9    anyone in HR about your recommendation of Ms. Henry's
10    termination after the recommendation?
11        A.   I don't recall.
12        Q.   And do you know who in Equal Opportunity
13    reviewed the decision for Ms. Henry?
14        A.   I don't.
15        Q.   Do you know who in Legal reviewed the
16    decision for Ms. Henry?
17        A.   I don't.
18        Q.   Do you know who in HR reviewed the decision
19    for Ms. Henry?
20        A.   That would be Kelly Merchant and Lisa
21    Abraham-Brown.
22            (Kircher Deposition Exhibit No. 4 was
23            marked for identification.)
24        Q.   Showing you what's been marked as Exhibit
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 138

```
 1    No. 4 --
 2        A.   Okay, sure.
 3        Q.   -- if you can take a moment and look at
 4    that and let me know if you identify it?
 5        A.   (Reviewing document).  Yeah.
 6        Q.   And what is this?
 7        A.   Pardon?
 8        Q.   What is this?
 9        A.   It's an e-mail.
10        Q.   It's two e-mails, one from Ms. Henry to you
11    dated July 15, 2008 at 7:32 a.m.?
12        A.   Correct.
13        Q.   And then you respond on the 15th at 7:00
14    p.m.?
15        A.   Correct.
16        Q.   And what did you do with this statement or
17    this e-mail from Ms. Henry?
18        A.   I added it to the file.
19        Q.   Did you do any investigation of any of the
20    concerns Ms. Henry had raised in the e-mail?
21        A.   No.
22            (Kircher Deposition Exhibit No. 5 was
23            marked for identification.)
24        Q.   We've handed you what's been marked as
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 139

```
 1    Exhibit 5.
 2        A.   Okay.
 3        Q.   Can you take a look at that and let me know
 4    if you recognize it?
 5        A.   (Reviewing document).  Yes, I do.
 6        Q.   And what is this?
 7        A.   This a document that I prepared.
 8        Q.   Okay.  And when did you prepare this
 9    document?
10        A.   I don't recall, I don't remember.  It
11    doesn't appear that I dated it.
12        Q.   Well, what was the purpose in preparing
13    this document?
14        A.   It was a summary of the events.
15        Q.   Who did you give -- did you give this
16    document to anybody?
17        A.   I did.
18        Q.   You state that George asked the lead agent
19    who had oversight of the flight to assign Rachelle Henry
20    to the flight.  Is that accurate?
21        A.   To my knowledge.
22        Q.   Would this document have been prepared
23    after you interviewed Rachelle Henry?
24        A.   Yes.
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 140

1    Q.    And the interview with Rachelle Henry was
2  on July 14, 2008?
3    A.    Um-hmm (nodding head affirmatively).
4    Q.    "Yes"?
5    A.    Yes, sorry.
6    Q.    So this document would have been prepared
7  after July 14th, 2008?
8    A.    Correct, correct.
9    Q.    And you said the lead announced in the
10  morning briefing that George requested Rachelle to work
11  the flight?
12        MR. CROALL:  Are you looking at the fourth
13     bullet point there at the top?
14        MS. MULLOY MYERS:  Yes
15    Q.    Who was the lead that you were referring
16  to?
17    A.    Pae.
18    Q.    And Flight 1213 was the San Diego flight?
19    A.    Correct.
20    Q.    And it had 20 open seats in, what --
21    A.    Coach.
22    Q.    -- "YC" is coach?
23    A.    That's coach, yeah.
24    Q.    Okay.  What's CVGPROT?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 141

1    A.    Cincinnati Protect.
2    Q.    Okay.  And what is protect for AA per IROP
3  UA?
4    A.    My understanding is for American -- IROP,
5  irregular operations is what IROP stands for, and UA is
6  United.
7    Q.    So protect for American, did you ask
8  Rachelle what that referenced?
9    A.    Yes.
10    Q.    And what did she say?
11    A.    That she was protecting seats for other
12  airline passengers.
13    Q.    Okay.  And is that --
14    A.    (Continued)  That she remembered.
15    Q.    And is there an operational requirement
16  sometimes or an operational need?
17    A.    It can be, but it's unusual that we put
18  other airline passengers in our first class cabin over
19  our own passengers.
20    Q.    But it can happen?
21    A.    I don't know.
22    Q.    All right.  And the lead you're referring
23  to offering to assist is Andre?
24    A.    Correct.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 142

1    Q.    What time was the flight to depart?
2    A.    9:15.
3    Q.    And it departed on time?
4    A.    I don't know the answer to that.
5    Q.    Well, in your last bullet point you put
6  9:15, the flight departed?
7    A.    Yeah, I may have meant the departure time.
8  I don't know or recall the actual departure time.
9    Q.    Well, your -- about six bullets down, you
10  say the flight, 7:17 for a 9:15 departure?
11    A.    I'm sorry, where's that at?
12    Q.    The sixth bullet.
13        MR. CROALL:  It should all be (indicating),
14     Rachelle begins working.
15    A.    Yeah.  For 9:15 departure, that's the
16  scheduled departure time for that flight was 9:15.
17    Q.    Okay.  And you said before the end of the
18  day on June 8th, CVG leaders were contacted on
19  improprieties on how the flight was worked.  Who were
20  the CVG leaders that were contacted?
21    A.    I don't know specifically, other than I
22  know Paul was one of them.
23    Q.    You said a different performance leader put
24  out an e-mail.  Who was that?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 143

1    A.    The performance leader that put out an
2  e-mail was Sam Tuminello.
3    Q.    And Sam's e-mail said the standby list was
4  cleared in error?
5    A.    Um-hmm (nodding head affirmatively).
6    Q.    And what was the error?
7    A.    I don't know if he said anything more than
8  that.
9    Q.    And Rachelle stated in the interview that
10  she cleared Gergits in full class over revenue standbys
11  because the revenues were all on board, correct?
12    A.    And which bullet are you referring?
13    Q.    The last bullet on the page.
14        MR. CROALL:  Bottom of the first page.
15     Are you asking her if that is what it says?
16        MS. MULLOY MYERS:  Yes.
17    Q.    Is that what it says?
18    A.    That's what it said.
19    Q.    And you cannot identify any policy that
20  that would have violated; is that correct?
21    A.    I don't know the policy where it is or the
22  way it's written.
23    Q.    Okay.  Did you look at the policies before
24  you recommended Rachelle Henry for termination?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                              11/18/2010

Page 144

```
 1        A.    I did not, no.
 2        Q.    So prior to recommending an employee, who
 3  you knew had over 20 years of employment, for
 4  termination, you didn't research the policies to see
 5  what policy she had violated in clearing the standby
 6  list?
 7        A.    When you says "research," I was informed it
 8  was violating the policy.
 9        Q.    By whom?
10        A.    By my counsel, which was Equal Opportunity
11  and Legal.
12        Q.    And don't tell me what Legal said --
13        MR. CROALL:  You can't talk about anything
14  that you were told by Legal --
15        THE WITNESS:  Okay.
16        MR. CROALL:  -- or anything that any other
17  business person told you what they were told by
18  Legal.
19        THE WITNESS:  Okay.
20        MR. CROALL:  But can you talk about
21  conversations among the business folks, but not
22  the lawyers.
23        Q.    So EEO told you that there was some policy
24  that was violated?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                              11/18/2010

Page 145

```
 1        A.    They told me that it was a terminable
 2  offense.
 3        Q.    Okay.  And was that Joanne Guerrant or
 4  someone else in Equal Employment Opportunity?
 5        A.    I think it was Joanne.
 6        Q.    As an HR professional, who's certified as a
 7  professional in HR, did it trouble you at all that a
 8  female employee was being terminated and a male employee
 9  was being placed on a PIP for actions arising out of the
10  same occurrence?
11        A.    No, because the actions by the two of them
12  were different.
13        Q.    Rachelle Caudill (sic) didn't receive any
14  personal benefit as a result of getting on that flight;
15  isn't that rule?
16        MR. CROALL:  Rachelle Henry?
17        MS. MULLOY MYERS:  Yeah.
18        THE WITNESS:  Thank you.
19        A.    She got her friend on the flight.  And I'll
20  add to that statement, there was a perception that they
21  were friends.
22        Q.    Mr. Gergits was Ms. Henry's supervisor?
23        A.    Correct.
24        Q.    And was there any evidence that they
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                              11/18/2010

