Greg Kuhn - 12/7/2010

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DIVISION OF KENTUCKY
COVINGTON DIVISION

RACHELLE HENRY,                ) CIVIL ACTION
                               ) NO. 2:10-CV-00009
          Plaintiff,           )
                               )
     vs.                       )
                               )
DELTA AIRLINES, INC.,          )
                               )
          Defendant.           )
_____)

DEPOSITION OF
GREG KUHN
December 7, 2010
1:41 P.M.
1030 Delta Boulevard
Atlanta, Georgia

Jannette Price, RPR, CSR

**Page 2**

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

    KELLY MULLOY MYERS, Esq.
    Freking & Betz, PC
    525 Vine Street
    Cincinnati, Ohio  45202

On behalf of the Defendant:

    DAVID T. CROALL, Esq.
    Porter, Wright & Arthur, LLP
    250 East Fifth Street
    Suite 2200
    Cincinnati, Ohio  45202-5118

On behalf of the Defendant:

    KELLY K. GIUSTINA
    Delta Airlines, Inc., Law Department
    981-1030 Delta Boulevard
    PO Box 20574
    Atlanta, Georgia  30320-2574

                 - - -

**Page 3**

TABLE OF CONTENTS
                                          Page
Examination by Ms. Mulloy Myers            4

Exhibit      Description              Page
  1     Delta Airlines Irregularity Report   19
  2     Ethics and Compliance Reporting      22
        General Information

  3     Ethics and Compliance Reporting      22
        General Information
  4     E-mail dated 1/1/08              24
  5     Delta Internal Memorandum dated      32
        7/15/08

  6     E-mail dated 7/15/08             40

  7     Delta Internal Memorandum dated      55
        dated 7/15/08

        (Reporter disclosure made pursuant to Article
8.b. of the Rules and Regulations of the Board of Court
Reporting of the Judicial Council of Georgia.)

**Page 4**

                GREG KUHN,
having been first duly sworn, was deposed and testified
as follows:
                EXAMINATION
BY MS. MULLOY MYERS:
     Q.   Good afternoon.  We met briefly a moment
ago but, again, my name is Kelly Myers, and I'm an
attorney representing Rachelle Henry in a matter she has
brought against her former employer, Delta, and the
reason we've asked you here today is you have been
identified as someone who may have knowledge of the
claims Ms. Henry has alleged.  So the purpose of this
afternoon is to ask you some questions to find out what
you may know and what you may not know, okay?
     **A.   Okay.**
     Q.   Have you ever had your deposition taken
before?
     **A.   Yes.**
     Q.   On how many occasions?
     **A.   Once.**
     Q.   Okay.  How long ago was that?
     **A.   Probably 2000, 2001, somewhere in that
neighborhood.**
     Q.   Okay.  Did that have anything to do with
Delta?

d2546bf2-2fb7-440b-a4a1-e668b8b8d4a2

**Greg Kuhn - 12/7/2010**

5

1   A.   Yes.
2      Q.   Having had your deposition taken before,
3   you kind of know what to expect, but there are a few
4   things to help the proceedings to go smoothly. Jannette
5   is a court reporter. She is taking down what we are
6   saying, verbatim. At the conclusion of the deposition,
7   a written transcript may be prepared. So with that in
8   mind, it's important to remember to keep your answers
9   verbal. Nodding your head won't come across on the
10  transcript. Also, yes or no is preferable to uh-huh or
11  uh-uh, just because it's clear on the written record,
12  okay?
13     A.   Okay.
14     Q.   If you don't hear or understand a question
15  that I've asked, please ask me to repeat or rephrase it.
16  If you do answer a question, I'm going to assume that
17  you heard and understood it, okay?
18     A.   (No response.)
19     Q.   Okay?
20     A.   Yes. Sorry.
21     Q.   That's okay. It's also difficult to take
22  down two people talking at once. So if you can, let me
23  finish a question before you begin to answer. That's
24  helpful. Even if you know where I'm going with it, let
25  me get it all out before you begin to speak, okay?

6

1      A.   Okay.
2      Q.   If you need a break for any reason, just
3   let me know. The only thing I would ask with respect to
4   breaks is, if there is a question pending, you answer
5   that one question before we adjourn.
6      A.   Sure.
7      Q.   Okay. And the first thing I'll have you do
8   is just verify your name for the record, please.
9      A.   It's Greg Kuhn.
10     Q.   And what is your month and year of birth?
11     A.   ███/52.
12     Q.   All right. What is your home address?
13     A.   ████████████████, Burlington,
14  Kentucky 41005.
15     Q.   Okay.
16        MR. CROALL: It just worked out
17  logistically to do this here. Yes, he is a
18  Cincinnati based guy, but it just worked out.
19        MS. MULLOY MYERS: Okay.
20        MS. GIUSTINA: He has a busy schedule.
21  BY MS. MULLOY MYERS:
22     Q.   And how long have you lived in Burlington?
23     A.   Since 1978.
24     Q.   And are you currently employed?
25     A.   Yes.

7

1      Q.   By whom are you employed?
2      A.   Delta Airlines.
3      Q.   What was your date of hire?
4      A.   4/16 of 2000.
5      Q.   What is your current position?
6      A.   I am a senior corporate security rep based
7   in Cincinnati.
8      Q.   How long have you held that position?
9      A.   Ten years. It'll be 11 in April.
10     Q.   Okay. So that's the position that you've
11  held throughout your tenure with Delta?
12     A.   Yes, ma'am.
13     Q.   Prior to your employment at Delta, what did
14  you do?
15     A.   I was a police officer with the Cincinnati
16  Northern Kentucky Airport Police Department for 27
17  years.
18     Q.   Okay. Did you do anything to prepare for
19  this afternoon's deposition?
20     A.   I just met with Mr. Croall.
21     Q.   Okay. Other than counsel, did you talk to
22  anybody about your deposition?
23     A.   No.
24     Q.   Did you review any documents in preparation
25  for your deposition?

8

1      A.   I did look at a few of them.
2      Q.   Okay. And what documents do you recall
3   reviewing in preparation for your deposition?
4         MR. CROALL: We are going to have the
5   same conversation that we had in the prior
6   deposition. To the extent that Mr. Kuhn looked
7   at documents on his own, he can tell you about
8   that. To the extent the only documents he
9   looked at were documents selected by me --
10        THE WITNESS: Right.
11        MR. CROALL: -- I'll object and instruct
12  him not to answer.
13  BY MS. MULLOY MYERS:
14     Q.   Did you review any documents that you
15  reviewed on your own?
16     A.   Just one.
17     Q.   What was that?
18     A.   The report Tammy Davis did after the
19  interview.
20     Q.   And is she also known as Tammy --
21     A.   Mauer.
22     Q.   Yeah. Okay. Any other documents that you
23  received on your own?
24     A.   No.
25     Q.   Did you review any documents with counsel

d2546bf2-2fb7-440b-a4a1-e668b8b84da2

**Greg Kuhn - 12/7/2010**

---

9

1  in preparation for your deposition?
2        MR. CROALL:  You can answer that yes or
3  no.
4        THE WITNESS:  Yes.
5  BY MS. MULLOY MYERS:
6     Q.   Okay.  I'm going to ask you the question,
7  and I think your counsel is going to object, but what
8  documents did you review --
9     A.   Oh, I'm sorry.  Let me turn this off.
10    Q.   That's okay.
11    A.   Okay.  Sorry.
12    Q.   That's okay.  What documents did you review
13  in preparation for your deposition?
14       MR. CROALL:  Selected by counsel, are
15  you asking him for that, right?
16       MS. MULLOY MYERS:  Prepared by counsel
17  or given to you by counsel.
18       MR. CROALL:  Object and instruct not to
19  answer on privilege and/or work product.  So
20  you don't have to answer.
21  BY MS. MULLOY MYERS:
22    Q.   Are you going to decline to answer the
23  question?
24    A.   I decline.
25    Q.   Okay.  What are your duties as a senior

