Form 0412-20023
REPORT 1-80
SP 3525

**DELTA AIR LINES**

# IRREGULARITY REPORT

| STATION | CVG | DATE REPORT FILED: | 6/9/08 | 1213 / 07 / Jun |
|---|---|---|---|---|
| | | | | FLIGHT / DAY OF IRREGULARITY / MONTH |

**TYPE OF IRREGULARITY:**
- [ ] CUSTOMER INCONVENIENCE
- [ ] EXPRESS, FREIGHT, OR COMAT
- [ ] PERSONNEL FAILURE
- [ ] BAGGAGE MISHANDLING
- [x] PASS OR REDUCED - RATE
- [ ] OTHER _____

**DETAILED EXPLANATION OF IRREGULARITY:**

- [ ] FURTHER CONSUMER AFFAIRS ACTION REQUIRED

Flight 1213/7JUN CVGSAN, 3 non revenue passengers were boarded in F/C cabin. There were 6 medallion passengers onboard the aircraft seated in Y class, desiring upgrades. I spoke with Rachelle Henry the gate agent assigned to this flight, she stated (her statement is attached) It was a busy flight with inexperienced help, Lisa from the Crown Room assisting boarding. The medallion passengers boarded the flight between 0849 and 0903, one of them was a Gold medallion on a discounted fare, which made him low on the upgrade list. The non revenue passengers boarded after the medallions and were cleared into Y class in row 10. As they were boarding, Rachelle noticed she had F/C seats open. She reseated 3 of the five in F/C; the employee was seated in 10C. Late connections, inexperienced help, a full flight and the fact current policy states we will not reseat passengers desiring an upgrade after they have boarded in the Y cabin of the aircraft, Rochelle was very busy at crunch time. There does not seem to be any effort to cover her tracks; meaning, she could have seated them there without a paper trail.

| SUBMITTED BY: | Sam Tumminello CSS CVG Gates | APPROVED BY: _____ | STATION APPARENTLY |
|---|---|---|---|
| DEPT. NO. | 125 | SUPERVISOR OR MANAGER | IN ERROR |

**INVESTIGATION OF IRREGULARITY (REPLIES MUST BE COMPLETED AND MAILED WITHIN THREE DAYS)**

APPROVED BY: _____   STATION: _____
SUPV. OR MGR.

ORIGINATOR DISTRIBUTES IRREGULARITY REPORTS INVOLVING CUSTOMER INCONVENIENCE OR BAGGAGE MISHANDLING AS FOLLOWS:
Copy 1 - Consumer Affairs;   Copies 2, 3, & 4 - Station apparently in error;   Copy 5 - Local File
SEE SP 3525 FOR COMPLETE DISTRIBUTION OF ALL TYPES OF IRREGULARITY REPORTS.

0915 skd dept



EXHIBIT
Kuhn 1
12·7·10

DL 000157

| Report# 806110326 | DELTA AIR LINES, INC. | Page 1 of 2 |
|---|---|---|

# Ethics and Compliance Reporting

## General Information

| | | |
|---|---|---|
| Caller Name: PATSY ZIMMERMANN | Client Name: Delta Air Lines, Inc. | Report #: 806110326 |
| Type: Employee | Location #: UNK | Priority: 2 |
| Title: GATE AGEN | DBA: DELTA AIR LINES, INC. | Trans #: 1 |
| Phone: | Address: CINCINNATI AIRPORT | Rpt Date: 06/11/2008 |
| Best Time to Call: ANYTIME | City,State,Zip: CINCINNATI - OH | Time: 07:10AM |
| | Country: USA | Origin: Phone Call |
| Email: | Phone: | |

## Summary Information

| WHO: | Caller, PATSY ZIMMERMANN, reported GEORGE GERGITS and RICHELLE HENRY. |
|---|---|
| WHAT: | Policy Issues |
| WHEN: | 6/8/2008 |
| WHERE: | AT THE LOCATION |

## Incident Description

6/11/2008 7:10:00 AM - Original Call

Caller, ZIMMERMANN, reported that on 6/8/2008, Performance Leader, George GERGITS, asked Agent, Richelle HENRY, to clear him to be seated in first class ahead of other revenued first class passengers on the 9:15 pm San Diego flight out of Cincinnati. HENRY complied, and the company could pull the flight records to verify. However, ZIMMERMAN reported that per company policy, all airline employees are required to fly stand-by and cannot be granted a seat on a flight until all revenued passengers are seated first.

