**RACHELLE HENRY**                                                    **PLAINTIFF**

**VS.**                              **MEMORANDUM OPINION AND ORDER**

**DELTA AIR LINES, INC.**                                        **DEFENDANT**

      This is an employment discrimination case in which plaintiff alleges gender discrimination under federal and Kentucky law, as well as wrongful discharge in violation of Kentucky public policy.

      This matter is before the court on defendant's motion for summary judgment (Doc. 16). The court held oral argument on this motion on July 15, 2011.

      Having heard the parties' arguments, and after carefully reviewing the record, the court concludes that there are no genuine disputes of material fact and that defendant is entitled to judgment as a matter of law.

*Factual and Procedural Background*

A.  <u>Rachelle Henry</u>

Plaintiff Rachelle Henry began working at Delta Airlines ("Delta") in March 1987[1] and continued to work there in various positions until her termination in October 2008.  (Henry Depo. 29-32)  During her over twenty years of employment at Delta, Henry held multiple positions, including cargo agent, ramp agent, reservation agent, and gate agent. (*Id.* at 31-32, 41-44, 58)  In May 2005, Henry was promoted to lead agent, a quasi-supervisory position in which Henry managed a team of frontline employees.  (*Id.* at 49-51)  However, in April 2006, Henry voluntarily stepped down from the lead agent position to care for her daughter's serious illness and thereafter worked as a senior customer service agent.  (*Id.* at 57-58)  Henry received positive performance evaluations in 2006, 2007, and 2008.   (*Id.* at 96-100; Schmidberger Decl. ¶ 10)

B.  <u>George Gergits</u>

George Gergits ("Gergits") began working at Delta in 1971 and has also held various positions.  (Gergits Depo 6-7)  At all times relevant to this action, Gergits held the position of performance leader and was Henry's supervisor.  (*Id.*)  Beginning in May 2008, Henry's co-workers began to spread allegedly false rumors that Henry had a romantic relationship with Gergits.  (Schmidberger Depo. 34-35; Gergits Depo. 71-72; Henry Depo. 113-17)  As a result of the rumors, Henry alleges that her co-workers ostracized and avoided her.  (Henry Depo. 109-10)  Specifically, Henry testified that one co-worker told her she was going to request not to work with Henry (*id.*); another co-worker repeatedly called her gate to ask if her "boyfriend" was there (*id.* at 114-15); and

---

[1] Henry was hired by Western Airlines in 1986 and became a Delta employee when Delta acquired Western Airlines in 1987.  (Henry Depo. 29-32).

an employee insinuated that Henry had spent the night with Gergits when she arrived late for a shift.  (*Id.*)  Henry testified that she complained to her supervisors about the rumors and her co-workers' negative treatment toward her, but that no one ever addressed the issue.  (*Id.* at 116-18)

C.     Gate Agent's Duties

Delta expects its gate agents to assist passengers, prepare necessary flight-related paperwork, and implement the timely and orderly boarding of the aircraft. (Schmidberger Decl. ¶ 4)  When a gate agent logs into the computer at the gate to perform his or her required duties, he or she uses a secure identification number that is unique to that agent.  (Davis Decl. ¶ 5; Henry Depo. 69-70)  Once logged in, an agent has access to passenger name records ("PNR").  (Davis Decl. ¶ 6; Henry Depo. 70-71)  A PNR contains passenger information, including seat assignments and upgrades, reflects any changes that are made to the passenger's itinerary, and records the time that a passenger is cleared and boards the aircraft.  (Davis. Decl.¶ 6)

In addition, agents have access to the standby list for the departing flight.  (*Id*. ¶ 7) The list contains two groups of passengers:  revenue passengers who have paid for their seat and non-revenue passengers who obtained their seat at a reduced fair or for free. (*Id.*; Henry Depo. 62-64)  Revenue passengers always have priority over non-revenue passengers.  (Davis. Decl. ¶ 7; Henry Depo. 83)  In addition, medallion passengers who are seeking upgrades are on the standby list in order of entitlement.[2]  (Brown Decl. ¶ 5)

---

[2] Medallion passengers have special status in recognition of the thousands of miles they have flown on Delta during the previous year.  (Brown Decl. ¶ 5)  Medallion passengers receive many benefits, including complimentary upgrades from coach to first class.  (*Id.*)  When medallion passengers would like an upgrade for a flight, they request the upgrade in advance of departure and Delta's computer system automatically places them on the standby list in order of entitlement based on different factors, such as medallion level and time of the upgrade request.  (*Id.*)

However, medallion passengers sometimes will board coach early rather than waiting for an upgrade to first class. (Schmidberger Depo. 55-56; Davis Depo. 25) In that event, Delta does not require the gate agent to move the medallion passenger to first class if an upgrade is available. (Gergits Depo. 41-42; Kircher Depo. 113-14)

The gate agent is responsible for managing the standby list, including upgrading medallion passengers into available first class seats and seating non-revenue passengers, (Schmidberger Decl. ¶ 7), and he or she is afforded some discretion in moving passengers' seats. (Davis Depo. 28; Henry Depo. 93) Henry testified that she normally started to re-assign seats for passengers on the standby list after the final boarding call, typically ten minutes before departure. (Henry Depo. 86)

