1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                   NORTHERN DIVISION AT COVINGTON


 3

     RACHELLE HENRY,                   :   Docket No. CV 10-9
 4                                     :
                 Plaintiff,            :   Covington, Kentucky
 5                                     :   Friday, July 15, 2011
           versus                      :   1:30 p.m.
 6                                     :
     DELTA AIRLINES, INC.,             :
 7                                     :
                 Defendant.            :
 8
                                  -  -  -
 9

10                    TRANSCRIPT OF ORAL ARGUMENT
                     BEFORE WILLIAM O. BERTELSMAN
11                 UNITED STATES DISTRICT COURT JUDGE


12
     APPEARANCES:
13
     For the Plaintiff:         KELLY MULLOY MYERS, ESQ.
14                              Freking & Betz
                                525 Vine Street, Sixth Floor
15                              Cincinnati, OH 45202

16
     For the Defendant:         DAVID T. CROALL, ESQ.
17                              Porter, Wright, Morris & Arthur
                                250 E. Fifth Street, Suite 2200
18                              Cincinnati, OH 45202
                                 and
19                              KELLY K. GIUSTINA, ESQ.
                                Delta Airlines, Inc. Law Department
20                              981-1030 Delta Boulevard
                                P.O. Box 20574
21                              Atlanta, GA 30320-2574

22
     Court Reporter:            JOAN LAMPKE AVERDICK, RMR-CRR
23                              Official Court Reporter
                                35 W. Fifth Street, Box 1073
24                              Covington, KY 41012
                                (859) 291-9666
25          Proceedings recorded by mechanical stenography,
     transcribed by computer.
```

2

```
 1                (Proceedings commenced in chambers at 1:30 p.m.)

 2                THE COURT:  Note your appearances, please.

 3                MS. MYERS:  Kelly Myers on behalf of the plaintiff,

 4     Rachelle Henry.  And Rachelle Henry is here with me as well.

 5                MR. CROALL:  David Croall on behalf of Delta

 6     Airlines.

 7                THE COURT:  And who's on the phone?

 8                MS. GIUSTINA:  And this is Kelly Giustina.  I'm the

 9     general attorney with Delta Airlines.

10                THE COURT:  Your flight was cancelled?

11                MS. GIUSTINA:  It was.  Unfortunately, despite my

12     requests, they would not get me on another flight to get me

13     there in time.  My apologies.

14                THE COURT:  If you can't do it, who can?  Are you a

15     full-time employee of Delta?

16                MS. GIUSTINA:  I am, yes.

17                MR. CROALL:  It happens to them too, Your Honor.

18                THE COURT:  I don't feel so bad now.  Okay.  Well, I

19     don't see any problem with it.  This is all going to be mostly

20     oral anyway.

21                Okay.  We have, one of many that we have these days,

22     an employment case and a motion for summary judgment.  It's a

23     little bit unusual.  I think we can work our way through it.