Page 146

```
 1  socialized outside of work?
 2        A.    Ms. Henry advised us that there's a
 3  perception of them being friends because they have
 4  coffee together every morning.
 5        Q.    Do other agents have coffee in the -- is
 6  there a breakroom?
 7        A.    There's a couple breakrooms.
 8        Q.    Okay.  Do other agents have coffee with
 9  supervisors?
10        A.    I don't know.  And I want to go on record
11  by saying, I don't know if Rachelle directly reported to
12  George or not.  As I mentioned earlier, you know, they
13  have different reporting structures depending on the
14  bid.
15        Q.    Rachelle Henry was not on that flight, was
16  not taking the flight, did not benefit from being able
17  to get on that flight and fly; isn't that correct?
18        A.    She didn't fly on the flight, correct.
19        Q.    Didn't fly?
20        MR. CROALL:  Kelly, it's 1:30.  We've been
21  going at this for three-and-a-half hours.  I
22  detect no signs that we're getting close to the
23  end.  I detect signs that I am hungry and of need
24  a lunch.
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                              11/18/2010

Page 147

```
 1        MS. MULLOY MYERS:  Okay
 2        MR. CROALL:  We have another witness
 3  scheduled at 2:00 --
 4        MS. MULLOY MYERS:  Um-hmm.
 5        MR. CROALL:  -- you tell me what you want
 6  to do.
 7        MS. MULLOY:  Well, I mean, if you want to
 8  break for about a half-an-hour, have a lunch
 9  break, that's fine, and we can come back at 2:00.
10        MR. CROALL:  Okay, we'll come back as soon
11  as we can.  I'm not going to promise that we'll be
12  back at 2:00.  It takes five minutes to walk back
13  to my office, five minutes to walk back here.
14        MS. MULLOY MYERS:  Okay.  Do we have flight
15  concerns?
16        MR. CROALL:  Well, we do for Kelly, but
17  she's not testifying.
18        MS. MULLOY MYERS:  I mean, what would you
19  prefer?  Would you prefer to put him -- move him
20  to a different day and reschedule him, or would
21  you prefer to delay him and see how things go?
22        MR. CROALL:  Well, I mean, do you have a
23  best guess on how much more you have with
24  Ms. Kircher?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

**Henry vs. Delta  KIRCHER**                11/18/2010

Page 148

```
 1          MS. MULLOY MYERS:  I don't have a crystal
 2   ball.  I mean, I think it's going to be at least
 3   another hour, but, you know, it kind of depends.
 4          MR. CROALL:  Yeah, I know.  Well, maybe we
 5   give him that choice, because he may be at my
 6   office right now.  So let me talk to him and we'll
 7   see.
 8          MS. MULLOY MYERS:  Okay, that's fine.
 9          MR. CROALL:  And it may come down to, you
10   know, his preference is, I've got this day
11   blocked, I'm ready to do it, let's do it.
12          MS. MULLOY MYERS:  Right.  I mean, I can
13   stay late, I'm fine with finishing Deb and moving
14   on to him.
15          MR. CROALL:  I have a thing tonight, but I
16   can stay until like 5:45, but.
17          MS. MULLOY MYERS:  All right.
18          (At which time, a recess was taken from
19   1:32 p m. until 2:44 p.m.)
20   Q.    All right.  You indicated previously that
21   you were present in the interview with Rachelle Henry --
22   A.    Um-hmm (nodding head affirmatively).
23   Q.    -- along with some other individuals?
24   A.    Correct.
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                11/18/2010

Page 150

```
 1   Q.    -- between the flight and the interview,
 2   correct?
 3   A.    Correct.
 4   Q.    Had anyone asked Ms. Henry closer in the
 5   time of the flight in June of '08 to provide any kind of
 6   statement or notes regarding her recollection of what
 7   happened with the flight?
 8   A.    I believe somebody did, because I had a
 9   statement from Rachelle as well, some computerized
10   documents that showed the key strokes.
11   Q.    Okay.  And when was that?
12   A.    I don't recall when I got it, but it was
13   before this meeting on July 14th.
14   Q.    So was this a handwritten statement from
15   Ms. Henry?
16   A.    I can't remember if it was a handwritten;
17   it was fairly short.
18   Q.    And what do you recall it saying?
19   A.    I recall it saying something to the effect
20   of -- the way she cleared the standbys, that they were
21   already on board, and that's why George's family got up
22   front, something to that effect, I really can't remember
23   the details.
24   Q.    Who is Janet Glenn?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                11/18/2010

Page 149

```
 1   Q.    How long did that meeting last?
 2   A.    Oh, I'd say 45 minutes to an hour, from
 3   what I remember.
 4   Q.    Now, this interview took place, what, over
 5   a month after the flight?
 6   A.    The one on July 14th?
 7          MR. CROALL:  The interview on July 14th?
 8   Q.    Right, the interview with --
 9   A.    Um-hmm (nodding head affirmatively).
10   Q.    -- Ms. Henry?
11   A.    On July 14th, correct.
12   Q.    Was that the first interview that she had?
13   A.    From what I remember.
14   Q.    Okay.  And the flight had occurred on June
15   8th, 2008 --
16   A.    Correct.
17   Q.    -- correct?
18   A.    Correct.
19   Q.    And Ms. Henry was not told in advance that
20   she was going to be interviewed regarding the June 8th
21   flight, correct?
22   A.    Correct.
23   Q.    And over a month had passed --
24   A.    Um-hmm (nodding head affirmatively).
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                11/18/2010

Page 151

```
 1   A.    I'm sorry, who?
 2   Q.    Janet Glenn?
 3   A.    Janet Glenn.
 4          MR. CROALL:  G-L-E-N-N?
 5          MS. MULLOY MYERS:  Correct.
 6   A.    I don't think I know who that is.
 7   Q.    Okay.  What do you recall about the meeting
 8   that was held on July 14th, 2008 with Ms. Henry?
 9   A.    Well, Tammy, who was our representative
10   from RPU, presented the information she had from a
11   computer standpoint.  And we were questioning Rachelle
12   about the standby list and about the seats being
13   protected and hung, and the timeline, and all that kind
14   of stuff, we -- actually that was our chance to get her
15   perspective.
16   Q.    And what did Ms. Henry tell you?
17   A.    She can't remember why she protected those
18   seats.
19          And then we asked her if George had asked
20   her to do that, I think we asked that two or three
21   times, and she repeatedly said no.
22   Q.    Do you recall Ms. Henry indicating that
23   Mr. Gergits had only approached her about an hour before
24   the flight time?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 152

1      A.    I don't remember that.
2      Q.    Okay.  Do you recall Ms. Henry saying that
3   she would create CVG protect records occasionally in
4   order to protect seats for other agents who expressed a
5   need for them on their own overbooked flights?
6      A.    I'm sorry, can you repeat that?
7      Q.    Sure.  Do you recall Ms. Henry stating in
8   the meeting, on July 14th, 2008, that she would
9   sometimes create CVG protect records to protect seats
10  for other agents who needed them for overbooked flights?
11     A.    I do believe I remember her saying that,
12  yes.
13     Q.    And would there be anything wrong or in
14  violation of a policy or procedure for an agent to do
15  that?
16     A.    At the time we had this meeting on July
17  14th?
18     Q.    Yes.
19     A.    I was under the impression that there was
20  nothing wrong with that.
21     Q.    Okay.  And has your impression changed --
22     A.    It did.
23     Q.    -- since July 14th, 2008?
24     A.    Yes.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 153

1      Q.    When?
2      A.    I can't give you an exact date, but if you
3   recall, I didn't know what a hung seat meant going into
4   the situation.  And although, during our meeting on the
5   14th, Rachelle couldn't explain why she did that, and
6   there was no operational need that we could do in our
7   research to determine why she did that, I didn't really
8   fully realize what the level of offense, if you will,
9   was by taking that action, because I'm not a ticketing
10  agent.
11     Q.    Well, and we've tied down the fact that
12  protecting a seat or blocking a seat is the same as
13  hanging a seat, the only difference is a hung seat is
14  one that hasn't been cleared?
15     A.    When the record hasn't been ended.
16     Q.    When the record hasn't been ended?
17     A.    Correct.
18     Q.    Otherwise, hanging a seat, or blocking a
19  seat, or protecting seat, we're talking about the
20  same --
21     A.    As I stated earlier --
22     Q.    -- thing?
23     A.    -- I think it's different.
24     Q.    The only difference being that a hung seat,

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 154

1   the record hasn't been cleared?
2      A.    The record hasn't been ended, correct.
3      Q.    What's the difference between "cleared" and
4   "ended"?
5      A.    Well, I guess it's more of a technical
6   term.  When you run a reservation, if you will, or I'm
7   not even sure what the computer -- what it's called in
8   the computer, but when you end the record, you end the
9   transaction.
10          If you don't end it, it's hung, it's left
11  open; but the seats can still not be taken unless you
12  clear that, and we talked about that earlier.
13     Q.    And did you do anything as part of this
14  investigation to determine how often seats that had been
15  blocked or protected ended up being hung because they
16  didn't -- they were not ended?
17     A.    No, I don't have the capability to do that.
18     Q.    Was there any discussion in the termination
19  meetings about, hey, let's find out how often this
20  occurs, where an agent will block a seat or protect a
21  seat and then doesn't get back around to ending the
22  record?
23     A.    I don't remember.
24     Q.    Okay.  Ms. Henry -- do you recall Ms. Henry