---

10

1  corporate security representative?
2     A.   We do employee investigations, criminal,
3  check fraud, credit card fraud, abuse of passenger,
4  workplace violence, compliance, site security
5  assessments, new startup stations.  What else?
6  Workplace -- did I say workplace violence?
7     Q.   Yes.  What was the -- are you saying use of
8  passenger?
9     A.   Abuse of passenger.
10    Q.   Oh.
11    A.   Passenger misconduct.
12    Q.   And you mentioned criminal investigations.
13  Is that involving employees or ...
14    A.   Outside sources and employees, either one.
15    Q.   And what authority do you have to conduct
16  criminal investigations?  Do you have any police
17  authority?
18    A.   No.
19    Q.   Okay.  So it's basically internal
20  investigations that it might involve --
21    A.   Correct.  If I have to go to law
22  enforcement or county attorney, if I need any legal
23  assistance.
24    Q.   And what type of employee investigations
25  would you be involved with in your position as senior

---

11

1  corporate security representative?
2     A.   Employee thefts; some waivers and favors,
3  as they call them; employees involving credit card
4  fraud; employee thefts, I said; employees involved with
5  workplace violence.  I'm trying to think.  You know,
6  those are the type of investigations that I do.
7     Q.   Okay.  And when you say you're based out of
8  Cincinnati, do you do investigations at other locations?
9     A.   Yes, I cover a region.
10    Q.   What's the region that you cover?
11    A.   Well, I'm in the -- I'm in the northeast
12  region, but I got a lot of the midwest.  But we're
13  spread all over.  If you want, I can give you the
14  domestic stations, if you need them.
15    Q.   Okay.
16    A.   Lexington, Louisville, Cincinnati, Dayton,
17  Cleveland, Columbus, Chicago, St. Louis, Kansas City,
18  Toronto, Montreal.  Probably missing something.
19    Q.   Okay.
20    A.   Indi (phonetic), a lot of the midwest and
21  then I have international stations.
22    Q.   To whom do you report?
23    A.   To John Edwire in JFK.
24    Q.   Mr. Edwire is based out of JFK?
25    A.   Yes, ma'am.

---

12

1     Q.   What's his position?
2     A.   He's a corporate security manager over the
3  northeast region.
4     Q.   When did you first come to know or know of
5  Rachelle Henry?
6     A.   I can't give you a date, but back when this
7  thing was ongoing, Paul Baird, the field director in
8  Cincinnati, had mentioned to me that him and Deb Kircher
9  had information that employees had given them that they
10  thought Ms. Henry did some wrongdoing with part of her
11  process of her job with working a flight, hanging some
12  seats.
13        Employees had contacted them and said that
14  what happened was wrong and they needed somebody to look
15  into it, and him and Deb asked me then if I could look
16  into that, Deb Kircher, or have someone look into it, I
17  should say, within corporate security.
18    Q.   Okay.  So the first time you became aware
19  of Rachelle Henry was when Paul Baird called you and
20  said we would like you to do an investigation?
21    A.   Yes.
22    Q.   Essentially.  Okay.  And you said Paul
23  Baird's position was a field director at CVG?
24    A.   That's correct.
25    Q.   And did you understand Deb Kircher was in

---

d2546bf2-2fb7-440b-a4a1-e668b8b8d4a2

**Greg Kuhn - 12/7/2010**

---

13

1  human resources?
2  **A.   That's correct.**
3  Q.   What's your day-to-day interaction with
4  Paul Baird, if any?  How often do you --
5  **A.   Quite often.  He's security conscious and,**
6  **you know, he asks me to help when he needs it.**
7  Q.   Okay.  So the first communication was a
8  phone call?
9  **A.   I don't know if it was by phone call or in**
10  **person, but he came to me either by phone -- I can't**
11  **remember.  It's been a long --**
12  Q.   So oral communication?
13  **A.   Yes, ma'am.**
14  Q.   Then what happened next?
15  **A.   I don't remember if him or Deb supplied --**
16  **probably was Deb.  I just can't remember for sure.**
17  **Somebody supplied me what reports they had in the**
18  **station, what statements they had collected, what**
19  **information they -- they had already did their internal**
20  **-- they had already started their investigation with**
21  **airport customer service, and they gave me all of their**
22  **information that they had gathered on this.**
23  Q.   Did they ask you to investigate George
24  Gergits?
25  **A.   Yes.**

---

14

1  Q.   Was that at the same time?
2  **A.   Yes.**
3  Q.   What did they tell you about George
4  Gergits?
5  **A.   They asked if -- the presumption was that**
6  **George -- the allegation was that he was recruiting**
7  **someone to work a flight and appearances that George**
8  **wanted her to work the flight.  So he was in hopes of**
9  **getting, I guess, up in first class, is what the**
10  **allegations were, to get up front.**
11  Q.   Did you have any document -- did you
12  receive any documents regarding Mr. Gergits?
13  **A.   I had numerous papers.  I can't -- was it**
14  **specifically something from him?  I don't understand the**
15  **question.  Something from him?**
16  Q.   Well, related that anyone gave you
17  regarding the statements.
18  **A.   Yeah, he was mentioned in the statements**
19  **that employees had -- some of the statements they gave**
20  **me, he was mentioned in there, the allegations, what the**
21  **employees thought he did and she did based on their**
22  **complaints.**
23  Q.   Okay.
24  **A.   So I did get -- I got numerous statements**
25  **and some documentation, computer documentation out of**

---

15

1  the records, out of Delta's records.
2  Q.   Did you maintain a file on your
3  investigation?
4  **A.   I did.**
5  Q.   And did you produce that file to counsel?
6  **A.   I did.**
7  Q.   What did you do to look for any records
8  that you may have regarding the Henry and/or Gergits
9  investigation that you participated in?
10  **A.   Based on the allegations, this -- I'm not a**
11  **-- I'm not a ticketing person.  I have a law enforcement**
12  **background.  I'm not -- we investigate.  I don't do a**
13  **lot of -- I'm not good at ticketing.  I'm not trained in**
14  **it.  So what I do is, I submitted all the paperwork to**
15  **Atlanta to the Revenue Protection Unit, which is part of**
16  **corporate security, and had them research everything we**
17  **had to see if it was anything -- anything that we needed**
18  **to look at here.**
19  Q.   Okay.  You said that you submitted some
20  paperwork to Atlanta.  You said the Revenue Protection
21  Department?
22  **A.   Yes.**
23  Q.   And asked them to look at the
24  documentation?
25  **A.   And the facts of the case to see if there**

---

16

1  was anything there.
2  Q.   And you did that because you're not
3  intimately familiar with the ticketing operations at the
4  airport.  Is that fair to say?
5  **A.   Or the Delta ticketing system.**
6  Q.   Okay.  You felt that they would be more
7  familiar?
8  **A.   That's what they do.**
9  Q.   Okay.  Who in the Revenue Protection
10  Department did you submit the file to or the documents
11  to?
12  **A.   That I can't remember.  Probably the**
13  **manager, Paulette Henderson.  I'm not sure.  It's either**
14  **her and Pam Fears, is who I usually send stuff to and**
15  **then they assign.**
16  Q.   And was an assignment made?
17  **A.   Yes.**
18  Q.   And who was that?
19  **A.   Tammy Mauer; now Tammy Davis.**
20  Q.   Okay.  My question was actually -- it was a
21  poor question.  What did you do as part of this
22  litigation to look for documents that you may have had
23  possession of or control over to produce to counsel, if
24  anything?
25  **A.   I don't understand that question.  Again?**