ZIMMERMAN; Lead, Rick ANDRE; Lead, Harold CHRISTENSEN; Agent, Caron MINDEL; and Agent, David CHAMPAGNE, witnessed the incident. Several other Agents (Names DECLINED) also heard of the incident, and some of them reported it to Performance Leader, Sam TUMMIELLO, who took no action.

ZIMMERMAN would like for the company to take whatever action it deems appropriate.

How does the caller know about the incident?: Witnessed

What documentation is available?: The company could pull GERGITS' flight records

## Involved Parties

Reported Individuals:
  Name: RICHELLE HENRY
  Title: AGENT

  Name: GEORGE GERGITS
  Title: PERFORMANCE LEADER

Management Notified: NO

Involved/Aware Parties: YES
  Name: SAM TUMMIELLO
  Title: PERFORMANCE LEADER
  Role: Co-Worker

  Name: RICK ANDRE
  Title: LEAD
  Role: Witness

  Name: HAROLD CHRISTENSEN

EXHIBIT
Kuhn 2
12·7·10

DL 003005

| Report# 806110326 | DELTA AIR LINES, INC. | Page 2 of 2 |
|---|---|---|

| | |
|---|---|
| **Name:** | CARON MINDEL |
| **Title:** | AGENT |
| **Name:** | DAVID CHAMPAGNE |
| **Name:** | DECLINED DECLINED |
| **Title:** | AGENTS |
| **Role:** | Co-Worker |

## Supplemental Information

How does caller know about hotline:   Intranet

Interviewer Observations:

## Client Instructions

The caller has provided his/her name and/or contact information indicating an interest in discussing this matter with a company representative.

Conditions:
The information contained in this report was provided by a third party source. The Network, Inc. does not verify the accuracy or the completeness of the information contained in this report, and therefore, cannot guarantee its accuracy or completeness.

If you have questions, concerns or updates such as escalation and/or dissemination instructions relative to our service or this incident report please contact us at "clientcommunication@tnwinc.com".

DL 003006

| Report# 806160454 | DELTA AIR LINES, INC. | Page 1 of 2 |

## Ethics and Compliance Reporting

### General Information

| | | | | | |
|---|---|---|---|---|---|
| Caller Name: | KIT PALMER | Client Name: | Delta Air Lines, Inc. | Report #: | 806160454 |
| Type: | Employee | Location #: | UNK | Priority: | 2 |
| Title: | SENIOR TICKET COUNTE | DBA: | DELTA AIR LINES, INC. | Trans #: | 1 |
| Phone: | | Address: | CINCINNATI NORTHERN KENT | Rpt Date: | 06/16/2008 |
| Best Time to Call: | 6:30 TO 2:30PM FRIDAY TO TUESDAY | City,State,Zip: | HEBRON - KY | Time: | 09:08AM |
| | | Country: | USA | Origin: | Phone Call |
| Email: | | Phone: | | | |

### Summary Information

| | |
|---|---|
| WHO: | Caller, KIT PALMER, reported GEORGE GERGITS and ROCHELLE HENRY. |
| WHAT: | Policy Issues |
| WHEN: | 6/8/08 |
| WHERE: | DEPARTMENT 125 |

### Incident Description

**6/16/2008 9:08:00 AM  -  Original Call**

Caller, PALMER, reported that on 6/8/08 Performance Lead, George GERGITS, had Gate Agent, Rochelle HENRY, "primary" (sole responsibility for the flight) flight #1213 from CVG (airport code for Cincinnati) to San Diego, so him and his three children, who were flying standing by, would make it on the flight. As a result, HENRY boarded GERGITS three children into first class, and GERGITS flew in coach. There were Medallion Members, however, left on stand by, even though they are revenue passengers, and must board before non revenue passengers. PALMER mentioned that HENRY was aware there were Medallion Members standing by, so she HENRY cleared the first one, but left the others on stand by. HENRY then changed the second Medallion Member's seat even though she was supposed to be upgraded to first class.

PALMER spoke with Performance Lead, Sam TUMANELLO, who told her that there was no paper trail of wrongdoing. PALMER didn't know if perhaps his experience level may have prevented him from researching the information needed to investigate this further.