In some situations, Delta encourages the gate agents to take proactive steps and hold seats to ensure a timely departure. (Schmidberger Decl. ¶ 5; Henry Depo. 78-82) For instance, when a flight is oversold, gate agents can "protect" seats in order to accommodate passengers on either the departing flight or another flight that day. (Schmidberger Decl. ¶ 5) When a seat is "protected," it is taken out of the inventory for sale and held for a passenger who made need it. (*Id.*; Davis Decl. ¶ 8). According to Delta officials, to properly "protect" seats, the agent must create a passenger record, block the required seats, enter "CVG Protect" as an explanation, and end the record. (*See, e.g.*, Davis Decl. ¶ 8; Schmidberger Decl. ¶ 5) By ending the record, there is an official, transparent record of the agent's actions that can be viewed on any computer by any agent who is looking for seats on that flight. (Davis Decl. ¶ 8; Schmidberger Decl. ¶ 5) According to Delta, "protecting" seats is only permitted when necessary in an oversold flight situation. (Davis Decl. ¶ 8; Schmidberger Decl. ¶ 5)

An agent can also hold a seat by "hanging" it. A "hung" seat is created when an agent goes to a different screen on her computer and removes the seat so that it cannot be sold or assigned. (Schmidberger Decl. ¶ 6) In contrast to "protecting" seats, there is no official record of the transaction that is visible to other agents because a "hung" seat record is not ended in the computer. (*Id.*) In fact, the "hung" seat can only be viewed on the computer on which it was created and the record of a "hung" seat disappears when the seat is "unhung." (*Id.*) According to Delta employees, agents are never allowed to "hang" a seat. (*Id.*; Davis Decl. ¶ 9)

Henry testified that, as a gate agent, she occasionally hung seats for short periods of time to accommodate passengers. (Henry Depo. 90-93) For example, Henry stated that she would tentatively hang seats so that passengers traveling together from a connecting flight could sit together. (*Id.*) Henry testified that hanging seats was sometimes a preferable method of holding seats when the agent wanted to confirm that the passenger approved the seat change before officially assigning it. (*Id.*)

D.  Gergits's Request for a Gate Agent for Flight 1213

Gergits and his three children were planning to fly as non-revenue passengers from Cincinnati to San Diego on Flight 1213 on June 8, 2008 ("Flight 1213"). Days before the flight, Gergits asked another lead agent to assign a retiring employee to work as gate agent on Flight 1213, so that the agent could move his family to first class before other passengers without facing discipline. (Kircher Depo. 52-53; Baird Depo. Exh. 4) Gergits admits that he made such a request, but claims that he was joking. (Gergtis Depo. 60-61, Exh. 6) Later, Gergits requested that Henry work as the gate agent for

Flight 1213. (*Id.* at 55-57) Henry testified that she did not know that Gergits had personally requested her as gate agent beforehand. (Henry Depo. 142-43)

During the staff briefing on the morning of June 8, 2008, a lead agent announced that Henry had been personally requested to work Flight 1213. (Henry Depo. 142-43; Gergtis Depo. 55-56) Henry was mortified at this public announcement because she felt it reinforced the unfounded gossip regarding her relationship with Gergits. (Henry Depo. 143-44) Thus, Henry testified that she complained about the announcement to another performance leader, but Delta never responded to her complaint. (*Id.* at 144-45, Exh. 14)

E.    Boarding Flight 1213

Henry was the primary gate agent for Flight 1213, though a less experienced employee from another department later joined Henry to assist in boarding. (Henry Depo. Exh. 14) That morning, there were open seats on Flight 1213,[3] and the standby list contained seven medallion passengers awaiting first class upgrades and six non-revenue passengers, including Gergits and his three children. (Davis Decl. ¶ 10) At the time of boarding, there were four unassigned first class seats on Flight 1213. (*Id.*)

The parties dispute what happened during the boarding of Flight 1213. Henry testified that the boarding process was "extremely challenging" and that she was behind in the boarding process. (Henry Depo. Exh. 14) In her written statement to Delta, Henry explained that she was "unable to clear all first class passengers in a timely manner." (Henry Depo. Exh. 11) Therefore, Henry claims that all of the medallion passengers had boarded by the time she was able to work on the standby list. (*Id.*) Then, according to Henry, as the Gergtis family boarded very close to departure time, she asked Gergits if his children would like to take the three available first class seats and he agreed. (Henry

---

[3] Delta reported that there were 20 open seats on Flight 1213. (Davis Decl. ¶ 14)

Depo. Exh. 14)  Henry testified that she did not upgrade the medallion passengers because it was her policy not to move passengers once they had already boarded, even if they were eligible for an upgrade.  (Henry Depo. 87)

On the other hand, Delta claims that boarding for Flight 1213 started on time. (Davis Decl. ¶ 11)  Further, Delta asserts that Rick Andrae, a lead agent, checked on the boarding status of the flight several times and that on one occasion, Henry told Andrae that she had two hung seats that would need to be addressed.  (Kircher Decl. Exh. 2) When Andrae offered to fix them for Henry though, Henry responded that she would take care of it.  (Tumminello Depo. Exh. 3)  Delta alleges that as departure time grew closer, Henry assigned the Gergtis party coach seats, but two minutes later, moved Gergits's three children to first class while Gergits remained in coach.  (Davis Decl. ¶ 11)

Ultimately, Gergits's three children flew to San Diego in first class and Gergits flew in coach.  Only one medallion passenger flew first class to San Diego and the other six medallion passengers sat in coach.