24                Well, why don't we do it this way.  Why don't the

25     defendants start, since it's their motion, but make sort of a
```

1    succinct statement.  I know you're going to say they haven't

2    proven their case, but make a succinct statement, and then

3    we'll let them tell us how they think they have proved their

4    case, and then you can respond.

5         MR. CROALL:  I will do my best, Your Honor, to keep

6    it short.

7         THE COURT:  Keep the first part short.

8         MR. CROALL:  We do believe we're entitled to summary

9    judgment.

10        THE COURT:  I've been working on it all morning and

11   I'm pretty familiar with it.

12        MR. CROALL:  Okay.  You know, it is undisputed the

13   conduct occurred.  She hung those three first-class seats two

14   hours before the flight.  She kept them in that hidden status

15   until two minutes before the flight was boarded; and then as

16   soon as the last medallion passenger got on the plane, the

17   three hung seats became available.  She gave them to the

18   non-revenue party, who happened to be her supervisor's family.

19        Undisputed that in the initial investigation, she was

20   unable to give any explanation as to why that happened, except

21   to say that it was unintentional.  And it's undisputed that

22   the Delta management group that looked at it reached the

23   conclusion that it was, in fact, intentional.  She had gamed

24   the system to the benefit of a Delta employee, who hadn't

25   asked her for it, and to the detriment of Delta's best

4

1    customers, the high-valued customers.  And we don't think she

2    makes a prima facie case because there's nothing to connect

3    her gender to that decision.

4         You know, I know the argument is that, you know,

5    Gergits was similarly situated.  We don't think that's right.

6    We think that's pretty fully briefed.  We don't think Gergits

7    engaged in any conduct that was close to being the same as

8    this conduct.  He said some stupid stuff.  He did engage in

9    some misconduct, and he got disciplined for it; and he got,

10   you know, slapped around.  But he didn't engage in the same

11   level of misconduct that Delta concluded Miss Henry did.

12   And, you know, that doesn't make their prima facie case.

13        And we think even if she could make the prima facie

14   case, there's no evidence of pretext.  There's no evidence

15   that the stated reason Delta has given from the beginning --

16   that Delta believed, based on the information it had, that she

17   had engaged in intentional misconduct about the seating

18   process and the ticketing procedures in favor of the non-rev

19   passenger and to the detriment of Delta's customers -- there's

20   no evidence that that's not the real reason or wasn't

21   sufficient to motivate the discharge.

22        THE COURT:  Do you want to comment on whether or not

23   she was replaced?

24        MR. CROALL:  Well, you know, it's one of those

25   situations where Department 125 is the biggest work group in

5

1    the airline.  The ticket agents and the gate agents, it's the

2    biggest group, and nobody specifically took her position.

3             THE COURT:  Did they hire somebody, any males?

4             MR. CROALL:  Some males, but the person hired closest

5    in time to her was another female.

6             THE COURT:  Okay.

7             MR. CROALL:  You know, and, really, her duties get

8    absorbed by the whole group.  That's the way it works.  It is

9    a shrinking work force generally.  Certainly at CVG, it's a

10   shrinking work force.

11            THE COURT:  Even if they would get by the prima facie

12   case, as I understand your position, you're saying this was a

13   nondiscriminatory reason; it meets the test for the same?

14            MR. CROALL:  Correct.  And there's no evidence of

15   pretext.

16            THE COURT:  I read quite a few cases I ran on Weslaw

17   this morning.  I think we had 25 cases before we got through

18   five years.

19            MR. CROALL:  Yeah.  And, you know, the public policy

20   claim -- you know, we think we're entitled to summary judgment

21   on the discrimination claim.  Both under state and federal

22   law, the same analysis applies.  The public policy claim,

23   while creative, you know, doesn't exist.  She's asking you to

24   make new law.  We don't think the Kentucky Supreme Court would

25   make that new law.  We don't think you should make that new

1   law in the absence of any guidance from the Kentucky Supreme

2   Court.  It's just not there.  There's mixed law on the other

3   side of the river.  There's one bad case that I had the

4   misfortune of representing the defendant, but we won it at

5   trial.  But that has since been cut against.  There's just no

6   law in Kentucky to support the argument that there's a cause

7   of action for being fired allegedly for saying you're thinking

8   about hiring an attorney.

9           THE COURT:  Well, I don't know.  But you'd have the

10  same McDonnell-Douglas analysis.

11          MR. CROALL:  Well, it's a little different, but

12  there's no -- you know, the Kentucky Supreme Court's been very

13  narrow, narrower than most states, about whether there's an

14  exception and when there's an exception, and this just

15  doesn't --

16          THE COURT:  I think I had a jury duty case.

17          MR. CROALL:  There's a Workers' Comp. case.  I think