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 155

1   advising you that the flight was very busy?
2      A.    Um-hmm (nodding head affirmatively).
3      Q.    That it was very chaotic?
4      A.    Yes.
5      Q.    That she been sent help from the crown room
6   that didn't know how to board a plane?
7      A.    I don't remember that part.
8      Q.    Okay.  And the help -- the person that
9   showed up to help her did not appear until the plane was
10  being -- until after the plane was being boarded?
11     A.    Again, I don't recall that part of it.
12     Q.    What do you recall about the meeting that
13  was held with Mr. Gergits?
14     A.    What I recall about the meeting with
15  Mr. Gergits is that we asked him if he had asked
16  Rachelle to block those seats for him in order to travel
17  first class to San Diego, him and his family, and he
18  said he did not.  However, he admitted to making joking
19  comments about wanting agents that are possibly leaving
20  the company, retiring, taking a package, to work that
21  flight, he admitted that he made those comments in jest,
22  if you will.  And he did say that he said to Rachelle,
23  "do you think I could possibly get a first class seat
24  for my son, he's over six-feet tall," that's what I

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER          11/18/2010

Page 156

1   recall.
2       Q.     Did he ask if he could get a first class
3   seat for his son, or did he ask if his son could --
4       A.     I don't know how exactly it was phrased.
5       Q.     Right.
6       A.     (Continued)  I remember him saying
7   something about -- to the effect that he son is over of
8   six-feet tall, could he possibly get a first class seat.
9       Q.     Are you sure it was a first class seat
10  request, or could it have been a request for a seat with
11  additional leg room, a bulk head seat or an emergency
12  row seat?
13      A.     It could have been one or the other --
14      Q.     Right.
15      A.     -- that I recall to my memory.
16      Q.     Right.  So you can't testify that he had
17  asked for a first class seat for his six-foot son,
18  correct?
19      A.     I could testify it would be a first class
20  seat or a bulk head seat, one that could accommodate his
21  tall son.
22      Q.     Okay.  What else do you recall about the
23  interview with Mr. Gergits?
24      A.     I recall us counseling him on how we think

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 157

1   the perception of his actions were as a leader.
2       Q.     And what did you counsel him about?
3       A.     Does he realize the perception he created
4   by his comments that were inappropriate as a leader.
5       Q.     And what did he say?
6       A.     He agreed they were inappropriate.
7       Q.     Now, those comments were not made to Ms.
8   Henry, correct?
9       A.     Correct.
10      Q.     They were made to Mr. Christiansen?
11      A.     Yeah, I don't recall exactly who they were
12  made to.
13      Q.     Okay.  So, I mean, there's no indication
14  that Ms. Henry had any idea that George Gergits had
15  joked with some people about having the retirees work --
16  or at least imminent retirees working that gate?
17      A.     Yeah, I can't remember if he did or not.
18      Q.     Okay.  What else do you recall about your
19  meeting with Mr. Gergits?
20      A.     I don't recall anything else.
21      Q.     Why did over a month elapse between the
22  flight and the time when Ms. Henry was interviewed and
23  asked to recount her recollection of what happened?
24      A.     Well, we wanted to have all the information

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 158

1   available to us before we were prepared to talk to
2   Rachelle and George, and it took that long time for
3   several reasons, I know I think I mentioned earlier,
4   that particular summer Gary started his own business,
5   Gary Schmidberger, and was off a lot, and he was
6   critical to the investigation.  And I think just the
7   amount of time it took to get the information we needed,
8   you know, working and accommodating peoples' schedules
9       Q.     Would you agree that Ms. Henry's
10  recollection of what happened on the flight would be
11  fresher on or around the day it happened, than over a
12  month later?
13      A.     It could be.
14      Q.     Now, you stated that Ms. Henry mentioned
15  something about having coffee with Mr. Gergits?
16      A.     Um-hmm (nodding head affirmatively), yes.
17      Q.     Tell me more about that.  When was that
18  mentioned?
19      A.     In her interview on the 14th of July.
20      Q.     And what did she say regarding the coffee?
21      A.     She said, from what I remember, that
22  there's a perception that her and George are friends
23  because they have coffee every morning together.
24      Q.     Could Ms. Henry have said that they

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 159

1   occasionally have coffee together?
2       A.     I remember it being almost every morning.
3       Q.     Was it that many employees, beyond Ms.
4   Henry and Mr. Gergits, would basically open up the
5   Starbucks when it opened in the concourse?
6       A.     I don't know the answer to that.
7       Q.     All right.  Do you recall anything else
8   about your July 14th, 2008 interview with Ms. Henry?
9       A.     Not that I haven't already stated.
10      Q.     What happened next after you had
11  interviewed the folks that we talked about in your
12  written notes, there was an interview with Ms. Henry --
13      A.     Um-hmm (nodding head affirmatively).
14      Q.     -- and an interview with Mr. Gergits?
15      A.     Um-hmm (nodding head affirmatively).
16      Q.     What happened next?
17      A.     Well, I know we, as a group, allowed
18  Rachelle to return back to work after her interview, and
19  we did the same for George.
20      Q.     And "as a group" being?
21      A.     The folks that were in the interview.
22      Q.     Okay.
23      A.     (Continued)  And actually, if I may
24  correct:  With Rachelle, she was off -- as you recall,

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

```
 1   she came back from already being home, so she went home,
 2   not back to work, but we returned her to active status.
 3       Q.    Rachelle had been working between the
 4   flight on June 8th, 2008 --
 5       A.    Um-hmm (nodding head affirmatively).
 6       Q.    -- and July 14th, 2008?
 7       A.    Correct, right, absolutely.
 8       Q.    Okay.  So after the interview --
 9       A.    Unless there was some time off there, I
10   don't know what she said.
11       Q.    But she wasn't on any kind of disciplinary
12   suspension?
13       A.    No.
14       Q.    No?
15       A.    No.
16       Q.    So "as a group" would include you, Greg
17   Kuhn, Tammy --
18       A.    Mauer.
19       Q.    -- Mauer, Gary Schmidberger?
20       A.    Correct.
21       Q.    Anybody else?
22       A.    Did you say Greg Kuhn?
23       Q.    Yes.
24       A.    Okay, that should do it.
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

```
 1       Q.    And then what happened?
 2       A.    After?
 3       Q.    After Rachelle Henry was cleared to return
 4   to work, after the July 14th, 2008 interview?
 5       A.    After that happened, Tammy is responsible,
 6   as I mentioned earlier, for creating the notes on the
 7   interview and on the case for both Rachelle and George,
 8   which she did, took some time to do that, and then when
 9   she finished that, she's got a protocol that she follows
10   that she sends it to, and I'm on that list.
11       Q.    What is Ms. Guerrant's first name?
12       A.    Joanne.
13       Q.    Joanne.  So Tammy prepared, what, a
14   synopsis or a write-up of the investigation?
15       A.    Correct, a summary.
16       Q.    A summary.  And she disseminated that to
17   various individuals, including yourself?
18       A.    Correct.
19       Q.    Okay.  What do you recall about that
20   summary that Ms. Mauer authored and disseminated?
21       A.    I believe you have a copy of it, but she
22   summarizes all of the details around the case.  And she
23   summarizes in detail what was said in the interview.
24       Q.    And what was her summarization?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

```
 1       A.    I don't remember what exactly she said in
 2   the document itself; she just stated what she knew, what
 3   was presented.
 4       Q.    Was there some recommendation at that
 5   point?
 6       A.    No, I don't believe she makes
 7   recommendations.
 8       Q.    Okay.
 9       A.    (Continued)  I don't believe there's a
10   recommendation in that document, that summary, that she
11   provides.
12       Q.    Okay.
13             MS. MULLOY MYERS:  Actually, why don't we
14   take a quick break?  I have the cover e-mail, but
15   apparently not the attachment, let me get that.
16             THE WITNESS:  Oh, okay
17             (At which time, a recess was taken from
18             3:05 p.m. until 3:12 p.m.)
19             (Kircher Deposition Exhibit No. 6 was
20             marked for identification.)
21       Q.    Handing you what was marked as Exhibit 6,
22   if you can take a moment and look at that --
23       A.    Okay.
24       Q.    -- and let me know if you recognize it.
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