---

d2546bf2-2fb7-440b-a4a1-e668b8b84da2

**Greg Kuhn - 12/7/2010**

17

1      Q.   Sure.  Do you have any documents in your
2   possession or under your control regarding Ms. Henry or
3   the Henry or Gergits' investigation?
4      A.   Yes.
5      Q.   What documents were those?
6      A.   **Everything that was given to me as part of**
7   **the investigation that they had already done within**
8   **customer service.  They sent me everything and then I**
9   **forwarded it to RPU.**
10     Q.   And did you produce that file?
11     A.   **Oh, yeah.**
12     Q.   Those documents that you had to counsel in
13  this matter?
14     A.   **Oh, yes, yes.**
15     Q.   Okay.  Now, what did you do to look for
16  documents?  Is there anything outside of that file that
17  you still have?
18     A.   **No.  Yeah, I still have copies.**
19     Q.   Anything outside of the file that you
20  produced to counsel?
21     A.   **No.  I don't have anything else.**
22     Q.   Would you have had e-mails?
23     A.   **I don't have any myself.**
24     Q.   Okay.  Do you have a computer or a laptop
25  that you use for work?

18

1      A.   **Umn-hmn.  Yes, ma'am.**
2      Q.   Do you archive e-mails that you get
3   regarding investigations?
4      A.   **No, not usually.  Sometimes I just -- I**
5   **usually do hard copies and keep them in my file.**
6      Q.   Okay.  Did you understand that there had
7   been a local investigation done prior to Paul Baird
8   asking you to investigate the matter?
9      A.   **I was aware of that, yes.**
10     Q.   And how did you become aware of that?
11     A.   **I was told by Paul based on -- I think a**
12  **performance leader did an internal investigation and**
13  **collected all the information that they gave me.**
14     Q.   And who do you recall that being?
15     A.   **It was Sam Tumminello.**
16     Q.   And had Mr. Tumminello reached a conclusion
17  as to whether there had been any offense --
18     A.   **It's been a while since I read his --**
19     Q.   -- that warranted disciplinary action?
20     A.   **It's been a while since I read his**
21  **statement.  I couldn't tell you how he worded it.  I**
22  **don't have that answer right now.**
23     Q.   Okay.  Did Paul Baird give you any kind of
24  indication about what he thought about the allegation
25  that Ms. Henry may have violated some policy?

19

1      A.   **He just -- he said he wanted me to have**
2   **somebody look at this so he could get this thing**
3   **resolved.  That's pretty much what he wanted to do.**
4      Q.   Did he say he wanted somebody to look at it
5   so he could get this thing resolved?
6      A.   **He wanted me to -- he wanted me to send it**
7   **to RPU or to anybody I could get to look at it to see if**
8   **there was any wrongdoing.**
9                    (Whereupon, the court reporter
                     marked Exhibit 1 for
10                   identification.)
11  BY MS. MULLOY MYERS:
12     Q.   I'm handing you what we are going to mark
13  Kuhn Exhibit 1.  I'll ask you to take a look at that and
14  let me know if you can identify it.
15     A.   **I'm familiar with that.**
16     Q.   Okay.  You can hang on to it.  I might have
17  some questions about it.
18          Did you receive this from anyone at CVG as you
19  began your investigation into the Henry matter?
20     A.   **Yes.  That was one of the pages that I was**
21  **given.**
22     Q.   If we can just let me get a question out
23  before you begin to speak.  I know you know where I'm
24  going with it, but try and let me finish before you
25  start.

20

1      A.   **Okay.  Sorry, sorry.**
2      Q.   That's okay.  No, it's -- I mean, I know we
3   are in a conversation, but it would make it a lot easier
4   for Jannette.
5      A.   **I apologize.  Sorry.**
6      Q.   That's okay.  All right.  So Exhibit 1 was
7   one of the documents that you received from Paul Baird
8   as you began the Henry investigation?
9      A.   **Yes, that's the one I received.**
10     Q.   Okay.  And what did you understand this
11  document to be?
12     A.   **His summary of what he talked to Rachelle,**
13  **what he told her some of the reasons were this happened.**
14  **Didn't tell me -- didn't give me really an answer one**
15  **way or the other.**
16     Q.   Whose summary?
17     A.   **Sam's.**
18     Q.   Sam Tumminello's?
19     A.   **Yes, ma'am.**
20     Q.   Did you talk to Sam about this irregularity
21  report?
22     A.   **No.**
23     Q.   Did you understand Sam had drafted this
24  report?
25     A.   **Yes.**

d2546bf2-2fb7-440b-a4a1-e668b8b84da2

**Greg Kuhn - 12/7/2010**

21

1  Q. Okay. What was the irregularity that was
2  being investigated?
3  **A. What my understanding was, is that several**
4  **hours before boarding, two hours I believe, Rachelle,**
5  **what they call "hung" or "blocked" three first class**
6  **seats on a flight to San Diego.**
7  Q. And what is hanging a seat?
8  **A. Blocking it so nobody can ticket it or get**
9  **to it for any reason.**
10  Q. And is that something that is a practice of
11  gate agents?
12  **A. I can't answer that. I don't know.**
13  Q. Did you do any investigation into that part
14  of it?
15  **A. No.**
16  Q. That's what you turned over to RPU?
17  **A. No, that's -- that's correct.**
18  Q. And did you understand after reviewing
19  Exhibit 1 that Mr. Tumminello did not feel that there
20  was at least a termination offense here?
21  **A. I don't know what -- based on this, this**
22  **didn't tell me much. As far as I -- it didn't tell me**
23  **much.**
24  Q. Okay. Did you ever interview
25  Mr. Tumminello or ask him what his thoughts were with

22

1  respect to the situation?
2  **A. No.**
3  Q. Did you receive the 800 line calls as part
4  of your investigation?
5  **A. The ethics compliance?**
6  Q. Yes.
7  **A. Yes.**
8      (Whereupon, the court reporter
       marked Exhibits 2 and 3 for
9      identification.)
10  BY MS. MULLOY MYERS:
11  Q. I'm going to hand you what's been marked
12  Exhibits 2 and 3. If you can, take a moment and let me
13  know if you can identify them.
14  **A. These are the two ethics compliance reports**
15  **that came through from two of our employees in**
16  **Cincinnati.**
17  Q. And what did you do with these reports?
18  **A. I read them. And the one that came from**
19  **the lady who seemed to have firsthand knowledge, who had**
20  **more information, I asked her for another statement,**
21  **Mrs. Zimmerman. The other one, I didn't do anything**
22  **because this was all -- I think all was what she -- was**
23  **rumors and what she heard from other people.**
24  Q. Okay. So you received Exhibits 2 and 3 to
25  start your investigation. You reviewed them and then

23

1  you asked Patsy Zimmerman for an additional statement?
2  **A. Yes.**
3  Q. Did you speak to Kit Palmer at all?
4  **A. No, ma'am.**
5  Q. Because you didn't -- did you choose
6  not to speak to Ms. Palmer?
7  **A. Because from information there, I think**
8  **everything was what she heard.**
9  Q. Okay.
10  **A. Not what she knew.**
11  Q. Okay. What do you recall about your
12  communication with Ms. Zimmerman regarding her ethics
13  and compliance report?
14  **A. I just wanted her to give me more**
15  **information, another statement, and she did. That's all**
16  **I asked.**
17  Q. The time you had asked Ms. Zimmerman for
18  another statement, had you involved -- what is it RP --
19  **A. Revenue protection; RPU, Revenue Protection**
20  **Unit.**
21  Q. RPU. Yeah, the RPU group; do you recall?
22  **A. I can't tell. You are asking me if I**
23  **notified them before or about this?**
24  Q. Yeah. Oh, here. I'll give that right
25  back. I hadn't given it to you yet. I was asking you a