PALMER claimed that Terminal Manager, Gary SCHMIDBERGER, and Station Manager, Paul BAIRD, are aware of this information, and accepted TUMANELLO's conclusion. PALMER also said that the Gate Agents, Names DECLINED, are aware of this information too.

PALMER indicated that they are all friends with GERGITS, so she doesn't know if that is why it was not addressed further.

PALMER added that it was GERGITS' responsibility to remind HENRY that there were Medallion Customers on board.

PALMER wants this information addressed so it doesn't happen again. She mentioned that if Medallion Members find out this information, Delta can lose their credibility.

PALMER believes that someone needs to be held accountable for these policy violations.

PALMER declined to provide additional information.

| | |
|---|---|
| How does the caller know about the incident?: | Heard from others |
| What documentation is available?: | Printout of the standby list, and the seat changes made to the Medallion passenger. |

### Involved Parties

**Reported Individuals:**
   Name:   ROCHELLE HENRY
   Title:   GATE AGENT


EXHIBIT
Kuhn 3
12·7·10

DL 003007

| Report# 806160454 | DELTA AIR LINES, INC. | Page 2 of 2 |
|---|---|---|

| | |
|---|---|
| **Name:** | GEORGE GERGITS |
| **Title:** | PERFORMANCE LEAD |

**Management Notified:** NO

**Involved/Aware Parties:** YES

| | |
|---|---|
| **Name:** | NAMES DECLINED |
| **Title:** | GATE AGENTS |
| **Role:** | Witness |
| **Name:** | SAM TUMANELLO |
| **Title:** | PERFORMANCE LEAD |
| **Role:** | Other |
| **Name:** | GARY SCHMIDBERGER |
| **Title:** | TERMINAL MANAGER |
| **Name:** | PAUL BAIRD |
| **Title:** | STATION MANAGER |

## Supplemental Information

**How does caller know about hotline:** Intranet

**Interviewer Observations:**

## Client Instructions

The caller has provided his/her name and/or contact information indicating an interest in discussing this matter with a company representative.

Conditions:
The information contained in this report was provided by a third party source. The Network, Inc. does not verify the accuracy or the completeness of the information contained in this report, and therefore, cannot guarantee its accuracy or completeness.

If you have questions, concerns or updates such as escalation and/or dissemination instructions relative to our service or this incident report please contact us at "clientcommunication@tnwinc.com".

DL 003008

Kircher, Deborah

**From:** Kuhn, Greg
**Sent:** Tuesday, July 01, 2008 8:05 AM
**To:** Kircher, Deborah; Schmidberger, Gary
**Subject:** FW: Medallion upgrades on SAN flight

fyi

**Greg Kuhn**
**Sr. Corporate Security Representative CVG**
**Office - 859-767-5200**
**FAX - 859-767-7702**
**Cell - 859-322-3460**

---

**From:** Zimmerman, Patsy
**Sent:** Monday, June 30, 2008 9:42 PM
**To:** Kuhn, Greg
**Subject:** Medallion upgrades on SAN flight

On Sunday, June 8th, I was working a 7:00am-3:30pm shift. As I was walking to the employee breakroom for briefing I waved to the agents (Teresa Stuntebeck, Caron Mindel, Rachelle Henry) working the 7:20am ATL flight at gate B17. After attending briefing, I noticed Pam Scherer (ex-Delta employee) at gate B23. Pam had been a gate agent in CVG for a number of years, but had quit to pursue other interests. But tragically, she had since been in an auto accident that left her paralyzed from the neck down. After speaking with Pam for awhile I wanted to let the other agents know she was travelling to MCO----since everyone would want to say hello. I went back to gate B17 and spoke with Teresa and Caron about Pam. While inquiring about the whereabouts of Rachelle, Caron told me that Rachelle had already left to work the **SAN** flight stating "George Gergits had specifically requested her to work the flight".

I had been scheduled to assist agent David Champagne on the 9:00am SNA flight at gate B2 and then work the charter for AeroMexico at gate B1----the 9:15am **SAN** flight was departing out of gate B4 (all gates are in close proximity to one another). While in the process of boarding SNA I noticed George Gergits behind the podium of B4 a few times conversing with Rachelle. After boarding was completed on my flight (around 8:55am) I pulled up the A*T counts for the **SAN** flight to see if Rachelle would need some assistance. All in all, I observed the flight to be basically routine and boarding appeared to be progressing in a normal matter. However, I did notice from the A*T that 2-First class seats were unassigned and 1-First class seat was hung up in the system. I could not understand why Rachelle had not started clearing her standby medallions into those open First class seats. I approached Caron Mindel at gate B3, and with some apprehension, asked her if she thought Rachelle was going to possibly circumvent the standby list and seat George and his family in First class. As we were speaking we noticed George (and family) had been cleared into Row 10 of Coach class----but, moments later, three of the Gergits family had been re-assigned to First class seats in Row 4 with George still seated in Row 10.