F.      Reaction to Flight 1213

Following Flight 1213, Delta employees began to gossip that Henry had not properly cleared the standby list and that she had purposefully moved Gergits's children to first class in front of medallion passengers.   (Kircher Depo. 17; Tumminello Depo. 15-17, 25-26)  In fact, employees printed the documents regarding Flight 1213 and hung them in the employee break room.  (Gergtis Depo. 26)

When Sam Tumminello, a performance leader, became aware of the gossip, he discussed the situation with Henry.  (Tumminello Depo. 15)  Tumminello testified that Henry was visibly upset when he approached her, so they talked privately about the

incident. (*Id.* at 15-16) Henry denied any wrongdoing and made a written statement explaining that it was a busy flight and she did not have time to clear the standby list before the medallion passengers had boarded. (Tumminello Decl., Exh. 1) At that time, Tumminello concluded that Henry had not acted improperly in boarding Flight 1213 and considered the investigation closed. (Tumminello Decl. ¶ 4) Further, the next day, Tumminello sent an email to the other performance leaders asking them to announce at the next staff briefing that there had been a full internal investigation of the boarding of Flight 1213 with a determination of no improper conduct. (Tumminello Depo. Exh. 2)

      G.     <u>Investigation into Flight 1213</u>

A few days later though, Delta received two phone calls on the compliance and ethics line from employees reporting concerns about Henry's boarding of Flight 1213. (Kircher Depo. 22) Thus, on June 11, 2008, Delta opened an investigation. (*Id.* at 82)

As part of the investigation, Delta's revenue protection unit ("RPU") pulled data from the boarding process of Flight 1213, including the standby list and all Henry's keystrokes from the computer. (Davis Decl. ¶ 10) According to Delta, the RPU investigation revealed electronic information that was not available when Tumminello initially looked into the incident. (*Id.*) Delta's RPU Analyst Tammy Davis ("Davis") allegedly discovered that Henry had "hung" three first class seats. (*Id.* ¶ 12) Specifically, Davis claims to have discovered the following sequence of events:

At 7:21 a.m., Henry retrieved the Gergits listing in the computer.[4] (*Id.* ¶ 11)

At 7:23 a.m., Henry opened another computer screen and "hung" three first class seats. (*Id.*)

---

[4] The scheduled departure time was 9:15 a.m.

At 7:26 a.m., Henry added remarks in the "hung" seat record that she was protecting the seats for an American Airlines operation problem.[5]  (*Id.*)

Henry upgraded one medallion passenger to first class, but allowed the remaining medallion passengers to board in their coach seats while the three first class seats remained "hung."  (*Id.*)

At 8:58 a.m., the fifth of the six remaining medallion passengers boarded the aircraft in coach.  (*Id.*)

At 9:02 a.m., the Gergits party was cleared in coach.  (*Id.*)

At 9:03 a.m., the last remaining medallion passenger boarded the aircraft in coach.  (*Id.*)

At 9:03 a.m., Henry immediately placed the Gergits family back on the standby list.  (*Id.*)

At 9:04 a.m., Henry assigned the three "hung" first class seats to Gergits's three children.  (*Id.*)

Following Davis's findings, four Delta officials interviewed Henry on July 14, 2008.[6]  (*Id.* ¶ 13)  At the meeting, Henry explained that boarding for Flight 1213 was chaotic and that the medallion passengers had already boarded by the time she had cleared the standby list and realized there were first class seats available.  (Davis Decl. Exh. 3)  Henry stated that she offered Gergits's three children the available first class seats because the Gergits family boarded very close to departure time, after the medallion passengers were already on board.  (*Id.*)  According to Delta, Henry denied that she

[5] Davis testified that she did not discover any American Airlines operational problems that morning and that it is not a typical practice to block first class seats for a competitor's airline's passengers. (Davis Decl. ¶ 11)
[6] Tammy Davis (RPU Unit), Deb Kircher (Human Resources), Gary Schmidberger (Station Manager), and Greg Kuhn (Corporate Security) were present at the meeting.  (Davis Decl. Exh. 2)

intentionally hung any seats, but she did not have any other explanation. (Davis Decl. ¶ 6) In her written statement following the meeting, Henry wrote, "As to why I failed to end the record and document on 6/8, I can only say it was accidental and unintentional. I cannot remember the specifics that may have warranted it." (Davis Decl. Exh. 3) In addition, Henry stated that Gergits did not request that she put his family in first class. (*Id.*)