18  you're right, there's a jury duty case.  But there's no case

19  like this.

20          THE COURT:  I think it's a separate statute from one

21  that's Worker's Comp.

22          Okay.  Well, let me hear from the plaintiff.  And to

23  try to speed it up some, of course, she is female.  Of course,

24  an unfavorable action was taken.  And the defendant has

25  articulated a nondiscriminatory reason.  Now the burden is on

1    you to show that there was pretext.

2              MS. MYERS:  Yes, Your Honor.

3              THE COURT:  You rely heavily on the treatment that

4    was received by this other gentleman whose name escapes me for

5    the moment.  But he doesn't seem to me, to be perfectly frank,

6    to be comparable under these cases.  And I read six or seven

7    of them this morning; and they all say got to have the same

8    supervisor, you got to have at least a comparable job at the

9    same level, and this gentleman doesn't seem to be comparable,

10   but I'm willing to be convinced.

11             MS. MYERS:  All right.  Ms. Henry was a long-time,

12   20-year employee.  Record of very good performance.  Described

13   as efficient, dependable, knowledgeable, proactive.

14   Gergits --

15             THE COURT:  So why would they, all of a sudden,

16   decide now to pick on her because of her gender?

17             MS. MYERS:  Well, I think the issue comes down to the

18   event --

19             THE COURT:  She was treated well up until this event.

20             MS. MYERS:  Right.  And oftentimes, it's what

21   happens -- the proof is in the pudding.  When they had in

22   front of them the conduct of the male employee and the female

23   employee, they terminated the female employee and they placed

24   the male employee on a three-day suspension and a PIP.

25             Now, under Ercegovich, seminole Sixth Circuit case

1   that talks about who's properly similarly situated, it's

2   similarly situated in all relevant respects.  They don't have

3   to be --

4          THE COURT:  But you have to have a relevance.  That

5   one says you have to have the same supervisor.  They took it

6   back a little in the subsequent unpublished case.

7          MS. MYERS:  Exactly.

8          THE COURT:  However you pronounce that Ercegovich,

9   I've always pronounced it, but that's come up in many, many

10   cases.

11          MR. CROALL:  No one knows.

12          THE COURT:  It's come up in many, many cases, and it

13   specifically says they have to be employed at the same level

14   and have the same supervisor.  Here's a bunch more I read this

15   morning.  But go ahead.  I'll let you do it without

16   interruption.  Go ahead.

17          MS. MYERS:  There is case law in Martin and I think

18   Ercegovich and in --

19          THE COURT:  Martin cites Ercegovich, however you want

20   to pronounce it.  It says in that case --

21          MS. MYERS:  Right.  In Alfrey --

22          THE COURT:  The trial court made findings of fact

23   that they were in dispute, is basically what he said.  He

24   actually says if the trial court went back and revisited the

25   facts, the factors might still be.  But anyway, go ahead.

1          MS. MYERS:  If we look at Alfrey v. AK Steel -- well,

2     there's case law that indicates, especially with respect to

3     the prima facie case, it shouldn't be onerous.  Here we're

4     looking at similarly situated.  Managers testified that --

5     there's significant testimony in the record that everyone,

6     including Gergits, was subject to these rules and policies, to

7     the waivers-and-favors policy and to the non-rev policy.

8          The defendant has argued several times in the brief

9     and orally here today that they found -- that the defendant

10    found that Ms. Henry gamed the system.  And when they were

11    looking, this was the same incident.  Mr. Gergits was

12    intimately involved in the incident that resulted in

13    Ms. Henry's termination.  He was there.  He was on the flight.

14    He is the one that actually enjoyed any benefit from his

15    family getting on the first-class flight.  Ms. Henry did not.

16         The supervisor -- and I think the Alfrey case

17    indicates that a jury could conclude that Gergits was subject

18    to a higher standard because he was the supervisor.

19         THE COURT:  Okay.  "To be deemed similarly --"

20    quoting from the Sixth Circuit, Russell v. The University of

21    Toledo 537 F.3d 596, but this is the same language that

22    appears in many, many cases, 2008, at Headnotes 11 and 12.

23    "In the alternative, to satisfy the third prong of the pretext

24    analysis framework, the plaintiff must show that the

25    employer's proffered reasons for the challenged employment

1    action were insufficient to motivate that discharge.  Such a

2    showing ordinarily consists of evidence of other employees,

3    particularly employees not in the protected class, were not

4    fired, even though they engaged in substantially identical

5    conduct to that which the employer contends motivated its

6    discharge of the plaintiff."

7          Then quoting from the case Ercegovich, however we want

8    to pronounce it, 154 F.3d 344 at 352, "To be deemed similarly

9    situated in a disciplinary context, the individuals with whom

10   the plaintiff seeks to compare his or her treatment must have