```
 1       A.    (Reviewing document).  I do.
 2       Q.    And what it is?
 3       A.    This is Tammy Mauer's report.
 4       Q.    How did Ms. Mauer calculate the revenue
 5   loss for three first-class seats was $4,197?
 6       A.    I think you would have to ask her that
 7   question, I don't know the answer.
 8       Q.    Okay.  Because the -- even the medallion
 9   flyers wouldn't pay to be upgraded to first class, would
10   they?
11             MR. CROALL:  Objection, asked and answered.
12   You can answer again.
13       A.    I suspect that that report was based on
14   when the seats were blocked, not because they were
15   upgraded.  The seats still in inventory could be sold.
16   But again, that's a question for Tammy.
17       Q.    Do you recall Ms. Henry raising a question
18   of discrimination in the July 14th, 2008 interview?
19       A.    I do not, no.
20       Q.    Do you know what Delta's policy or practice
21   is with respect to asking passengers to wait in the gate
22   area in hopes that they would be upgraded to first
23   class?
24       A.    Just to make sure I understand:  Do I
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 164

```
 1   understand what Delta's policy is?
 2        Q.   Yeah -- well, I guess first:  Is there a
 3   policy that speaks to whether or not a gate agent should
 4   instruct passengers to wait in the gate area in hopes
 5   that they would be upgraded to first class?
 6        A.   I don't know if there's a policy, but I
 7   routinely hear gate agents say one or the other, make an
 8   announcement, you know, either there's still an
 9   opportunity for -- and they usually name -- suggest the
10   passengers by name --
11        Q.   Um-hmm.
12        A.   -- remain in the gate house for an upgrade
13   or the first-class cabin has checked in full, please
14   take your coach seat; I hear that routinely.
15        Q.   Okay.  And then passengers can make the
16   decision as to what they want to do?
17        A.   Well, typically if that announcement is
18   made, they're going to board, because there is no
19   opportunity for them to upgrade.
20        Q.   Okay.  And if there's still openings, they
21   may make a decision to either get on the plane or
22   continue to wait?
23        A.   They can make that decision, correct.
24        Q.   How many seats were on the San Diego plane,
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 165

```
 1   do you know how many seats that equipment held?
 2        A.   I don't.  I'm not aware of what kind of
 3   equipment it was.
 4        Q.   So Ms. Mauer concluded her notes of the
 5   interview by saying that the employee was returned to
 6   work pending further investigation?
 7        A.   Correct.
 8        Q.   Was there discussion on July 14th, 2008 as
 9   to what the further investigation would be?
10        A.   Discussion with Rachelle?
11        Q.   Among the interviewees or the group?
12        A.   I think the discussion was, that the group
13   had, was that we agreed to go ahead and let her return
14   home, or return back to work, and that she would type up
15   the summary and we would reconvene and determine what
16   the course of action would be.
17        Q.   Ms. Mauer?
18        A.   The whole group that interviewed Rachelle.
19        Q.   But you say "she would type up the
20   summary" --
21        A.   Right.
22        Q.   -- you're saying Ms. Mauer --
23        A.   Right.
24        Q.   -- would type up the summary --
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 166

```
 1        A.   Right.
 2        Q.   -- and you would reconvene?
 3        A.   Right, that was her responsibility.
 4        Q.   Okay.
 5        A.   (Continued)  And when I say "we would
 6   reconvene," it's really more with myself and the
 7   leaders.
 8        Q.   Okay.
 9        A.   (Continued)  Greg Kuhn and Tammy's roles at
10   this point, unless there's more investigation that needs
11   to be done, really didn't need to be a part of what the
12   decision was.
13        Q.   Okay.  And who is Kelly Nabors?
14        A.   Kelly Nabors is a person, a former
15   employee, that used to work in Equal Opportunity.
16        Q.   In Atlanta?
17        A.   Correct.
18        Q.   Do you know why she was copied on Tammy
19   Mauer's summary of the July 14th interview?
20        A.   Because she's in Equal Opportunity, I don't
21   know how -- what their system is for assigning cases,
22   but Kelly and Joanne, they had the same role.
23        Q.   Okay.  So you received Ms. Mauer's notes?
24        A.   Um-hmm (nodding head affirmatively).
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 167

```
 1        Q.   And what happened next?
 2        A.   Okay.  And George's notes, as well, from
 3   Tammy.
 4        Q.   Okay.
 5        A.   (Continued)  After that, I was informed
 6   that this possibly was more serious than we had thought
 7   as an interview team.
 8        Q.   By whom?
 9        A.   By Equal Opportunity.
10        Q.   Who in Equal Opportunity?
11        A.   I can't remember if it was Joanne or Kelly;
12   it was one of the two.
13        Q.   Was this by voicemail, or e-mail, or in
14   person?
15        A.   It wouldn't have been in person.  Most
16   likely by phone.
17        Q.   By phone, all right.  What did either
18   Joanne or Kelly tell you?
19        A.   They told me from a comparable standpoint
20   this looks like something that we normally terminate
21   for.
22        Q.   What looks like something that they
23   normally terminate for?
24        A.   That protecting the seats, they became
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 168

1  hung, and putting nonrevs up there before the standbys
2  that were waiting for first class that were revenue
3  passengers.
4      Q.    Did they provide any examples of any
5  employees who had been accused of hanging seats and
6  putting nonrevs ahead of revenues?
7      A.    I think I mentioned earlier they may have,
8  but in any level of detail, I don't recall.
9      Q.    So did Equal Opportunity give you any
10 feedback on Ms. Mauer's write-up from the Gergits
11 interview?
12     A.    I don't remember them giving me feedback on
13 the write-up. I think they questioned, the same
14 question we had, in terms of asking if he
15 had conversation clarifying that George didn't ask
16 Rachelle to do this.
17     Q.    Do you recall Equal Opportunity asking
18 anything else or making any other comments regarding the
19 Mauer interview summary for either Henry or Gergits?
20     A.    On the summary itself, no, I don't recall
21 any other conversation on that.
22     Q.    Or anything to do with the Henry and
23 Gergits investigation?
24     A.    Well, the -- it was determined -- we

**AMS DEPO**
(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 169

1  determined that we needed to talk about it, and that was
2  purpose of the conference call that was scheduled at the
3  end of July.
4      Q.    Had an initial local investigation
5  initially cleared Ms. Henry of any disciplinary action?
6      A.    No.
7      Q.    Had there been any determination prior to
8  the termination determination?
9      A.    Well, initially, after the 14th interview
10 of Rachelle, we concluded, and George for that matter,
11 the group concluded that we -- you know, some level of
12 discipline needed to be issued, we just didn't know
13 what, but we didn't think at that point it was a
14 termination.
15     Q.    Who determined that you needed to talk
16 about it more? You said it was determined we needed to
17 talk about it more?
18     A.    Yeah, I would say that it was myself and
19 Joanne or Kelly, whoever the Equal Opportunity rep was I
20 was talking to.
21     Q.    Okay. So what did you do to talk about it
22 more?
23     A.    We had that conference call at the end of
24 July.

**AMS DEPO**
(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 170

1      Q.    Prior to that, did you do anything?
2      A.    I don't remember doing anything.
3            (Kircher Deposition Exhibit No. 7 was
4            marked for identification.)
5      Q.    Do you recognize Exhibit 7 as an e-mail
6  string between you and Tammy Mauer regarding the Henry
7  and Gergits investigation?
8      A.    (Reviewing document). Yes, I do.
9      Q.    Okay. And you asked Tammy to research
10 George's nonrev history to see if Ms. Henry was working
11 on any of his flights. Why did you do that?
12     A.    (Reviewing document). I don't know if I
13 did that because I was instructed to, or just because we
14 were trying to determine a pattern.
15     Q.    Did you look at George -- did you ask for
16 information to see whether George Gergits had been
17 upgraded to first class on other nonrev flights?
18     A.    No.
19     Q.    Why were you asking her to investigate Ms.
20 Henry and not Mr. Gergits, this pattern?
21     A.    Well, the pattern -- the pattern, we were
22 looking to see if there was an association between
23 Rachelle and George when George was traveling --
24     Q.    Okay.

**AMS DEPO**
(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 171

1      A.    -- and that's what this -- I think the
2  middle e-mail is asking, to see if there's any history
3  there, to see if when he's nonrev-ing, if Rachelle is
4  working the flight.
5      Q.    But you were concerned that Mr. Gergits had
6  asked a gate agent to move him up to first class; isn't
7  that fair to say?
8      A.    That's a question we asked in the
9  investigation, yes.
10     Q.    Right. And you were concerned that if he
11 had done that that would have been inappropriate,
12 correct?
13     A.    Correct.
14     Q.    So why didn't you look and see whether he
15 had been upgraded on flights that didn't involve
16 Rachelle Henry being the gate agent of Mr. Gergits?
17     A.    At this time?
18     Q.    Sure.
19     A.    It was after we learned that that didn't
20 happen, George did not ask Rachelle to do that.
21     Q.    So you took no further investigation with
22 respect to Gergits' role in this San Diego flight?
23     A.    If I did, I don't remember.
24     Q.    Okay. And Ms. Mauer advised you that Ms.