24

1  question. Do you recall if you had asked RPU for their
2  input at the time you asked Ms. Zimmerman for a
3  statement?
4  **A. I can't remember which came first.**
5      (Whereupon, the court reporter
       marked Exhibit 4 for
6      identification.)
7  BY MS. MULLOY MYERS:
8  Q. Okay. Let me hand you what's been marked
9  Exhibit 4. If you can, take a moment and look at that
10  document and let me know if you can identify it.
11  **A. That's the e-mail she sent to me upon my**
12  **request.**
13  Q. Exhibit 4 is the e-mail Ms. Zimmerman sent
14  to you?
15  **A. Yes, ma'am.**
16  Q. And then you forwarded the e-mail to Debra
17  Kircher and Gary Schmidberger?
18  **A. That's correct.**
19  Q. And Ms. Kircher was local HR at the time?
20  **A. That's correct.**
21  Q. And Mr. Schmidberger, what was his position?
22  **A. He's our manager, our hub manager.**
23  Q. Okay. What did you do upon receiving this
24  additional statement from Ms. Zimmerman?
25  **A. As I did with everything, when I got it, I**

d2546bf2-2fb7-440b-a4a1-e668b8b84da2

**Greg Kuhn - 12/7/2010**

25

1    probably forwarded it to RPU to help them, but I don't
2    remember when.
3        Q.    Did you do any follow-up investigation?
4        A.    With her?
5        Q.    Yes, with Ms. Zimmerman.
6        A.    No, no.
7        Q.    Did you interview any of the individuals
8    Ms. Zimmerman had named such as Teresa Suttenback or
9    Caron Mindel?
10        A.    No, I didn't.
11        Q.    Did you do any investigation at all into
12    kind of the seating procedure or did you turn that over
13    strictly to RPU?
14        A.    Turned it over to RPU.
15        Q.    Okay.  Did you interview Rick Andre?
16        A.    No.
17        Q.    Did you interview Harold Christensen?
18        A.    No.
19        Q.    Did anyone -- well, would you be involved
20    in investigations for harassment in the workplace?
21        A.    I have been, yes, in the past.
22        Q.    What types of harassment?
23        A.    I've done stalking, harassing
24    communications involving employees, things of that
25    nature.

26

1        Q.    What kind of harassing communications?
2        A.    E-mails, phone calls, you know,
3    ex-boyfriends or -- another agent threatening me or my
4    ex-husband while I'm at work is calling.  Stuff like
5    that.
6        Q.    Okay.  What about sex harassment issues?
7    Do you become involved in that, new investigations like
8    that?
9        A.    Not usually.  I haven't had a whole lot of
10    the sexual harassment.
11        Q.    I'm sorry?
12        A.    Not a lot of sexual harassment cases.
13        Q.    Okay.  It's more like violence harassment
14    that you would be involved in?
15        A.    Criminal harassment.  Like I say,
16    communications harassment, stalking, things of that
17    nature.
18        Q.    Okay.  All right.  So what do you recall
19    the next step in this investigation being?  You received
20    some documents.  Did you receive any documents other
21    than the irregularity report, the two ethics and
22    compliance reporting documents as you began your
23    investigation?
24        A.    Yes.
25        Q.    What other documents do you recall

27

1    receiving?
2        A.    Some statements from some employees.
3        Q.    Were they handwritten statements?
4        A.    Yes, ma'am.  Well, I would have to look.  I
5    know some were.  Some may have been typed, e-mailed.
6        Q.    From which employees?
7        A.    I'd have to look at my file to tell you.
8    Harold Christensen was one.  Rick Andre was one.  If I
9    can remember -- I got the one from Patsy Zimmerman.  But
10    other than that, I would have to look.  Who else?  Who
11    else?  There was one --
12        Q.    Do you recall any of the substance of those
13    employee statements?
14        A.    Do I recall what?
15        Q.    The substance of any of those employee
16    statements.
17        A.    Some of them.
18        Q.    What do you recall the substance being, the
19    ones that you can recall?
20        A.    The one that comes to mind is Harold
21    Christensen's statement.
22        Q.    And what did he say?
23        A.    It was alleging George was trying to
24    recruit someone to work the flight that couldn't get in
25    trouble that was ready to retire.  But to give you

28

1    everything, I would have to look at it.
2        Q.    Do you recall the substance of any other
3    statements that you received as you began your
4    investigation?
5        A.    I read them, but I don't remember every
6    detail of everyone.
7        Q.    Don't need every detail.  Just what you
8    recall other than Christensen?
9        A.    That one.  The other ones -- the other one,
10    Rick Andre, I didn't -- I remember reading it, but I
11    can't remember what his response was.  I'd have to read
12    it again.
13        Q.    Okay.  Anything else that you received
14    other than some employee statements, the irregularity
15    report and the ethics reports?
16        A.    And some documentation taken from the Delta
17    computer with the seating and the standby lists and, all
18    that information was there that the station had given me
19    that somebody acquired.  I'm assuming it was Sam.  I'm
20    not sure though.
21        Q.    Okay.  Anything else?
22        A.    Not that I can think of.
23        Q.    Okay.  All right.  And you reviewed that
24    information; you asked Ms. Zimmerman for a follow-up
25    statement?

**Greg Kuhn - 12/7/2010**

29

1    A.   Yes.
2    Q.   You received that from her?
3    A.   Yes.
4    Q.   You forwarded that to Kircher and
5    Schmidberger?
6    A.   Yes.
7    Q.   What else, what was your next activity as
8    part of this investigation?
9    A.   Basically, I gave everything I had to RPU,
10   waiting for them to take a look at all this information
11   to see if there was -- what happened, what the
12   allegations were, if there was substance to it.
13   Q.   Okay.  So then what was your -- after you
14   gave the information to RPU, what happened next?
15   A.   Then RPU did their investigation.  I don't
16   remember the time line.  They came back and concurred
17   that there was three seats hung on this flight.
18   Mr. Gergits' three sons ended up getting those three
19   seats and that there was some revenue passengers that --
20   they were Medallions or Diamond Medallions, whatever,
21   there was standbys, paying passengers, that got seated
22   in coach that didn't get those seats.
23   Q.   Now, who from RPU came back and concluded
24   that there were three seats hung?
25   A.   Tammy, Tammy Davis.

30

1    Q.   Now, was this conclusion drawn before or
2    after you interviewed Ms. Henry and Mr. Gergits?
3    A.   This was before.
4    Q.   So Ms. Davis in RPU took a look at the
5    documentation and then came back and said she thought
6    that there were three seats hung?
7    A.   Correct.
8    Q.   Was this an oral communication between the
9    two of you or was it written?
10   A.   That was -- I believe that was oral.
11   Q.   Okay.  Do you recall anything else that
12   Ms. Davis told you at this point?
13   A.   No.  Just that we needed to probably speak
14   to these employees.
15   Q.   And Ms. Davis is located here in Atlanta?
16   A.   Yes, ma'am.
17   Q.   Okay.  What happened next?
18   A.   We set up a date to interview the two
19   employees.
20   Q.   So you set up interviews with the two
21   employees?
22   A.   That's correct.
23   Q.   Being Ms. Henry and Mr. Gergits?
24   A.   Correct.
25   Q.   Do you know how the meetings were set up?