The two Lead agents, Rick Andre and Harold Christiansen, working in the area were asked if they were at all aware of the situation that had just transpired, but more important, if they had given their approval. Both Leads disapproved and advised us they would look into the matter.

One day later, an email from Performance Leader Sam Tumminello was sent out stating that "no improprieties had occured on the **SAN** flight and the matter should be put to rest". It was at this time that several agents thought the matter needed a little more investigation!

7/1/2008

EXHIBIT
Kuhn 4
12·7·10

DL 000154

**△ DELTA**

Internal Memorandum
Date: July 15, 2008

**TO:** Paulette Henderson, Manager - Revenue Protection Unit, Dept. 687/ATG
**FROM:** Tammy Mauer, Revenue Protection Unit, Dept. 687/ATG
**SUBJECT:** Case 32912 - Rachelle Henry, EN 028822500, DOE 07/21/86, CVG

**DATE/LOCATION:** July 14, 2008, CVG Airport Main Terminal Conference Room

**INTERVIEWERS:** Tammy Mauer - Revenue Protection Unit

**PREDICATION:**
Employee 288225, Rachelle HENRY was interviewed due to information received by Deb Kircher, Human Resources in CVG. Other employees in the station are questioning activity on flight 1213/08Jun CVG to SAN, in which HENRY was the primary gate agent. Employees are stating CVG Performance Leader George Gergits was standing by, NRSA, with his three children. Gergit's three children were cleared in first class, while revenue upgrade passengers boarded with their coach seats. The other employees are stating that HENRY and Gergits are friends and believes that the upgrade list was not handled appropriately.

The investigation revealed that HENRY booked 3 first class seats approximately 2 hours before flight time. The seats were booked in a different area of the computer and were booked under the name CVGPROT/A/B/C. The booking was never ended, causing the seats to be hung.

Revenue lost for the three first class seats was $4,197.00.

**INTERVIEW:** (Rachelle Henry)
The interview of Rachelle HENRY was held at the CVG airport main terminal conference room. Present in the interview was Greg Kuhn, Corporate Security, Deb Kircher, Human Resources, Gary Schmidberger, Station Manager, and the writer.

After introductions were made, Greg Kuhn asked HENRY if she knew why we were talking to her today. HENRY stated she had no idea. Greg explained that we needed to discuss what had transpired on flight 1213/08Jun CVG to SAN. Greg asked HENRY if she knew what people were saying about that flight. HENRY stated she did not know what people were saying, but she did know she was being treated differently by other employees. HENRY stated she would be left at the gate by herself with no assistance and people would actually walk down the other side of the hallway as her. HENRY also stated that inappropriate comments were made about her and Performance Leader George Gergits. Other agents were even suggesting the two had a personal relationship. HENRY stated she would try her best not to react to the comments.



DL 000150

Rachelle Henry, EN 028822500, DOE 07/21/86, Dept./CVG
July 15, 2008
Page 2

Greg Kuhn asked HENRY if she knew that George Gergits and his family were traveling on the SAN flight on June 8th. HENRY stated yes. Greg asked HENRY if she knew George had requested for her to work that flight. HENRY stated no. HENRY stated when she came into work on June 8th, her Lead advised her that she needed to work the flight to SAN. Greg asked HENRY if George had asked her to take care of him and his family on this flight. HENRY stated the only thing George asked her was how the flight looked for non revenue travel.