During the July 14 meeting, Henry voiced her concerns about the hostile manner in which her co-workers had been treating her. (Henry Depo. Exh. 14) However, Henry claims that the Delta officials refused to talk about the issue, but her supervisor, Gary Schmidberger, promised to discuss it at another time. (*Id.*) Although Henry subsequently emailed Schmidberger several times to arrange a time to discuss her concerns, they never met. (*Id.*) In addition, the day after the meeting, Henry sent Kircher an email explaining the harassment she had been receiving from co-workers and asking her to consider that the employees who called the ethics hotline were biased. (Henry Depo. Exh. 12) Kircher placed a copy of the email into Henry's file, but she never investigated any of the concerns Henry raised in the email. (Kircher Depo. 138)

On July 14, 2008, the same Delta officials also interviewed Gergits regarding his conduct in relation to Flight 1213. Gergits stated the he did not request that Henry put his family in first class, but admitted that he told Henry he would appreciate whatever she could do to put his tall son in first class. (Davis Depo. Exh. 5) Further, Gergits admitted that he had specifically requested Henry as the gate agent for Flight 1213, but explained that he did so only because she was a good gate agent who would do her best to get his family seated together. (*Id.*)

H.    Disciplinary Action Against Henry

On August 4, 2008, Schmidberger informed Henry that she was suspended. (Henry Depo. Exh. 14) According to Henry, Schmidberger did not provide any explanation for her suspension. (Henry Depo. 134-35) Following this meeting, Henry claims that she left a voicemail for Schmidberger informing him that she was going to hire an attorney and requesting her employment file. (Henry Depo. Exh. 14) Within two weeks, Schmidberger gave Henry her employment file. (*Id.*) Henry was suspended for approximately two months without any contact from Delta. (*Id.*)

After reviewing the information gathered from the RPU investigation and the interviews of Henry and Gergits, various Delta departments and employees considered whether Henry should be terminated. (*See, e.g.*, Nabors Decl. ¶¶ 5-7; Kircher Decl. ¶ 10) Kelly Nabors, the program manager of Delta's Equal Opportunity Department ("EO Department") and Deborah Kircher, human resources generalist, concluded that Henry had purposefully manipulated the boarding process so that Gergits's family could board in first class. (Nabors. Decl. ¶ 5; Kircher Decl. ¶ 9) Further, Nabors determined that Henry's misconduct was very serious and historically such conduct had resulted in termination. (Nabors Decl. ¶ 6) Nabors informed Kircher of her findings. (*Id.*)

Then, Nabors and Kircher consulted with local management, hub manager, Gary Schmidberger, and director of airport customer service, Paul Baird, who were initially opposed to terminating Henry in light of her otherwise good employment record. (Nabors. Decl. ¶ 7; Kircher Decl. ¶ 11). However, Schmidberger and Baird stated that they changed their positions once they learned that Delta had terminated employees for similar misconduct in the past, realizing the importance of maintaining consistency in

disciplining employees.[7]  (Schmidberger Decl. ¶ 14; Baird Decl. ¶ 5)  Ultimately, Schmidberger and Baird signed the recommendation to terminate Henry, which was then approved by the EO Department and several levels of the Human Resources Department. (Baird Decl. ¶ 5; Schmidberger Decl. ¶ 14; Nabors Decl. ¶ 7; Kircher Decl. ¶ 11; Brown Decl. ¶ 6)

In early October 2008, Delta sent Henry a letter, stating she was terminated for "deliberately manipulating the Company's ticketing system and boarding process to allow George Gergits's three children to board first class as non-revenue passengers ahead of revenue-paying Delta Sky Miles Medallion passengers." (Henry Depo. Exh. 15)

I.      Disciplinary Action Against Gergits

Delta concluded that Gergits should also be subject to some disciplinary action for requesting that retiring employees work Flight 1213 so that he could be seated in first class and requesting that Henry work Flight 1213.  (Schmidberger Decl. ¶ 15; Nabors Decl. ¶ 8; Kircher Decl. ¶ 12)  However, Delta determined that Gergits was not improperly seeking to be upgraded to first class because both Gergits and Henry had denied that he had explicitly made such a request.  (Schmidberger Decl. ¶ 15; Nabors Decl. ¶ 8; Kircher Decl. ¶ 12)  Accordingly, human resources and operation management, in consultation with the EO Department, suspended Gergits without pay for three days and placed him on a performance improvement plan for ninety days.[8]  (Schmidberger Decl. ¶ 15; Nabors Decl. ¶ 8; Kircher Decl. ¶ 12)

---

[7] There is some inconsistency in Gary Schmidberger's testimony about his position on terminating Henry. In his deposition, Schmidberger testified that he was always opposed to Henry's termination, but that he "went along with it.." (Schmidberger Depo. 82-83)  As discussed below, this inconsistency is not material.