11   dealt with the same supervisor, have been subject to the same

12   standards, and have engaged in the same conduct without such

13   differentiating or mitigating circumstances that would

14   distinguish their conduct or the employer's treatment of them

15   for it."

16         Okay.  Well, they don't have the same supervisor

17   because he is her supervisor.  Maybe up the road -- there's

18   another later case unpublished that up the road says maybe if

19   they have a common supervisor at the top, it's enough, so we

20   could leave that part out of it.  It says, "They have been

21   subject to the same standards, have engaged in the same

22   conduct, without such differentiating or mitigating

23   circumstances that would distinguish their conduct or the

24   employer's treatment of them for it."

25         Well, this gentleman had a different job.  He wasn't

1    immediately in charge of the gate.  He -- well, it's

2    different.  And he was disciplined.  He has a different

3    position.  I don't know what his employment record was.  And

4    they might have reasons for treating him differently.  It's a

5    different kind of a job.  He's an executive.

6           MS. MYERS:  And I respect --

7           THE COURT:  And so he's not comparable.  But all

8    these cases -- in fact, we could sit here the rest of the

9    afternoon and I could cite cases that say the same thing.

10          MS. MYERS:  And I would respectfully point to Martin

11   v. Toledo Cardiology Consultants.

12          THE COURT:  I read that one, too.

13          MS. MYERS:  It's a case out of the Sixth Circuit that

14   came out a decade later.  And it indicated that, "The prima

15   facie case is not intended to be onerous, and the relevant

16   factors for determining whether an employee are similarly

17   situated often include employee's supervisors, the standards

18   that the employees had to meet, and the employee's conduct;

19   and the weight given to each factor can vary depending on the

20   particular case."

21          And in this case, it's undisputed that Gergits

22   reported -- he was a line leader, a front-line supervisor.  He

23   reported to Baird and Schmidberger, who were operations

24   manager, as did Ms. Henry through the line.

25          THE COURT:  There's a later case that would probably

1     say that's enough so I'm going to leave out the

2     same-supervisor claim.

3              MS. MYERS:  It's also undisputed that they were both

4     subject to the same --

5              THE COURT:  But there are differentiating or

6     mitigating circumstances that would distinguish their conduct

7     or the employer's treatment of them for it.

8              MS. MYERS:  Well, they were subject to the same

9     policies and procedures with respect to the alleged violation.

10    And I think as a matter of law on summary judgment, the Court

11    can't make that decision.  I think it has to be for the jury

12    to determine.  I think that there's -- they were involved in

13    the same incident.  He flew on that flight.  And what the

14    defendant is arguing is that, well, we believed him and we

15    didn't believe Ms. Henry, so we fired her.  And that is going

16    to require questions of credibility, which is inappropriate on

17    summary judgment and not determined as a matter of law.

18            This is a quintessential case where I think the

19    comparators are pretty easy.  It's the male employee who gets

20    on the flight and he gets his hand slapped and he gets a PIP,

21    and it's the female employee that's fired from a 20-year, good

22    employment record.  And there's testimony that the defendant

23    decided that Ms. Henry was gaming the system and that she was

24    giving her supervisor a break and that Mr. Gergits was just

25    joking when he said that he wanted to make sure that there was

1    a gate agent who was retiring so he could, you know, have good

2    seats on the flight.

3              THE COURT:  Well, where's the evidence that this

4    decision, even though -- let's say it's arbitrary or

5    unreasonable -- is based on gender?  She's the same gender she

6    was for the 20 years and was treated well, promoted, given a

7    good job.  Nothing was done until she committed this offense.

8              MS. MYERS:  It's the disparity --

9              THE COURT:  And then, you know, all of a sudden,

10   we're going to discriminate against her because of her gender.

11             MS. MYERS:  It's the --

12             THE COURT:  It doesn't make any sense.

13             MS. MYERS:  It's the disparate treatment that

14   arose --

15             THE COURT:  I see the plaintiff here herself.  The

16   law is not that the defendant is unreasonable or arbitrary or

17   capricious or mean.  The question is did they discriminate, in

18   this case on the basis of gender.  Sometimes it's age.

19   Sometimes it's disability.  But in this case, it's gender.

20             MS. MYERS:  And it's the disparate --

21             THE COURT:  So where is the -- you know, she had a

22   great career all the while being of the same gender.

23             MS. MYERS:  It's the disparate treatment that arose

24   between she and Gergits when the rubber hit the road.  When

25   they conducted this investigation and determined that, well,

1    he was just joking, the male was just joking, but she was out

2    to game the system so we're going to terminate her.  It's the