**AMS DEPO**
(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                11/18/2010

Page 172

1   Henry had not been involved in any other George Gergits'
2   nonrev flights?
3        A.    She said, "I pulled the reservations
4   regarding this travel.  Rachelle Henry did not touch any
5   of George's reservations, except the one we discussed,"
6   and you can read the rest.
7        Q.    And she tells you "the airport standby list
8   is only active for 24 hours"?
9        A.    Correct.
10       Q.    Who printed the Flight 1213, June 8th
11  standby list?
12       A.    I don't know the answer to that.  However,
13  I was advised it was printed and posted somewhere so the
14  employees could see it the following morning -- it may
15  have been that same day, I don't remember.
16       Q.    So other than asking Ms. Henry to
17  investigate whether Ms. Henry -- well, worked on any
18  other Gergits flights, did you take any other action to
19  investigate this flight or this matter?
20       A.    I don't remember if I did.
21       Q.    Do you recall Ms. Henry advising you that
22  she was concerned that she was being treated differently
23  because there were rumors that there was some sort of
24  personal romantic relationship between her and Gergits?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                11/18/2010

Page 174

1   calls for speculation, but you can go ahead and
2   answer.
3        A.    I think I would ask more questions to find
4   out why the perception is out there, what's causing
5   that.  And typically, when I asked questions, it leads
6   to more information, it leads to more people, names, and
7   when I hear names, that's who I speak to.  But I don't
8   recall that coming up.
9        Q.    Would it violate Delta's policies for an
10  employee to be treated differently because of some
11  perception that she was having some relationship with a
12  male manager?
13            MR. CROALL:  Being treated differently by
14  whom?
15            MS. MULLOY MYERS:  By coworkers.
16       A.    Can I ask you to repeat that?  I don't
17  think I understand the question.
18       Q.    All right.  What's Delta's policy against
19  harassment in the workplace?
20       A.    It's not tolerated.  If the infraction, if
21  you will, meets the definition of harassment.
22       Q.    And what is the definition of harassment?
23       A.    It depends on whether you're asking about,
24  you know, sexual harassment --

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                11/18/2010

Page 173

1        A.    No.
2        Q.    You don't recall that?
3        A.    No, I don't.
4        Q.    Well, do you recall her saying that other
5   agents were suggesting the two of them had a personal
6   relationship?
7        A.    No.  We may have asked her, because that's
8   something that we asked in interviews, if there was a
9   personal relationship beyond friendship, we may have
10  asked that, but I don't recall her saying that.
11       Q.    Okay.  Do you recall her saying that she
12  felt she was being treated differently by other
13  employees because they were suggesting that she had a
14  personal relationship with Gergits?
15       A.    I don't.
16       Q.    Okay.  If Ms. Henry had said that, as an HR
17  Generalist, would you have taken any action to
18  investigate that?  If a female gate agent says I think
19  I'm being treated differently because people are
20  accusing me of having some sort of relationship with a
21  male supervisor?
22       A.    I think I would have, yes.
23       Q.    And what would you have done?
24            MR. CROALL:  Objection to the extent it

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                11/18/2010

Page 175

1        Q.    Just Delta's policy?
2        A.    -- racial.  I mean, we don't tolerate it.
3        Q.    Gender-based?
4        A.    Yeah.
5        Q.    Sexual?
6        A.    Anything like that, correct.
7            (Reference to previously-marked Kircher
8            Deposition Exhibit No. 7.)
9        Q.    Okay.  So other than Exhibit 7, do you
10  recall any further communication with anyone about the
11  Gergits/Henry investigation between the time that Equal
12  Opportunity, either Joanne or Kelly, said this could be
13  more serious and the conference call on July 30th?
14       A.    Do I recall anymore conversation with
15  anybody about it?
16       Q.    Yes.  I mean, we have Exhibit 7 --
17       A.    Right.
18       Q.    -- where you ask for some additional
19  information.  Was there anything else that transpired
20  between those two events?
21       A.    I imagine I had conversation about it with
22  my boss at the time, which was Kelly.
23       Q.    Okay.
24       A.    (Continued)  I don't recall what that was.

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 176

```
 1      Q.   Okay.
 2      A.   (Continued)  Probably more logistical.  But
 3  I do know that I was on vacation that week of the
 4  conference call.
 5      Q.   With respect to the conversation with Kelly
 6  Marchant, did she have any opinion as to disciplinary
 7  action to take against Ms. Henry before Ms. Mauer's
 8  notes were transcribed?
 9      A.   No, we never had a chance to discuss that.
10      Q.   Do recall any conversations you had --
11  basically what I'm hearing you say, you think that you
12  would have talked to your supervisor, Ms. Marchant?
13      A.   Right.
14      Q.   Do you recall anything that you would have
15  talked about with her?
16      A.   I think what we would have talked about is
17  why we, as a group, didn't think that it was a
18  termination at the time we interviewed her, and why the
19  comparables speak otherwise and what are we going to do,
20  and what are the next steps, that's what I imagine I
21  would have talked to Kelly about.
22      Q.   So initially you didn't feel it was a
23  terminable offense?
24      A.   Correct.
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 178

```
 1           (Reference to previously-marked Kircher
 2           Deposition Exhibit No. 3.)
 3      Q.   Right.  And so from your notes of that
 4  call, which is Exhibit 3 --
 5           MR. CROALL:  I'm going to object to the
 6  characterization that Exhibit 3 are notes from the
 7  call.
 8      Q.   Well, does Exhibit 3 include notes from the
 9  July 30th conference call?
10      A.   No.
11      Q.   Did you keep notes from the July 30th
12  conference call?
13      A.   I don't recall taking notes.
14           MR. CROALL:  There's a couple of notes on
15  Exhibit 3 about the call --
16           MS. MULLOY MYERS:  Right.
17           MR. CROALL:  -- where they refer to the
18  call, but.
19      Q.   I'm looking at your notes that reflect the
20  July 30th conference call.  Is there anything in here
21  which indicates who were all the participants on this
22  call?
23      A.   On this document?
24      Q.   Yes.
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 177

```
 1      Q.   Either Joanne or Kelly Nabors said this may
 2  be a terminable offense?
 3      A.   Correct.
 4      Q.   But did they give you names, did they give
 5  you case files to look at?
 6      A.   They may have; not necessarily case files,
 7  they may have given me examples.
 8      Q.   Okay.  And do you recall having received
 9  examples?
10      A.   I don't recall.
11      Q.   If you would have received examples of
12  comparables who have engaged in allegedly similar
13  conduct and had been terminated or not, would you have
14  expect that would have been noted in your documentation
15  of the investigation?
16      A.   I don't remember.  I mean, I think the
17  purpose of that conference call that last week of July
18  was so they could speak to us since they had the
19  knowledge, whichever one was on the call, and I think it
20  was Joanne.
21      Q.   So the purpose of the July 30th conference
22  call was so Equal Opportunity could speak to the issue
23  of comparators?
24      A.   Correct, with the leaders.
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

| Henry vs. Delta  KIRCHER | 11/18/2010 |
|---|---|

Page 179

```
 1      A.   (Reviewing document).  I don't see anything
 2  that identifies who was on the call.  But this again, if
 3  I can clarify, is not -- the purpose of this document
 4  was not to document the call.
 5      Q.   Okay.  And you don't recall if you took
 6  notes from that conference call?
 7      A.   I don't recall.
 8      Q.   Were you sitting in the room with anybody
 9  else or were you --
10      A.   I was at home.
11      Q.   You were at home on the phone?
12      A.   Um-hmm (nodding head affirmatively).
13      Q.   Did you ever see notes from that conference
14  call?
15      A.   I have not.
16      Q.   But you think this was Joanne Guerrant?
17      A.   I think so from my memory.
18      Q.   Okay.  So in that July 30th conference
19  call, do you recall Joanne giving you any examples of
20  comparables?
21      A.   I don't know if it was Joanne or somebody
22  else on the call, but I do recall them talking about
23  examples.
24      Q.   And what do you recall?
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER          11/18/2010

Page 180

1       A.    And again, I don't recall what they were.
2            MR. CROALL:  Again, the same caution as
3   before about the 7/30 call with the extent that
4   Meg Taylor was being asked for or giving legal
5   advice, you can't talk about that, but anything
6   else is fair game.
7            THE WITNESS:  Okay.
8       Q.    So you think that there were some examples,
9   but you don't recall if these folks were terminated or
10  not terminated, or what the alleged violations might
11  have been?
12      A.    I don't recall.
13      Q.    You don't recall?
14      A.    I imagine they would have been termination
15  cases, because that's why we were having the discussions
16  in terms of a comparable, but I don't recall specifics
17  of the comparable examples themselves.
18      Q.    Do you recall anything else about that July
19  30th conference call that didn't involve the
20  attorneys -- or the attorney and that we haven't
21  discussed yet?
22      A.    No, we discussed everything and the
23  attorney was in the call.
24      Q.    And at the conclusion of that call, the

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 181

1   decision was reached to terminate Ms. Henry?
2       A.    Correct.
3       Q.    And to put Mr. Gergits on a PIP?
4       A.    Correct.
5       Q.    Did you take a written statement from Ms.
6   Henry from the July 14th, 2008 meeting?
7       A.    Yes, we did.
8            (Kircher Deposition Exhibit No. 8 was
9            marked for identification.)
10      Q.    We've handed you what's been marked Exhibit
11  8. Can you just review that and identify it as
12  Ms. Henry's written statement from the July 14th, 2008
13  meeting?
14      A.    (Reviewing document).  That's her
15  statement.
16      Q.    So were there first-class seats that were
17  unoccupied when Flight 723 -- or not 723, when the San
18  Diego flight left that morning?
19      A.    Did it leave with the first-class seats
20  unoccupied?
21      Q.    Yes.
22      A.    I don't know the answer to that.
23      Q.    Is there some requirement that all
24  first-class seats be filled?