31

1    A.   Probably through Deb Kircher and through
2    Gary Schmidberger, the manager.
3    Q.   Okay.  You weren't involved in doing that,
4    in scheduling the meetings with the employees?
5    A.   Well, we requested them to find a date that
6    we could talk to them.
7    Q.   Okay.  And who was interviewed first?
8    A.   I believe Ms. -- I can't -- it's been a
9    while.
10   Q.   If you recall?
11   A.   I can't recall which one went first.
12   Sorry.
13   Q.   Were you present at both interviews?
14   A.   Yes, I was.
15   Q.   What do you recall about the interview with
16   Ms. Henry?
17   A.   I asked them -- I introduced everyone in
18   the interview and I asked some questions of Ms. Henry to
19   lead into the interview, and without having the report
20   in front of me, I can't remember what questions I asked.
21   Q.   And what report are you referring to?
22   A.   Tammy Davis' report.
23   Q.   Did you prepare any type of report as a
24   result of the interview?
25   A.   No.  She did the note taking and the

32

1    transcribing of the interview.  I don't normally do that
2    when I interview people.  She took the notes.
3    Q.   Did you take any notes at all during the
4    meeting?
5    A.   Nope.
6    Q.   Okay.
7    A.   No, ma'am.
8         (Whereupon, the court reporter
               marked Exhibit 5 for
9              identification.)
10   BY MS. MULLOY MYERS:
11   Q.   Let me hand you what's been marked Exhibit
12   5.  I'll ask you to take a moment and look at that and
13   then let me know if you can identify it.
14   A.   That's the report of the interview that
15   Tammy and I did with George Gergits and Rachelle Henry.
16        MR. CROALL:  Does this one cover
17   Gergits?
18        MS. MULLOY MYERS:  No, it does not.
19        THE WITNESS:  There is -- there is one
20   but this is just hers.
21   BY MS. MULLOY MYERS:
22   Q.   As part of the investigation, did you
23   interview anyone other than Henry and Gergits?
24   A.   No.
25   Q.   Did you have any conversation with anyone

**Greg Kuhn - 12/7/2010**

---

33

1    after the Henry interview about the course of the
2    interview or the substance of the interview?
3        **A.   Discussion about the interview?**
4        Q.   Yes.
5        **A.   Just with Tammy Mauer.**
6        Q.   What did you and Tammy Mauer discuss after
7    the interview regarding what had been said during the
8    interview?
9        **A.   Just, you know, basically summarized that**
10   **there was three hung seats and that Ms. Henry couldn't**
11   **account for why she did it, give an explanation of why**
12   **the three seats were hung.**
13       Q.   Well, did Ms. Henry tell you that she
14   received a call to hold for approximately 12 connecting
15   passengers from a late flight?
16       **A.   I don't recall her response to that, no.**
17       Q.   Did Ms. Henry tell you that as a gate
18   agent, she would try to be proactive in pre-boarding,
19   pre-departure or would try to seat passengers together
20   who were traveling together and would sometimes move
21   seats around to try to anticipate any problems before
22   boarding began?
23       **A.   If she said it, I don't remember that**
24   **conversation.  I didn't ask her about that particular**
25   **part.**

---

34

1        Q.   Did Ms. Henry say that if passengers
2    potentially eligible for upgrade had already boarded,
3    she would not reseat them, to move them up into first
4    class, if they had already gotten on the plane?
5        **A.   I do remember that.**
6        Q.   Did you do anything to investigate whether
7    that was proper procedure?
8        **A.   That's what Tammy does.  I didn't**
9    **investigate that part.**
10       Q.   Okay.  How long after the flight did this
11   interview occur?
12       **A.   The interview was on, what, July 15th --**
13   **14th, 14th.  And the date of the incident was, I**
14   **believe, June 8th.**
15       Q.   How many flights had Ms. Henry worked from
16   the June 8th flight until the June 14th interview?
17       **A.   Till the June 14th.**
18       Q.   July 14th interview.
19       **A.   I have no idea.**
20       Q.   Why had there been over a month long delay
21   before inquiring about what had happened on this
22   June 8th flight by Ms. Henry?
23       **A.   By the time -- when I got it, it was**
24   **probably -- I think I got it later in the -- end of the**
25   **month, towards end of the month.  And then RPU takes it**

---

35

1        **from there.  And if they are busy, it could -- you know,**
2        **they do -- if they are swamped, so that could be why it**
3        **took that long.**
4        Q.   Okay.  In your experience at both CVG as a
5    police officer and in your decade in corporate security,
6    is it fair to say that memories are fresher closer in
7    time to events as they occur?
8        **A.   Normally, yes.**
9        Q.   Okay.  The details fade with time?
10       **A.   Yes.**
11       Q.   Was Ms. Henry given any kind of opportunity
12   to prepare for this interview or pull any documents
13   together to review?
14       **A.   Not that I'm aware of.**
15       Q.   Were you aware that Ms. Henry was called
16   from home to attend this interview?
17       **A.   I don't know how she was notified of the**
18   **interview.**
19       Q.   Okay.  Did she indicate that she had
20   obligations, children's appointment that she was missing
21   as a result of being called into this interview?
22       **A.   That, I can't remember.**
23       Q.   Was any investigation done to determine how
24   often agents would book protection seats?
25       **A.   Tammy Davis did the investigation there.**

---

36

1        **She could answer that.**
2        Q.   Okay.  You did not do any kind of
3    investigation?
4        **A.   Not on that piece, no, ma'am.**
5        Q.   Do you know if Ms. Davis did?
6        **A.   I can't answer that, if she did or didn't.**
7        Q.   Ms. Henry advised you during the interview
8    that the gate was hectic, correct?
9        **A.   If I asked that question, I don't see that**
10   **answer here.**
11       Q.   On the third page.
12       **A.   Oh, okay.  Let me get there.**
13       Q.   Sure.  Kind of midway of the first full
14   paragraph.  Henry stated that the gate was hectic.
15       **A.   I'm missing it.  Oh, up here.  That was a**
16   **question asked by Ms. Mauer.  I can't -- I mean, she**
17   **told -- that's what Ms. Mauer asked her, not me.**
18       Q.   Okay.  Do you recall Ms. Henry stating that
19   the gate was hectic and she was working the gate by
20   herself?
21       **A.   Yes, I do remember that.**
22       Q.   And you asked Henry if anyone had asked her
23   to hold the seats?
24       **A.   Yes.**
25       Q.   And why did you ask her that?

d2546bf2-2fb7-440b-a4a1-e668b8b84da2

**Greg Kuhn - 12/7/2010**

37

1      A.   Because the allegations were that
2  Mr. Gergits had requested her to work the flight and
3  that his three sons got on the flight.  And so I asked
4  her did anyone ask her.  Did he ask her to do it or
5  anyone else.
6      Q.   Were any passengers denied boarding because
7  the Gergits got on the flight?
8      A.   I don't know that answer.
9      Q.   Was any revenue lost because the Gergits'
10  family got on the flight?
11     A.   I guess there could be.  I don't know what
12  -- how that works.
13     Q.   Did anyone ever determine whether or not
14  Mr. Gergits had asked for Ms. Henry to work that flight?
15     A.   Yes, there were statements to that effect.
16     Q.   Who made those states?
17     A.   Let me think.  I'm trying to think.  I
18  can't remember the names now.
19     Q.   Are you finished with your answer that you
20  don't remember?
21     A.   Without reviewing my information, I can't
22  answer the ones I read those in.  I don't want to give
23  you bad information.
24     Q.   Okay.  Did Ms. Henry indicate that the
25  upgraded passengers or that the passengers subject to

38

1  upgrade had already boarded when she realized there were
2  seats available then she moved to the next people on the
3  standby list?
4      A.   Yes.
5      Q.   Was there any policy to prohibit her from
6  doing so?
7      A.   Doing what?
8      Q.   Moving to the next people on the standby
9  list once other passengers had boarded the plane.
10     A.   The revenue passengers should be cleared up
11  front first.
12     Q.   Okay.  And if the revenue passengers decide
13  to go ahead and board the plane, is there anything that
14  would prohibit a gate agent from moving to the next
15  people on the standby list?
16     A.   I don't know how their -- what their rules
17  are as far as agents.
18     Q.   Okay.
19     A.   What they are supposed to do.
20     Q.   How long did this interview take?
21     A.   I can't remember.
22     Q.   Okay.  Did you receive a copy of
23  Ms. Henry's post interview statement?
24          MR. CROALL:  I think there were a
25  couple.