The writer asked HENRY to rate herself as a gate agent. HENRY stated she was exceptional. The writer asked HENRY to explain her procedure for checking in a flight. HENRY stated she would pull the predeparture paperwork and check for connections on the flight. HENRY also stated she would look for passengers traveling together and try to move people around to get them seats together. The writer asked HENRY if she recalled any irregular operation on this flight. HENRY stated she received a call to hold for approximately 12 connecting passengers from a late flight. The writer asked HENRY if this was a connection carrier flight. HENRY stated yes. The writer asked HENRY if she could recall any other irregularities. HENRY stated no. The writer asked HENRY to explain how she would handle the standby list on a flight. HENRY stated she would do all possible to get standby and non revenue passengers together, she would sometimes ask revenue passengers to move around to get people together. The writer asked HENRY to explain what happened with the upgrade standby passengers on flight 1213 on June 8th. HENRY stated she had a hard time handling the flight and the standby list that day. HENRY stated she recalled the upgrade standby passengers asking her how it looked, and she told them that it may be possible to upgrade. The writer asked HENRY if she ever asked them to wait in the gate area, or if she told them to go ahead and board with their coach seat. HENRY stated she never makes an announcement about either of those things. HENRY stated she gets to the list as soon as she can and if the upgrade passengers have already boarded, then she moves to the next people on the list. The writer then stated to HENRY, in this case, the next people on the list were the Gergits family. HENRY stated yes.

The writer showed HENRY the keystrokes from the set she was working on at the gate June 8th. The writer explained to HENRY that she began working the flight at 7:17am and pulled the predeparture paperwork. The writer also explained that she had removed a through passenger in first class - 4B to a different seat - 1D. HENRY stated she was trying to get two other passengers seats together. The writer advised HENRY that the first class passenger was moved before his flight even got into CVG. HENRY advised it was two other people, but she did not recall the names. The writer advised HENRY there was no passenger seated in 4A. HENRY could not explain why no passengers were seated in 4A and B. The writer continued with HENRY'S keystrokes and explained that at 7:23am she logged into another area in the computer - level C, and booked 3 first class seats. The writer asked HENRY if she could explain why she booked those seats. HENRY stated she had no idea. HENRY asked what the names were on the booking. The writer explained it was booked under CVGPROT. HENRY stated if she booked protection seats she would always document and end the record. The writer explained the record was documented at 7:26am "protect for AA per IROP UA", and seats 4ABD were assigned, but

DL 000151

Rachelle Henry, EN 028822500, DOB 07/21/86, Dept./CVG
July 15, 2008
Page 3

the record was not ended. The writer also advised HENRY there were approximately 20 open seats in coach, and asked why it was necessary to book protection seats. HENRY could not explain the documentation for the IROP and repeatedly stated she did not know why she created the booking.

The writer asked HENRY, as an exceptional agent, and knowing that 3 seats were blocked in first class, why didn't she tell the upgrade standbys to wait in the gate area because their chances to clear in first class were good. HENRY stated she would not tell the upgrade passengers that, she would just tell them it may be a possible to clear in first class. HENRY stated the gate was hectic, because of a lot of things going on and she was working the gate by herself. She stated the standby list kind of got away from her. The writer advised HENRY that the standby list was not that large. There were 7 upgrade passengers, two other non revenue passengers and the Gergits family.

Greg Kuhn advised HENRY that this was very serious and this was her opportunity to tell us if anyone asked her to hold those seats for the Gergits family. HENRY stated that no one asked her to block the seats and she did not know why she blocked them. Greg advised HENRY that he had a statement from another agent saying he offered to help her with the flight and HENRY told him she had a hung seat, but she would take care of it. Greg said it seemed like she knew about the blocked seats, because when the other agent offered to help, she said she had a hung seat. HENRY stated by the time the other agent offered to help her, she had already taken care of the seat issue. The writer advised HENRY to explain why the Gergits family was assigned the hung seats. HENRY stated the upgrade passengers had already gone onboard when she realized the seats were available, and she moved on to the next people on the standby list. The writer advised the next people on the standby list were the Gergits family. HENRY stated yes. The writer asked HENRY again why she booking the 3 first class seats and did not end the record. HENRY stated she already told us that she did not know.

The writer asked HENRY to write a statement regarding what was discussed. After approximately 20 minutes the interview was concluded.

The employee was returned to work pending further investigion.


cc: Kelley Nabors - EO Policy & Procedure
    Deb Kircher - Human Resources

DL 000152

## Davis, Tammy

**From:** Kuhn, Greg
**Sent:** Tuesday, July 15, 2008 10:07 AM
**To:** Mauer, Tammy
**Subject:** RE: Addendum

were on the same page but I am not sure about Gary and Deb.