[8] The performance improvement plan required Gergits to meet with the morning shift employees to discuss the incident with Henry and Flight 1213 and their expectations of him as a leader, and to complete two leadership training courses.

J.    Henry's Appeal of Her Termination

Henry appealed the termination of her employment. She submitted her initial letter of appeal on November 12, 2008, which was supplemented by a January 21, 2009 letter from her attorneys. (Guerrant Decl. ¶ 4; Henry Depo. 140-42) In Henry's appeal, she alleged that three male employees had engaged in misconduct similar to hers, but had not been terminated. (Henry Depo. Exh. 14) Joanne Guerrant, program manager of the EO Department, testified that she looked into each of the employment situations Henry had identified, and in all three of the incidents, she determined that the misconduct was not similar to that for which Henry was discharged. (Guerrant Decl. ¶¶ 5-8) Accordingly, the EO Department determined that Henry had not presented any new information to warrant her reinstatement of employment and it upheld the decision to terminate Henry. (*Id.* ¶ 9)

K.    Current Action

Henry filed this action on January 25, 2010. (Doc. 1) In her complaint, Henry alleges the following claims against Delta: (1) gender discrimination under federal and Kentucky law; and (2) wrongful discharge in violation of Kentucky public policy. After the parties engaged in discovery, on April 29, 2011, Delta filed a motion for summary judgment which is now ripe for resolution.

*Analysis*

A.     Gender Discrimination[9]

As Henry has not claimed to have any direct evidence of gender discrimination, the *McDonnell Douglas* burden-shifting analysis applies, under which:  (1) the plaintiff must establish a prima facie case of discrimination; (2) the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; (3) if the employer meets this burden, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *DiCarlo v. Potter*, 358 F.3d 408, 414-15 (6th Cir. 2004).  At all times throughout the burden-shifting process, the plaintiff bears the burden of persuading the factfinder that the employer intentionally discriminated against her.  *DiCarlo*, 358 F.3d at 415.[10]

1.     Prima Facie Case

To establish a prima facie case of gender discrimination under Title VII, a plaintiff must prove:  "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly-situated non-protected employees were treated more favorably than she was."  *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).

---

[9] The elements are the same for a gender discrimination claim under federal law and Kentucky law.  *See Spees v. James Marine, Inc.*, 617 F.3d 380, 389 (6th Cir. 2010).

[10] Delta argues that it is entitled to a presumption of non-discrimination because the individuals who decided to terminate Henry were female.  However, this principle, sometimes referred to as the "same-group" inference, has been rejected by the U.S. Supreme Court and the Sixth Circuit.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003).

Here, the parties do not dispute that Henry has satisfied the first three elements: (1) she is a woman; (2) she was terminated; and (3) she was qualified for her position. Nonetheless, Henry has failed to satisfy the fourth prong of the test, which requires her to show either that she was "replaced" by a person outside the protected class, or that a non-protected similarly situated employee was treated more favorably. *Peltier*, 388 F.3d at 987.

Henry cannot establish that she was "replaced." It is well established in the Sixth Circuit that an employee is not "replaced" when his or her job duties are redistributed among existing employees. *Majewski v. Automatic Data Processing*, 274 F.3d 1106, 1115 (6th Cir. 2001); *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement.").

The record is undisputed that Henry's duties were spread among the remaining Delta agents at the Cincinnati airport. (Schmidberger Decl. ¶ 17) Further, the employee given a senior customer service agent position closest in time to Henry's termination was a woman. (Croall Decl., Exh. 1) Therefore, Henry has not demonstrated that she was replaced.

In addition, Henry has raised no triable issue as to whether any similarly situated male employees were treated more favorably than she was. Employees are "similarly situated" when they are similar in "all *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original). Specifically, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in

the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Further, "[i]n the disciplinary context, . . . the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)).

Henry argues that Gergits is similarly situated to her because he was subject to the same Delta policies and procedures regarding upgrading medallion passengers. She asserts that Gergits was aware that his children were sitting in first class ahead of medallion passengers because the standby lists, which included the list of medallion passengers awaiting upgrades, were displayed on the overhead monitors near the gate for Flight 1213. (Henry Depo. 63) Further, she contends that Gergits was treated more favorably than she was because he engaged in similar conduct, by specifically requesting Henry to work the gate for Flight 1213 and then asking her to do what was possible to upgrade his son to first class, yet he was not terminated.