3    disparate treatment.

4         THE COURT:  He's in a different position, though.

5    He's a different position.  He's more elevated.

6         MS. MYERS:  He, again --

7         THE COURT:  Maybe he gets another break.  I don't

8    know.  That may be unreasonable, but I don't think it's based

9    on gender.

10        MS. MYERS:  And I don't think it's the law of the

11   Circuit because he's similarly situated in relevant respects.

12   He reported to Schmidberger, he reported to Baird, as did

13   Ms. Henry.  He was subject to the same policies and procedures

14   with respect to the waiver-and-favor infraction and with

15   respect to the revenue passengers.

16        THE COURT:  I probably read 15 cases this morning.

17   I'm familiar with them from other cases.  Nothing is a

18   surprise.  There are three or four or five cases from the

19   Sixth Circuit a year, maybe more.  They all say the same

20   thing.  And I would be remiss if, because I thought maybe they

21   were unreasonable with her, that it's based on gender.

22        She's not a union employee so she doesn't have -- I

23   guess so she has no union remedies.

24        MS. MYERS:  Correct.  She's employed at will.

25        THE COURT:  So she's an employee at will.

1        MS. MYERS:  She's employed at will.  And I think the

2   disparate treatment --

3        THE COURT:  And you don't deny that she did this.

4        MS. MYERS:  Yes, she denied that she --

5        THE COURT:  Okay.  What's your position on that?

6        MS. MYERS:  She absolutely denies that there was any

7   intentional effort to put him on that flight ahead of

8   non-revenue passengers.  There were -- as the flight was

9   boarding, there's testimony -- and you'll see in the briefs

10  and you'll see in the record that it was a busy flight.  Gate

11  agents get to the standby list often in the last 15 or 20

12  minutes of the flight.  Medallion members can board the flight

13  if they choose to without waiting to see whether they're going

14  to be upgraded or elevated to first class, and that's what

15  happened on this flight.

16        The non-rev passengers boarded -- or I'm sorry, the

17  revenue medallion member passengers boarded.  There was no

18  policy in place at the time that they be unboarded and moved

19  back up to first class.

20        There is evidence, there's testimony, that the

21  priority was to make sure the flight was dispatched on a

22  timely manner.  So if the medallion members made the decision

23  to go ahead and get on board, which there's a lot of testimony

24  that often they would because they wanted to go ahead and find

25  an overhead space for their luggage and go ahead and take

1    their seat, that's what happened.

2         The flight was boarded.  The Gergits boys and family

3    were still waiting in the boarding area, and they were able to

4    board the flight.  Three of -- the three boys, three children,

5    adult children, were upgraded to first class, and

6    Mr. Gergits --

7         THE COURT:  Why were the seats hidden till the last

8    minute?

9         MS. MYERS:  There is testimony that that happens.

10   It's not particularly favored, but that management knew that

11   it was done and knew that it happened, and it was done for

12   basically customer service reasons.  Particularly, when

13   there's a proactive agent such as Ms. Henry was, conceded to

14   be, when she would start working a flight, she would look to

15   see if people were going to be in situations where they had

16   missed a flight or whether they were a family was split up and

17   they might need seats together or there was special needs

18   people or there was somebody had been inconvenienced down

19   line.

20        Basically, they used it as a sweetener to give the

21   customer an upgrade if there had been a problem, to make that

22   customer happy and to benefit the customer.  And these seats

23   were hung.

24        THE COURT:  Without beating a dead horse, I think,

25   you know, the company had a reasonable basis.  Maybe I

1   wouldn't have done it that way.  You know, maybe a reprimand

2   would have done it or something like that like they did to the

3   other guy.  But I don't think she's similarly situated, and I

4   don't think there's any reason for pretext.

5          MS. MYERS:  Well, I think that that's a decision for

6   the jury to make on summary judgment.

7          THE COURT:  Well, your objection is noted.  Our duty

8   is to apply the standards of summary judgment, the test being

9   would I have to direct a verdict if this were the evidence at

10   trial.

11          MS. MYERS:  And under the Martin case --

12          THE COURT:  Save everybody the expense, including

13   you, of having a trial.  Do you have any other theories?

14          Well, you have this Kentucky theory.  Now, the

15   Kentucky theory, they didn't order her to do an illegal act so

16   that's out.  And you run into the same thing with because she

17   talked about getting a lawyer.

18          MS. MYERS:  Right.

19          THE COURT:  Well, you've got the same thing.  You

20   have this other reason and it's not a pretext.  You've got the

21   McDonnell-Douglas analysis for both counts.

22          MS. MYERS:  Well, I think with respect to the

23   pretext, the disparate -- and again, it's all about the

24   disparate treatment in this case.  And I think that the