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 182

1       A.    No.
2            (Kircher Deposition Exhibit No. 9 was
3            marked for identification.)
4       Q.    Can you identify what we marked as Exhibit
5   9?
6       A.    (Reviewing document).  Sure.  That's the
7   letter I referenced earlier in our conversation, that's
8   the recommendation for termination that I prepared, in
9   addition to Gary's, who was the leader, recommendation
10  for termination, and it's signed by my manager and you
11  can see it's also signed by our Director of HR.
12      Q.    And that's Lisa?
13      A.    Abraham-Brown.
14      Q.    Abraham-Brown, okay.  Now, you state in
15  this e-mail that -- or I'm sorry, in this
16  recommendation that Rachelle violated Delta's policy by
17  booking three first-class seats and seating nonrevenue
18  passengers in those seats before revenue passengers,
19  resulting in a revenue loss of $4,197?
20      A.    Yes.
21      Q.    On what do you base that statement that
22  there was a revenue loss of $4,197?
23      A.    On Tammy's information.
24      Q.    And do you know what Tammy relied on to

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER          11/18/2010

Page 183

1   come up with that?
2       A.    She had a detailed report she brought to
3   the interview; I don't recall the details of it.
4       Q.    And medallion members are upgraded to first
5   class, if they are, on a complimentary basis, correct?
6       A.    I don't know the answer to that.
7       Q.    After you prepared Exhibit 9, what happened
8   next?
9       A.    I put it in the file, in this case
10  Rachelle's, and I sent it to my boss.
11      Q.    Okay.  And what happened next?
12      A.    I don't know what happens next.
13      Q.    Okay.  Did you have any further involvement
14  in the termination decision of Ms. Henry after you
15  prepared and distributed Exhibit 9?
16      A.    The only other involvement I would have is
17  when we received the decision -- the recommendation I
18  should say, is approved, I typically have conversation
19  with the leader and walk them through next steps.
20      Q.    And the recommendation -- do you know who
21  approved or who reviewed the recommendation for
22  Ms. Henry's termination?
23      A.    I don't know who specifically.  I mean,
24  obviously Kelly and Lisa Abraham-Brown reviewed it,

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 184

1  because their signatures are on file, but I do know that
2  it goes through Equal Opportunity and to Legal's office.
3       Q.    So did you get some confirmation back that
4  the recommendation had been accepted?
5       A.    Yes.
6       Q.    And who did you get that information back
7  from?
8       A.    I don't remember who it came from.  It
9  usually comes from one of our analysts in HR, and at the
10  time I don't recall which one it was.
11      Q.    Okay.  So somebody told you that the Henry
12  recommendation had been upheld?
13      A.    Correct.
14      Q.    And did you do anything at that point?
15      A.    At that point is when I asked the leader to
16  call me and we'll discuss the next steps.
17      Q.    Okay.  And do you have a recollection of
18  doing that for Ms. Henry's matter?
19      A.    Not specifically, because I have the same
20  conversation with every leader when I receive approval.
21  So I can tell you what I usually say, but I can't recall
22  specifically what I told Gary.
23      Q.    Okay.  Do you recall talking to him
24  specifically?  I mean, do you have any recollection of

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 185

1  talking to Gary Schmidberger saying, the termination
2  recommendation has been upheld?
3       A.    Well, he's copied in on that message.
4       Q.    Okay.
5       A.    (Continued)  And Gary has been a leader for
6  a long time, so I'd imagine that he knew what the next
7  step would be, so he may have acted without my counsel,
8  he may have not, I don't recall if I talked to him or
9  not.  I specifically do have a conversation with them,
10  but I don't remember if I had with Gary.
11            (Reference to previously-marked Kircher
12            Deposition Exhibit No. 4.)
13      Q.    Okay.  Did you have any further
14  communication with Ms. Henry, other than the July 14th
15  interview and the e-mail that you received from her that
16  we've look at in Exhibit 4?
17      A.    I recall us corresponding in e-mail about
18  insurance --
19      Q.    Okay.
20      A.    -- and I don't recall anything else.
21      Q.    You don't recall any other communication
22  with Ms. Henry?
23      A.    I don't, no.
24            (Kircher Deposition Exhibit No. 10 was

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 186

1            marked for identification.)
2       Q.    Okay.  Let me hand you what has been marked
3  Exhibit 10.
4       A.    Okay.
5       Q.    If you can take a moment and look at that
6  and let me know if you can identify it?
7       A.    (Reviewing document).  Yeah, notes.
8       Q.    And what is it?
9       A.    This is a note from myself to Joanne who
10  was with Equal Opportunity --
11      Q.    Right.
12      A.    -- in regards to, I believe, some questions
13  about other cases that were received that she was asking
14  me to research.
15      Q.    Why was the subject matter the Rachelle
16  Henry case?
17      A.    If I recall, it came from -- I want to say
18  it came from your office.
19      Q.    Okay.  And what was -- well, actually --
20            (Kircher Deposition Exhibit No. 11 was
21            marked for identification.)
22      Q.    Do you recognize what has been marked as
23  Exhibit 11?
24      A.    Yes.

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 187

1       Q.    And what is this?
2       A.    It's the same document.  I believe Joanne
3  had a follow-up question for me and I added the answer
4  at the end of Page 2.
5       Q.    When did the -- do you recall what incident
6  No. 1 was that's referenced in Exhibit 10?
7       A.    Is that with the -- Incident 1, are you
8  referring to?
9       Q.    Yes, Incident 1.
10      A.    In Exhibit 10?
11      Q.    Yes.
12      A.    Yeah, I recall that that flight was
13  oversold by one, and there was a party of two that were
14  not boarded that didn't want to split up, only one seat
15  left on the plane, and the party of two didn't go,
16  Harold was the one that went, and he was a nonrev.
17      Q.    Were there -- so there apparently was an
18  overbooked situation or people waiting to get on?
19      A.    I think it was oversold.
20      Q.    Oversold?  Do you know when this flight
21  occurred?
22      A.    I don't remember.
23      Q.    And do you recall this flight leaving
24  around the time that Ms. Henry was being investigated

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 188

```
 1   for the Gergits matter?
 2        A.   The flight?
 3        Q.   That Christiansen --
 4        A.   No, I had no knowledge of it until it came
 5   from your office about that flight.
 6        Q.   And when you researched it, did you learn
 7   that the flight had occurred around the time of the
 8   investigation of Ms. Henry?
 9        A.   I don't remember the time.
10        Q.   And did you look at whether or not the
11   flight went out with an empty seat?
12        A.   I don't have the ability to do that.
13        Q.   And how did you investigate --
14        A.   (Continued)  And let me clarify, I don't
15   think -- from what I found out, it went out with an
16   empty seat, I think there was one seat left that Harold
17   got as a nonrev standby.
18        Q.   What did do you to investigate
19   Mr. Christiansen being seated on a flight as a nonrev?
20        A.   If I recall, I asked the agent who booked
21   the flight what transpired.
22        Q.   And who was that?
23        A.   I can't remember who it was.
24        Q.   Was it a male?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 190