39

1          THE WITNESS:  There was two.
2  BY MS. MULLOY MYERS:
3      Q.   Okay.  You recall receiving two post
4  interview statements from Ms. Henry?
5      A.   I believe she wrote one that day and then
6  she e-mailed another one, a follow-up one.
7      Q.   Okay.  Did someone ask Ms. Henry to
8  handwrite a statement that day?
9      A.   Yes.
10     Q.   Who was that?
11     A.   I don't remember.  It could be one of us in
12  the interview, Deb Kircher or myself.
13     Q.   I'm going to show you what's previously
14  been marked Deb Kircher Exhibit 8.
15     A.   Umn-hmn.
16     Q.   Do you recognize that as a handwritten
17  statement from Ms. Henry following the July 14th
18  interview?  Ignore the highlighting.  That's mine.
19     A.   Yes.  This is what she gave after the
20  interview was completed.  This is what she sat down and
21  supplied us.
22     Q.   Okay.  And you received a copy of that at
23  the time?
24     A.   I do have a copy of that.
25     Q.   Okay.  Did you do anything with that

40

1  statement from Ms. Henry?
2      A.   I wasn't -- no.  I just got a copy.  They
3  supplied me a copy.
4      Q.   Did you look at Ms. Henry's personnel file
5  to see if she had any prior disciplinary action?
6      A.   I'm not privy to that.  That's an HR thing.
7      Q.   Okay.  That wouldn't be part of something
8  that you would investigate?
9      A.   Her record, no.
10         (Whereupon, the court reporter
11          marked Exhibit 6 for
11          identification.)
12  BY MS. MULLOY MYERS:
13     Q.   Let me hand you what's been marked
14  Exhibit 6.  I'm going to ask you to take a moment and
15  look at that and let me know if you can identify it.
16     A.   That's a -- this is the -- I guess her
17  third interview statement or third statement she
18  supplied Delta with.
19     Q.   What was the first statement?
20     A.   The first one she handwrote -- or, no, she
21  typed a small statement when Sam Tumminello interviewed
22  her.
23     Q.   Okay.  And the second one is --
24     A.   The handwritten --
25     Q.   -- the handwritten that was just --

**Greg Kuhn - 12/7/2010**

41

1    A.   -- after the interview.
2    Q.   That we just looked at as Kircher
3  Exhibit 8.
4    A.   Yes, ma'am.
5    Q.   Okay.  And you received a copy of this
6  typewritten statement from Ms. Henry?
7    A.   Yes.
8    Q.   And you forwarded a copy of the statement
9  to Tammy Mauer?
10   A.   I did.
11   Q.   And you said "As the World Turns, Soap
12  Opera City"?
13   A.   Yes.
14   Q.   What was that comment about?
15   A.   I don't know why I said it that way.  Just
16  a -- based on, I guess, the statement, you know,
17  another -- a third statement.  I just said -- that's
18  what I wrote.
19   Q.   All right.  And Ms. Mauer responded to you
20  and said, "Doesn't surprise me, but she still didn't
21  explain why she blocked three FC seats.  I fully
22  expected and want to hear more from her."  And three FC
23  is full class seats?
24   A.   Yes.
25        MS. GIUSTINA:  First.

42

1        MR. CROALL:  First class --
2  first class.  F class -- first class.  You're making up classes, Kelly.
3  I'm pretty sure it's first.
4  BY MS. MULLOY MYERS:
5    Q.   So FC is first class seats.  All right.
6  Now, then you responded, "We're on the same page, but
7  I'm not sure about Gary and Deb."
8  Can you tell me what you meant by that comment?
9    A.   Yeah, that -- we believe that she blocked
10  -- you know, believe that the first class seats were
11  blocked with no explanation, you know.  I guess I don't
12  know what Gary and Deb felt about it.  I guess I didn't
13  -- I wasn't sure how they reacted to it and what they
14  thought about it.
15   Q.   Well, had you talked to Gary Schmidberger
16  about what he thought about it?
17   A.   No, no.  It was just, you know ...
18   Q.   Had you talked to Deb Kircher about what
19  she thought about the investigation?
20   A.   I may have, but I can't recall what we
21  talked about.
22   Q.   Okay.  So what was your next involvement
23  after the interview of Ms. Henry and your receipt of her
24  handwritten and then written statement?
25   A.   And everything -- they just gave me copies

43

1  of it and I wasn't asked to do anything else or to have
2  anybody look at anything else.  Pretty much I concluded
3  my part.
4    Q.   Okay.  You sat in on the Gergits' interview
5  as well?
6    A.   Yes.
7    Q.   Did you do anything after you sat in on the
8  Gergits' interview with respect to his -- the
9  investigation surrounding him?
10   A.   Interviewed him, asked him some questions.
11  Tammy asked him some questions.  He gave a statement in
12  writing and that was the end of the conversations with
13  him as far as I'm concerned.
14   Q.   Okay.  So after you submitted -- well, you
15  received the written statement from Ms. Henry, forwarded
16  on to Tammy Mauer.  Did you play any role in determining
17  whether or not there would be any disciplinary action
18  issued to either Henry or Gergits?
19   A.   No, no.  I just supplied the information.
20   Q.   Okay.  Did you reach any kind of conclusion
21  as to whether any policies had been violated by either
22  Henry or Gergits?
23   A.   I'm not asking -- I'm not understanding
24  what you're asking me here.
25   Q.   Well, did you draw a conclusion as to

44

1  whether Ms. Henry had violated any of Delta's policies
2  or procedures or was that something that was --
3    A.   No.  My personal conclusion, just what I
4  viewed, I viewed it, I believe, that the seats were hung
5  and that the three children got up in first class.
6    Q.   And did you draw any conclusion as to
7  whether that would have violated any policy and
8  procedure?
9    A.   It would.
10   Q.   What policy would that be?
11   A.   I don't have that in front of me.  I don't
12  have that policy, but RPU has all that information.
13   Q.   And why didn't -- what did you base your
14  opinion on that the seats had been hung to put the three
15  Gergits children --
16   A.   Based on what we heard and saw in the
17  information.
18   Q.   Which is what?
19   A.   The statements I saw where he was
20  recruiting her to work the flight.  The fact that he
21  said he asked her to help his son get up in first class
22  because he's big.  That was in his statement.  What
23  Tammy Mauer talked to me about when we reviewed the case
24  when she told me what she found in her information.
25   Q.   When did you and Tammy Mauer talk?