Greg Kuhn
**Sr. Corporate Security Representative CVG**
Office - 859-767-5200
FAX - 859-767-7702
Cell - 859-322-3460

---

**From:** Mauer, Tammy
**Sent:** Tuesday, July 15, 2008 10:05 AM
**To:** Kuhn, Greg
**Subject:** RE: Addendum

doesn't surprise me.....but she still didn't explain why she blocked 3 FC seats.....
I fully expect we will hear more from her..

---

**From:** Kuhn, Greg
**Sent:** Tuesday, July 15, 2008 9:58 AM
**To:** Mauer, Tammy
**Subject:** FW: Addendum

AS THE WORLD TURNS. SOAP OPERA CITY.

Greg Kuhn
**Sr. Corporate Security Representative CVG**
Office - 859-767-5200
FAX - 859-767-7702
Cell - 859-322-3460

---

**From:** Henry, Rachelle D
**Sent:** Tuesday, July 15, 2008 7:32 AM
**To:** Kircher, Deborah
**Cc:** Kuhn, Greg; Schmidberger, Gary
**Subject:** Addendum

Deb,

EXHIBIT
Kuhn 6
12.7.10

DL 000563

You asked a question yesterday that inquired as to why I think anyone would feel compelled to target me and make accusations such as they have. I don't remember your question verbatim, but that was the gist of it. I know that my response was emotional and insufficient as for the last six weeks the answer to that question has eluded and troubled me more than you can imagine. I have been unable to reconcile to it until last night.

As I mentioned yesterday, certain agents and Leads with whom I work daily have exhibited strange, alienating, shunning and malicious behaviors toward me. As I listened to what the four or you outlined and then processed that in the context of the dynamics of my daily and weekly work environment, things began to make some sense.

Prior to this event, Harold Christiansen who has been my Lead for years, sought me out on a daily basis in a relentless manner in order to malign members of senior management, express his resentment and feelings of being underappreciated for his efforts and having his suggestions for improving the operation categorically dismissed by his direct supervisors and their leaders. He would often relay provocative (albeit inappropriate) comments about behind close door conversations he and other Leads had with their Performance Leaders about my peers. Countless times he tried to elicit my support and validation of his negative feelings against other Leads Joanne Stefan, Pae Caudill, Patsy Zimmerman (when she was in the Lead Program), and Rick Cropenbaker. He did the same regarding Performance Leaders Mike Murphy, George Gergits, and Sam Tumminello. I made a genuine effort to dismiss his comments, or redirect the conversation which on one occasion met with an angry outburst about my lack of understanding of all matters Delta. Later he apologized for his outburst. Apology accepted. Needless to say, I chose to tread lightly around him and tried to maintain an appropriate relationship as he is often my direct supervisor and had the potential to make things difficult for me.

Additionally, Patsy Zimmerman has been outspoken in her disdain for George Gergits specifically, and Delta management in general, in numerous direct conversation with me. I try to listen and empathize when my colleagues are notably angry and upset so as to offer some solace, but regardless of my attempts to appease her anger on the subject, she maintained her stance and even appeared to go out of her way to avoid having to work with me. One one occasion she said to me after George walked away from the gate the two of us were working, " I already told them not to put me with Julie Donohue, I guess I will have to add your name to the list".

I spoke briefly yesterday about my tendency to be outspoken in my comments as they pertain to the implementation of ACS policy. To that end I should mention that very recently, in fact not long before this incident, Pae Caudill gave numerous briefings in which she repeatedly relayed what I knew to be inaccurate information about Breezeway boarding policy changes. Not only was the information she relayed wrong, but delivered in a disdainful and sarcastic tone and comments that made it clear to all listening that she did not agree with what Gary Schmidberger had to say on the subject and felt the entire Breezeway initiative was ridiculous. The first day I simply approached her in her office with a copy of the most recent bulletin on the matter and highlighted what I thought to be clarification on the matters in which we disagreed. I asked that she attempt to get clarification as I wished to comply but did not completely understand what she was saying. The next days briefing was very similar in vein and contained additional information about the new involuntary DBC payout process. Again it was delivered with inaccurate content. As the policy was to take effect the next day I spoke up in briefing to contradict her comments and express how I understood the policy to read. She said she had not read it fully and would need to do so.