Henry's argument fails because Gergits is not "similarly situated" to her in several respects. Gergits and Henry had different job titles and different job responsibilities. *See Campbell v. Hamilton Cnty.*, 23 F. App'x 318, 326 (6th Cir. 2001) (finding that employees with different job titles were not similarly situated); *Mitchell v. Detroit Med. Ctr.*, No. 99-1402, 2000 WL 977349, at *2 (6th Cir. July 3, 2000) (concluding that employees with different job duties were not similarly situated).[11]

---

[11] At oral argument, Henry argued that in considering whether employees are similarly situated, the important factor is not whether employees have the same direct supervisor, but whether both employees would be disciplined by the same "ultimate decision-maker." *See Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 481-82 (6th Cir. 2008). Although the Sixth Circuit has indicated that "same supervisor"

Moreover, Henry has failed to establish that Gergits engaged in acts of "comparable seriousness." *Wright*, 455 F.3d at 710. Based on the results of the RPU investigation, Delta had evidence that indicated that Henry manipulated the boarding process so that Gergits's family could fly in first class. On the other hand, Delta had no evidence that Gergits asked Henry to improperly move his family to first class ahead of medallion passengers because both Henry and Gergits denied that Gergits did so. Thus, the only evidence of Gergits engaging in misconduct was that he asked for retiring employees and Henry to work as gate agents for Flight 1213.[12] Given these differentiating circumstances, Gergits and Henry "are not similarly situated because their alleged acts of misconduct are of a very different nature, and there are legitimate reasons why [Delta] would treat them differently." *Id. Cf. Hagedorn v. Veritas Software Corp.*, 129 F. App'x 1000, 1003 (6th Cir. 2005) (determining that the plaintiff who made a racially offensive comment was not similarly situated to his supervisor who laughed at the comment); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (finding that non-protected employees who had engaged in the same misconduct as the plaintiff were not similarly situated because the plaintiff caused serious injury to another employee while the other employees did not).

In addition, in Henry's internal appeal of her termination, she alleges that three male Delta employees had previously engaged in misconduct similar to her own, but they

---

can be interpreted in this manner, it is not a determinative issue in this case because Gergits's conduct was not of "comparable seriousness."

[12] Henry argues that Gergits's misconduct was of comparable seriousness because Delta admitted that Gergits's conduct also violated company policy. While it is true that Kircher admitted that it would be a violation of Delta policy "for a manager to ask a gate agent to place [him] in first class" (Kircher Depo. 53-54), Delta had no evidence that Gergits did, in fact, ask Henry to be placed in first class. Further, Henry contends that Gergits asked Henry to do "all possible" to have his son seated in first class, which suggested that she place him in first class. However, Gergits's written statement to Delta officials states, "The day of departure, I asked [Henry] that if there was *any way possible*, [one first class] seat for my 6'4" son would be great, but if not that was fine." (Davis Decl. Exh. 5)

were not terminated.[13]  (Henry Depo. Exh. 17)  However, Delta looked into all three situations and determined they were distinguishable because the misconduct was not comparable to Henry's. (Guerrant Decl. ¶¶ 5-8)  Even more, Delta produced evidence that twelve employees were terminated for hanging seats or creating fictitious bookings, six of which were male and six female.  (Nabors Suppl. Decl. ¶ 4, Exs. 1, 2)  In fact, Delta asserts that in 2009, a male employee was terminated because he assigned first class seats to non-revenue passengers ahead of medallion passengers.  (*Id.*)  Essentially, Henry's "allegations regarding other employees not being fired for different, but what she subjectively believes to be more serious, misconduct does not satisfy [the fourth] element."  *Mitchell*, 964 F.2d at 583.

Henry has failed to meet her burden of producing evidence to establish that there were "similarly situated" male employees who were not terminated, *Mitchell*, 964 F.2d at 584.  Thus, Delta is entitled to judgment as a matter of law.

---

[13]      The first incident involved a former male lead agent who was attempting to travel as a non-revenue passenger on a full flight.  The gate agent paid "denied boarding compensation" to two revenue passengers to give up their seats.  However, the lead agent obtained a seat on the flight as a non-revenue passenger.  The gate agent was not disciplined.  Henry alleges that Delta lost revenue because it had to pay "denied boarding compensation" to the passengers even though it was not necessary.

The EO Department determined there was no wrongdoing in the first incident because one revenue passenger on the standby list needed a seat.  However, the only passengers willing to give up their seats were traveling together and refused to split up.  Therefore, Delta offered denied boarding compensation to both of them, leaving one available seat and only person left on the standby list was the lead agent.

In the second incident, a male gate agent told two revenue passengers awaiting seat assignments that they would not clear the standby list and should go to the information counter for rerouting.  Ultimately, the gate agent cleared three non-revenue passengers, but the two revenue passengers did not get on the flight.  Consequently, Henry alleges that Delta lost revenue because it had to pay for their lunch and reroute their flights.  No disciplinary action was taken against the gate agent.

The EO Department found no improper conduct in the second incident.  It determined that the revenue passengers were deleted from the standby list two minutes before the scheduled departure and then the non-revenue passengers were cleared immediately before departure.  The agent justified his actions on the ground that he did not have sufficient time to page the revenue passengers.

In the third incident, Henry's male manager, Schmidberger, and his friend traveled on a charter flight after they could not obtain seats as non-revenue passengers on a Delta flight.  The charter representative consented to Schmidberger's request to fly on the charter service. Schmidberger was not disciplined.  The EO Department found that there was no company policy violation in flying on the charter flight.