25   supervisor, Gergits, was -- there's testimony that he, before

1    the flight ever happened, was making comments that have been

2    alleged to be jokes; that he was requesting certain people be

3    put on the flight.  And then he gets on the flight.  He

4    accepts the seats on the flight.  He benefits from getting on

5    the flight and getting the first-class seats.

6        Now, there's credibility issues and there's a question

7    of fact as to why Gergits was deemed to have been, oh, just

8    joking, and Henry was deemed to have knowledgeably violated

9    policies and procedures.

10       THE COURT:  Well, maybe he had more pull with the

11   higher-ups, but I don't see anything there that is based on

12   gender.  I just don't see it.  And I would be remiss for me to

13   let it go to the jury and spend everybody's money in a

14   two-week trial, probably, when they're going to have the same

15   result at the end of your case.  You're probably better off

16   anyway getting it resolved ahead of time.

17       So I am going to sustain the summary judgment on the

18   ground that the -- let's say we get by the prima facie case.

19   The defendant has articulated a nondiscriminatory reason

20   supported by the facts.  Whether they are unreasonable or not

21   is not the issue.  And I know people who are in the situation

22   like the plaintiff is find that difficult to understand.  But

23   that, nevertheless, is the law.

24       And I think they believed that this incident occurred,

25   whether she was -- I was going to say criminal intent, but

1    it's not criminal.  I'm too used to criminal cases.  Whether

2    she had the intent to violate the rules or not, there's

3    evidence they were violated.  And this seems to be what they

4    acted on, and I don't see any evidence of any gender

5    discrimination.  And I'll elaborate more and put these cases

6    in.  Every case says the same thing.  I quit when I got to ten

7    of them this morning.

8              MR. CROALL:  I don't think there's any real --

9              THE COURT:  They're all in the last three years, and

10   they all say the same thing.  And this gentleman, if he were

11   the same rank, if he had been a co-gatekeeper and collaborated

12   in it and they both had done it and he were given the

13   different treatment, then you might have something there.  In

14   this case, there isn't any way under the existing standards

15   that you can say is comparable.

16             MR. CROALL:  And, Your Honor, a big distinguishing

17   factor, I think, is the fact that he's a passenger on this

18   flight.  He's not working.

19             THE COURT:  That's true, too.

20             MR. CROALL:  He's not an employee.  He's a non-rev

21   passenger.  It's not his job to manage the standby list.  It

22   was Ms. Henry's job.

23             THE COURT:  I thought I was doing a pretty good job,

24   but if you want to add to it.

25             MR. CROALL:  I agree to it.  But, you know, I think,

1    you know, the big flaw in plaintiff's theory on that is, you

2    know, he's there as a passenger.  He's a Delta employee flying

3    non-rev.  He's not on duty.  He doesn't have any

4    responsibilities for doing anything other than, you know,

5    making sure that, you know, he shows up within enough time

6    before the --

7         THE COURT:  Well, I don't necessarily agree with

8    that.

9         MS. MYERS:  He was disciplined.  So if he was a

10   passenger, why was he disciplined?

11        MR. CROALL:  For the conduct before -- for the

12   conduct beforehand, not for what he did on the flight.

13        THE COURT:  I don't necessarily agree with that

14   analysis.  So anyway, I'm sure this will go up.  You can get

15   it clarified.  You might ask them to clarify what they mean by

16   "supervisor" because I always understood Ercegovich to mean

17   that they had to have the same immediate supervisor, which is

18   clearly not the case here.  But there's a later case that's

19   unpublished that -- it's not Martin.  It's another one.

20        MS. MYERS:  Martin is --

21        THE COURT:  -- that says if they have the same

22   supervisor up at the top of the decision-making process, that

23   that's enough.  But that's an unpublished one.  So I'm not

24   going to rely on the fact whether or not they worked for the

25   same supervisor.  But their jobs are totally different

1   otherwise, as I understand it.  This guy's the supervisor of

2   the gatekeeper so they're maybe cutting him a better break

3   because he's a supervisor.

4          So anyway, that's the ruling.  I feel sorry for the

5   plaintiff.  I know she lost a good job.  Probably was just

6   trying to help somebody out.  People have a right to exercise

7   their business judgment in these situations.

8          MR. CROALL:  Thank you, Your Honor.

9          THE COURT:  Okay.

10         MS. MYERS:  Thank you.

11         MS. GIUSTINA:  Thank you, Your Honor.

12         (Proceedings concluded at 1:57 p.m.)

13                        -  -  -

14                 C E R T I F I C A T E

15         I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that the
    foregoing is a correct transcript from the record of
16  proceedings in the above-entitled case.

17   \s\ Joan Lampke Averdick            August 26, 2011
    JOAN LAMPKE AVERDICK, RMR-CRR          Date of Certification
18  Official Court Reporter

19

20

21

22

23

24

25