```
 1   flight, and I do recall they spoke to, his name was Ron
 2   Zimmerman, who was the agent working the flight,
 3   according to my documents, the flight to Orlando, and
 4   Ron had told them that the flight was full, it didn't
 5   look good that they would get on, and told them they
 6   might want to reconsider their options, or see what
 7   their options are, and re-directed them to the
 8   information counter.
 9        Q.   And Ron Zimmerman is a male agent?
10        A.   He is.
11        Q.   Okay.  Okay.  So was Ms. Van Winkle the
12   person who Mr. Zimmerman sent these two revenue
13   passengers to?
14        A.   She was at the information counter where
15   they were sent.
16        Q.   Okay.  She was trying to get these two
17   revenues passengers on the flight?
18        A.   She didn't have the capability of doing
19   that, but she thought they had a chance to get on.
20        Q.   And why did she think that?
21        A.   I imagine she looked at the information on
22   the computer.
23        Q.   Okay.  And do revenue passengers have
24   priority to board a flight over nonrev passengers?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 189

```
 1        A.   I can't remember.
 2        Q.   Do you remember the agent being Dennis
 3   Sourhagen (phonetic), who?
 4        A.   I'm sorry, who?
 5        Q.   Dennis Sourhagen (phonetic).
 6             MS. HENRY:  Sourhagen (phonetic)?
 7        A.   I honestly don't remember.
 8        Q.   Did you talk to Harold Christiansen about
 9   the flight?
10        A.   I don't recall talking about that.
11        Q.   Would there be records that indicated
12   whether or not this flight departed with empty seats?
13        A.   At this juncture, or earlier on?
14        Q.   Earlier, back in '09?
15        A.   I don't believe there is.  That information
16   is timely.  Unless, I think, there may be some way to
17   pull it --
18        Q.   Um-hmm.
19        A.   -- archived in Atlanta, but I wouldn't know
20   what that is.
21        Q.   And what's Incident No. 2?
22        A.   This is an incident where there were two
23   revenue standbys that were apparently -- I don't know,
24   it appears that they were trying to stand by for a
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

Henry vs. Delta  KIRCHER                    11/18/2010

Page 191

```
 1        A.   Yes.
 2        Q.   What is that priority?  They should go on
 3   first no matter what?
 4        A.   Yes.  They go on before nonrevs, yes.
 5        Q.   And the nonrevs, they were a certain number
 6   of nonrevenue passengers that were trying to board the
 7   same flight?
 8        A.   I believe there were.
 9        Q.   Okay.  And the nonrevs had not been cleared
10   or boarded to the flight?
11        A.   They were cleared.
12        Q.   Well, did Ms. Van Winkle tell you that the
13   nonrevs were not yet cleared?  Or the last sentence in
14   your fourth bullet?
15        A.   Fourth bullet?
16        Q.   Yes.
17        A.   (Reviewing document).  That's what it says.
18   I don't think they were cleared until real close to
19   departure time; I don't remember exactly when the
20   departure time or when they were cleared, but I do
21   remember Ron telling me he thought he may have paged the
22   revenue passengers and they weren't there, the two that
23   were standing by.
24        Q.   That he had sent away?
```

**AMS DEPO**

(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                          **11/18/2010**

Page 192

```
 1        A.    Well, he told them that it didn't look
 2  good, the flight didn't look good, it was full.  You
 3  might want to consider your other options, you know, go
 4  check our information desk and see what that would be;
 5  that's a routine discussion that agents have with
 6  passengers.
 7        Q.    So the information desk, calling Ron
 8  Zimmerman, they are right here?
 9        A.    I don't -- I think it's in my document here
10  somewhere, she called the gate, but I don't think she
11  talked to him.  Is that in here?
12        Q.    Well, it says she calls the gate and spoke
13  to the agent working, which was Ron Zimmerman, and asked
14  if they could get the revenue passengers on, she's
15  waving her hands saying they're right here; is that your
16  understanding?
17        A.    That's my understanding, and I don't know
18  the time frame of that.
19        Q.    Okay.  And Ms. Van Winkle was upset because
20  she perceived that nonrevs had been --
21        A.    Um-hmm (nodding head affirmatively).
22        Q.    -- cleared and boarded before these revenue
23  passengers, correct?
24        A.    Correct.
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                          **11/18/2010**

Page 193

```
 1        Q.    And she reported the incident to PL, what's
 2  PL?
 3        A.    Performance Leader.
 4        Q.    And that's Barry Erb?
 5        A.    Correct.
 6        Q.    Now, did you do anything to find out
 7  whether or not Mr. Erb had taken any action?
 8        A.    Yeah, and if may back up, I think you
 9  missed a point in here where, When Wendy called the
10  gate, the agent she spoke to said that those seats were
11  not -- they didn't think they were actually open, I
12  think that's in the fourth from the bottom.
13        Q.    So Ms. Van Winkle believed that they were
14  and that nonrev passengers were cleared after?
15        A.    No, the next bullet says, Wendy accepted
16  this because she is not a gate agent and assumed they
17  acted appropriate.
18        Q.    But then you go on to say but after the
19  fact she saw that nonrevs were cleared --
20        A.    Um-hmm (nodding head affirmatively).
21        Q.    -- and she became angry and reported the
22  incident to Mr. Erb?
23        A.    Correct.
24              MR. CROALL:  Can I call final restroom
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                          **11/18/2010**

Page 194

```
 1  break?
 2              (At which time, a recess was taken from
 3              4:04 p m. until 4:07 p.m.)
 4        Q.    How far away is the information counter
 5  from the gate that this --
 6        A.    I think is -- is that in here?
 7        Q.    -- Flight 1247 was departing from, right
 8  across the hall?
 9        A.    It says that here, I believe.  (Reviewing
10  document).
11              MR. CROALL:  (Indicating).
12        A.    Yeah, first bullet point.
13        Q.    So Mr. Erb, the performance leader, did he
14  know about the incident when it was occurring?
15        A.    Did I?
16        Q.    No, did Mr. Erb?
17        A.    Oh.
18        Q.    Shortly after it occurred, Ms. Van Winkle
19  complained to Barry Erb about the nonrevenue passengers
20  boarding and the rev passengers being denied boarding?
21        A.    Yeah, second-to-last bullet.  I don't know
22  when she reported it to Barry.
23        Q.    Did you look at Ms. Zimmerman's personnel
24  file to see if there was any notations in it regarding
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

---

**Henry vs. Delta  KIRCHER**                          **11/18/2010**

Page 195

```
 1  this incident?
 2        A.    Well, I questioned Barry about the
 3  incident.  And when Barry said that he didn't see where
 4  Ron did anything wrong, I didn't probably look for
 5  anything that Barry would have put in the file about it.
 6        Q.    Do you recall calling Wendy Van Winkle to
 7  inquire about, calling or e-mailing or communicating in
 8  some way with Ms. Van Winkle, about this incident during
 9  the investigation of Ms. Henry?
10        A.    No.  Just again, if I clarify, I was
11  investigating this information as a result of a letter
12  that came from your office.
13        Q.    Okay.  But do you recall speaking to
14  Ms. Van Winkle to inquire about this information earlier
15  at the time that you were investigating --
16        A.    No.
17        Q.    -- Ms. Henry?
18        A.    I don't recall.
19        Q.    And what was the third incident on Exhibit
20  10?
21        A.    It appears I was asked to investigate why
22  Gary's son and his friend were able to travel to Miami
23  on a charter flight.
24        Q.    And when was the charter flight?
```

**AMS DEPO**

(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 196

1      A.   I don't know, I don't remember.  It must
2  have been during a -- some sort of football game,
3  because of the first bullet point.
4      Q.   Are there gate agents that work these
5  charter flights?
6      A.   I believe so, yes.
7      Q.   Did you do any further investigation of
8  this charter flight?
9           (Reference to previously-marked Kircher
10          Deposition Exhibit No. 11.)
11     A.   I think that's in the next, Exhibit 11 --
12     Q.   Um-hmm.
13     A.   -- where it says "additional information."
14     Q.   Okay.  And that was dated, what, 3/17/09,
15 is that when you added that additional information?
16     A.   Correct.
17     Q.   Does Delta have any policies with respect
18 to nonrev passengers riding on charter flights?
19     A.   We do.
20     Q.   And what's that?
21     A.   If I recall, I believe they can ride on it
22 on nonactive parts of the charter.  For example, if the
23 plane is being repositioned, and that's about the extent
24 of my knowledge about charters; I'm not really familiar

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 197

1  with charter flights.
2      Q.   Okay, all right.  Is there a policy that
3  prohibits a nonrev, a buddy passenger, from riding on an
4  active part of a charter?
5      A.   I don't know the answer to that.
6      Q.   Did you do anything to research that?
7      A.   I believe I looked it up in the manual.
8      Q.   Okay.  And what did you learn when you
9  looked it up?
10     A.   What I just told you.
11     Q.   That you thought a buddy couldn't ride on
12 the active side of the charter?
13     A.   I think the way it's worded is something to
14 the degree of nonrevenue travel is permitted on the
15 nonactive portion of the charter flight, something of
16 that regard.
17     Q.   So was any disciplinary action taken
18 against Mr. Schmidberger?
19     A.   I don't know if that was on active or
20 versus nonactive charter.
21     Q.   Did you look?
22     A.   I have no way of looking.
23     Q.   What do you mean you have no way of
24 looking?