45

1    A.   Just when she told me it was time to do the
2    interview.  She told me that she found that three seats
3    were hung and that -- when we talked about setting up
4    the interview, she gave me a synopsis of what she found.
5    Q.   Okay.  Did you reach a conclusion as to
6    whether or not Mr. Gergits had violated any policies or
7    procedures of Delta?
8    A.   Based on what I saw and what he did prior
9    to the day and everything and the things that I -- in
10    the statements that I read and so forth that -- in his
11    own -- what he said in his interview and in his
12    statement that, you know, it looked to me like he was
13    attempting to get this done.
14    Q.   Your opinion was that Mr. Gergits was
15    involved in requesting that these seats be given to his
16    family?
17    A.   That's what it looks like.
18    Q.   Now, do you have any knowledge as to the
19    disciplinary action that was imposed on either
20    individual, Henry or Gergits?
21    A.   I do.
22    Q.   Well, how did you develop that knowledge?
23    A.   That was told by the HR, Deb Kircher.
24    Q.   When was that?
25    A.   I don't remember when.  I guess when the

46

1    decision was made via the HR, legal, and the EO people,
2    I imagine.
3    Q.   So is that your next knowledge of this
4    event when Kircher told you what had happened?
5    A.   Right.  That's how I found out the
6    disciplinary action on the two.
7    Q.   Okay.  So basically -- I just want to make
8    sure.  You participated in these interviews.  You got
9    the statement from Henry, forwarded that on.  Did you
10    have any other role to play in this investigation after
11    that point?
12    A.   After the interviews were concluded and all
13    -- everything was turned over, no.  This goes to HR and
14    I'm out of it.
15    Q.   Okay.  Did you provide an opinion, your
16    opinion to anyone in HR?
17    A.   No.
18    Q.   Did you provide an opinion to Tammy Mauer?
19    A.   I did.
20    Q.   What did you -- was this written or oral?
21    A.   Just a verbal.
22    Q.   What did you tell Ms. Mauer?
23    A.   I told her -- you know, we talked and we
24    both believed the same, that three seats were hung and
25    there was no reasonable explanation as to why she hung

47

1    those three seats.  That's pretty much the bottom line.
2    Q.   And did you tell Ms. Mauer that you thought
3    George played a role in this?
4    A.   Yes.
5    Q.   Do you recall when you learned from
6    Ms. Kircher what the outcome of the investigation was?
7    A.   I don't know.  The process is she -- the
8    manager receives a recommendation.  It goes to her and they
9    go to EO and legal.  That's how that process works.  I'm
10    not involved in that process as far as writing the
11    recommendations.
12    Q.   All right.  So what do you recall Kircher
13    telling you about the outcome?
14    A.   I believe that the decision was made to
15    suspend Rachelle Henry, pending a review, and that
16    Mr. Gergits -- I believe he was suspended for five days
17    and he received a PIP, which is a performance
18    Improvement Plan.  And I don't know much about those
19    because I never been -- dealings with that type of
20    stuff.
21    Q.   Okay.  And is a suspension pending a review
22    basically a precursor determination?
23    A.   Is it what?
24    Q.   Is that a precursor determination, the
25    suspension pending review?

48

1    A.   Explain again.
2    Q.   Did you understand it's a suspension
3    pending review for termination?
4    A.   That's what the process -- that's what I
5    understand it to be, yes.
6    Q.   Okay.  And did you later learn that
7    Ms. Henry had been terminated?
8    A.   I was told, yes.
9    Q.   By whom?
10    A.   Deb Kircher.
11    Q.   What did she tell you at that time?
12    A.   That she was terminated based on -- that
13    was all.
14    Q.   Did Ms. Kircher offer any kind of opinion
15    as to the discipline issue to Henry and Gergits?
16    A.   No.
17    Q.   Were you surprised?
18        MR. CROALL:  Objection.  But you can
19    answer.
20        THE WITNESS:  What?
21        MR. CROALL:  You can answer.
22        THE WITNESS:  Was I surprised at what?
23    BY MS. MULLOY MYERS:
24    Q.   At the disciplinary action that was issued
25    to Gergits.

Greg Kuhn - 12/7/2010

49

1    A.   I thought it might be more severe, but no.
2    You know, I don't have anything to do with this.
3    Q.   Were you surprised that Ms. Henry was
4    terminated and Mr. Gergits was not?
5    A.   I don't make any -- like I say, I don't
6    make these decisions, so I can't say one way or the
7    other.   You know, I thought it might be a little bit
8    more than a PIP but, you know, I don't --
9    Q.   Okay.
10   A.   That's just my thought, you know.
11        MR. CROALL:   Time for a bathroom break.
12        MS. MULLOY MYERS:   Sure.
13        (A recess was taken.)
14   BY MS. MULLOY MYERS:
15   Q.   Does anyone else conduct investigations
16   like this at CVG, or would you be the point person for
17   these types of investigations?
18   A.   Every station is different.  Some will go
19   directly to RP.  Some can come to me.  Most of my
20   stations will tell me something.  If it's not an area
21   that I'm proficient at, I'll forward it to RPU to get
22   the -- to look at the allegations.  That's normally the
23   way I handle it.
24   Q.   Okay.  Were you asked by anyone in 2008 or
25   2009 to investigate Harold Christensen flying on a

50

1    non-rev pass?
2    A.   That never came to me, no.
3    Q.   Do you know if anybody investigated that?
4    A.   No, I'm not aware.
5    Q.   Okay.  Did anybody ask you to investigate
6    an agent by the name of Ron Zimmerman clearing two
7    non-rev agents before -- clearing two non-rev passengers
8    before some revenue passengers for a flight?
9    A.   Nobody came to me with that.
10   Q.   Did anybody ask you to investigate Gary
11   Schmidberger's son and his friend flying a charter to a
12   UC game, a University of Cincinnati game?
13   A.   I never heard of that either.
14   Q.   Have you had any other interviews that
15   involved what I heard you mention in your depo and I've
16   heard others call "waiver and favor issues"?
17   A.   Yes.
18   Q.   What other investigations like that have
19   you participated in?
20   A.   A number?
21   Q.   Sure.  First a number and then --
22   A.   I couldn't tell you how many, but several.
23   Q.   At CVG?
24   A.   Yes, and other places.
25   Q.   Okay.  Just focus right now on CVG.

51

1    A.   Okay.
2    Q.   Can you think of the allegations, what you
3    were investigating on these waiver and favor
4    investigations that you did?
5    A.   You want past or -- how far back?  I mean,
6    I don't know where you want me to go with that.
7    Q.   Past five years.
8    A.   Just one here recently that I can recall.
9    There may be more.  One here recently I did with an
10   agent in CVG.
11   Q.   What was the issue?
12   A.   He was a -- sorry -- a Sky Club agent that
13   was waiving upgrades for high valued customers, not
14   charging them.
15   Q.   Do you know the outcome of the
16   investigation?
17   A.   Yes.
18   Q.   What was the outcome?
19   A.   He was disciplined by the station for his
20   actions.
21   Q.   Do you know what discipline he received?
22   A.   I believe he got a letter of warning.
23   Q.   Do you recall the agent's name?
24   A.   Matt Lemming.
25        MR. CROALL:   Designate as confidential.

52

1    BY MS. MULLOY MYERS:
2    Q.   L-e-m-m-i-n-g?
3    A.   Yes, ma'am.
4    Q.   Okay.  Any others that you can think of?
5    A.   Not waivers and favors.  There were some
6    thefts but that's it.  I mean, I can't recall any other
7    waivers and favors in these recent years.
8    Q.   Do you recall any other waivers and favors
9    at all --
10   A.   In the past?
11   Q.   -- at CVG?
12   A.   Yes, yes.
13   Q.   What else do you recall?
14   A.   Back in my early career with Delta, we had
15   a -- don't quote me, but there were four to five agents
16   that were doing waivers and favors for a local travel
17   agency in Cincinnati.  They were upgrading their
18   passengers without charging them and doing waivers and
19   favors, ticketing violations.  I can't give you specific
20   stuff because it was so long ago.
21   Q.   How long ago do you think that was?
22   A.   Probably in the 2001, 2002 range.
23   Q.   Okay.
24   A.   Several employees that were in his pocket
25   getting paid.  Some admitted to cash; some admitted to

53

1    gifts.
2        Q.   So these employees were benefiting from --
3        A.   They were getting paid by him in some form
4    or fashion for helping his clients and his travel agency
5    business.  That was the gist of the case.
6        Q.   "Him" being the travel agent --
7        A.   Yes, ma'am.
8        Q.   -- was paying these gate agents to waive
9    certain --
10       A.   Exactly, for his customers.
11       Q.   Okay.  Do you recall any of the names of
12   the agents involved in that?
13       A.   I do.
14           MR. CROALL:  Again, broadly designate as
15       confidential all personnel matters relating to
16       employees other than Ms. Henry.  You can go
17       ahead and answer.
18           THE WITNESS:  There is a gentleman named
19       George Williams, Chris Adams, Richard Cook, a
20       female that I cannot remember her name.  And
21       there might have been another one.  It's just
22       been so long ago.
23   BY MS. MULLOY MYERS:
24       Q.   It's okay.
25       A.   Sorry.