When I consider that these are the individuals from whom I have experienced the most hostility in the last 6 weeks, it follows for me that they are most likely some of the individuals on whose comments you have based your conclusions to date. That said, I feel it is incumbent on those involved in the investigation of these allegations to consider the possibility that they may be building a case on the distorted comments of agents with a personal vendetta or otherwise compromising agenda. Also, you repeatedly mentioned the seriousness of this situation, I feel that these observations are important for me to note in writing.

Would you please add a printed copy of this email to the handwritten statement I left with Greg Kuhn yesterday afternoon? Also, would you please send me a copy of the full statement for my records?

Thank you,

Rachelle Henry

DL 000564

3/9/2010

288225

DL 000565

3/9/2010



**Internal Memorandum**
Date: July 15, 2008

TO: Paulette Henderson, Manager - Revenue Protection Unit, Dept. 687/ATG
FROM: Tammy Mauer, Revenue Protection Unit, Dept. 687/ATG
SUBJECT: Case 32809 - George Gergtis, EN 034891300, DOE 10/25/71, CVG

DATE/LOCATION: July 14, 2008, CVG Airport Main Terminal Conference Room
INTERVIEWERS: Tammy Mauer - Revenue Protection Unit

PREDICATION:
Employee 348913, George GERGITS was interviewed due to information received by Deb Kircher, Human Resources in CVG. Other employees in the station are questioning activity on flight 1213/08Jun CVG to SAN, in which GERGITS and his family were traveling non revenue. Employees are stating GERGITS requested his friend, Rachelle Henry work the flight to ensure he and his family were cleared in first class. Other employees were aware that the GERGITS family were cleared in first class, while revenue upgrade passengers boarded with their coach seats. The other employees are stating that GERGITS and Henry are friends and believes that the upgrade list was not handled appropriately.

The investigation revealed that Henry booked 3 first class seats approximately 2 hours before flight time. The seats were booked in a different area of the computer and were booked under the name CVGPROT/A/B/C. The booking was never ended causing the seats to be hung. Revenue lost for the three first class seats was $4,197.00.

INTERVIEW: (George Gergtis)
The interview of George GERGITS was held at the CVG airport main terminal conference room. Present in the interview was Greg Kuhn, Corporate Security, Deb Kircher, Human Resources, Gary Schmidberger, Station Manager, and the writer.

After introductions were made, the writer asked GERGITS to explain what had transpired on flight 1213, on the 8th of June. GERGITS stated that he and his family were traveling non revenue and were initially cleared in coach, but when they went to board they realized that three of the four passengers were in first class. Greg Kuhn asked GERGITS if he had asked Henry to clear them in first class. GERGITS stated the only thing he said to Henry was to do all possible to sit his son in first class because he was over six feet tall. Henry stated the only thing GERGITS asked her was how the flight looked for non revenue travel. Greg asked GERGITS if he knew that Henry had blocked three first class seats on the flight. He stated he did not. Greg



DL 000110

asked GERGITS if he asked her to block the seats. GERGITS stated he did not. Greg advised GERGITS that it appeared to us that HENRY booked the three first class seats so that his family could clear in first class. Greg told GERGITS that Henry could be in a lot of trouble, and if he asked her to do this, he needed to tell us. GERGITS again stated the only thing he asked Henry to do was to do all possible to get a first class seat for his son.

Deb Kircher asked GERGITS if he realized what a difficult position he put Henry in by asking her to do all possible to get his family in first class. He stated he never meant for her to block seats for that reason. Greg asked GERGITS if he ever made the comment to other agents that he was going to have an agent that was taking a package work the gate to get him and his family in first class. This way the agent would not get in trouble, because they were leaving the company. GERGITS stated he did say that, but he was joking. Greg asked GERGITS if he requested that Henry work the flight that morning. GERGITS stated he did ask for Henry to work the flight because he knew that she would get the family seats together. GERGITS stated that there were some gate agents that would go out of their way to seat his family in separate seats. Greg asked GERGITS again if he asked Henry to ensure he made it in first class on flight 1213. GERGITS stated he only asked her to do all possible to get his son in first class. Greg asked GERGITS if he thought she would have hung the first class seats to honor his request. GERGITS stated he did not ask Henry to block seats.

The writer asked GERGITS to write a statement regarding what was discussed. After approximately 10 minutes the interview was concluded.

The employee was returned to work pending further investigation.


cc: Kelley Nabors - EO Policy & Procedure
    Deb Kircher - Human Resources

DL 000149