2.     Pretext

Even assuming Henry established a prima facie case, there is no evidence from which a reasonable jury could conclude that Delta's reason for terminating her was a pretext for gender discrimination.  Under the *McDonnell Douglas* burden-shifting analysis, once the employer presents evidence that it terminated an employee for reasons unrelated to the alleged discrimination, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the proffered reasons were pretext for discrimination. *DiCarlo*, 358 F.3d at 414-15.  Here, Delta produced evidence that it terminated Henry because it believed that she deliberately manipulated the ticketing system and boarding process so that Gergits's family could be seated in first class ahead of medallion passengers.[14]  Thus, Delta has articulated a legitimate, non-discriminatory reason for terminating Henry.

A plaintiff can show pretext in three ways:  "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her] discharge, or (3) that they were insufficient to motivate discharge."  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir. 2009) (emphasis in original).  To carry her burden on summary judgment, Henry "must produce sufficient evidence from which a jury could reasonably doubt the employer's explanation."  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009).

---

[14] Further, Delta has submitted multiple declarations of Delta employees involved in the decision to terminate Henry stating that Henry was terminated due to her misconduct in boarding Flight 1213 and that her gender was not a factor in the decision to terminate her. (*See* Brown Decl. ¶ 6; Schmidberger Decl. ¶ 16;  Kircher Decl. ¶ 13; Nabors Decl. ¶ 9; Baird Decl. ¶ 7)

To the extent Henry argues that Delta's reason for terminating her had no basis in fact, her argument fails because the Sixth Circuit has adopted the "honest belief" doctrine. *Majewski*, 274 F.3d at 1117. Under that doctrine, as long as the employer demonstrates that it "reasonably relied 'on the particular facts that were before it at the time the decision was made,'" the employee cannot prove pretext, even if the facts turned out to be incorrect. *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). Accordingly, an employer only has to present evidence that it "made a reasonably informed and considered decision before taking an adverse employment action." *Wright*, 455 F.3d at 708.

Here, Delta conducted an investigation regarding the boarding of Flight 1213, including reviewing the electronic records on the computer Henry used, interviewing Henry and Gergits about the incident, and researching how employees had historically been disciplined for similar conduct. Further, multiple Delta officials were involved in the termination decision. Thus, Delta made a "reasonably informed" decision to terminate Henry and therefore it is protected by the "honest belief" doctrine. *See id.* at 708-09 (concluding that under the "honest belief" doctrine, an employee could not prove pretext because the employer had investigated the allegations of the employee's misconduct and interviewed the employee regarding the incident). *See also Seeger v. Cincinnati Bell Tel. Co., LLC*, Civil Action No. 08-207-DLB, 2010 WL 3259989, at *8-9 (E.D. Ky. Aug. 18, 2010) (determining that the plaintiff had failed to establish pretext because the employer had an "honest belief" that the plaintiff had committed disability fraud after it conducted a thorough investigation).

Next, Henry argues that Delta's proffered reason for termination did not actually motivate the termination decision. Under this method of proving pretext, "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Manzer*, 29 F.3d at 1084 (emphasis in original). Rather, the plaintiff contends that "the sheer weight of the circumstantial evidence of discrimination make it 'more likely that not' that the employer's explanation is a pretext, coverup." *Id.*

To support her argument, Henry argues that there is conflicting deposition testimony regarding the timing and reason for her termination, which creates a genuine issue of material fact for the jury. *See Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523-24 (6th Cir. 1997) (finding there was a genuine issue of material fact when there was conflicting testimony as to who made the decision to terminate the plaintiff and the managers provided different reasons for the termination).

Specifically, Henry argues that Delta's witnesses have contradicted each other regarding the reason for her termination and when the decision to terminate her was made. First, Henry points to Kircher's testimony that: after the July 14 meeting with Henry, Delta officials were not planning on terminating her (Kircher Depo. 169, 176); Kircher did not decide to terminate Henry until after a conference call on July 30, during which the EO Department explained that historically, Delta employees had been terminated for conduct similar to Henry's (*Id.* at 89-90, 109-10, 167-70, 177, 180-81); and Kircher could not remember any specific examples of past discipline supporting her decision to terminate Henry. (*Id.* at 168) Henry contends that the proffered reasons for Henry's termination in Kircher's declaration, *i.e.,* the severity of Henry's conduct and the

prior treatment of employees engaging in similar conduct, were inconsistent with her deposition testimony. She argues that if Kircher's testimony that she initially did not believe that termination was warranted is true, then her decision could not have been based on the severity of Henry's misconduct alone.

Second, Henry points to Schmidberger's testimony that: after the July 14 meeting, Kircher said that Henry should be terminated for her conduct (Schmidberger Depo. 65); and Schmidberger was not aware of further investigation after the July 14 meeting. (*Id.* at 85) Henry argues that Schmidberger's testimony directly contradicts Kircher's testimony about her reasons and the process for terminating Henry.