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 198

1      A.   I don't have the capability to do that.
2      Q.   Well, did you direct anyone who had the
3  capability to investigate this matter?
4      A.   I don't remember if I did or not.  I think
5  the policy, the way it is written, is in regards to
6  Delta, flights that we charter.  Independent charters, I
7  don't know what their policy is.  In this case, it was
8  an independent charter.
9      Q.   Was there anything discussion prior to
10 making the recommendation for termination to place Ms.
11 Henry on a probationary program?
12     A.   We had no discussion about what level of
13 administrative action to put her on prior to the
14 recommendation.  We talked about, you know, disciplinary
15 action should be issued, we didn't talk about what
16 level.
17     Q.   Well, then how did you decide termination?
18     A.   No, that was before, that was before
19 Tammy's report and got Equal Opportunity, and we were
20 advised that it possibly could be a termination.
21     Q.   Okay.  So after you were advised that it
22 possibly could be a termination, was there discussion
23 about some level of discipline less than termination,
24 either probationary or final warning?

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 199

1      A.   No, not that I remember.
2                * * *
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 201

```
 1                      * * *
 2           CONFIDENTIAL MATERIAL EXCERPTED
 3                   UNDER SEAL
 4                    PAGE 200
 5                      * * *
 6      Q.    And what is disciplinary probation?
 7      A.    If you recall from our earlier
 8  conversation, there are levels of administrative
 9  actions.  It starts with a verbal, warning letter,
10  disciplinary probation, and then final warning; that's
11  what discipline probation is, it's the step before
12  final.
13      Q.    Okay, the step before final.  And what
14  happens when you put someone on disciplinary probation?
15      A.    What do you mean, what happens?
16      Q.    Is there some sort of time frame or is
17  there some sort of expectations that are communicated to
18  the employee to acheive while on the disciplinary
19  probation?
20      A.    Yeah, what is communicated to them is there
21  is an expectation for a minimum of six months that their
22  performance approves.
23      Q.    Is it akin to the PIP process for the
24  managerial employees, or similar to the PIP process for
```

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 202

```
 1  the managerial employees?
 2      A.    I would classify those as different.
 3      Q.    How are they different?
 4      A.    The managerial employees that are placed on
 5  a performance improvement plan are expected to complete
 6  different things in order to successfully complete their
 7  PIP, if you will.  And it's very detailed and there's a
 8  lot that we challenge that leader to do to improve their
 9  performance.  We don't call it "probation" and the
10  timeline varies based on what the leader thinks they
11  need.
12      Q.    And what is final warning?  Is that just,
13  hey, this is your last warning, the next infraction may
14  lead to termination?
15      A.    Correct.
16      Q.    Did you do any investigation to see if
17  agents who had been accused of manipulating the
18  ticketing system, if they had had levels of disciplinary
19  action imposed prior to termination, if they had been
20  given a final warning or a probation warning before
21  termination?
22      A.    Two-part answer.
23      Q.    Okay.
24      A.    The first part is, I believe that's more
```

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 203

```
 1  Equal Opportunity from a corporate comparable standpoint
 2  to see how similar cases are handled.
 3           From my own perspective, in my own personal
 4  experience, I think we talked earlier about that,
 5  there's all of two that I recall being involved with
 6  that involved ticketing that were not terminated; we
 7  talked about those two.
 8      Q.    Are you familiar with a job description for
 9  a customer service agent?
10      A.    I am.
11      Q.    And did Ms. Henry meet the job
12  qualifications for her position?
13      A.    I imagine so, she'd been doing it for
14  years.
15      Q.    So she had the objective qualifications to
16  perform the --
17      A.    Correct.
18      Q.    -- duties?
19      A.    She was hired prior to me being in HR, but
20  yes, I assume she had met the qualifications.
21      Q.    Have you heard the term of waivers and
22  favors?
23      A.    Yeah, I believe I used in earlier in this
24  discussion.
```

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

Henry vs. Delta  KIRCHER                    11/18/2010

Page 204

```
 1      Q.    What is that, waivers and favors?
 2      A.    I don't know if I can define it, but from
 3  my perspective waivers and favors means that an employee
 4  is going in using their ability, and their ticketing
 5  ability, to do something differently than what they
 6  should be doing for gain, whether it's for them or
 7  themselves, or for themselves or others.
 8      Q.    Do you have any knowledge as to whether
 9  gate agents will make seat assignment changes for
10  reasons other than passenger requests?
11      A.    I don't.
12           MR. CROALL:  Ten-minute warning, Kelly.
13           MS. MULLOY MYERS:  You're eating into my
14  time by warning me.
15           MR. CROALL:  We're just sitting here
16  quitely waiting for the next question.
17      Q.    Did you play any role in preparing the
18  company's position statements to the Equal Employment
19  Opportunity Commission?
20      A.    No.
21      Q.    Now, would you have recommended a
22  termination for Mr. Gergits if you believed he had
23  requested that his family be placed in first class?
24           MR. CROALL:  Objection to the extent it
```

**AMS DEPO**
(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 205

1    calls for speculation, but you can answer.
2        A.    If he requested to Ms. Henry?
3        Q.    Yes.
4        A.    I would support a recommendation for
5    termination if that was the case.
6        Q.    And did you support a recommendation for
7    termination for Gergits?
8        A.    I'm sorry, repeat that.
9        Q.    Did you want Mr. Gergits to be terminated?
10   What was your position?
11       A.    Well, that's not my decision to make.
12       Q.    Okay.
13       A.    (Continued)  But, no, I never supported
14   that.
15       Q.    Why?
16       A.    Since he did not ask Ms. Henry to block the
17   seats for his family, as I stated earlier.
18       Q.    So if -- okay.
19            MS. MULLOY MYERS:  All right.  I want to
20   take a quick break
21            (At which time, a recess was taken from
22            4:30 p.m. until 4:35 p.m.)
23            MS. MULLOY MYERS:  All right, those are all
24   the questions I have.

**AMS DEPO**

**(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 207

1                C E R T I F I C A T E
2    STATE OF OHIO        :
                          : ss
3    COUNTY OF HAMILTON   :
4            I, Theresa L. Westfelt, Court Reporter, the
5    undersigned, a duly qualified and commissioned notary
6    public within and for the State of Ohio, do hereby
7    certify that, before giving of the aforesaid deposition,
8    DEBORAH KIRCHER, was by me first duly sworn to depose
9    the truth, the whole truth, and nothing  but the truth;
10   that the foregoing is the deposition given at said time
11   and place by DEBORAH KIRCHER; that said deposition was
12   taken in all respects pursuant to stipulations of
13   counsel hereinbefore set forth; that I am neither a
14   relative of nor employee of any of their counsel, and
15   have no interest whatever in the result of the action.
16           I further certify that I am not, nor is the
17   court reporting firm with which I am affiliated, under a
18   contract as defined in Civil Rule 28(D).
19           IN WITNESS WHEREOF, I hereunto set my hand
20   and official seal of office at Cincinnati, Ohio, this
21   _____ day of _____, 2011.
22
23                      _____
                         THERESA L. WESTFELT
24   My commission expires:
     January 9, 2015       Notary Public - State of Ohio

**AMS DEPO**

**(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio**

---

**Henry vs. Delta  KIRCHER**                    **11/18/2010**

Page 206

1            THE WITNESS:  Oh, okay.
2            MR. CROALL:  Okay, we would like to read
3    and signature.
4
5
6            _____

             DEBORAH KIRCHER
7
8                - - -
9       DEPOSITION CONCLUDED AT 4:35 P.M.
10               - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**AMS DEPO**

**(513) 941-9464   amsdepo@fuse.net   Cincinnati, Ohio**

Henry vs. Delta                          **KIRCHER**                          11/18/2010

Page 207

1                           C E R T I F I C A T E

2       STATE OF OHIO           :
                               :  SS
3       COUNTY OF HAMILTON      :

4               I, Theresa L. Westfelt, Court Reporter, the

5       undersigned, a duly qualified and commissioned notary

6       public within and for the State of Ohio, do hereby

7       certify that, before giving of the aforesaid deposition,

8       DEBORAH KIRCHER, was by me first duly sworn to depose

9       the truth, the whole truth, and nothing  but the truth;

10      that the foregoing is the deposition given at said time

11      and place by DEBORAH KIRCHER; that said deposition was

12      taken in all respects pursuant to stipulations of

13      counsel hereinbefore set forth; that I am neither a

14      relative of nor employee of any of their counsel, and

15      have no interest whatever in the result of the action.

16              I further certify that I am not, nor is the

17      court reporting firm with which I am affiliated, under a

18      contract as defined in Civil Rule 28(D).

19              IN WITNESS WHEREOF, I hereunto set my hand

20      and official seal of office at Cincinnati, Ohio, this

21      _____9th____ day of ____May_____, 2011.

22

23                                  _____Theresa L. Westfelt_____

24      My commission expires:          THERESA L. WESTFELT
        January 9, 2015                 Notary Public - State of Ohio

**AMS DEPO**
**(513) 941-9464  amsdepo@fuse.net  Cincinnati, Ohio**

ORIGINAL