54

1        Q.   That's all right.  Do you know the outcome
2    of that --
3        A.   They were all terminated from Delta
4    Airlines.
5        Q.   Any other waiver and favor-like
6    investigations that you participated in at CVG?
7        A.   Other than those, there might be a few
8    others, but I just can't recall.  I'm sorry.
9        Q.   Any other waiver and favor investigations
10   you participated in at any airport since 2008, January
11   of 2008?
12       A.   No, not very often.  Mostly it's other
13   things.  Not too many waivers and favors anymore.  RPUs
14   does some of them on their own that I'm not even aware
15   of.
16       Q.   Did you have any communication with Tammy
17   Mauer Davis about the outcome of the investigation and
18   the disciplinary action that was imposed?
19       A.   We talked about it.
20       Q.   What did you and Tammy talk about?
21       A.   Just what they got.  Pretty much that's it.
22   Just said, you know, we don't have -- we don't make
23   recommendations.  We leave it up to the people down
24   here.
25       Q.   Did Tammy give any kind of opinion as to

55

1    Henry being terminated and Gergits receiving a PIP?
2        A.   I don't recall if she said anything one way
3    or the other on it.
4            (Whereupon, the court reporter
5                marked Exhibit 7 for
6                identification.)
7    BY MS. MULLOY MYERS:
8        Q.   I'm going to hand you what's been marked as
9    Exhibit 7.  Do you recognize this as the interview notes
10   from the July 14th, 2008 interview with George Gergits?
11       A.   Yes, that is the report.
12       Q.   Did you do an investigation of a David
13   Jolly during your time at Delta?
14       A.   Yes.
15       Q.   What do you recall about that?
16       A.   Without getting my report, I can't
17   remember.  I'll be honest, but I did investigate.  I was
18   a part of that.
19       Q.   Do you know if Mr. Jolly received any
20   disciplinary action?
21       A.   He did.
22       Q.   Do you know what it was?
23       A.   I believe he was terminated.
24       Q.   Do you know, was he alleged to have
25   received any kind of personal benefit?
       A.   I don't recall the circumstances of the

56

1    case.
2        Q.   Do you recall having any conversations or
3    communications with anyone else regarding this Henry and
4    Gergits investigation that we haven't discussed this
5    afternoon?
6        A.   No, ma'am.
7        Q.   I've exhausted your memory of this
8    investigation?
9        A.   That was pretty much the end of everything
10   that we talked about.  That was pretty much it.
11       Q.   Okay.
12           MS. MULLOY MYERS:  Those are all the
13       questions I have for you.  I thank you for your
14       time.  I appreciate it.
15           MR. CROALL:  And, again, we would like
16       an opportunity to review and signature, if and
17       when it is transcribed.
18           MS. MULLOY MYERS:  Thank you very much.
19
20   (Whereupon, the deposition concluded at 3:07 p.m.)
21
22
23
24
25

Greg Kuhn - 12/7/2010

57

```
 1
 2
 3                  C E R T I F I C A T E
                    - - - - - - - - - - - -
 4    STATE OF GEORGIA:
      COUNTY OF FULTON:

 5
 6    I hereby certify that the foregoing transcript was taken
 7    down, as stated in the caption, and the questions and
 8    answers thereto were reduced to typewriting under my
 9    direction; that the foregoing pages 1 through 56 represent
10    a true and correct transcript of the evidence given upon
11    said hearing, and I further certify that I am not of kin
12    or counsel to the parties in the case; am not in the
13    regular employ of counsel for any of said parties; nor am
14    I in anywise interested in the result of said case.
15            This, the 5th day of May, 2011.
16
17            _____

              JANNETTE PRICE, CCR-B-2177
18
19
20
21
22
23
24
25
```

58

```
 1                  E R R A T A   P A G E
 2
 3
 4        Pursuant to Rule 30(e) of the Federal
      Rules of Civil Procedure and/or Georgia Code Annotated
 5    9-11-30(e), any changes in form or substance which you
      desire to make to your deposition testimony shall be
 6    entered upon the deposition with a statement of the
      reasons given for making them.
 7
 8    To assist you in making any such corrections, please use
      the form below.  If supplemental or additional pages are
 9    necessary, please furnish same and attach them to this
      errata sheet.
10
      I, the undersigned, GREG KUHN, do hereby certify that I
11    have read the foregoing deposition and that to the best
      of my knowledge, said deposition is true and accurate
12    (with the exceptions of the following corrections
      below).
13
14    Page  /Line /   Change        / Reason
15
16    ___ /___/ _____/_____/
17    ___ /___/ _____/_____/
18    ___ /___/ _____/_____/
19    ___ /___/ _____/_____/
20    ___ /___/ _____/_____/
21    ___ /___/ _____/_____/
22    ___ /___/ _____/_____/
23    ___ /___/ _____/_____/
24    ___ /___/ _____/_____/
25        /   /                      /          /
```

59

```
 1    ___ /___/ _____/_____/
 2    ___ /___/ _____/_____/
 3    ___ /___/ _____/_____/
 4    ___ /___/ _____/_____/
 5    ___ /___/ _____/_____/
 6    ___ /___/ _____/_____/
 7    ___ /___/ _____/_____/
 8    ___ /___/ _____/_____/
 9    ___ /___/ _____/_____/
10    ___ /___/ _____/_____/
11    ___ /___/ _____/_____/
12    ___ /___/ _____/_____/
13    ___ /___/ _____/_____/
14    ___ /___/ _____/_____/
15    ___ /___/ _____/_____/
16    ___ /___/ _____/_____/
17    ___ /___/ _____/_____/
18    ___ /___/ _____/_____/
19    ___ /___/ _____/_____/
20    ___ /___/ _____/_____/
21    Greg Kuhn
22        Sworn to and subscribed before me
23        _____,
          Notary Public, this _____ day of
24
          _____, 2011.
25        My commission expires: _____
```

d2546bf2-2fb7-440b-a4a1-e668b8b84da2

**Greg Kuhn - 12/7/2010**

```
 1

 2

 3                   C E R T I F I C A T E
                     - - - - - - - - - - - -
 4     STATE OF GEORGIA:
       COUNTY OF FULTON:
 5

 6     I hereby certify that the foregoing transcript was taken

 7     down, as stated in the caption, and the questions and

 8     answers thereto were reduced to typewriting under my

 9     direction; that the foregoing pages 1 through 56 represent

10     a true and correct transcript of the evidence given upon

11     said hearing, and I further certify that I am not of kin

12     or counsel to the parties in the case; am not in the

13     regular employ of counsel for any of said parties; nor am

14     I in anywise interested in the result of said case.

15          This, the 5th day of May, 2011.

16

17

18     JANNETTE PRICE, CCR-B-2177

19

20

21

22

23

24

25
```