Additionally, Henry asserts that Schmidberger contradicts himself. Specifically, she points out that he signed a declaration stating that although he initially opposed Henry's termination, he changed his mind once he learned that other employees had been terminated for similar conduct (Schmidberger Decl. ¶ 14); yet, he testified that he never agreed with Henry's termination, even when he signed a letter recommending her termination. (Schmidberger Depo. 82-83, 87)

Third, Henry argues that there are inconsistencies in Davis's testimony. She argues that Davis emphasized the timing of the transactions as evidence that Henry deliberately manipulated the system, yet during her deposition, Davis did not mention the timing of the transactions and she testified that she did not remember anything specific from Henry's keystrokes. (Davis Depo. 35-36, 49) In addition, Henry argues that Davis was inconsistent by testifying that sometimes medallion passengers will board before the standby list is cleared, yet concluding that Henry had engaged in improper conduct during the boarding of Flight 1213. (*Id.* at 33-34) Moreover, Henry argued that Davis

was inconsistent because she reported that Delta lost $4,000 in revenue as a result of Henry's conduct, but she admitted in her deposition that the medallion passengers would have been upgraded for free and no one was denied a seat. (*Id.* at 54-56)

None of these alleged inconsistencies create a genuine issues of material facts on which a reasonable jury could conclude that Delta unlawfully discriminated against Henry based on her gender. Although there are differences in how Delta employees described Henry's termination, all Delta employees agree that her termination arose out of the same incident. When multiple individuals are involved in a termination decision, it is immaterial that they describe the situation differently as long as they all are referring to the same basic conduct. *Cf. Conley v. U.S. Bank Nat'l Assoc.*, 211 F. App'x 402, 408-09 (6th Cir. 2006) (finding that the inconsistencies regarding the employer's reasons for termination did not amount to a "serious disagreement" because "[r]egardless of the various ways in which different supervisors might describe the situation, this is not a case . . . in which the defendant plainly changed its preferred reason for termination"); *Williams v. Columbus Metro. Hous. Auth.*, 90 F. App'x 870, 876-77 (6th Cir. 2004) (finding it immaterial in plaintiff's failure-to-promote claim that there were some inconsistencies in testimony regarding the interview process because there was agreement as to the significant facts, stating that "inconsistencies . . . relat[ing] entirely to matters of process" do not establish pretext).

Finally, Henry argues that Delta's proffered reason for her termination was insufficient. Ordinarily, a plaintiff shows pretext in this manner by demonstrating that non-protected employees were not terminated even though they engaged in substantially similar conduct. *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008).

However, as discussed above, Henry has failed to identify a similarly situated male employee who was treated more favorably.

Therefore, Henry has failed to meet her burden of establishing that Delta's proffered reason for termination was pretext for discrimination. To prove pretext by a preponderance of the evidence, Henry cannot merely assert that the reason for her termination was incorrect or invalid. *See Irvine v. Airco Carbine*, 837 F.2d 724, 726 (6th Cir. 1987). Rather, Henry must produce evidence from which a reasonable jury could infer that she was the victim of intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000). She has failed to do so. Accordingly, Delta is entitled to summary judgment on Henry's gender discrimination claims.

B.     Public Policy Tort

In Kentucky, "ordinarily an employer may discharge [its] at-will employees [such as Henry] for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). Although Kentucky recognizes a public policy exception to the at-will employment doctrine, it has been narrowly applied. Under Kentucky law, absent explicit legislative statements prohibiting the discharge, there are only two situations in which the reason for terminating an employee is so contrary to public policy as to be actionable: (1) "where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment"; and (2) "when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Hall v. Consol of Ky., Inc.*, 162 F. App'x 587, 589 (6th Cir. 2006) (quoting *Gryzb v. Evans*,

700 S.W.2d 399, 402 (Ky. 1985)) (citing Kentucky cases in which the courts have limited the public policy exception to these two enumerated situations).

Henry's wrongful discharge claim based on the public policy exception fails as a matter of law.[15] Henry's only argument in support of her claim is that Delta wrongfully terminated her because after finding out about her suspension, she informed Schmidberger she was planning to hire an attorney. Not only has Henry failed to offer sufficient evidentiary support for this claim,[16] her claim does not fall within the narrow scope of Kentucky's public policy tort. Henry does not allege that she was terminated for refusing to violate a law in the course of her employment, nor does she cite any legislative enactments.[17]

Therefore, Delta is also entitled to summary judgment on Henry's wrongful discharge in violation of public policy claim.

A separate judgment shall enter concurrently herewith.

This 8th day of August, 2011.



Signed By:
*William O. Bertelsman*
United States District Judge

---

[15] The determination of whether a plaintiff has based her wrongful discharge claim on actionable public policy grounds is a matter of law. *Grzyb*, 700 S.W.2d at 401.

[16] Henry's only support for her claim is her own deposition testimony that she left a voicemail for Gary Schmidberger that she would be hiring an attorney. (Henry Depo. 191-92) However, Henry acknowledged that Schmidberger never discussed hiring an attorney with her at all. (*Id.*)

[17] In fact, the Kentucky Supreme Court has already rejected a wrongful discharge based on Section 14 of the Kentucky Constitution, which guarantees individuals open access to the courts. *Boykins v. Hous. Auth. of Louisville*, 842 S.W.2d 527, 530 (Ky. 1992).